## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **HERBERT and DORIS STEELE, on behalf of themselves and all others similarly situated,**<br><br>　　　　**Plaintiffs,**<br>**vs.**<br><br>**GE MONEY BANK, a federal savings bank; WMC MORTGAGE CORPORATION and WMC MORTGAGE, LLC**<br><br>　　　　**Defendants.** | **Case No.**<br>FILED: APRIL 1, 2008<br>08CV1880　　PH<br>JUDGE MANNING<br>MAGISTRATE JUDGE ASHMAN<br><br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiffs Herbert and Doris Steele, on behalf of themselves and all others similarly situated, by their undersigned attorneys, allege as follows:

1.　　　　This is a class action brought by Plaintiffs, on behalf of themselves and other similarly situated minority homeowners, against GE Money Bank, a federal savings bank, WMC Mortgage Corporation, ("WMC") and WMC Mortgage, LLC (collectively "Defendants"), under the Equal Credit Opportunity Act, 15 U.S.C. § 1691, <u>et</u> <u>seq</u>. ("ECOA") and the Fair Housing Act, 42 U.S.C. § 3601 <u>et seq</u>.  Plaintiffs seek remedies for themselves and the Class (defined in ¶68, below) for the discriminatory effects of the Defendants' home financing policies and practices.

1

2.     As described below, the Defendants have established a specific, identifiable and uniform credit pricing system, a component of which, referred to herein as the Discretionary Pricing Policy, authorizes unchecked, subjective surcharge of additional points and fees to an otherwise objective risk-based financing rate.  In other words, after a finance rate acceptable to the Defendants is determined by objective criteria (e.g., the individual's credit history, credit score, debt-to-income ratio and loan-to-value ratios), the Defendants' credit pricing policy authorizes additional discretionary finance charges. These subjective, additional finance charges have a widespread discriminatory impact on minority applicants for home mortgage loans, in violation of ECOA and the FHA.

3.     The Defendants have established policies for access to their loan products that subject minority financing applicants to a significantly higher likelihood of exposure to discretionary points and fees. These costs drive up the average cost of a mortgage loan made by Defendants to minority homeowners.

4.     Plaintiffs seek damages, declaratory and injunctive relief, disgorgement and restitution of monies disparately obtained from minority borrowers.

## JURISDICTION AND VENUE

5.     Plaintiffs invoke the jurisdiction of this Court pursuant to 28 U.S.C. §1331, which confers original jurisdiction upon this Court in a civil action arising under federal law.

6.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) inasmuch as the unlawful discriminatory practice is alleged to have been committed in this District, Defendants regularly conduct business in this District, and the named Plaintiffs reside in this District.

2

## PARTIES

7.      Plaintiffs, Herbert and Doris Steele (the "Steeles"), are minority homeowners who reside at 2237 East 92nd Place, Chicago, Illinois 60617.

8.      Defendant, GE Money Bank, is a federal savings bank with a principal place of business at 4246 South Riverboat Road, Suite 200, Salt Lake City, Utah 84123.  It is a wholly-owned subsidiary of GE Consumer Finance, Inc., a consumer lending unit of General Electric Company and its holding company, General Electric Capital Corporation.

9.      Defendant, WMC Mortgage LLC is successor in interest to WMC Mortgage Corporation ("WMC"), a California corporation and a mortgage lender with a principal place of business at 3100 Thornton Avenue, Burbank, CA 91504.  Defendant WMC and its parent company, WMC Finance Co., were acquired by GE Consumer Finance in June 2004, although WMC's mortgage lending practices pre-date that acquisition.  A number of loans originated and financed by WMC (both prior to and subsequent to the acquisition which resulted in Defendant GE Money Bank and Defendant WMC having common ownership within GE's consumer lending unit) have been assumed by GE Money Bank as the latter continues to expand the scope of its lending activity.  After the acquisition, WMC granted to GE Money Bank the right to use its trade names, including "WMC Mortgage."

## FACTS

**A.    MORTGAGE LENDING IN THE UNITED STATES HISTORICALLY HAS DISCRIMINATED AGAINST MINORITIES**

10.      Racial discrimination in America's mortgage lending industry has a long legacy. As this Complaint attests, that unfortunate history continues to this day due to discriminatory treatment of minority borrowers by mortgage banks such as Defendants.

3

11.     According to the Joint Center for Housing Studies at Harvard University's 2005 study called "The Dual Mortgage Market:  The Persistence of Discrimination in Mortgage Lending," mortgage lending discrimination today is subtle but pervasive, with minority consumers continuing to have less-than-equal access to loans at the best price and on the best terms that their credit history, income, and other individual financial considerations merit more than three decades after the enactment of national fair lending legislation.

12.     The passage of civil rights legislation and fair lending laws in the 1960s and 1970s brought an end to the most virulent forms of overt racial discrimination in the housing markets, but throughout the 1980s and 1990s, mortgage lenders found more subtle ways to discriminate, including maintaining offices only in white neighborhoods and engaging in practices such as redlining (refusing to lend on properties in predominantly minority neighborhoods).

13.     After such redlining practices were challenged in the 1990s, mortgage lenders changed tactics once again, making loans to minorities, but charging higher interest rates and loan-related fees than they charged to similarly-situated white borrowers.  Loan data that mortgage lenders must now compile and disclose under the federal Home Mortgage Disclosure Act ("HMDA") reveals profound loan pricing disparities between minority borrowers and similarly-situated white borrowers.

14.     The HMDA requires mortgage lenders to report information about the home loans they process each year.  In 2005, lenders reported information on more than 30 million home loan applications pursuant to HMDA.  In 1989, Congress required lenders to begin disclosing information about mortgage borrowers' race and ethnicity.  In 2004, concerned with potential racial discrimination in loan pricing and recognizing that racial or other types of discrimination

4

can occur when loan officers and mortgage brokers have latitude in setting interest rates, the Federal Reserve Board began requiring lenders to also report information concerning rates, points, and fees, charged to borrowers on high-cost loans.

15.    According to the Federal Reserve, both 2004 and 2005 HMDA data revealed that "Blacks and minority borrowers were more likely . . . to have received higher-priced loans than non-minority whites. . . . [which has] increased concern about the fairness of the lending process."  Robert B. Avery, Kenneth P. Brevoort and Glenn B. Canner, "Higher-Priced Home Lending and the 2005 HMDA Data," Federal Reserve Bulletin, A124, A159 (revised Sept. 18, 2006) (available at http://www.federalreserve.gov/pubs/bulletin/2006/hmda/bull06hmda.pdf) (last viewed March 10, 2008).

16.    HMDA data for 2004 reveals profound loan pricing disparities between minority borrowers and non-minority whites even after controlling for borrowers' gender, income, property location, and loan amount.  After accounting for those differences in the 2004 HMDA data, minority borrowers were still almost twice as likely to receive a higher-rate home loan as non-minority whites.  Testimony of Keith Ernst before the Subcommittee on Financial Institutions and Consumer Credit, June 13, 2006 at 3 (available at http://www.responsiblelending.org/pdfs/Testimony-Ernst061306.pdf) (last viewed March 10, 2008).  In an October 2006 speech, the Vice-Chairman of the Federal Deposit Insurance Corporation, Martin Gruenberg, discussed the 2004 HMDA data and observed that that data "clearly indicated" that minority borrowers are more likely to receive high-cost home loans than are non-minority whites.  (available at http://www.fdic.gov/news/news/speeches/archives/2006/chairman/spoct1806.html) (last viewed March 10, 2008).

17.     Likewise, HMDA data for 2005 shows that "for conventional home-purchase loans, the gross mean incidence of higher-priced lending was 54.7 percent for blacks and 17.2 percent for non-minority whites, a difference of 37.5 percentage points."  Avery et al., <u>supra</u>, at A159.  The situation is similar for refinancing, where there is a difference of 28.3 percentage points between blacks and non-minority whites.  <u>Id.</u> at A124, A159.

18.     A growing number of research studies and investigations show that significant racial disparities still exist in lending practices.  California Reinvestment Coalition, et al., "Paying More for the American Dream: A Multi-State Analysis of Higher Cost Home Purchase Lending" (March 2007) (<u>available at http://www.nedap.org/pressroom/documents/2007_Report-2005_HMDA.pdf</u>) (last viewed March 10, 2008); Ross, "The Continuing Practice and Impact of Discrimination" (Revised July 2006) (Univ. of Connecticut, Working Paper 2005-19R) (<u>available at http://www.econ.uconn.edu/working/2005-19r.pdf</u>) (last viewed March 10, 2008).

19.     Just this month, the California Reinvestment Coalition, jointly with several other non-profit and housing advocacy groups, published another report.  The organizations examined the impact of lending by subprime, high-risk lenders in 7 metropolitan areas – Boston, Charlotte, Chicago, Cleveland, Los Angeles, New York City and Rochester, NY. California Reinvestment Coalition, et al., "Paying More for the American Dream: A Multi-State Analysis of Higher Cost Home Purchase Lending" (March 2008) ("CRC Report") (available at <u>http://www.nedap.org/resources/reports.html</u>) (last viewed March 12, 2008).

20.     The CRC Report focuses on a subset of 228 subprime lenders that, since late 2006, have either closed, gone bankrupt, or been sold. The subset consists of 35 subprime high-risk lenders, which combined have made over 1.1 million loans nationally. Notably, the CRC Report found that 4 of the subprime high-risk lenders included in the analysis accounted for

approximately 57% of the total lending made by the group of 35 lenders. WMC was one of these 4, making up 14% of the 1.1 million subprime, high-risk loans during this period. *Id.*, at 3.

21.    In addition, the study showed that subprime high-risk lenders are concentrated in minority neighborhoods.  Data supporting this finding demonstrated that subprime high-risk lenders had 20% of the market share in predominantly minority neighborhoods in these metro areas, compared to a 4% market share in predominantly white neighborhoods.  CRC Report at 5. In addition, over 40% of the loans made by subprime high-risk lenders were in neighborhoods where 80% or more of the residents were minorities.  *Id.*  In stark contrast, less than 10% of subprime high-risk lender loans were in areas where less than 10% of the residents were minorities.  *Id.*

22.    In metro Chicago, where the named Plaintiffs reside, the same study shows that the subprime, high-risk lender market share in predominantly minority neighborhoods was 3.5 times the high-risk lender market share in predominantly white neighborhoods. CRC Report at 9. *See also*, CRC Report, Appendices & Dot Density Maps.

23.    The Association of Community Organizations for Reform Now (ACORN) released a report entitled," dated September 27, 2005, that found that "[i]n every metropolitan area where at least 50 refinances were made to African-American homeowners, African-Americans were more likely to receive a high-cost loan than White homeowners." "The High Cost of Credit: Disparities in High-priced Refinanced Loans to Minority Homeowners in 125 American Cities" at 11 (available at

http://www.acorn.org/fileadmin/Afforable_Housing/hmda/High_Cost_of_Credit_Report.doc)

(last viewed March 10, 2008).

24.    Moreover, and importantly, research studies have suggested that borrowers' credit profiles cannot fully explain why some borrowers, and not others, are saddled with higher cost loans. Researchers have raised "doubts that risk can adequately explain racial differences" in high-cost loans. Bradford, Center for Community Change, "Risk or Race? Racial Disparities and the Subprime Refinance Market" (May 2002) (available at http://www.knowledgeplex.org/kp/report/report/relfiles/ccc_0729_risk.pdf) (last viewed March 10, 2008). In other words, evidence "suggests that weak borrower credit profiles do not fully explain why some borrowers get stuck with higher-cost home loans." California Reinvestment Coalition, et al., "Paying More for the American Dream: A Multi-State Analysis of Higher Cost Home Purchase Lending" at 7 (March 2007).

25.    Defendants' lending practices have been consistent with this history of mortgage loan discrimination.

**B.    THE DEFENDANTS' DISCRETIONARY PRICING POLICY CONTINUES THE PERVASIVE DISCRIMINATION AGAINST MINORITIES IN MORTGAGE LENDING**

**1.    Defendants' Relationships With Mortgage Brokers and Correspondent Lenders**

26.    Defendants GE Money Bank and WMC have been among America's largest mortgage lenders. Prior to its discontinuance of operations, WMC was one of the top ten subprime lenders nationwide. Defendants originated and funded billions of dollars in mortgage loans through brokers and correspondent lenders.

27.    On information and belief, Defendants' authorized mortgage brokers and correspondent lenders to broker and fund loans in collaboration with Defendants, and in conformance with Defendants' Discretionary Pricing Policy.

28.    Defendants established and implemented their Discretionary Pricing Policy, causing minority borrowers to pay subjective fees such as yield spread premiums and other mortgage-related finance charges at higher rates than similarly situated non-minority borrowers. By its Discretionary Pricing Policy Defendants discriminated against Plaintiffs and Class Members, systematically giving them mortgage loans with less favorable terms than were given to similarly situated non-minority borrowers.  This pattern of discrimination is not the result of random or non-discriminatory factors.  Rather, it is a direct result of Defendants' business model and loan-funding practices.

29.    Defendants authorized mortgage brokers and correspondent lenders to receive part or all of their compensation from Defendants based on the interest rate charged to the borrower.  Defendants' authorized brokers and correspondents receive more compensation from Defendants when they steer their clients into loans with higher interest rates, and less compensation when they place their clients into loans with lower interest rates.

30.    Defendants actively implemented their Discretionary Pricing Policy in a variety of ways, including actively educating brokers about Defendants' credit policies and procedures and directing brokers regarding the marketing of loan products.  For example, Defendant WMC published a broker newsletter and hosted "Broker and Loan Officer Bootcamp" events across the country.  WMC also supplied its authorized brokers with training and marketing resources such as software packages, free customizable flyers, direct mailings and compliance resources (http://www.wmcmortgage.com/cms/resources.aspx, last viewed on December 19, 2007).[1]

31.    Defendants evaluated and monitored their authorized brokers and correspondent lenders to ensure that they complied with Defendants' loan pricing policies and procedures.  For

---

[1] The website www.wmcmortgage.com no longer exists.

example, when a correspondent or broker submitted a loan application through Defendant

WMC's Internet site, the broker or correspondent agreed to comply with WMC's credit pricing

policies.  (http://www.wmcmortgage.com/cms/pdf/fairlending.pdf (last viewed December 19,

2007).)  WMC took "appropriate corrective action" against brokers and correspondents when

any "deficiencies [are] noted in the monitoring of their loan packages." *Id.*

32.     Defendants' Discretionary Pricing Policy permitted authorized mortgage brokers

and correspondent lenders subjectively to charge certain loan applicants including minority loan

applicants, yield spread premiums and other discretionary charges.  This resulted in

discrimination against minority loan applicants.

33.     This pattern of discrimination cannot be justified by business necessity, and could

be avoided through the use of alternative policies and procedures that have less discriminatory

impact and no less business efficacy.

    2.     **Defendants' Discriminatory Discretionary Credit Pricing System**

34.     Defendants discriminated through their authorized mortgage brokers.  Authorized

mortgage brokers acted as Defendants' agents in originating mortgage loans.  Authorized

mortgage brokers entered into agreements with Defendants to accept loan applications on behalf

of Defendants; communicate to loan applicants financing terms and rates set by Defendants; tell

loan applicants about Defendants' various financing options; and ultimately originate mortgage

loans funded by Defendants using Defendants' forms and in accordance with Defendant' policies

and procedures.

35.     Likewise, Defendants authorized correspondent lenders, acting as Defendants'

agents, to work with Defendants to make loans in accordance with Defendants' credit policies

and procedures.  Defendants funded correspondent-generated loans before or shortly after they

go to closing.

36.    Defendants funded loans originated by their authorized mortgage brokers and

correspondent lenders, set the terms and conditions of credit on those loans, and shouldered part

or all of the risk on such loans.

37.    Defendants actively and intentionally enforced their credit policies through their

authorized mortgage brokers and correspondent lenders in a variety of ways.  Among other

things, Defendants supplied their correspondent lenders and mortgage brokers with an array of

loan-related forms and agreements, including loan contracts, loan applications, and instructions

on completing loan applications and contracts.  And, as noted above, Defendant WMC actively

trained its authorized brokers to follow WMC's policies and procedures, and reinforced that

training with marketing support.

38.    Once a loan applicant provided credit information through a mortgage broker or

correspondent lender, Defendants performed an initially objective credit analysis.  Defendants

would first evaluate numerous risk-related credit variables, including debt-to-income ratios, loan-

to-value ratios, credit bureau histories, debt-to-asset ratios, bankruptcies, automobile

repossessions, prior foreclosures, payment histories, credit scores, and the like.

39.    Defendants derived a risk-based financing rate from these objective factors, which

Defendants and others in the mortgage industry simply call the "par rate." (Defendants' brokers

and correspondent lenders can also estimate the par rates by referring to an applicant's credit

bureau-determined credit score.)

40.    Although Defendants' initial analysis applied objective criteria to calculate this

risk-related interest rate, Defendants' Discretionary Pricing Policy authorized their brokers and

correspondent lenders to mark up that rate later and also impose additional non-risk-based charges, including yield spread premiums, and other discretionary fees. Defendants regularly communicated applicable par rates, authorized yield spread premiums, and other discretionary fees to brokers and correspondent lenders *via* "rate sheets" and other communications.

41.     Defendants gave authorized mortgage brokers and correspondent lenders discretion to impose yield spread premiums and other subjective fees on borrowers. When borrowers pay yield spread premiums, Defendants share in additional income generated by the premium because the yield spread premium-affected borrower is locked into a higher interest rate going forward on their GE Money Bank or WMC loan than they would be if they had been placed in a par rate loan without a yield spread premium.

42.     Defendants' borrowers paid yield spread premiums and other discretionary fees that inflated their finance charges not knowing that a portion of their finance charges are non-risk-related.

43.     Defendants' Discretionary Pricing Policy caused persons with identical or similar credit scores to pay differing amounts for obtaining credit. Such subjective loan pricing–which by design imposes differing finance charges on persons with the same or similar credit profiles– disparately impacts Defendants' minority borrowers.

44.     While Defendants' use of its Discretionary Pricing Policy for all loan applicants might appear to be facially neutral, Defendants' use of yield spread premiums and other discretionary fees disproportionately and adversely affected minorities (relative to similarly situated non-minorities). Defendants' Discretionary Pricing Policy caused and causes minorities to pay disparately more finance charges than similarly situated non-minorities. As the HMDA

data cited herein indicates, minorities, after controlling for credit risk, are substantially more likely than similarly situated non-minorities to obtain high-priced loans.

45.     Defendants' Discretionary Pricing Policy is in fact intentionally discriminatory. In an attempt to insulate themselves from the discriminatory decision-making, Defendants intentionally designed their subjective and Discretionary Pricing Policy to allow and encourage their lending agents to obtain greater profits from minority borrowers.  As described above, Defendants' Discretionary Pricing Policy by design discriminates against minority borrowers and directly causes this disparate impact.

46.     Brokers and correspondent lenders were agents of Defendants for the purpose of setting credit price, which was always set based on Defendants' policies.

47.     The disparate impact suffered by minorities is a direct result of Defendants' Discretionary Pricing Policy in that Defendants designed, disseminated, controlled, implemented and profited from the Discretionary Pricing Policy creating the disparate impact.

48.     Defendants have a non-delegable duty to ensure that its mortgage financing structure and policies do not have a disparate impact on legally protected classes.  Despite having such a non-delegable duty, Defendants chose to use a commission-driven, subjective pricing policy that it knew or should have known has a significant and pervasive adverse impact on minority homeowners.

49.     The disparities between the terms of Defendants' transactions involving minority homeowners and the terms involving White homeowners cannot be a product of chance and cannot be explained by factors unrelated to race, but, instead, are the direct causal result of the use of the discriminatory Discretionary Pricing Policy.

50.     There are no legitimate business reasons to justify Defendants' discriminatory Discretionary Pricing Policy that could not have been achieved by a policy that has no discriminatory impact or a greatly reduced discriminatory impact.

## C.  THE DEFENDANTS' DISCRETIONARY PRICING POLICY DISCRIMINATED AGAINST PLAINTIFFS

### *Facts Relating To Herbert and Doris Steele*

51.     Plaintiffs, Herbert and Doris Steele (the "Steeles") are African-American homeowners who reside at 2237 East 92nd Place, Chicago, Illinois 60617.

52.     On June 30, 2006, the Steeles refinanced their previous Wilshire Credit Corp. home loan with WMC.

53.     The loan, (Loan No. 11605257), is a 30-year adjustable rate loan with a disclosed APR of 10.819%. The interest rate is set to adjust after 2 years. The principal amount of the WMC loan was $167,200.

54.     According to the HUD-One Settlement Statement, the Steeles paid a $2,100.00 "Loan Origination Fee," and a $480.00 "Processing Fee," to US Mutual Banc Corp. In addition, US Mutual Banc Corp. received a $2,508.00 yield spread premium, and a $275.00 "Appraisal Fee" (paid outside of closing). WMC also charged the Steeles a $597.00 "Application Fee."

55.     True and correct copies of Truth-in-Lending disclosure and HUD-One Settlement Statement provided in connection with Loan No. 11605257 are attached hereto and labeled Exhibit 1 and Exhibit 2, respectively.

56.      Because of the discretionary fees, the rates in the Plaintiffs' transaction exceed the rates provided to white borrowers with similar or identical credit characteristics.

57.     On information and belief, unbeknownst to the Steeles, the contract APR on the mortgage loan was actually a combination of an objective, risk-based calculation and a totally

14

subjective, discretionary component added pursuant to the Defendants' Discretionary Pricing Policy.

58.    On information and belief, the Steeles were subject to the Defendants' Discretionary Pricing Policy.

59.    On information and belief, the Defendants charged the Steeles a disproportionately greater amount in non-risk-related credit charges than it charges similarly situated white persons.

## TOLLING OF STATUTES OF LIMITATON

60.    The causes of action alleged herein accrued upon discovery of the discriminatory impact of the Defendants' Discretionary Pricing Policy.  Plaintiffs and members of the Class did not discover and could not have discovered through the exercise of reasonable diligence the factual bases of those claims.  Indeed, the data forming the basis of Plaintiffs' claims only recently was released and analyzed in a comprehensive manner.  Moreover, because the Defendants knowingly and actively concealed the facts alleged herein, Plaintiffs and the Class have been kept ignorant of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part.

61.    Commission-driven, discretionary pricing systems, such as those used in the mortgage industry and structurally similar to the system utilized by the Defendants, have been found to produce significant discriminatory effects.  Knowledge concerning the significant and pervasive discriminatory impact of such commission-driven, discretionary credit pricing systems has been widely circulated within the financing industry for several years, as a result of numerous actions by the United States Department of Justice and federal regulatory agencies. *See*, Facts, Section A *supra*. Thus, the Defendants knew or should have known that their credit

15

pricing system causes minority homeowners to pay more for mortgage financing than the amounts paid by white customers with identical or effectively identical credit scores.

62.     Despite the fact that the Defendants knew or should have known of the discriminatory effect of their Discretionary Pricing Policy, none of the loan documents informs the customer that its finance rates ultimately are subjective and not based solely on risk-related characteristics.

63.     The Defendants were and are under a continuous non-delegable duty to disclose to the Plaintiffs and Class material information regarding their loans. The fact that certain loan terms are subjective and discretionary is information a reasonable borrower would consider important when deciding whether to accept the loan and on what terms. The fact that the subjective and discretionary components result in a disparate impact on minority is also information a reasonable minority borrower would consider important.

64.     The Defendants failed to disclose this information, however, and Plaintiffs and the Class reasonably relied upon the Defendants' representation that terms of their loans would be based on their creditworthiness. The Defendants' financing documents falsely fostered the image that the Defendants offer competitive rates that objectively are set. However, the Defendants never disclosed to its credit applicants the fact that: (a) its credit rates are subjective and can vary significantly among persons with identical credit profiles; and (b) it had authorized and provided a financial incentive to mortgage brokers to subjectively increase the credit rate above the rate otherwise available to the homeowner.

65.     Due to the inherent nature of the Defendants' undisclosed Discretionary Pricing Policy and due to the Defendants' deception and concealment, the Defendants' minority customers had no way of knowing or suspecting: (a) the existence of the Defendants' subjective

16

credit pricing policy; (b) that they were charged additional subjective credit charges;  (c) that they were charged a disproportionately greater amount for their cost of credit than similarly situated white persons, and or (d) that any part of the loan price was negotiable.  Thus, the Defendants are estopped from relying on any statutes of limitation in their defenses of this action.

## CLASS ALLEGATIONS

66.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

67.    Plaintiffs sue on their own behalf and on behalf of a class of persons under Rules 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

68.    This class action is brought pursuant to ECOA and the FHA by the individually named Plaintiffs on behalf of themselves and all minority consumers (the "Class") who obtained a WMC home mortgage loan in the United States between January 1, 2001, and the date of judgment in this action (the "Class Period") and who were subject to the Defendants' Discretionary Pricing Policy pursuant to which they paid discretionary points, fees or interest rate mark-ups in connection with their loan.  For the purposes of this Complaint, the term "minority" shall refer to Black and Hispanic persons as those terms are defined for the purposes of federal law.

69.    The phrase "Discretionary Pricing Policy" refers to the Defendants' policy of authorizing its loan officers and brokers to impose subjective, discretionary charges and interest mark-ups that are included in the finance charge loans they originate.

70.    Plaintiffs do not know the exact size or identities of the proposed Class, since such information is in the exclusive control of the Defendants.  Plaintiffs believe that the Class encompasses many thousands or tens of thousands of individuals who are dispersed

17

geographically throughout the United States.  Therefore, the proposed class is so numerous that joinder of all members is impracticable.

71.    All members of the Class have been subject to and affected by the same Discretionary Pricing Policy.  There are questions of law and fact that are common to the Class, and predominate over any questions affecting only individual members of the Class.  These questions include, but are not limited to the following:

a.    the nature, scope and operations of  Defendants' Discretionary Pricing Policy;

b.    whether Defendants are creditors under the ECOA because, for example, in the ordinary course of its business they participate in the decision as to whether or not to extend credit to consumers;

c.    whether  the Defendants' Discretionary Pricing Policy is a facially neutral credit pricing system that has effected racial discrimination in violation of ECOA;

d.    whether there are statistically significant disparities between the amount of the discretionary charges  imposed on minority persons and the amount of the discretionary charges imposed on white persons that are unrelated to creditworthiness;

e.    whether any legitimate business reason for the Discretionary Pricing Policy can be achieved by a credit pricing system less discriminatory in its impact;

f.    whether the Court can enter declaratory and injunctive relief; and

g.    the proper measure of disgorgement or damages.

72.    The claims of the individual named Plaintiffs are typical of the claims of the Class and do not conflict with the interests of any other members of the Class in that both the Plaintiffs

18

and the other members of the Class were subject to the same Discretionary Pricing Policy that disproportionately has affected minority homeowners.

73.    The individual named Plaintiffs will fairly and adequately represent the interests of the Class. They are committed to the vigorous prosecution of the Class' claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection and discrimination actions.

74.    A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.

75.    In the alternative,  Defendants have acted or refused to act on grounds generally applicable to the case, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

<u>COUNT I</u>

**DISCRIMINATION IN VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT**

76.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

77.    The Defendants are creditors as defined in ECOA, and in the ordinary course of its business, participated in the decision of whether or not to extend credit to the Plaintiffs, the proposed Class representatives herein, and all prospective Class members.

78.    The Defendants designed, disseminated, controlled, implemented and profited from the discriminatory policy and practice alleged herein — the Discretionary Pricing Policy — which has had a disparate economic impact on minorities compared to similarly situated whites.

19

79.    All actions taken by Defendants' account executives were in accordance with the specific authority granted to them by Defendants and were in furtherance of the Defendants' policies and practices.

80.    As a result of the Defendants' Discretionary Pricing Policy, the Defendants have collected more in finance charges from minority borrowers than from similarly situated white persons, for reasons unrelated to credit risk.

81.    The Defendants' Discretionary Pricing Policy violates the Equal Credit Opportunity Act.

82.    Plaintiffs and prospective class members are aggrieved persons as defined in ECOA by virtue of having been subject to the Defendants' discriminatory, Discretionary Pricing Policy.

<u>COUNT II</u>

**DISCRIMINATION IN VIOLATION OF THE FAIR HOUSING ACT**

83.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

84.    The Defendants engaged in residential real estate-related transactions with respect to the Plaintiffs, the proposed Class representatives herein, and all prospective Class members.

85.    The Defendants' Discretionary Pricing Policy has resulted in discrimination with respect to the Plaintiffs, the proposed Class representatives herein, and all prospective members of the Class.

86.    As a result of the Defendants' Discretionary Pricing Policy, the Defendants have collected more in finance charges from minorities than from similarly situated white persons, for reasons unrelated to credit risk.

20

87.     The Defendants' Discretionary Pricing Policy violates the Fair Housing Act and constitutes actionable discrimination on the basis of race.

88.     Plaintiffs and the Class are aggrieved persons as defined in FHA by virtue of having been subject to the Defendants' discriminatory, Discretionary Pricing Policy.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request the following relief:

a.     Certify this case as a class action and certify the named Plaintiffs herein to be adequate class representatives and their counsel to be class counsel;

b.     Enter a judgment, pursuant to 15 U.S.C. §1691e(c) and/or 42 U.S.C. §3613, declaring the acts and practices of Defendants complained of herein to be in violation of ECOA and the FHA;

c.     Grant a permanent or final injunction, pursuant to 15 U.S.C. §1691e(c) and/or 42 U.S.C. §3613(c), enjoining the Defendants, and the Defendants' agents and employees, affiliates and subsidiaries, from continuing to discriminate against plaintiff and the members of the Class because of their race through further use of the Discretionary Pricing Policy or any other non-risk-related discretionary pricing policy employed by the Defendants;

d.     Order the Defendants, pursuant to 15 U.S.C. §1691e(c) and/or 42 U.S.C. §3613(c), to adopt and enforce a policy that requires appropriate training of the Defendants' employees and its brokers and correspondent lenders to prevent discrimination;

e.     Order the Defendants, pursuant to 15 U.S.C. §1691e(c) and/or 42 U.S.C. §3613(c), to monitor and/or audit the racial pattern of its financings to ensure the cessation of discriminatory effects in its home mortgage transactions;

21

      f.      Order disgorgement, pursuant to 15 U.S.C. §1691e(c), of all disproportionate non-risk charges imposed on minorities by the Defendants' Discretionary Pricing Policy; and order the equitable distribution of such charges to all appropriate class members; together with other relief for unjust enrichment;

      g.      Order actual and punitive damages and/or restitution to the Plaintiffs and the Class pursuant to 42 U.S.C. § 3613(c);

      h.      Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees, pursuant to 15 U.S.C. §1691e(d) and/or 42 U.S.C. §3613(c); and

      i.      Grant Plaintiffs and the Class such other and further relief as this Court finds necessary and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Al Hofeld, Jr.
Al Hofeld, Jr.
Law Offices of Al Hofeld, Jr., LLC
and The Social Justice Project, Inc.
208 S. LaSalle Street, Suite #1650
Chicago, IL 60604
Phone - 312-345-1004
Fax - 312-346-3242

Gary Klein (BBO # 560769)
Elizabeth Ryan (BBO # 549632)
Shennan Kavanagh (BBO # 655174)
Kevin Costello (BBO # 669100)
RODDY KLEIN & RYAN

22

727 Atlantic Avenue
Boston, MA   02111-2810
Telephone:  (617) 357-5500 ext. 15
Facsimile:   (617) 357-5030

-

Marvin A. Miller
Matthew E. VanTine
Lori A. Fanning
MILLER LAW LLC
115 South LaSalle Street, Suite 2910
Chicago, IL  60603
Telephone:  (312) 332-3400

Samuel H. Rudman
Robert M. Rothman
Mark S. Reich
COUGHLIN STOIA GELLER RUDMAN &
ROBBINS LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  (631) 367-7100
Facsimile:   (631) 367-1173

Dated: April 1, 2008

08CV1880   PH
JUDGE MANNING
MAGISTRATE JUDGE ASHMAN

# EXHIBIT 1

**A. U.S. Department of Housing and Urban Development**

**Settlement Statement**

| | | |
|---|---|---|
| | | **B. Type of Loan** |
| 1. [ ] FHA | 2. [ ] FMHA | 3. [ x ] Conv. Unins. |
| 4. [ ] VA | 5. [ ] Conv. Ins. | [ ] Other. |
| 6. File Number 486971 | | 7. Loan Number 11805257 |
| II. Mortgage Ins. Case No. | | |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked ("POC") were paid outside the closing; they are shown here for information purposes and are not included in the totals.

D. Name of Borrower: Herbert P Steele, 2237 East 92nd Place, Chicago IL 60617
Doris Jones Steele

E. Name of Seller:

F. Name of Lender: WMC Mortgage Corp., 1 Ramland Rd, Orangeburg, NY 10962

G. Property Location: 2237 East 92nd Place, Chicago, IL 60617

H. Settlement Agent: Stewart Title of Illinois
Place of Settlement: 2 N. LaSalle Street Suite 625 Chicago IL 60602       TIN: 36-3849696

I. Settlement Date: 6/30/2006            Proration Date: 7/6/2006

| J. Summary of borrower's transaction | | K. Summary of seller's transaction | |
|---|---|---|---|
| **100. Gross amount due from borrower:** | | **400. Gross amount due to seller:** | |
| 101. Contract sales price | | 401. Contract sales price | |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | 5,301.90 | 403. | |
| 104. P/O Mtg to Wilshire Credit Corp. | 146,571.72 | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | | |
| 106. City/town taxes | | 406. City/town taxes | |
| 107. County taxes | | 407. County taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. Gross amount due from borrower:** | 151,873.62 | **420. Gross amount due to seller:** | 0.00 |
| **200. Amounts paid by or in behalf of borrower:** | | **500. Reductions in amount due to seller:** | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 167,200.00 | 502. Settlement charges to seller (line 1400) | 0.00 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | | |
| 210. City/town taxes | | 510. City/town taxes | |
| 211. County taxes | | 511. County taxes | |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total paid by/for borrower:** | 167,200.00 | **520. Total reduction in amount due seller:** | 0.00 |
| **300. Cash at settlement from/to borrower:** | | **600. Cash at settlement to/from seller:** | |
| 301. Gross amount due from borrower (line 120) | 151,873.62 | 601. Gross amount due to seller (line 420) | 0.00 |
| 302. Less amount paid by/for borrower (line 220) | 167,200.00 | 602. Less total reduction in amount due seller (line 520) | 0.00 |
| **303. CASH (FROM) (X)TO BORROWER** | 15,326.38 | **603. CASH (FROM) (TO SELLER** | 0.00 |

SUBSTITUTE FORM 1099 SELLER STATEMENT - The information contained in Blocks E, G, H and I and on line 401 (or, if line 401 is asterisked, lines 403 and 404), 406, 407 and 408-412 (applicable part of buyer's real estate tax reportable to the IRS) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.

SELLER INSTRUCTION - If this real estate was your principal residence, file form 2119, Sale or Exchange of Principal Residence, for any gain, with your income tax return, for other transactions, complete the applicable parts of form 4797, Form 6252 and/or Schedule D (Form 1040).

You are required by law to provide Stewart Title of Illinois with your correct taxpayer identification number.

If you do not provide Stewart Title of Illinois with your correct taxpayer identification number, you may be subject to civil or criminal penalties.

| | | | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|---|
| 700. | Division of commission (line 700) as follows. | | | | |
| 701. | $ | | | | |
| 702. | $ | | | | |
| 703. | Commission paid at settlement | | | | |
| 704. | | | | | |
| 801. | Loan origination fee | to | US Mutual Banc Corp. | 2,100.00 | |
| 802. | Loan discount | | | | |
| 803. | Appraisal fee | to | US Mutual Banc Corp. | POCB 275.00 | |
| 804. | Credit report | to | US Mutual Banc Corp. | 46.83 | |
| 805. | Lender's inspection fee | | | | |
| 806. | Mortgage insurance application fee | | | | |
| 807. | Assumption fee | | | | |
| 808. | Tax Contract Fee | to | Fidelity National | 20.00 | |
| 809. | Processing Fee | to | US Mutual Banc Corp. | 480.00 | |
| 810. | Flood Determination Fee | to | First American Flood Data Service | 12.00 | |
| 811. | Application Fee | to | WMC Mortgage Corp. | 597.00 | |
| 812. | Broker Comp Pd By Lender | to | US Mutual Banc Corp. | POCL 2508.00 | |
| 813. | | | | | |
| 814. | | | | | |
| 815. | | | | | |
| 901. | Interest from 7/8/2006 to 8/1/2006 at $41.4335/day for 28 days. | | | 1,077.27 | |
| 902. | Mortgage insurance premium for | | | | |
| 903. | Hazard insurance premium for | | to Allstate Insurance Cor | 402.00 | |
| 904. | | | | | |
| 905. | | | | | |
| 1001. | Hazard insurance | | | | |
| 1002. | Mortgage insurance | | | | |
| 1003. | City property taxes | | | | |
| 1004. | County property taxes | | | | |
| 1005. | Annual assessments (maint.) | | | | |
| 1006. | | | | | |
| 1007. | | | | | |
| 1008. | | | | | |
| 1009. | | | | | |
| 1101. | Settlement or closing fee | to | Stewart Title of Illinois | 150.00 | |
| 1102. | Abstract or title search | | | | |
| 1103. | Title examination | | | | |
| 1104. | Title insurance binder | | | | |
| 1105. | Document preparation | | | | |
| 1106. | Notary fees | | | | |
| 1107. | Attorney's fees to | | | | |
| | includes above items no.: | | | | |
| 1108. | Title insurance | to | Stewart Title of Illinois | 275.00 | |
| | includes above items no.: | | | | |
| 1109. | Lender's coverage | $187,200.00 | $275.00 | | |
| 1110. | Owner's coverage | | | | |
| 1111. | P/O Pkg Processing Fee | to | Stewart Title of Illinois | 35.00 | |
| 1112. | Stat Policy Fee | to | Stewart Title of Illinois | 3.00 | |
| 1113. | E-Mail Fee | to | Stewart Title of Illinois | 25.00 | |
| 1201. | Recording fees/ Surcharge fees: | | Mortgage $80.00 | 80.00 | |
| 1202. | City/county tax/stamps: | | | | |
| 1203. | State tax/stamps: | | | | |
| 1204. | | | | | |
| 1205. | | | | | |
| 1206. | | | | | |
| 1301. | Survey | | | | |
| 1302. | Pest Inspection | | | | |
| 1303. | | | | | |
| 1304. | | | | | |
| 1305. | | | | | |
| 1400. | Total settlement charges (entered on lines 103, section J and 502, section K) | | | 5,301.90 | |

CERTIFICATION: I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of HUD-1 Settlement Statement.

Robert P Steele

Doris Jones Steele

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

Stewart Title of Illinois                                                                                  Date

SELLER'S AND/OR PURCHASER'S STATEMENT Seller's and Purchaser's signature hereon acknowledges neither their approval of the prorations and agrees their understanding that prorations were based on taxes for the preceding year, or estimates for the current year, and in the event of any change for the current year, all necessary adjustments must be made between Seller and Purchaser; likewise any default in delinquent taxes will be reimbursed to Title Company by the Seller.

Title Company, in its capacity as Escrow Agent, is and has been authorized to deposit all funds it receives in this transaction in any financial institution, whether affiliated or not. Such financial institution may provide Title Company computer accounting and audit services directly or through a separate entity which, if affiliated with Title Company, may charge the financial institution reasonable and proper compensation therefore and retain any profits therefrom. Any escrow fees paid by any party involved in this transaction shall only be for disbursements and input to the computers, but not for aforesaid accounting and audit services. Title Company shall not be liable for any interest or other charges on the earnest money and shall be under no duty to invest or reinvest funds held by it at any time. Sellers and Purchasers hereby acknowledge and consent to the deposit of the escrow money in banking institutions with which Title Company has or may have other banking relationships and further consent to the retention by Title Company and/or its affiliates of any and all benefits (including advantageous interest rates on loans) Title Company and/or its affiliates may receive from such financial institutions by reason of their maintenance of said escrow accounts.

The parties have read the above statement, acknowledge that the provisions herein are received, agree to same, and recognize Title Company in relation to the above

Purchasers/Borrowers                                                                        Sellers

Robert P Steele

Doris Jones Steele

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

# EXHIBIT 2

Names of Borrower(s): HERBERT STEELE
DORIS STEELE

Date: 06/30/2006
Serv #: 11605257

Borrower Mailing:2237 EAST 92ND PLACE, CHICAGO, IL 60617
Property Address:2237 EAST 92ND PLACE, CHICAGO, IL 60617

Loan Number: 11605257

Lender: WMC MORTGAGE CORP. , 3100 THORNTON AVENUE, BURBANK, CA 91504

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 10.819 % | $398,530.36 | $161,241.73 | $559,772.09 |

You have the right to receive at this time an itemization of the Amount Financed.
[X] I want an itemization.          [ ] I do not want an itemization.

### Payment Schedule

| Number of Payments | Monthly Payments of | Payments are Due Monthly beginning: | Number of Payments | Monthly Payments of | Payments are Due Monthly beginning: |
|---|---|---|---|---|---|
| 24 | 1,350.75 | September 1, 2006 | | | |
| 335 | 1,569.50 | September 1, 2008 | | | |
| 1 | 1,571.59 | August 1, 2036 | | | |

Assuming the index remains unchanged for the life of the loan. The index used to calculate the APR is 5.320 %.

[ ] This loan has a demand feature
[X] Variable Rate: Disclosures about the variable rate feature have been provided to you earlier.
[ ] Variable Rate Not Applicable

Security: [ ] You are giving a security interest in the property being purchased
[X] Other (describe): 2237 EAST 92ND PLACE, CHICAGO, IL 60617

Late Charge: If payment is 16 days late, the penalty charge is 5.000 % of the payment.
The minimum late charge is N/A . The maximum late charge is N/A .

Filing Fees/Recording Fees: $ 75.00

Prepayment: If you pay off this loan early, you [ ] may [X] will not have to pay a penalty. And you [ ] may [X] will not be entitled to a refund of part of the finance charge.

Assumption: Someone buying your home
[X] will not be allowed to assume the remainder of this mortgage on the original terms.
[ ] may, subject to conditions, be allowed to assume the remainder of this mortgage on the original terms.

Required Deposit: The annual percentage rate does not take into account your required deposit.
Property Insurance is required to obtain credit and may be obtained from anyone you want who is acceptable to this Lender.
[X] Property Insurance is not available through Lender.
[ ] If you obtain Property Insurance from _____ , you will pay $ _____ for a term of _____

CREDIT LIFE AND DISABILITY INSURANCE are not required to obtain credit and will not be provided at the time of closing. You may be offered these plans after closing, but they are not in effect at this time. No such insurance will be in force until you have completed an application, the insurance company has issued the policy, and the effective date of that policy has been provided.

See your loan documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, and prepayment refunds and penalties.

'e' means estimate

I / we acknowledge receipt of a completed copy of this disclosure. SIGNED AND DATED:

_Herbert Steele_                    30 JUNE 2006
- Borrower - HERBERT STEELE - DATE -

DOCUPREP
WCDNDII.VTX 08/28/2005

Names of Borrower(s):  HERBERT STEELE
                        DORIE STEELE

Date: 06/30/2006
Serv #: 11605257

Borrower Mailing:2237 EAST 92ND PLACE, CHICAGO, IL 60617
Property Address:2237 EAST 92ND PLACE, CHICAGO, IL 60617

Loan Number: 11605257

Lender: WMC MORTGAGE CORP., 3100 THORNTON AVENUE, BURBANK, CA 91504

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 10.819  % | $398,530.36 | $161,241.73 | $559,772.09 |

You have the right to receive at this time an Itemization of the Amount Financed.
[x] I want an itemization.          [ ] I do not want an itemization.

### Payment Schedule

| Number of Payments | Monthly Payments of | Payments are Due Monthly beginning: | Number of Payments | Monthly Payments of | Payments are Due Monthly beginning: |
|---|---|---|---|---|---|
| 24 | 1,350.75 | September 1, 2006 | | | |
| 335 | 1,569.50 | September 1, 2008 | | | |
| 1 | 1,571.59 | August 1, 2036 | | | |

Assuming the index remains unchanged for the life of the loan. The index used to calculate the APR is  5.320  %

[ ] This loan has a demand feature
[x] Variable Rate: Disclosures about the variable rate feature have been provided to you earlier.
[ ] Variable Rate Not Applicable

Security:   [ ] You are giving a security interest in the property being purchased
            [x] Other (describe): 2237 EAST 92ND PLACE, CHICAGO, IL 60617

Late Charge: If payment is  **15**  days late, the penalty charge is  **5.000**  % of the payment.
The minimum late charge is  **N/A** . The maximum late charge is  **N/A**

Filing Fees/Recording Fees:    $ 75.00

Prepayment: If you pay off this loan early, you  [ ] may  [x] will not  have to pay a penalty. And you  [ ] may  [x] will not
be entitled to a refund of part of the finance charge.

Assumption:  Someone buying your home
             [x] will not be allowed to assume the remainder of this mortgage on the original terms.
             [ ] may, subject to conditions, be allowed to assume the remainder of this mortgage on the original terms.

Required Deposit: The annual percentage rate does not take into account your required deposit.
Property Insurance is required to obtain credit and may be obtained from anyone you want who is acceptable to this Lender.
[x] Property Insurance is not available through Lender.
[ ] If you obtain Property Insurance from _____, you will pay $ _____ for a term of _____.
CREDIT LIFE AND DISABILITY INSURANCE are not required to obtain credit and will not be provided at the time of closing.
You may be offered these plans after closing, but they are not in effect at this time. No such insurance will be in force until you have
completed an application, the insurance company has issued the policy, and the effective date of that policy has been provided.

See your loan documents for any additional information about nonpayment, default, any required repayment in full before the
scheduled date, and prepayment refunds and penalties.

'e' means estimate

I/we acknowledge receipt of a completed copy of this disclosure. SIGNED AND DATED:

Doris Steele    6/30/06
- Borrower -  DORIS STEELE - DATE -

DOCUMENT
ORIGINAL.VTX 08/25/2005

DEFINITION OF TRUTH-IN-LENDING TERMS

## ANNUAL PERCENTAGE RATE

This is not the Note rate for which the borrower applied. The Annual Percentage Rate (APR) is the cost of the loan in percentage terms taking into account various loan charges of which interest is only one such charge. Other charges which are used in calculation of the Annual Percentage Rate are Private Mortgage Insurance or FHA Mortgage Insurance Premium (when applicable) and Prepaid Finance Charges (loan discount, origination fees, prepaid interest and other credit costs). The APR is calculated by spreading these charges over the life of the loan which results in a rate higher than the interest rate shown on your Mortgage/Deed of Trust note. If interest was the only Finance Charge, then the interest rate and the Annual Percentage Rate would be the same.

## PREPAID FINANCE CHARGES

Prepaid Finance Charges are certain charges made in connection with the loan and which must be paid upon the close of the loan. These charges are defined by the Federal Reserve Board in Regulation Z and the charges must be paid by the borrower. Non-inclusive examples of such charges are: Loan origination fee, "Points" or Discount, Private Mortgage Insurance or FHA Mortgage Insurance, Tax Service Fee. Some loan charges are specifically excluded from the Prepaid Finance Charge such as appraisal fees and credit report fees.

Prepaid Finance Charges are totaled and then subtracted from the Loan Amount (the face amount of the Deed of Trust/Mortgage Note). The net figure is the Amount Financed as explained below.

## FINANCE CHARGE

The amount of interest, prepaid finance charge and certain insurance premiums (if any) which the borrower will be expected to pay over the life of the loan.

## AMOUNT FINANCED

The Amount Financed is the loan amount applied for less the prepaid finance charges. Prepaid finance charges can be found on the Good Faith Estimate/Settlement Statement (HUD-1 or 1A). For example if the borrower's note is for $100,000 and the Prepaid Finance Charges total $5,000, the Amount Financed would be $95,000. The Amount Financed is the figure on which the Annual Percentage Rate is based.

## TOTAL OF PAYMENTS

This figure represents the total of all payments made toward principal, interest and mortgage insurance (if applicable) over the life of the loan.

## PAYMENT SCHEDULE

The dollar figures in the Payment Schedule represent principal, interest, plus Private Mortgage Insurance (if applicable) over the life of the loan. These figures will not reflect taxes and insurance escrows or any temporary buydown payments contributed by the seller.

DOD17EP
D000269.VTX 16/25/2005