UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| HERBERT and DORIS STEELE, ERIC R. CHAVEZ, ALEXANDRA DIAZ, and SONIA TORRES, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>GE MONEY BANK, a federal savings bank, WMC MORTGAGE CORPORATION and WMC MORTGAGE, LLC,<br><br>        Defendants. | Case No. 08CV 1880 PH<br><br>JUDGE MANNING<br><br>MAGISTRATE JUDGE ASHMAN |

**MEMORANDUM IN SUPPORT OF MOTIONS OF DEFENDANT
WMC MORTGAGE CORPORATION TO DISMISS FOR FAILURE TO STATE
A CLAIM, OR IN THE ALTERNATIVE TO JOIN NECESSARY PARTIES AND
TO STRIKE CERTAIN ALLEGATIONS IN THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................ i

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ........................................................................................................... 1

    A.    Procedural History ................................................................................. 1

    B.    Mortgage Loans Involving Mortgage Brokers ..................................... 1

    C.    HMDA Data Regarding Mortgage Lending ......................................... 1

    D.    Plaintiffs' Loans .................................................................................... 1

    E.    Plaintiffs' Claims ................................................................................... 1

ARGUMENT ................................................................................................................ 1

I.    THE COURT SHOULD DISMISS THE AMENDED COMPLAINT IN ITS
ENTIRETY FOR FAILURE TO STATE A CLAIM ........................................... 1

    A.    Standard For A Motion To Dismiss Pursuant To Rule 12(b)(6) ........... 1

    B.    Plaintiffs Have Failed To State A Claim Under The ECOA Or FHA ...... 1

        1.    Plaintiffs Have Failed To Allege Facts Showing A Disparate
Impact Or Causal Injury/Standing ............................................. 1

        2.    Plaintiffs Have Failed To Allege Facts Showing A Specific
Practice Or Policy Of Defendant ................................................ 1

        3.    Plaintiffs Have Failed To Allege Facts Showing A Causal
Connection Between Any Specific Policy Or Practice Of
Defendant And The Alleged Disparate Impact ........................... 1

        4.    Plaintiffs Have Failed To Allege Facts Showing That Any Of
Plaintiffs' Brokers Was An Agent of WMC ................................ 1

    C.    Ms. Diaz's Claims Should Be Dismissed Against WMC In Their Entirety
Because She Alleges No Dealings With WMC ...................................... 1

II.    THE ABSENT MORTGAGE BROKERS ARE NECESSARY PARTIES TO
THIS ACTION ...................................................................................................... 1

A.    The Mortgage Brokers' Interests Will, As A Practical Matter, Be Affected By The Outcome Of This Action ........................................................................ 1

B.    Complete Relief Cannot Be Accorded Without The Mortgage Brokers ................ 1

III.    THE COURT SHOULD STRIKE PLAINTIFFS' ALLEGATIONS AIMED AT TOLLING THE STATUTE OF LIMITATIONS BECAUSE, INTER ALIA, EACH OF THE PLAINTIFFS' CLAIMS IS ALLEGED TO BE TIMELY WITHOUT RESORT TO TOLLING ................................................................... 1

IV.    THE COURT SHOULD STRIKE PLAINTIFFS' PRAYERS FOR DISGORGEMENT AND RESTITUTION BECAUSE SUCH RELIEF IS NOT AVAILABLE AS A MATTER OF LAW ...................................................... 1

CONCLUSION ........................................................................................................ 1

## <u>TABLE OF AUTHORITIES</u>

Page

### <u>Cases</u>

Acton Co. v. Bachman Foods, Inc., 668 F.2d 76 (1st Cir. 1982) ..................................29

AFSCME v. Washington, 770 F.2d 1401 (9th Cir. 1985) ............................................22

Bannister v. Dal-Tile Int'l, Inc., No Civ. A. 3:02-CV-2498, 2003 WL 21145739
    (N.D. Tex. May 14, 2003)...........................................................................................17

Beauchem v. Rockford Products Corp., No. 01 C50134, 2003 WL 1562561
    (N.D. Ill. Mar. 24, 2003)............................................................................................32

Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955 (2007) ..................................14, 15, 24, 26

Bennett v. Matlin, No. 96 C 6915, 1997 WL 757867 (N.D. Ill. Nov. 26, 1997)...............16, 17, 23

Brown v. Coach Stores, Inc., 163 F.3d 706 (2d Cir. 1998) ..........................................23

Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93 (2d Cir. 2001)......................21

Cas. Indem. Exch. v. Vill. of Crete, 731 F.2d 457 (7th Cir. 1984)................................28

Cerutti v. BASF Corp., 349 F.3d 1055 (7th Cir. 2003) ................................................16

Chavez v. GE Money Bank, No. 2:07-5967 (C.D. Cal. filed Sept. 13, 2007)............................5, 6

Claybrooks v. Primus Auto. Fin. Servs., Inc., 363 F. Supp. 2d 969 (M.D. Tenn. 2005)...............32

Coates v. Ill. State Bd. of Educ., 559 F.2d 445 (7th Cir. 1977)....................................15

Collette v. St. Luke's Roosevelt Hosp., 132 F. Supp. 2d 256 (S.D.N.Y. 2001) ...........................18

Cont'l Ins. Co. v. Loewen Group, Inc., No. 96 CV 1427, 1998 WL 142380
    (N.D. Ill. Mar. 17, 1998)......................................................................................27, 31

EEOC v. Concentra Health Servs., Inc., 496 F.3d 773 (7th Cir. 2007)..................................15, 26

EEOC v. Honda of Am., Mfg., Inc., No. 2:06-cv-00233, 2007 WL 1541364
    (S.D. Ohio May 23, 2007) ..........................................................................................22

Farrell v. Butler Univ., 421 F.3d 609 (7th Cir. 2005)...................................................16

Fulcher v. City of Wichita, 445 F. Supp. 2d 1271 (D. Kan. 2006)................................22

Hashop v. Fed. Home Loan Mortgage Corp., 171 F.R.D. 208 (N.D. Ill. 1997)..........27, 28, 29, 30

Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993) .......................................................15

Heller Fin., Inc. v. Midwhey Powder Co., 883 F.2d 1286 (7th Cir. 1989)....................31

Henson v. CSC Credit Servs., 29 F.3d 280 (7th Cir. 1994)............................................5

Hirsch v. BankAmerica Corp., 328 F.3d 1306 (11th Cir. 2003)....................................9

Iqbal v. Hasty, 490 F.3d 143 (2d Cir. 2007).................................................................15

Kulkarni v. City University of New York, No. 01 Civ. 10628, 2002 WL 1315596
    (S.D.N.Y. June 14, 2002)..........................................................................................21

Lawhead v. Ceridian Corp., 463 F. Supp. 2d 856 (N.D. Ill. 2006)...............................15

Limestone Dev. Corp. v. Vill. of Lemont, Ill., 520 F.3d 797 (7th Cir. 2008) ...............14

Lopez v. GE Money Bank, No. CV08-00479 (C.D. Cal., filed Jan. 25, 2008) ...............6

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) .......................................16, 18, 24

Martinez v. Freedom Mortgage Team, Inc., 527 F. Supp. 2d 827 (N.D. Ill. 2007)......20

Moore v. Ashland Oil, Inc., 901 F.2d 1445 (7th Cir. 1990) ..........................................31

Mora v. McDonald's Corp., No. 96 C 5957, 1997 WL 102546 (N.D. Ill. Mar. 6, 1997) .............27

Morales v. Trans World Airlines, Inc., 504 U.S. 374 (1992) ........................................33

Moseke v. Miller and Smith, Inc., 202 F. Supp. 492 (E.D. Va. 2002) ..........................32

Nelson v. Monroe Reg'l Med. Ctr., 925 F.2d 1555 (7th Cir. 1991) ..........................5, 15

Newman v. Apex Financial Group. Inc., No. 07 C 4475, 2008 U.S. Dist. LEXIS 2249
    (N.D. Ill. Jan. 11, 2008) ...........................................................................................20

Pet Quarters Inc. v. Depository Trust & Clearing Corp., 545 F. Supp. 2d 845
    (E.D. Ark. 2008) .........................................................................................................5

Prince v. Rice, 453 F. Supp. 2d 14 (D.D.C. 2006) ................................................21, 23

Rand Bond of N. Am., Inc. v. Saul Stone & Co., 726 F. Supp. 684 (N.D. Ill. 1989).............24, 25

Rhone-Poulenc, Inc. v. Int'l Ins. Co., 877 F. Supp. 1170 (N.D. Ill. 1995)...................27

Richardson v. New Century Mortg. Corp., No. Civ.A. 2:03CV372PA, 2005 WL 1554026
    (N.D. Miss. July 1, 2005)..........................................................................................26

Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380 (7th Cir. 1984).....................33

Schuetz v. Banc One Mortgage Corp., 292 F.3d 1004 (9th Cir. 2002) ....................................9, 24

Smith v. City of Jackson, Miss., 544 U.S. 228 (2005)......................................................16, 20, 22

Soo Line R.R. Co. v. St. Louis Sw. Ry. Co., 125 F.3d 481 (7th Cir. 1997) ..................................14

Thompson v. Jiffy Lube Int'l Inc, No. 05-1203-WEB, 2006 U.S. Dist. LEXIS 39113
     (D. Kan. June 13, 2006)..................................................................................................29

Trezza v. Hartford, Inc., No. 98 CIV. 2205(MBM), 1998 WL 912101
     (S.D.N.Y. Dec. 30, 1998) ................................................................................................23

Tribett v. BNC Mortgage, Inc., No. 07 C 2809, 2008 WL 162755
     (N.D. Ill. Jan. 17, 2008) ...............................................................................19, 24, 26

TRW Inc. v. Andrews, 534 U.S. 19 (2001) ..............................................................................32

United States ex rel. Hall v. Tribal Dev. Corp., 100 F.3d 476 (7th Cir. 1996)......................28, 31

Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989), superseded on other grounds
     by statute, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (1991)......... passim

Ware v. Indymac Bank, FSB, 534 F. Supp. 2d 835 (N.D. Ill. 2008)......................................19, 20

Watson v. Fort Worth Bank & Trust, 487 U.S. 977 (1988)................................................17, 21, 22

Williams v. S. Ill. Riverboat/Casino Cruises, Inc., No. 06-cv-664,
     2007 WL 3253239 (S.D. Ill. Nov. 5, 2007) ..........................................................................16

Young v. Murphy, 90 F.3d 1225 (7th Cir. 1996)..........................................................................15

## Statutes

12 U.S.C. § 2603.......................................................................................................................3

12 U.S.C. § 2607(c)(2)...............................................................................................................3

12 U.S.C. §§ 2801-2810 .............................................................................................................3

12 U.S.C. § 2804(a) ..................................................................................................................10

15 U.S.C. §§ 1691-1691f ...........................................................................................................2

15 U.S.C. § 1691e...................................................................................................31, 32, 33

42 U.S.C. §§ 3601-3631 .............................................................................................................2

42 U.S.C. § 3613 ............................................................................................................31, 33


## **Regulations**

12 C.F.R. pt. 203 ..................................................................................................3, 9, 10, 18

24 C.F.R. pt. 3500, App. B ........................................................................................3, 9, 22


## **Other Authorities**

Department of Housing and Urban Development Statement of Policy 1999-1 Regarding
    Lender Payments to Mortgage Brokers, 64 Fed. Reg. 10,080 (Mar. 1, 1999)......................7, 8

Real Estate Settlement Procedures Act Statement of Policy 2001-1, 66 Fed. Reg. 53,052
    (Oct. 18, 2001) ...............................................................................................7, 8, 24

Restatement (Third) of Agency § 1.01 (2006) ..............................................................25

Restatement (Third) of Agency § 2.03 (2006) ..............................................................26

Defendant WMC Mortgage, LLC ("WMC"), formerly known as WMC Mortgage Corp., submits this memorandum of law in support of its motion to dismiss Plaintiffs' amended class action complaint ("Amended Complaint" or "AC") pursuant to Fed. R. Civ. P. 12(b)(6), and its alternative motions to require Plaintiffs to join their mortgage brokers as necessary parties pursuant to Fed. R. Civ. P. 12(b)(7) and 19, and to strike certain allegations and prayers for relief pursuant to Fed. R. Civ. P. 12(f).

## PRELIMINARY STATEMENT

Plaintiffs Herbert and Doris Steele (jointly), Eric Chavez, and Sonia Torres allegedly obtained home mortgage loans from WMC by engaging the services of three independent, non-party mortgage brokers of their choosing, E-Z Home Loans, Apex Mortgage, and US Mutual Banc Corp.  See AC ¶¶ 54-90.  The fifth plaintiff in this action, Alexandra Diaz, together with non-party Mari S. Diaz, allegedly obtained a home mortgage loan from GE Money Bank ("GEMB") -- not WMC -- by engaging the services of an independent mortgage broker of their choosing, Bridgeline Capital Group, Inc. ("Bridgeline").  See AC ¶¶ 37, 73, 74.  According to Plaintiffs' allegations, these mortgage brokers worked directly with, and for, Plaintiffs to help them obtain their loans, including by taking Plaintiffs' loan applications and communicating loan terms to Plaintiffs.  See, e.g., AC ¶ 37.  Plaintiffs state that *they* were the "clients" of these non-party brokers (AC ¶ 32), that they "provided [their] credit information through a mortgage broker" (AC ¶ 41), and that it was the brokers who "ultimately originate[d] mortgage loans [to Plaintiffs]" (AC ¶ 37) and who were responsible for "setting [the] credit price" (AC ¶ 49).

Assertedly "minority homeowners," Plaintiffs contend that certain "discretionary fees" caused them to pay higher costs for a mortgage loan than the average non-minority borrower (AC ¶¶ 47-48).  Plaintiffs appear to challenge at least four different fees that one or more of them assertedly paid, which fall into two general categories:  (1) origination fees, appraisal fees, and

processing fees paid by the borrowers directly to their brokers ("Broker Fees"), (AC ¶¶ 57, 66, 75, 84) and (2) a fee paid by the borrowers indirectly to their brokers -- i.e., a "yield spread premium" ("YSP") (AC ¶¶ 57, 66), which assertedly corresponds to a higher interest rate on the loan (AC ¶ 44).[1]

Plaintiffs contend that their brokers imposed all of the "discretionary fees" at issue (see AC ¶¶ 57, 66, 75, 84). Plaintiffs do not, however, claim that WMC benefited in any way from any of the Broker Fees paid by Plaintiffs. They also do not claim that WMC benefited from the alleged YSP in connection with either the Steeles' or Ms. Torres' loan; rather, they merely make the conclusory assertion that "[w]hen borrowers pay [YSPs], Defendants share in additional income generated by the [YSP]." See AC ¶ 44. Nevertheless, Plaintiffs sue WMC. They claim violations by WMC of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691-1691f, and the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601-3631, based on an alleged discriminatory impact of all of the "discretionary fees," on the theory that WMC purportedly "allowed" the mortgage brokers -- independent businesses who are not alleged to have an exclusive relationship with WMC -- to charge those fees to their customers (Plaintiffs).

The Court should dismiss these claims for multiple reasons. First, Plaintiffs fail to allege any facts to support their conclusory assumption that they "pa[id] more for mortgage financing than the amounts paid by white customers." AC ¶ 92. For example, Plaintiffs do not allege any facts indicating (1) what the average similarly situated non-minority borrower paid in "discretionary fees" for a mortgage loan, (2) what the average minority borrower paid, or (3)

---

[1] The Amended Complaint does not identify which of these fees are so-called "discretionary fees" at issue in this action. For purposes of this memorandum, WMC will assume arguendo that each of the Broker Fees identified in the Amended Complaint, as well as the YSP, is a "discretionary fee" challenged by Plaintiffs. In light of the legal theory articulated by Plaintiffs in their pleading (i.e., that WMC "authorized [its] brokers . . . to impose additional non-risk-based charges"), WMC assumes that the "application fee" allegedly paid by the Steeles, the "administration fee" allegedly paid by Ms. Torres directly to WMC, and the administration fee allegedly paid by Ms. Diaz directly to GEMB see AC ¶¶ 57, 75, 84), are not "discretionary fees" challenged by the Amended Complaint.

how Plaintiffs' transactions -- which differ markedly among themselves -- compare to these averages.

Plaintiffs themselves recognize that they must allege something more than speculation. Thus, they cite various purported studies of mortgage lending data disclosed pursuant to the Home Mortgage Disclosure Act ("HMDA"), 12 U.S.C. §§ 2801-2810, and its implementing Regulation C, 12 C.F.R. pt. 203. See AC ¶¶ 14-20. However, the HMDA data does not help them, because (i) the Broker Fees and YSPs they challenge here are not even reported as HMDA data; (ii) the HMDA data described in the Amended Complaint is aggregate industry information only, and does not pertain to WMC in particular; (iii) as the Federal Reserve Board has explained, the HMDA data itself does not show discrimination; and (iv) the HMDA data says nothing about how the "discretionary fees" paid by Plaintiffs relate to the fees paid by the average minority, and similarly situated non-minority, borrower in connection with comparable WMC transactions.

Plaintiffs also fail to allege a cognizable policy or practice by WMC, another element of any disparate impact claim. Although WMC does not receive the "discretionary fees" at issue here, Plaintiffs contend that the mortgage brokers imposed the fees pursuant to a purported "policy" of WMC (which Plaintiffs call the "Discretionary Pricing Policy") -- which amounts to nothing more than WMC's "permitting" innumerable independent third-parties to charge fees for services they provide to their clients, as expressly permitted by federal law. See 12 U.S.C. § 2607(c)(2). See also 24 C.F.R. pt. 3500, App. B, item 13 (requiring disclosure of YSPs on the HUD-1 settlement statement).

Nor have Plaintiffs pled any facts showing that this purported policy *caused* the alleged disparate impact. As shown in the table infra p. 13, Plaintiffs' own allegations show that the purported "discretionary fees" differ widely from Plaintiff to Plaintiff -- not only in amount, but

in whether they were even charged.  For instance, two of the Plaintiffs (Ms. Torres and Ms. Diaz) do not even allege that their loans involved a YSP.  <u>See</u> AC ¶¶ 73-81, 82-90.

The Court also should reject Plaintiffs' attempt to hold WMC liable for the "discretionary fees" of the non-party brokers based on the conclusory assertion that the brokers are WMC's "agents."  Plaintiffs have failed to allege any facts showing that each of the Plaintiffs' brokers is the agent of WMC, or that it imposed the fees while acting within the scope of that agency.

Alternatively, the Court should order Plaintiffs to join their mortgage brokers as defendants pursuant to Fed. R. Civ. P. 19 and 12(b)(7).  Plaintiffs' own allegations demonstrate that the absent brokers (whom Plaintiffs selected) played a central role in the loan transactions at issue in this case.  Plaintiffs allege that they dealt with the brokers, not WMC, in applying for and obtaining their mortgage loans, and that it was the brokers who imposed the "discretionary fees" at issue.  <u>See</u> AC ¶¶ 32, 37, 41, 49.  In particular, Plaintiffs concede that they paid the Broker Fees directly to their respective brokers.  <u>See</u> AC ¶¶ 57, 66, 75, 84.  They further concede that the YSPs referenced in connection with Mr. Chavez's and the Steeles' loans were paid by WMC to their respective brokers.  <u>Id.</u>  In contrast, Plaintiffs do not contend that they dealt directly with WMC, or negotiated any of the alleged "discretionary fees" at issue with WMC.

Thus, the mortgage brokers' conduct is at the center of this action, mandating their joinder because a decision in this action will, as a practical matter, implicate their interests at the most basic level -- their ability to charge the fees at issue and otherwise determine their pricing with respect to their own customers.  To decide this case in their absence would be fundamentally unfair.

Furthermore, complete relief cannot be accorded to the parties without joining the absent brokers.  Although the brokers may not be bound by a judgment rendered in their absence, a large part of the relief Plaintiffs seek directly targets the brokers' conduct.  <u>See</u> AC at 25, Prayer

for Relief ¶ c (requesting that the Court "[g]rant a permanent or final injunction . . . enjoining the Defendants, and the Defendants' *agents* . . . from . . . further use of the Discretionary Pricing Policy") (emphasis added); ¶ d (requesting that the Court "[o]rder the Defendants . . . to adopt and enforce a policy that requires appropriate training of the Defendants' employees and its *brokers*") (emphasis added).  As a result, the Court should order Plaintiffs to join the absent brokers pursuant to Fed. R. Civ. P. 19(a) and 12(b)(7).

Finally, should the Court determine that this case may proceed beyond the pleadings, it should strike certain material from the Amended Complaint.  Since, inter alia, Plaintiffs' claims with respect to the loans referenced in the Amended Complaint are alleged to be timely, the Court should strike as immaterial the allegations in the Amended Complaint that relate to tolling the statute of limitations.  The Court also should strike Plaintiffs' prayers for "disgorgement" and "restitution," which remedies are not available to them as a matter of law.

## BACKGROUND[2]

### A.    Procedural History

The Amended Complaint is actually the fifth in a series of abandoned or amended complaints against WMC and GEMB filed by varying subsets of the seven law firms representing Plaintiffs in this action.[3]  On September 13, 2007, certain of Plaintiffs' counsel filed a complaint in the Central District of California on behalf of Plaintiff Eric Chavez, asserting factual allegations nearly identical to those in the Amended Complaint, and asserting the same claims (and others).  See Complaint, Chavez v. GE Money Bank, No. 2:07-5967 (C.D. Cal. filed

---

[2]  The allegations of the Amended Complaint are taken as true solely for purposes of this motion. See, e.g., Nelson v. Monroe Reg'l Med. Ctr., 925 F.2d 1555, 1558 (7th Cir. 1991).

[3]  "'[A] district court may also take judicial notice of matters of public record,' without converting a 12(b)(6) motion into a motion for summary judgment."  Henson v. CSC Credit Servs., 29 F.3d 280, 284 (7th Cir. 1994) (citation omitted); accord Pet Quarters Inc. v. Depository Trust & Clearing Corp., 545 F. Supp. 2d 845, 847 (E.D. Ark. 2008) (court may consider matters of "public record" on motion to dismiss, including, inter alia, items published in the Federal Register and briefs and opinions of other jurisdictions).

Sept. 13, 2007).  On January 10, 2008, the <u>Chavez</u> attorneys, plus one more set of Plaintiffs' counsel, filed an amended complaint in that action, adding Plaintiff Alexandria Diaz and factual allegations and claims related thereto.  <u>See</u> Amended Complaint, <u>Chavez</u>, No. 2:07-5967 (C.D. Cal. filed Jan. 10, 2008).

On January 25, 2008, a different subset of Plaintiffs' counsel filed another complaint in the Central District of California asserting factual allegations nearly identical to those here (and in <u>Chavez</u>), and asserting the same claims as here.  <u>See</u> Complaint, <u>Lopez v. GE Money Bank</u>, No. 2:08-cv-479 (C.D. Cal. filed Jan. 25, 2008).  Shortly thereafter, the <u>Chavez</u> action was voluntarily dismissed.  <u>See</u> Notice of Dismissal, <u>Chavez</u>, No. 2:07-cv-5967 (C.D. Cal. filed Sept. 13, 2007).

On April 1, 2008, a third subset of Plaintiffs' counsel filed the original complaint in this action, on behalf of two of Plaintiffs, Herbert and Doris Steele.  Two days later, on April 3, 2008, those attorneys, together with the other three law firms that now represent Plaintiffs, filed the Amended Complaint, which is virtually identical to the original complaint, except that it names three new plaintiffs (including Plaintiffs Chavez and Diaz) and factual allegations and claims related thereto.  On April 30, 2008, the <u>Lopez</u> action was voluntarily dismissed.  <u>See</u> Notice of Dismissal, <u>Lopez</u>, No. 2:08-cv-479 (C.D. Cal. filed Jan. 25, 2008).

These maneuverings are part of a larger series of actions in which numerous mortgage lenders, often together with the plaintiffs' mortgage brokers, have been sued for alleged discrimination.  In the Northern District of Illinois alone, at least a dozen such cases have been filed.  Although Plaintiffs likely will attempt to rely on decisions denying motions to dismiss in some of these actions, they will not be able to cite a single such reported decision where the plaintiff is attempting to impose ECOA and FHA liability on a lender based on fees paid by the

plaintiff directly to the broker; nor can they cite a single such reported decision where the plaintiff challenged the broker's conduct without joining the broker in the case.

> **B.      Mortgage Loans Involving Mortgage Brokers**

Plaintiffs each concede that they did not deal with WMC directly, but chose and employed a mortgage broker to obtain their loans. AC ¶¶ 54-90. A mortgage broker is "[a]n individual or firm that receives a commission for matching mortgage borrowers with lenders." See Office of Thrift Supervision, Exam. Handbook ("OTS Handbook") § 750 (Mortgage Banking), at 174 (July 2007), *available at* http://www.ots.treas.gov/docs/r.cfm?422341.pdf (Exhibit A hereto); accord Dep't of Housing and Urban Dev. Statement of Policy 1999-1 Regarding Lender Payments to Mortgage Brokers ("1999 HUD Policy Statement"), 64 Fed. Reg. 10,080, 10,080-81 (Mar. 1, 1999) (Exhibit B hereto). "[I]n broker lending, the actual origination and discount points charged, as well as the nominal interest rate, are set via negotiations between the borrower and the broker, not the wholesale lender that underwrites the loan." See Stanley D. Longhofer and Paul S. Calem, "Mortgage Brokers and Fair Lending," Federal Reserve Bank of Cleveland (May 15, 1999) (Exhibit C hereto).

Mortgage brokers are separate and independent businesses from the mortgage lenders, with, inter alia, their own employees, practices, costs and prices, and they perform a different service from that of the lender, for which they are compensated through fees paid by the borrower and, in some cases, by the lender. See 1999 HUD Policy Statement, 64 Fed. Reg. at 10,081 (Exhibit B) ("Mortgage brokers provide various services in processing mortgage loans, such as filling out the application, ordering required reports and documents, counseling the borrower and participating in the loan closing."); Real Estate Settlement Procedures Act Statement of Policy 2001-1, 66 Fed. Reg. 53,052, 53,055 (Oct. 18, 2001) ("2001 HUD Policy Statement") (Exhibit D hereto) ("The level of services mortgage brokers provide in particular

transactions depends on the level of difficulty involved in qualifying applicants for particular loan programs.  For example, applicants have differences in credit ratings, employment status, levels of debt, or experience that will translate into various degrees of effort required for processing a loan.").

Mortgage brokers typically work with multiple lenders and "shop" a loan to attempt to obtain terms suitable to their client -- the borrower.  See Mortgage Brokers and Fair Lending (Exhibit C) ("The typical broker deals with several different lenders simultaneously . . ."); 1999 HUD Policy Statement, 64 Fed. Reg. at 10,080-81 (Exhibit B) ("Mortgage brokers generally fit into two broad categories:  those that hold themselves out as representing the borrower in shopping for a loan, and those that simply offer loans as do other retailers of loans.").  Furthermore, many factors may affect the pricing of a mortgage loan originated by a broker, including, inter alia: the borrower's needs as to the amount and type of loan; the borrowers' preferences with respect to the structure of the loan (e.g., whether the borrower prefers to pay more in up-front costs versus a higher interest rate); the borrower's credit profile; the broker(s) with which the borrower worked; the time the broker spent to counsel the borrower, complete an application, and assist the borrower in satisfying all closing conditions; and the lenders to which the brokers(s) "shopped" the borrower's loan application.

As a result, the loan may involve fees paid by the borrower to the broker (i.e., the Broker Fees alleged here), as well as, in some cases, a YSP paid by the lender to the broker (as is alleged to be the case with the Steeles' and Mr. Chavez's loans).  "A yield spread premium is calculated based upon the difference between the interest rate at which the broker originates the loan and the par, or market, rate offered by a lender."  2001 HUD Policy Statement, 66 Fed. Reg. at 53,054 (Exhibit D) ("Payments from lenders to brokers based on the rates of borrowers' loans

are characterized as 'indirect' fees and are referred to as yield spread premiums.").  As further

explained by HUD:

> Yield spread premiums permit homebuyers to pay some or all of the up front
> settlement costs over the life of the mortgage through a higher interest rate.
> Because the mortgage carries a higher interest rate, the lender is able to sell it to
> an investor at a higher price.  In turn, the lender pays the broker an amount
> reflective of this price difference.  The payment allows the broker to recoup the
> up front costs incurred on the borrower's behalf in originating the loan. . . . The
> Department [of Housing and Urban Development] believes, and industry and
> consumers agree, that a yield spread premium can be a useful means to pay some
> or all of a borrower's settlement costs. . . . The yield spread premium thus can be
> a legitimate tool to assist the borrower.

Id. at 53,054.  See also Hirsch v. BankAmerica Corp., 328 F.3d 1306, 1308 (11th Cir. 2003)

(YSPs "can be a useful means to pay some or all of a borrower's settlement costs" as well as "a

legitimate tool to assist the borrower."); accord Schuetz v. Banc One Mortgage Corp., 292 F.3d

1004, 1006 (9th Cir. 2002).

Each of the Broker Fees and YSPs Plaintiffs reference in the Amended Complaint is

specifically itemized and disclosed, as required by federal law, on their HUD-1 forms (settlement

statements), which were attached to the Amended Complaint.  See AC, Exs. 1-4;  see also 24

C.F.R. pt. 3500, App. B, item 13.

### C.    HMDA Data Regarding Mortgage Lending

HMDA requires mortgage lenders to report specified data about certain mortgage loans

and fees.  See Federal Reserve Board, Frequently Asked Questions About the New HMDA Data

(Apr. 3, 2006) ("FRB FAQ") (Exhibit E hereto), at 3-4; see also 12 C.F.R. § 203.4(a)(12).  The

Amended Complaint is replete with references to purported studies and statements related to

2004 and 2005 HMDA data.  See, e.g., AC ¶¶ 14-28.  However, HMDA simply requires

mortgage lenders to report the spread between a loan's annual percentage rate and a Treasury

bond of equivalent maturity, if that spread is greater than three percent (or five percent if a junior

lien mortgage).  See 12 C.F.R. § 203.4(a)(12).  The HMDA data does not include separate information on the fees at issue here -- neither Broker Fees nor YSPs are itemized therein.

Moreover, none of the statements referenced in the Amended Complaint concerns WMC specifically (AC ¶¶ 14-22, 26-28), with only one exception -- the "CRC Report" states that WMC originated a small minority (14%) of the "subprime" loans covered by the study. AC ¶ 23.  Plaintiffs' failure to allege any facts regarding WMC specifically is notable because statistics specific to WMC are publicly available online, see http://www.ffiec.gov/hmdaadwebreport/diswelcome.aspx and the public portions of WMC's Loan Application Register are available upon request.  See 12 C.F.R. § 203.5(c).

In addition, the Federal Reserve Board -- the federal agency charged with, inter alia, prescribing "such regulations as may be necessary to carry out the purposes of HMDA" (12 U.S.C. 2804(a)) -- has stated expressly that disparities in HMDA data do not indicate the existence of discrimination.  See, e.g., Joint Press Release, Board of Governors of the Fed. Reserve Sys. (Apr. 12, 2007) (Exhibit F hereto) ("[I]t is not possible to conclude from HMDA data alone whether a lender is complying with fair lending laws.  The HMDA data do not include many potential determinants of credit decisions and loan pricing, such as the borrower's credit history, the debt-to-income ratio, and the loan-to-value ratio.").

### D.    Plaintiffs' Loans

According to the Amended Complaint, Herbert and Doris Steele (the "Steeles") assertedly selected, contacted, and worked with a mortgage broker, non-party US Mutual Banc Corp ("US Mutual"), to refinance a previous mortgage loan with a loan funded by WMC.  AC ¶¶ 37, 55, 57.  The Steeles paid US Mutual a $2,100 origination fee, a $480 processing fee, and a $275 appraisal fee, and WMC paid US Mutual a YSP of $2,508.  AC ¶ 57.  The principal amount

of the Steeles' loan was $167,200.  AC ¶ 56.  The "discretionary fees" about which Plaintiffs complain thus were 3.2% of the Steeles' total loan amount.

Mr. Chavez selected, contacted, and worked with a mortgage broker, non-party E-Z Home Loans ("E-Z"), to refinance a previous mortgage loan with two loans funded by WMC. AC ¶¶ 37, 65-66.  Mr. Chavez paid a $7,680 origination fee to E-Z, and WMC paid a YSP of $3,840 to E-Z.  AC ¶ 66.  The principal amounts of Mr. Chavez's two loans totaled $480,000. AC ¶ 65.  The "discretionary fees" about which Plaintiffs complain thus were 2.4% of Mr. Chavez's total loan amount.

Ms. Torres selected, contacted, and worked with a mortgage broker, non-party Apex Financial Group ("Apex"), to refinance a previous mortgage loan with two loans funded by WMC.  AC ¶¶ 37, 83.  Ms. Torres paid a $5,500 origination fee to Apex, but does not allege that WMC paid Apex a YSP.  AC ¶ 84.  The principal amount of Ms. Torres's two loans totaled $269,000, (AC ¶ 83), so the "discretionary fees" about which Plaintiffs complain were 2.0% of Ms. Torres's total loan amount.

Ms. Diaz, together with non-party Mari S. Diaz, selected, contacted, and worked with a mortgage broker, non-party Bridgeline Capital Group, Inc. ("Bridgeline"), to refinance a previous mortgage loan with a loan funded by GEMB -- not WMC.  AC ¶¶ 37, 73, 74.  The Diazes paid a $4,990 origination fee and a $995 processing fee to Bridgeline.  AC ¶ 75.  The Amended Complaint does not allege that GEMB paid Bridgeline a YSP.  The principal amount of the Diazes' loan was $522,000 (AC ¶ 74), and the "discretionary fees" about which Plaintiffs complain thus were 1.14% of the Diazes' total loan amount.

Plaintiffs do not allege that any of the "discretionary fees" at issue here were paid to WMC.  To the contrary, they contend that the non-party brokers "impose[d the] additional non-risk-based-charges, including yield spread premiums, and other discretionary fees," and that the

brokers were the recipients of the challenged "discretionary fees," including any Broker Fees or YSP charged in connection with the mortgage loans. See AC ¶¶ 43, 48, 49, 57, 66, 75, 84.

Indeed, the only benefit that Plaintiffs even try to claim accrued to WMC relating to the purported "discretionary fees" is additional revenue potentially generated by a "higher interest rate" assertedly associated with a YSP. See AC ¶ 44. But any such potential benefit necessarily depends on the borrower's repayment behavior, because a borrower must pay the "increased rate" for at least some period of time before the lender will recoup the amount of the YSP paid to the broker. Plaintiffs fail to allege that WMC actually benefited from the alleged higher interest rate imposed by the brokers in connection with the YSPs relating to the Steeles' or Mr. Chavez's loans. And, since Ms. Torres does not even allege that her loan involved a YSP, and Ms. Diaz alleges no loan from WMC at all, Plaintiffs have not alleged any facts showing that WMC actually benefited from a higher interest rate in connection with any of the loans at issue.

Plaintiffs contend, "[o]n information and belief, [that] the Defendants charged [Plaintiffs] a disproportionately greater amount in non-risk-related credit charges than it charges similarly situated white persons." AC ¶¶ 63, 72, 81, 90. However, Plaintiffs fail to allege any facts showing what the average, similarly situated non-minority borrower paid, or what the average minority borrower paid for comparable loans, in comparison to what Plaintiffs paid.

Indeed, while Plaintiffs imply that they are "similarly situated" to each other and to the putative class they seek to represent, their own loans involve: (i) different assortments of fees paid to, and determined by, different brokers, (ii) in amounts that result in widely varying percentages of fees with respect to loan amounts. Thus, as noted above, the loans of two of the Plaintiffs (Ms. Torres and Ms. Diaz) did not involve a YSP. And all of the Plaintiffs' fee percentages differ widely -- with the Steeles' "fee percentage" roughly 280% of that of Ms. Diaz:

| Plaintiff | Broker | Origination Fee | Appraisal Fee | Processing Fee | YSP | Total "discretionary fees" as % of loan amount |
|---|---|---|---|---|---|---|
| Steeles | US Mutual Banc Corp | $2,100 | $275 | $480 | $2,508 | 3.2% |
| Chavez | E-Z Home | $7,680 | | | $3,840 | 2.4% |
| Torres | Apex Mortgage | $5,500 | | | | 2.0% |
| Diaz | Bridgeline Capital Group | $4,990 | | $995 | | 1.14% |

Moreover, although Plaintiffs offer a legal conclusion that the non-party mortgage brokers are WMC's "agents" (AC ¶ 37), they make no factual allegations to support this conclusion, and indeed their own allegations refute any such assertion. Plaintiffs do not allege that any of their brokers worked exclusively with WMC, and they concede that:

- Plaintiffs were the "clients" of the non-party brokers;

- Plaintiffs "provided [their] credit information through a mortgage broker;"

- The non-party brokers communicated financing options, terms and rates to Plaintiffs;

- The non-party brokers were responsible for "setting the credit price"; and

- The non-party brokers "ultimately originate mortgage loans [to Plaintiffs]."

See AC ¶¶ 32, 37, 41, 49.

### E.    Plaintiffs' Claims

Plaintiffs claim that WMC violated the Equal Credit Opportunity Act ("ECOA") and the Fair Housing Act ("FHA") by assertedly establishing "policies for access to their loan products that subject minority financing applicants to a significantly higher likelihood of exposure to discretionary points and fees." See, e.g., AC ¶ 3. Because Plaintiffs concede the mortgage brokers, not WMC, actually "imposed" the alleged "discretionary fees," Plaintiffs resort to two theories for asserting their claims against WMC: (1) Plaintiffs contend that WMC has a "policy" -- which Plaintiffs call the "Discretionary Pricing Policy" -- pursuant to which WMC allegedly "authoriz[es]" mortgage brokers to impose "subjective, additional finance charges" (AC ¶ 100);

and (2) Plaintiffs contend that the mortgage brokers are WMC's "agents," presumably rendering WMC vicariously liable for their conduct (AC ¶ 37).

Plaintiffs seek actual damages, equitable monetary relief, and prospective equitable relief in the form of an injunction and a declaration. Specifically, Plaintiffs seek to recover from WMC fees (or some portion thereof) paid to Plaintiffs' brokers (including a variety of fees paid by the borrower directly to the broker, and the YSP paid by the lender to the broker). See AC at 25, Prayer for Relief ¶ f (seeking "disgorgement . . . of all disproportionate non-risk charges imposed on minorities by the Defendants' Discretionary Pricing Policy"). They also seek expressly to change the non-party brokers' conduct. See AC at 25, Prayer for Relief ¶ c (requesting that the Court "[g]rant a permanent or final injunction . . . enjoining the Defendants, and the Defendants' *agents* . . . from . . . further use of the Discretionary Pricing Policy") (emphasis added); ¶ d (requesting that the Court "[o]rder the Defendants . . . to adopt and enforce a policy that requires appropriate training of the Defendants' employees and its *brokers*") (emphasis added).

## ARGUMENT

## I.    THE COURT SHOULD DISMISS THE AMENDED COMPLAINT IN ITS ENTIRETY FOR FAILURE TO STATE A CLAIM

### A.    Standard For A Motion To Dismiss Pursuant To Rule 12(b)(6)

The Court should dismiss a complaint if the plaintiff has alleged facts that reveal that there is no viable claim, thereby "plead[ing] himself out of court." Soo Line R.R. Co. v. St. Louis Sw. Ry. Co., 125 F.3d 481, 483 (7th Cir. 1997). Likewise, it should dismiss a complaint if plaintiff fails to allege facts showing that it plausibly may be entitled to relief. Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007). See also Limestone Dev. Corp. v. Vill. of Lemont, Ill., 520 F.3d 797, 803-04 (7th Cir. 2008) ("If discovery is likely to be more than usually costly, the complaint must include as much factual detail and argument as may be required to show that the

plaintiff has a plausible claim." (citing <u>Iqbal v. Hasty</u>, 490 F.3d 143, 157-58 (2d Cir. 2007)). "[I]t is not enough for a complaint to *avoid foreclosing* possible bases for relief; it must actually *suggest* that the plaintiff has a right to relief, by providing allegations that 'raise a right to relief above the speculative level.'" <u>EEOC v. Concentra Health Servs., Inc.</u>, 496 F.3d 773, 777 (7th Cir. 2007) (citing <u>Bell Atl. Corp.</u>, 127 S. Ct. at 1965, 1968-69).

While a court must assume that all well-pleaded factual allegations in a complaint are true for purposes of a Rule 12(b)(6) motion, it need not strain to find favorable inferences that are not apparent on the face of the complaint. <u>Coates v. Ill. State Bd. of Educ.</u>, 559 F.2d 445, 447 (7th Cir. 1977). Further, a court should not accept as true any unsupported conclusions of fact, assertions that involve mixed facts and law, or conclusions of law. <u>Young v. Murphy</u>, 90 F.3d 1225, 1233 (7th Cir. 1996); <u>Nelson v. Monroe Reg'l Med. Ctr.</u>, 925 F.2d 1555, 1559 (7th Cir. 1991).

### B. Plaintiffs Have Failed To State A Claim Under The ECOA Or FHA

To state a claim under the ECOA or FHA, Plaintiffs must allege sufficient facts under one of two theories: (1) disparate treatment or (2) disparate impact.[4] Plaintiffs' claims fail under both of these theories.

To state a claim for disparate treatment, Plaintiffs must, <u>inter</u> <u>alia</u>, plead facts showing discriminatory intent, that race "'played a role in [the decision-making] process,'" as well as that race "'had a determinative influence on the outcome.'" <u>Lawhead v. Ceridian Corp.</u>, 463 F. Supp. 2d 856, 862 (N.D. Ill. 2006) (Denlow, Mag. J.) (quoting <u>Hazen Paper Co. v. Biggins</u>, 507 U.S. 604, 610 (1993)); <u>see also</u> Concentra, 496 F.3d at 781 (holding that a plaintiff "must

---

[4] Although it is not asserting this argument in this motion, WMC disputes that either the ECOA or the FHA authorizes disparate impact claims, and it reserves all rights to assert this defense. It further reserves the right to argue, <u>inter alia</u>, that the "discretionary fees" challenged by Plaintiffs do not comprise an appropriate set of loan-related costs for purposes of assessing Plaintiffs' claims.

provide some specific description" of the allegedly illegal conduct, beyond the bare allegation that it was discriminatory or illegal); Bennett v. Matlin, No. 96 C 6915, 1997 WL 757867, at *3 (N.D. Ill. Nov. 26, 1997) (Williams, J.) ("A disparate impact theory differs from disparate treatment because in impact cases the plaintiff need not prove discriminatory intent."). The Amended Complaint alleges no facts whatsoever plausibly suggesting that WMC intended to discriminate. Thus, Plaintiffs cannot proceed on a theory of disparate treatment. See Williams v. S. Ill. Riverboat/Casino Cruises, Inc., No. 06-cv-664-JPG, 2007 WL 3253239, at *3 (S.D. Ill. Nov. 5, 2007) (dismissing disparate treatment claim under Rule 12(b)(6) based on failure to allege facts showing discriminatory intent of defendant).

To state a disparate impact claim, Plaintiffs must plead facts, inter alia:  (1) showing the existence of a purported disparate impact on a protected group, (2) identifying a specific practice or policy adopted by defendant; and (3) showing a causal connection between the challenged practice or policy and the alleged disparate impact. See Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 656-58 (1989), superseded on other grounds by statute, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (1991); Smith v. City of Jackson, Miss., 544 U.S. 228, 241 (2005); Farrell v. Butler Univ., 421 F.3d 609, 616 (7th Cir. 2005); Cerutti v. BASF Corp., 349 F.3d 1055, 1067 (7th Cir. 2003). In addition, Plaintiffs must allege facts showing causal injury to themselves. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) ("[T]he irreducible constitutional minimum of standing" requires, inter alia, for the plaintiff to have "suffered an 'injury in fact' -- an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.") (citations omitted). The Amended Complaint fails to allege facts sufficient to satisfy any of these elements.

1.      **Plaintiffs Have Failed To Allege Facts Showing A Disparate Impact Or Causal Injury/Standing**

To plead a disparate impact, Plaintiffs must, <u>inter alia</u>, state facts indicating (1) what the average minority borrower, and Plaintiffs, paid in "discretionary fees" for their mortgage loans, and (2) that the average, similarly situated non-minority borrower paid less in such fees for comparable loans.  The Supreme Court has noted that "the evidence in these 'disparate impact' cases usually focuses on statistical disparities," <u>Watson v. Fort Worth Bank & Trust</u>, 487 U.S. 977, 987 (1988), and courts regularly dismiss disparate impact claims that fail to allege a statistical disparity.  <u>See, e.g.</u>, <u>Bannister v. Dal-Tile Int'l, Inc.</u>, No Civ. A. 3:02-CV-2498, 2003 WL 21145739, at *2 (N.D. Tex. May 14, 2003) (granting (Rule 12(b)(6) motion because, <u>inter alia</u>, plaintiff failed to allege that the challenged practice or policy had a statistically significant adverse impact); <u>Bennett</u>, 1997 WL 757867, at *4 (granting motion to dismiss where plaintiff failed to provide "meaningful statistical comparison" between qualified persons and those actually hired).  <u>See also</u> <u>Wards Cove</u>, 490 U.S. at 650-51 ("It is such a comparison -- between the racial composition of the qualified persons in the labor market and the persons holding at-issue jobs -- that generally forms the proper basis for the initial inquiry in a disparate-impact case.").

Plaintiffs have failed to provide any factual allegations regarding what the average minority borrower, or the average, similarly situated non-minority borrower, paid in allegedly "discretionary fees" for comparable loans, or how the fees Plaintiffs paid compare to either of these two averages.  Indeed, Plaintiffs allege nothing more on this issue than the following:  "On information and belief, the Defendants charged [each Plaintiff] a disproportionately greater amount in non-risk-related credit charges than it charges similarly situated [non-minority] borrowers."  AC ¶¶ 63, 72, 81, 90.  Not only is this a wholly conclusory assertion, which the Court should not accept under Rule 12(b)(6), but it says nothing whatsoever -- even in

17

conclusory form -- as to whether the *average* minority borrower paid more in "discretionary fees" than the average, similarly situated non-minority borrower for a comparable loan.

Implicitly acknowledging that they must allege some facts regarding the alleged disparate impact, Plaintiffs attempt to fill this hole by citing reports of industry aggregate HMDA data. However, the HMDA data fall far short of what is needed to state a legally cognizable claim. See supra at 9-10.  In particular, the HMDA data do not include itemized information regarding the Broker Fees and YSPs that Plaintiffs challenge here.  See 12 C.F.R. § 203.4(a) (setting forth the HMDA data to be reported); FRB FAQ, Ex. E, at 3-4.  Nor do the studies Plaintiffs cite provide any information specific to fees imposed in connection with loans made by defendant WMC, but rather include only certain aggregate industry data.  AC ¶¶ 14-22, 26-28.  Moreover, as described supra at 10, the Federal Reserve Board has stated expressly that any disparities in HMDA data do not indicate the existence of discrimination.

Finally, the Amended Complaint does not even suggest that the HMDA data provide any basis to conclude that the "discretionary fees" *paid by Plaintiffs* reflect any disparate impact. Indeed, as the chart on page 13, supra, shows, the "discretionary fees" paid by Plaintiffs vary widely, including, inter alia, as to the type of fee(s) charged and as to overall percentage of loan amount.

Thus, Plaintiffs have failed to allege any basis for a claim of a disparate impact, or any standing to assert such a claim.  See Collette v. St. Luke's Roosevelt Hosp., 132 F. Supp. 2d 256, 277 (S.D.N.Y. 2001) (dismissing employee's claims for disparate impact for failure to allege "any 'significant' disparate impact, or indeed, any meaningful impact at all"); Lujan, 504 U.S. at 562 (reversing denial of summary judgment because of lack of standing and stating Plaintiffs "had not made the requisite demonstration of (at least) injury and redressability").

This Court (Kendall, J.) recently dismissed a complaint asserting ECOA and FHA claims with respect to YSPs. In Tribett v. BNC Mortgage, Inc., No. 07 C 2809, 2008 WL 162755, at *3 (N.D. Ill. Jan. 17, 2008), the plaintiffs alleged that "'[YSPs] disproportionately impact minority borrowers, such as themselves'" and that the "'payment and receipt of [YSPs] results in loan terms . . . [that] are intended to discriminate or have the effect of discriminating against Hispanic or African American borrowers.'" Id. at *2 (quoting Tribett complaint). On defendants' motion to dismiss, the Court held that plaintiffs' complaint stated "mainly vague and conclusory allegations that do not establish a plausible entitlement to relief under the FHA or the ECOA . . . ." Id. at *3. A fortiori, Plaintiffs' allegations here likewise fail to state a claim.

Faced with this recent authority, Plaintiffs likely will cite a number of recent decisions of this Court, including Ware v. Indymac Bank, FSB, 534 F. Supp. 2d 835 (N.D. Ill. 2008) (Bucklo, J.), which have denied motions to dismiss ECOA and FHA claims. None of the reported decisions to date are persuasive here, however, because not one of them analyzes all of the arguments presented by WMC in this motion. Moreover, each of them is distinguishable in light of the facts and claims alleged.

For instance, Ware is highly distinguishable and, to the extent it fails to follow Tribett, was wrongly decided. Ware -- which included both the lender and the broker as defendants -- appears to involve allegations of broker misconduct, as well as additional claims not alleged here. See id. at 838-39 (e.g., broker allegedly falsified information on loan application). Moreover, the court in Ware did not address the arguments WMC makes here; the only arguments of the lender that the Court addressed with respect to the FHA and ECOA claims against the lender were that plaintiffs had asserted "bare legal conclusions without any

supporting facts," "received a higher loan amount, thus belying any claim of discrimination" and that the lender "should not be subjected to costly discovery."  See id. at 840.[5]

Indeed, the Ware case militates in favor of dismissal here.  While the complaint involved in the motion to dismiss decision in Ware asserted an ECOA claim only with respect to YSPs (id. at 840), plaintiffs subsequently sought to amend their complaint to add allegations that, inter alia, fees paid by plaintiffs directly to their mortgage broker (e.g., origination fees and processing fees) were greater than the fees charged by the broker to white borrowers, and that the defendant lender's "policies not only permitted but fostered this discrepancy in the loans it originated" through brokers.  See Ware v. Indymac Bank, FSB, No. 1:07-cv-01982, Motion for Leave to File Amendments to Conform to the Evidence; Alternatively, Plaintiffs' Motion for Leave to File Second Amended Complaint, Ex. A (Proposed Amended Complaint), ¶ 32.  The Ware court rejected this effort, holding that plaintiffs could not expand their ECOA and FHA claims "to include alleged discrimination in 'broker compensation,'" stating that the proposed allegations "are too conclusory to survive a motion to dismiss.  Furthermore at oral argument, plaintiffs' counsel stated that he did not have any evidence to support the claim."  See Ware v. Indymac Bank, No. 1:07-cv-01982, Minute Entry (Apr. 28, 2008).

### 2.    Plaintiffs Have Failed To Allege Facts Showing A Specific Practice Or Policy Of Defendant

To state a claim for disparate impact, Plaintiffs also must state facts identifying a *specific* policy or practice of *on the part of the defendant* that creates the requisite statistical disparities. See Smith, 544 U.S. at 241 ("failure to identify the specific practice being challenged is the sort

---

[5] Other recent "mortgage discrimination" decisions that have survived motions to dismiss are likewise distinguishable and/or wrongly decided.  See Newman v. Apex Financial Group. Inc., No. 07 C 4475, 2008 U.S. Dist. LEXIS 2249 (N.D. Ill. Jan. 11, 2008) (Der-Yeghiayan, J.), and Martinez v. Freedom Mortgage Team, Inc., 527 F. Supp. 2d 827, 833 (N.D. Ill. 2007) (Shadur, J.), which, inter alia: (i) involve claims against lenders and mortgage brokers relating to YSPs (not fees paid directly by the borrowers to their brokers); (ii) contain allegations of broker misconduct (e.g., fraud) not present here; and (3) did not address many of the arguments made here.

of omission that could 'result in employers being potentially liable for the myriad of innocent causes that may lead to statistical imbalances'") (quoting Wards Cove, 490 U.S. at 657); Watson, 487 U.S. at 994; Prince v. Rice, 453 F. Supp. 2d 14, 27 (D.D.C. 2006) (dismissing employment discrimination claim because even under a "generous reading of her factual allegations," plaintiff failed to identify a specific employment practice that assertedly caused a disparate impact).

The alleged "policy" here is that WMC assertedly "permits" independent businesses to charge their own clients what they want for performing services for those clients. However, the mere presence of decision-making on the part of the broker -- which Plaintiffs have attempted to impute to WMC by using a manufactured term, "Discretionary Pricing Policy" -- is simply too generalized to amount to a legally cognizable "policy" or "practice" of WMC to support a claim of disparate impact.

In Kulkarni v. City University of New York, No. 01 Civ. 10628, 2002 WL 1315596 (S.D.N.Y. June 14, 2002), plaintiff brought a claim under Title VII alleging that two purported policies of the City University of New York's organizational model for its doctoral faculty -- the "Consortial Arrangement" and "Allocation System" -- had a disparate impact. As the Court explained: "The CUNY Graduate Center 'Cons[ort]ial Arrangement' is a practice in which defendants divide the CUNY doctoral faculty into two groups: 1) the Graduate Center Faculty; and 2) the College-based Faculty. . . . The 'Allocation System' of the CUNY Graduate Center is the financial 'scheme' or policy that implements the 'Consortial Arrangement.'" Id. at *1. The court granted the defendant's 12(b)(6) motion with regard to plaintiff's disparate impact claim, stating that these were not *specific* policies for the purposes of disparate impact analysis, but, rather, merely part of the organizational structure of the defendant. "'Simply gesturing towards the hiring process as a whole will not satisfy the requirement that the plaintiff identify a specific employment practice that is the cause of' the disparate impact.'" Id. at *1 (quoting Byrnie v.

Town of Cromwell, Bd. of Educ., 243 F.3d 93, 111 (2d Cir. 2001)); EEOC v. Honda of Am., Mfg., Inc., No. 2:06-cv-00233, 2007 WL 1541364, at *4-*5 (S.D. Ohio May 23, 2007) (dismissing disparate impact claims under rule 12(b)(6) where plaintiff failed to identify a specific policy or practice that led to the disparate impact); Fulcher v. City of Wichita, 445 F. Supp. 2d 1271, 1276-77 (D. Kan. 2006) (same).

Similarly here, the purported "Discretionary Pricing Policy" is not a specific policy or practice, any more than is the fact that a wholesaler of goods may "allow" retailers to re-sell products at prices of their choosing.  See AFSCME v. Washington, 770 F.2d 1401, 1406 (9th Cir. 1985) (holding that the purported policy of allowing competitive market forces to govern state employee compensation was too vague and nonspecific to constitute a "policy" for purposes of a disparate impact claim).  Rather, it simply notes the existence of the independent mortgage broker in the mortgage origination process, and constitutes an attack on the fees that, under Plaintiffs' allegations, the mortgage broker collects in its own discretion and pursuant to its own negotiations and own pricing policies.  See supra at 13.  Moreover, Plaintiffs were fully aware of the fees they were paying for the services involved with their loans, as each of the "discretionary fees" challenged by Plaintiffs is specifically itemized and disclosed on each of their HUD-1 forms (settlement statements).  See AC, Exs. 1-4; see also 24 C.F.R. pt. 3500, App. B, item 13 ("The mortgage broker's fee must be itemized in the Good Faith Estimate and on the HUD-1 Settlement Statement. . . . [A]lso, any other fee or payment received by the mortgage broker from either the lender or the borrower arising from the initial funding transaction, including a servicing release premium or yield spread premium, is to be noted on the Good Faith Estimate and listed in the 800 series of the HUD-1 Settlement Statement.").

Therefore, the Court should dismiss the Amended Complaint for this reason as well.  See Smith, 544 U.S. at 241; Watson, 487 U.S. at 994.

> **3.     Plaintiffs Have Failed To Allege Facts Showing A Causal Connection Between Any Specific Policy Or Practice Of Defendant And The Alleged Disparate Impact**

Plaintiffs also must allege facts showing that WMC's purported "Discretionary Pricing Policy" caused the alleged disparate impact, i.e., "that the disparity they complain of is the result of one or more of the . . . practices that they are attacking here, specifically showing that each challenged practice has a significantly disparate impact."  Wards Cove, 490 U.S. at 657; see also Brown v. Coach Stores, Inc., 163 F.3d 706, 712 (2d Cir. 1998) ("Brown's allegations of disparate impact fail because they do not adequately allege a causal connection between any facially neutral policy at Coach and the resultant proportion of minority employees."); Prince, 453 F. Supp. 2d at 27 (granting motion to dismiss and stating "[t]here is likewise no mention of the existence of any statistical or empirical data that may support causation"); Trezza v. Hartford, Inc., No. 98 CIV. 2205(MBM), 1998 WL 912101, at *8 (S.D.N.Y. Dec. 30, 1998) ("[E]ven accepting arguendo that the disparity between the sexes at the Managing Attorney level otherwise would be sufficient to state a disparate impact claim, plaintiff has alleged no fact that suggests this disparity was caused by discrimination."); Bennett, 1997 WL 757867, at *4 (granting motion to dismiss and stating, "the statistical disparities must sufficiently substantiate [the] inference of causation").

Here, although Plaintiffs allege, in conclusory fashion, that WMC's purported "policy" "caused" the asserted "disparate impact" (AC ¶ 46), they assert no facts whatsoever to support this conclusion.  To the contrary, their own allegations demonstrate that any purported disparate impact was caused by other factors, including, inter alia, the needs and preferences of Plaintiffs and the conduct of the mortgage brokers in interaction with the Plaintiffs.  See supra at 13 (collecting Plaintiffs' allegations regarding their dealings with the brokers); 2001 HUD Policy Statement, 66 Fed. Reg. at 53,053-54 (Exhibit D) (stating that yield spread premiums are one of a number of ways a borrower may choose to pay some or all of their closing costs, depending on

their needs and/or preferences); <u>see also</u> <u>Schuetz v. Banc One Mortgage Corp.</u>, 292 F.3d 1004, 1006 (9th Cir. 2002) ("Borrowers typically approach the mortgage settlement process with a variety of individual characteristics and needs, including their credit rating, income, sensitivity to interest rate variations, and preference for paying charges up front or spreading them out in the form of a higher interest rate.").

Indeed, Plaintiffs' own loans -- which vary widely in form and percentage of "discretionary fees" -- unequivocally confirm their inability to plead the requisite causation. While the Amended Complaint includes a challenge to YSPs, the loans of two of the four Plaintiffs did not, under Plaintiffs' allegations, involve YSPs.  In addition, Ms. Diaz allegedly paid "discretionary fees" to Bridgeline amounting to 1.14% of her loan amount, whereas the Steeles paid such fees to US Mutual amounting to almost three times as much as a percentage of their loan amount.

The Amended Complaint thus also should be dismissed in its entirety for failure to satisfy this causation element of a disparate impact claim, as well for failure to allege the causal injury necessary to support a private action here.  <u>See, e.g.</u>, <u>Wards Cove</u>, 490 U.S. at 651-53; <u>Bell Atl. Corp.</u>, 127 S. Ct. at 1964-65; <u>Lujan</u>, 504 U.S. at 560.

**4.      Plaintiffs Have Failed To Allege Facts Showing That Any Of Plaintiffs' Brokers Was An Agent of WMC**

Plaintiffs also attempt to hold WMC liable for the non-party brokers' conduct under the theory that the brokers are "agents" of WMC.  This effort likewise is unsuccessful, due to Plaintiffs' failure to allege any facts upon which such agency may be found.  <u>See</u> <u>Tribett v. BNC Mortgage, Inc.</u>, No. 07 C 2809, 2008 WL 162755, at *4 (N.D. Ill. Jan. 17, 2008) (Kendall, J.) (dismissing claims against lender based on agency theory where plaintiff failed to plead sufficient facts to create inference of agency relationship between lender and mortgage broker); <u>cf.</u> <u>Rand Bond of N. Am., Inc. v. Saul Stone & Co.</u>, 726 F. Supp. 684, 686-87 (N.D. Ill. 1989)

(Shadur, J) (dismissing under Rule 12(b)(6) Commodities Exchange Act claim for fraud against wrongdoer's alleged principal due to absence of factual allegations from which agency relationship could be inferred).

In Rand Bond, the court emphasized that:

> [A]gency is a legal relationship whose existence flows from *facts*. And though federal practice involves a notice-pleading regime rather than the fact pleading demanded by Illinois courts, it remains incumbent on the pleader to allege *some* factual predicate (even though generalized rather than evidentiary in nature) to create the inference contained in Rand Bond's bald "agency" assertions. No such facts have been alleged here, and consequently both [of] Rand Bond's agency-based claims . . . must be dismissed.

726 F. Supp. at 687 (citation omitted).

In particular, to support their agency theory Plaintiffs must -- but have failed to -- allege facts showing a fiduciary relation between WMC and the non-party brokers resulting from (1) consent by WMC that the mortgage broker shall act on WMC's behalf and subject to WMC's control, and (2) consent by the mortgage broker so to act.[6] See, e.g., Restatement (Third) of Agency § 1.01 (2006) ("Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to so act."). Plaintiffs' Amended Complaint is devoid of any allegations of fact showing that WMC agreed that any of the mortgage brokers could act on its behalf, that any of the brokers are subject to WMC's control, or that any of the brokers consented to act on behalf of WMC pursuant to its control. Plaintiffs have likewise failed to allege any facts showing that WMC manifested to each Plaintiff, and that each Plaintiff reasonably believed, that his or her

---

[6] Plaintiffs do not state what law of agency they contend would apply to determine whether each of the non-party brokers is the agent of WMC. Thus, for purposes of this brief only, WMC will assume arguendo that the principles set forth in the Restatement (Third) of Agency apply.

broker had the authority to act on behalf of WMC.  See, e.g., Restatement (Third) of Agency §2.03 (2006) ("Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.")  See also Tribett, 2007 WL 162755, at *4 ("To plead the existence of an agency relationship, the plaintiff must 'allege some factual predicate . . . to create the inference' of agency. . . .  This alleged [YSP] payment, standing alone, is insufficient to create the inference of an agency relationship -- either actual or apparent . . . .") (citation omitted).

To the contrary, under Plaintiffs' own allegations, the "discretionary fees" at issue here were charged at the discretion of the *broker* -- not WMC.  See, e.g., AC ¶ 43.  Plaintiffs' "Discretionary Pricing Policy" allegations thus directly contradict any conclusion that WMC controlled the broker's conduct, and that the brokers assented to such control.  See, e.g., Richardson v. New Century Mortg. Corp., No. Civ.A. 2:03CV372PA, 2005 WL 1554026, at *9 (N.D. Miss. July 1, 2005) ("[I]t would be unusual to perceive a mortgage broker as an agent of a lender, especially one lender among many that he routinely solicits loans from on behalf of the broker's client.")); see also OTS Handbook (Ex. A) § 750. at 174.  Thus, Plaintiffs have failed to state, and indeed have pleaded themselves out of, any agency-based claim against WMC.

### C.  Ms. Diaz's Claims Should Be Dismissed Against WMC In Their Entirety Because She Alleges No Dealings With WMC

The Amended Complaint alleges that GEMB was the lender on Ms. Diaz's mortgage loan, and does not allege any WMC involvement in connection with Ms. Diaz's loan.  See AC ¶¶ 74-81.  The Court should dismiss Ms. Diaz's claims as to WMC for this reason as well. See, e.g., Concentra, 496 F.3d 773; Bell Atl. Corp., 127 S. Ct. at 1964-69.

## II.    THE ABSENT MORTGAGE BROKERS ARE NECESSARY PARTIES TO THIS ACTION

If the Court does not dismiss the Amended Complaint under Rule 12(b)(6), WMC alternatively moves the Court, pursuant to Rules 12(b)(7) and 19, to join Plaintiffs' mortgage brokers -- US Mutual, E-Z Home, Bridgeline and Apex -- whose conduct is at the heart of this action.  Rule 12(b)(7) provides that a "party may assert the following defenses by motion:  . . . failure to join a party under Rule 19."  Fed. R. Civ. P. 12(b)(7).  Pursuant to Fed. R. Civ. P. Rule 19(a)(1), a party is necessary and should be joined if feasible if:

> (A)    in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B)    that person claims an interest relating to the subject matter of the action and is so situated that disposing of the action in the person's absence may:
>
> > (i)    as a practical matter impair or impede the person's ability to protect the interest; or
> >
> > (ii)   leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

While WMC need only show that the absent mortgage brokers are necessary parties pursuant to one of these categories, Plaintiffs' allegations show that at least two of the criteria set forth in Rule 19(a)(1) have been met.  Cont'l Ins. Co. v. Loewen Group, Inc., No. 96 CV 1427, 1998 WL 142380, at *13 (N.D. Ill. Mar. 17, 1998) (Manning J.); see also Hashop v. Fed. Home Loan Mortgage Corp., 171 F.R.D. 208, 211 (N.D. Ill. 1997); (Zagel, J.); Rhone-Poulenc, Inc. v. Int'l Ins. Co., 877 F. Supp. 1170, 1174 (N.D. Ill. 1995) (Conlon, J.).

### A.    The Mortgage Brokers' Interests Will, As A Practical Matter, Be Affected By The Outcome Of This Action

First, the brokers are necessary parties because "disposing of the action in [their] absence may as a practical matter impair or impede [their] ability to protect [their] interest[s]."  Fed. R. Civ. P. 19(a)(1)(B)(i).  See Mora v. McDonald's Corp., No. 96 C 5957, 1997 WL 102546, at *6

(N.D. Ill. Mar. 6, 1997) (Castillo, J.) (quoting <u>Cas. Indem. Exch. v. Vill. of Crete</u>, 731 F.2d 457, 461 (7th Cir. 1984)) ("The Seventh Circuit has held that 'Rule 19 requires us to look beyond whether a non-party would technically be bound and to consider whether the judgment would 'as a practical matter' impair the non-party's interest.'").

In <u>Hashop</u>, this Court (Zagel, J.) dismissed a putative class action against Federal Home Loan Mortgage Corporation (a/k/a Freddie Mac), in which the plaintiffs challenged allegedly excessive escrow payments charged by mortgage loan servicers, due to the plaintiffs' failure to join the servicers. 171 F.R.D. at 211. Freddie Mac had contracted with the servicers to "collect the monthly mortgage payments," "maintain[] the escrow accounts," and "determine[] how much money to collect and hold in the account" <u>Id.</u> at 210-11. In response to Freddie Mac's argument, the <u>Hashop</u> plaintiffs argued that they had sued Freddie Mac "on [its] own contractual obligations," and therefore "the servicers [were] not indispensable parties to a contract to which they [were] not a party." <u>Id.</u> at 213. The <u>Hashop</u> court rejected the plaintiffs' argument.

The <u>Hashop</u> court decided that the absent servicers have legal rights and future income at stake even though they were not parties, and stated that "a judgment against [defendant] cannot be entered unless this Court finds that the [absent] servicers engaged in a widespread and deliberate practice of overescrowing since the servicers are the ones that administer the accounts, not [defendant]." <u>Id.</u> at 212. The court also stated: "If this case proceeds without the servicers and it is found that overescrowing occurred, the servicers' future escrowing practices will have to change. As a result, the servicers will collect less money from the mortgagees and in turn will generate less income for the servicing companies." <u>Id.</u> at 212; <u>see also</u> <u>United States ex rel. Hall v. Tribal Dev. Corp.</u>, 100 F.3d 476, 478 (7th Cir. 1996) (affirming district court's determination that absent Indian Tribe, which could not be joined due to sovereign immunity, was necessary and indispensable party to action seeking rescission of contract to which Tribe was a party);

Acton Co. v. Bachman Foods, Inc., 668 F.2d 76, 78 (1st Cir. 1982) ("Even if [the absent party] would not be legally bound [by the prior ruling], an adverse ruling would be a persuasive precedent in a subsequent proceeding, and would weaken [the absent party's] bargaining position for settlement purposes . . . [or] 'impair or impede' [the absent party's] ability to protect its interests in this matter.").

Similarly here, the absent mortgage brokers have legal rights and obligations that, as a practical matter, could be directly impacted by a judgment in this case. The alleged "policy" that assertedly causes discrimination is one of "permitting" the brokers to charge their customers what they want. Thus, if Plaintiffs were to succeed in their claims, the brokers' conduct may (whether expressly or implicitly) be found to be in violation of the ECOA and FHA, and such a judgment could affect both their extant contracts and their ability to collect "discretionary fees" in the future. See Hashop, 171 F.R.D. at 212 ("the protection of an absent party's significant financial interests is also recognized as a determinative factor").

Furthermore, the Amended Complaint explicitly requests relief directed at changing the brokers' conduct. See AC at 25, Prayer for Relief ¶ c (requesting that the Court "[g]rant a permanent or final injunction . . . enjoining the Defendants, and the Defendants' *agents* . . . from . . . further use of the Discretionary Pricing Policy or any other non-risk-related discretionary pricing policy employed by the Defendants") (emphasis added); ¶ d (requesting that the Court "[o]rder the Defendants . . . to adopt and enforce a policy that requires appropriate training of the Defendants' employees and its *brokers*") (emphasis added). See Thompson v. Jiffy Lube Int'l Inc, No. 05-1203-WEB, 2006 U.S. Dist. LEXIS 39113, at *58-*59 (D. Kan. June 13, 2006) (ordering joinder of absent franchisee and stating, "the court does not see how the injunctive [relief] requested -- an order to prohibit the deceptive conduct allegedly engaged in by the franchisee -- could be granted in the absence of the franchisee"). It is thus indisputable that, "as

a practical matter," disposing of this action without the mortgage brokers may impair their interests.  See Fed. R. Civ. P. 19(a)(1)(B)(i); Hashop, 171 F.R.D. at 211.

### B.    Complete Relief Cannot Be Accorded Without The Mortgage Brokers

In addition, complete relief cannot be accorded in the absence of the mortgage brokers. See Fed. R. Civ. P. 19(a)(1)(A).  In analyzing this factor, it is necessary to look at the role that "[the defendants] and the [absent parties] play in relation to the plaintiffs, the claims against [the defendants], and the nature of the relief requested."  Hashop, 171 F.R.D. at 211.  The Hashop court noted that complete relief could not be accorded where "the party who maintains the practical control over the actions at issue is not a party to the suit." Id. (citations omitted).  The court further noted that "[t]his is particularly true where plaintiffs seek to impose liability on a party not for its own positive acts but for the positive acts of another not joined in the suit." Id. (citations omitted).  This case falls squarely within the criteria discussed in Hashop.

First, according to Plaintiffs' allegations, the absent mortgage brokers were the ones who met with, assisted, discussed and negotiated with Plaintiffs regarding their loans and the amounts to be paid on them.  See, e.g., AC ¶ 37; see also supra at 13.  Plaintiffs had direct contact with the absent mortgage brokers, not WMC, and are directly challenging fees imposed by, and directly or indirectly paid to, the mortgage brokers.  AC ¶¶ 57, 66, 75, 84.  Thus, the mortgage brokers "maintain practical control over" the conduct at issue in the Amended Complaint -- i.e., the exercise of their "discretion" to impose the challenged fees.

Second, Plaintiffs assert that WMC's purported "policy" was carried out *through* [its] authorized mortgage brokers."  See AC ¶ 37 (emphasis added).  Thus, Plaintiffs seek to "impose liability on" WMC "for the positive acts of" the brokers who are "not joined in the suit." Hashop, 171 F.R.D. at 211.  Indeed, as described above, Plaintiffs seek orders that WMC take certain purported remedial measures with respect to all of the brokers with which it deals.  Given

the critical role of the brokers in the transactions at issue in this lawsuit, it is impossible for the Court to grant "complete relief" in their absence.  See Loewen Group, 1998 WL 142380, at *13.

Thus, the brokers are necessary parties to Plaintiffs' claims and should have been joined by Plaintiffs.  Accordingly, the Court should order Plaintiffs to join the brokers, or face dismissal under Rules 12(b)(7) and 19(b) if they do not.  See Loewen Group, 1998 WL 142380, at *13 (citing Moore v. Ashland Oil, Inc., 901 F.2d 1445, 1447 (7th Cir. 1990)); accord Tribal Dev. Corp., 100 F.3d at 478.

**III.  THE COURT SHOULD STRIKE PLAINTIFFS' ALLEGATIONS AIMED AT TOLLING THE STATUTE OF LIMITATIONS BECAUSE, INTER ALIA, EACH OF THE PLAINTIFFS' CLAIMS IS ALLEGED TO BE TIMELY WITHOUT RESORT TO TOLLING**

Both the ECOA and FHA impose a two-year statute of limitations for bringing a civil action.  See 15 U.S.C. § 1691e(f) (ECOA); 42 U.S.C. § 3613(a)(1)(A) (FHA).  The Amended Complaint was filed on April 3, 2008, and, according to Plaintiffs' allegations, they each closed on the loans at issue, and thus their claims accrued, on April 4, 2006 or later.  See AC ¶¶ 55, 74, 83 and AC Ex. 3.  Accordingly, all of Plaintiffs' claims are alleged to be timely without resort to tolling of the statute of limitations, and the Court should strike paragraphs 91-96 of the Amended Complaint, pursuant to Federal Rule of Civil Procedure 12(f) as immaterial to Plaintiffs' claims. See Fed. R. Civ. P. 12(f) ("The court may strike from a pleading . . . any . . . immaterial . . . matter."); see also Heller Fin., Inc. v. Midwhey Powder Co., 883 F.2d 1286, 1294 (7th Cir. 1989) (granting motion to strike where it would "remove unnecessary clutter from the case," and "serve to expedite" proceedings).

Even if, arguendo, there were a basis to permit Plaintiffs to allege tolling even though they contend their claims are otherwise timely (which there is not), the Court should strike Plaintiffs' allegations as to fraudulent concealment because the allegations fail to meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which applies to

allegations of fraudulent concealment.  <u>See</u> Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); <u>see, e.g.</u>, Beauchem v. Rockford Products Corp., No. 01 C50134, 2003 WL 1562561, at *3 (N.D. Ill. Mar. 24, 2003) (Reinhard, J.) (fraudulent concealment must be pled with particularity, including the "who, what, when and where of the alleged fraudulent concealment").

Likewise, the Court should strike Plaintiffs' allegations aimed at invoking the "discovery rule," because the discovery rule does not apply to ECOA claims, in light of Congress' purposeful modifications to the statute that "make allowances for the difficulty of plaintiffs' discovering ECOA violations."  <u>Claybrooks v. Primus Auto. Fin. Servs., Inc.</u>, 363 F. Supp. 2d 969, 975-77 (M.D. Tenn. 2005) (holding that "the language of the statute and the apparent intent of Congress in amending 15 U.S.C. § 1691e(f) preclude application of a general discovery rule" to ECOA claims) (citing <u>TRW Inc. v. Andrews</u>, 534 U.S. 19, 28 (2001) (holding that the discovery rule may not be applied to claims under the federal Fair Credit Reporting Act where the statute "does not govern an area of the law that cries out for application of a discovery rule, nor is the statute 'silent on the issue' of when the statute of limitations begins to run," thus "evinc[ing] Congress' intent to preclude judicial implication of a discovery rule").  The discovery rule likewise does not apply to FHA claims, in light of the language of that statute. <u>Moseke v. Miller and Smith, Inc.</u>, 202 F. Supp. 2d 492 (E.D. Va. 2002).

## IV.    THE COURT SHOULD STRIKE PLAINTIFFS' PRAYERS FOR DISGORGEMENT AND RESTITUTION BECAUSE SUCH RELIEF IS NOT AVAILABLE AS A MATTER OF LAW

The Court also should strike Plaintiffs' prayers for equitable monetary relief in the form of "disgorgement" under ECOA § 1691e(c), and "restitution" under FHA § 3613(c), because such remedies are not available as a matter of law.  <u>See</u> AC at 25, Prayer for Relief ¶ f.  While

both the ECOA and FHA address equitable relief generally, 15 U.S.C. § 1691e(c), 42 U.S.C. § 3613(c)(1), neither expressly provides for equitable *monetary* relief.

Moreover, both statutes provide for legal remedies in the form of actual and punitive damages, as well as the right to recover a reasonable attorney's fee. See 15 U.S.C. §§ 1691e(a), (b), (d); 42 U.S.C. §§ 3613(c)(1), (2). It is axiomatic that equitable relief is available only where Plaintiffs do not have an adequate remedy at law. See Morales v. Trans World Airlines, Inc., 504 U.S. 374, 381 (1992) ("It is a basic doctrine of equity jurisprudence that courts of equity should not act . . . when the moving party has an adequate remedy at law . . . .") (citation omitted). Because both the ECOA and FHA expressly provide for legal remedies -- which remedies Plaintiffs seek here -- the Court should strike Plaintiffs' requests for equitable monetary relief from their Amended Complaint. See AC at 25, Prayer for Relief ¶¶ f, g; see also Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 386 (7th Cir. 1984) ("The absence of an adequate remedy at law is a precondition to any form of equitable relief.").

## CONCLUSION

Defendant WMC respectfully requests that the Court dismiss with prejudice Plaintiffs' claims against it pursuant to Fed. R. Civ. P. 12(b)(6). If the Court does not dismiss the Amended Complaint in its entirety, WMC respectfully requests that this Court (i) order Plaintiffs to join the absent mortgage brokers as necessary parties or face dismissal of the Amended Complaint, pursuant to Fed. R. Civ. P. 12(b)(7) and 19, (ii) strike Plaintiffs' allegations relating to tolling the statute of limitations, and Plaintiffs' prayers for disgorgement and restitution, pursuant to Fed. R. Civ. P. 12(f), and (iii) to grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

WMC Mortgage LLC,

By its attorneys,


Dated: July 11, 2008

s/ James L. Thompson_____
James L. Thompson - 6199621
Justin C. Steffen
JENNER & BLOCK, LLP
330 N. Wabash Avenue
Chicago, IL 60611
Telephone: (312) 222-9350
Facsimile: (312) 527-0484

Denise L. Plunkett
DICKSTEIN SHAPIRO LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 277-6500
Facsimile: (212) 277-6501

# EXHIBIT  A

Office of Thrift Supervision, Exam. Handbook
§ 750 (Mortgage Banking), pages 750.1, 750.174
(July 2007)  ("OTS Handbook")

# Other Activities                                     Section 750

## Mortgage Banking

This Handbook Section provides an introduction to mortgage banking followed by specific guidance in each of the following areas:

- Production

- Secondary marketing

- Hedging

- Servicing

- Earnings

- Accounting practices

- Capital.

It also includes regulatory references, a glossary, and an Examination Program. You can use this Handbook Section in its entirety for a comprehensive review of all mortgage-banking operations or refer to specific guidance to examine a particular area.

**L I N K S**

🗁 Program

The Mortgage Banking section covers single-family residential mortgage banking and multifamily servicing. It does not address multifamily or commercial mortgage banking, which are specialized activities that few mortgage banking firms conduct.

The remaining part of this introduction describes the basics of mortgage banking, introduces some of its common terminology, and outlines OTS's general expectations for savings associations in the identification, assessment, and management of the risks of this activity. We discuss other important mortgage banking terms, functions, and areas in the appropriate mortgage banking sections that follow this introduction. The Glossary includes definitions of all mortgage banking terminology, agencies, and related items, which you will find at the end of this Handbook Section.

### MORTGAGE BANKING BASICS

Mortgage banking involves the origination, sale, and servicing of mortgages. The fees on each transaction are generally small so the mortgage banker must process large volumes to generate reasonable profits. In processing a large volume of transactions, mortgage bankers must monitor the

# Other Activities                           Section 750

**MBA – Mortgage Bankers Association** – The national association representing the mortgage banking business.

**MBA Cost Study Report** – The annual report provides analysis of income and costs associated with origination, warehousing, marketing, and servicing.

**MBS – Mortgage Backed Security** – An investment instrument backed by mortgage loans as security. Ownership is evidenced by an undivided interest in a pool of mortgages or trust deeds. Cash inflows from the underlying mortgages are used to pay interest and principal on the securities. (Note – OTS's TFR instructions refer to this as an MPS or mortgage pool security.)

**MBSCC (MBS Clearing Corporation)** – The book entry depository for GNMA MBS.

**MERS** – Stands for the Mortgage Electronic Registrations System. MERS is a separate corporation that acts as the nominee for the lender and any of the lenders successors. MERS is the mortgagee and the loan is registered in the MERs system. When the loan is sold, the MERS system records the transaction but MERS remains as the mortgagee.

**Mortgage Banker** – An individual or firm that originates, purchases, sells, and/or services loans secured by mortgages on real property.

**Mortgage Broker** – (See Broker and Loan Broker) An individual or firm that receives a commission for matching mortgage borrowers with lenders. Mortgage brokers typically do not fund the loans they help originate.

**Mortgage Derivative Product (MDP)** – see CMO.

**Mortgage Insurance (MI) or Private Mortgage Insurance (PMI)** – Insurance coverage that protects mortgage lenders or investors in the event the borrower defaults. By absorbing some of the credit risk, MI allows lenders to make loans with lower down payments. The federal government offers MI for FHA loans; private companies offer MI for conventional loans. See also private mortgage insurance.

**Mortgage Pool** – A group of mortgage loans with similar characteristics that are combined to form the underlying collateral of a mortgage-backed security.

**Mortgage Servicing Rights (MSR)** – The right to service a mortgage loan or a portfolio of loans. The cost associated with acquiring these rights from other institutions may be capitalized under certain circumstances. The terms MSA and MSL (Mortgage Servicing Asset and Liability, respectively) are generally used only by the accounting world, to refer to the balance sheet item. The rest of the mortgage industry, banking industry, capital markets use the term MSR to refer to the right to be paid to service loans for other investors.

**MTA (Monthly Treasury Average)** – This index is the 12-month moving average of the monthly average yields of U.S. Treasury securities adjusted to a constant maturity of one year. It is calculated by averaging the previous 12 monthly values of the 1-Year Constant Maturity Treasury.

# EXHIBIT  B

Dep't of Housing and Urban Dev. Statement of
Policy 1999-1 Regarding Lender Payments to
Mortgage Brokers, 64 Fed. Reg. 10,080
(Mar. 1, 1999) ("1999 HUD Policy Statement")



Monday
March 1, 1999

Part IV

# Department of Housing and Urban Development

**24 CFR Part 3500**
**Real Estate Settlement Procedures Act (RESPA) Statement of Policy 1999–1 Regarding Lender Payments to Mortgage Brokers; Final Rule**

**10080**    Federal Register / Vol. 64, No. 39 / Monday, March 1, 1999 / Rules and Regulations

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**24 CFR Part 3500**

**[Docket No. FR–4450–N–01]**

**RIN 2502–AH33**

**Real Estate Settlement Procedures Act (RESPA) Statement of Policy 1999–1 Regarding Lender Payments to Mortgage Brokers**

**AGENCY:** Office of the Assistant Secretary for Housing-Federal Housing Commissioner, HUD.

**ACTION:** Statement of Policy 1999–1.

**SUMMARY:** This Statement of Policy sets forth the Department of Housing and Urban Development's position on the legality of lender payments to mortgage brokers in connection with federally related mortgage loans under the Real Estate Settlement Procedures Act ("RESPA") and HUD's implementing regulations. While this statement satisfies the Conferees' directive in the Conference Report on the 1999 HUD Appropriations Act that the Department clarify its position on this subject, HUD believes that broad legislative reform along the lines specified in the HUD/Federal Reserve Board Report remains the most effective way to resolve the difficulties and legal uncertainties under RESPA and the Truth in Lending Act (TILA) for industry and consumers alike. Statutory changes like those recommended in the Report would, if adopted, provide the most balanced approach to resolving these contentious issues by providing consumers with better and firmer information about the costs associated with home-secured credit transactions and providing creditors and mortgage brokers with clearer rules. Such an approach is far preferable to piecemeal actions.

**EFFECTIVE DATE:** This Statement of Policy is effective March 1, 1999.

**FOR FURTHER INFORMATION CONTACT:** Rebecca J. Holtz, Director RESPA/ILS Division Room 9146, Department of Housing and Urban Development, Washington, DC 20410; telephone 202–708–4560, or (for legal questions) Kenneth A. Markison, Assistant General Counsel for GSE/RESPA or Rodrigo Alba, Attorney for RESPA, Room 9262, Department of Housing and Urban Development, Washington, DC 20410; telephone 202–708–3137 (these are not toll free numbers). Hearing or speech-impaired individuals may access these numbers via TTY by calling the toll-free Federal Information Relay Service at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:** This Preamble to the Statement of Policy includes descriptions of current practices in the industry. It is not intended to take positions with respect to the legality or illegality of any practices; such positions are set forth in the Statement of Policy itself.

### I. Background

*A. General Background*

The Conference Report on the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1999 (H.R. Conf. Rep. No. 105–769, 105th Cong., 2d Sess. 260 (1998)) (FY 1999 HUD Appropriations Act) directs HUD to clarify its position on lender payments to mortgage brokers within 90 days after the enactment of the FY 1999 HUD Appropriations Act on October 21, 1998. The Report states that "Congress never intended payments by lenders to mortgage brokers for goods or facilities actually furnished or for services actually performed to be violations of [Sections 8](a) or (b) of the Real Estate Settlement Procedures Act (12 U.S.C. 2601 *et seq.*) (RESPA)]" (Id.). The Report also states that the Conferees "are concerned about the legal uncertainty that continues absent such a policy statement" and "expect HUD to work with representatives of industry, Federal agencies, consumer groups, and other interested parties on this policy statement" (Id.).

This issue of lender payments, or indirect fees, to mortgage brokers has proven particularly troublesome for industry and consumers alike. It has been the subject of litigation in more than 150 lawsuits nationwide (see additional discussion below). To understand the issue and HUD's position regarding the legality of these payments requires background information concerning the nature of the services provided by mortgage brokers and their compensation, as well as the applicable legal requirements under RESPA.

During the last seven years, HUD has conducted three rulemakings respecting mortgage broker fees. These rulemakings first addressed definitional issues and issues concerning disclosure of payments to mortgage brokers in transactions covered under RESPA. (See 57 FR 49600 (November 2, 1992); 60 FR 47650 (September 13, 1995).) Most recently in a regulatory negotiation (see 60 FR 54794 (October 25, 1995) and 60 FR 63008 (December 8, 1995)) and then a proposed rule (62 FR 53912 (October 16, 1997)), HUD addressed the issue of the legality of payments to brokers

under RESPA. In the latter, HUD proposed that payments from lenders to mortgage brokers be presumed legal if the mortgage broker met certain specified conditions, including disclosing its role in the transaction and its total compensation through a binding contract with the borrower. This rulemaking is pending.

In July 1998, HUD and the Board of Governors of the Federal Reserve delivered to Congress a joint report containing legislative proposals to reform RESPA and the Truth in Lending Act. If the proposals in this reform package were to be adopted, the disclosure and legality issues raised herein would be resolved for any mortgage broker following certain of the proposed requirements, and consumers would be offered significant new protections.

*B. Mortgage Brokerage Industry*

When RESPA was enacted in 1974, single family mortgages were largely originated and held by savings and loans, commercial banks, and mortgage bankers. During the 1980's and 1990's, the rise of secondary mortgage market financing resulted in new wholesale and retail entities to compete with the traditional funding entities to provide mortgage financing. This made possible the origination of loans by retail entities that worked with prospective borrowers, collected application information, and otherwise processed the data required to complete the mortgage transaction. These retail entities generally operated with the intent of developing the origination package, and then immediately transmitting it to a wholesale lender who funded the loan. The rise in technology permitted much more effective and faster exchange of information and funds between originators and lenders for the retail transaction.

Entities that provide mortgage origination or retail services and that bring a borrower and a lender together to obtain a loan (usually without providing the funds for loans) are generally referred to as "mortgage brokers." These entities serve as intermediaries between the consumer and the entity funding the loan, and currently initiate an estimated half of all home mortgages made each year in the United States. Mortgage brokers generally fit into two broad categories: those that hold themselves out as representing the borrower in shopping for a loan, and those that simply offer loans as do other retailers of loans. The first type may have an agency relationship with the borrower and, in some states, may be found to owe a

responsibility to the borrower in connection with the agency representation. The second type, while not representing the borrower, may make loans available to consumers from any number of funding sources with which the mortgage broker has a business relationship.

Mortgage brokers provide various services in processing mortgage loans, such as filling out the application, ordering required reports and documents, counseling the borrower and participating in the loan closing. They may also offer goods and facilities, such as reports, equipment, and office space to carry out their functions. The level of services mortgage brokers provide in particular transactions depends on the level of difficulty involved in qualifying applicants for particular loan programs. For example, applicants have differences in credit ratings, employment status, levels of debt, or experience that will translate into various degrees of effort required for processing a loan. Also, the mortgage broker may be required to perform various levels of services under different servicing or processing arrangements with wholesale lenders.

Mortgage brokers vary in their methods of collecting compensation for their work in arranging, processing, and closing mortgage loans. In a given transaction, a broker may receive compensation directly from the borrower, indirectly in fees paid by the wholesaler or lender providing the mortgage loan funds, or through a combination of both.

Where a broker receives direct compensation from a borrower, the broker's fee is likely charged to the borrower at or before closing, as a percentage of the loan amount (e.g., 1% of the loan amount) and through direct fees (such as an application fee, document preparation fee, processing fee, etc.).

Brokers also may receive indirect compensation from lenders or wholesalers. Such indirect fees may be referred to as "back funded payments," "servicing release premiums," or "yield spread premiums." These indirect fees paid to mortgage brokers may be based upon the interest rate of each loan entered into with the borrower. These fees have been the subject of much contention and litigation. Another method of indirect compensation, also the subject of significant controversy and uncertainty, is "volume-based" compensation. This generally involves compensation to a mortgage broker by a lender based on the volume of loans that the mortgage broker delivers to the lender in a fixed

period of time. The compensation may come in the form of: (1) a cash payment to the broker based on the amount of loans the broker delivers to the lender in excess of a "threshold" or "floor amount"; or (2) provision of a lower "start rate" (often called a discount) for such loans; the compensation to the broker results from the difference in yield between the "start rate" and the loan rate. Volume based compensation may be received at settlement or well after a particular loan has closed.

Payments to brokers by lenders, characterized as yield spread premiums, are based on the interest rate and points of the loan entered into as compared to the par rate offered by the lender to the mortgage broker for that particular loan (e.g., a loan of 8% and no points where the par rate is 7.50% will command a greater premium for the broker than a loan with a par rate of 7.75% and no points).[1] In determining the price of a loan, mortgage brokers rely on rate quotes issued by lenders, sometimes several times a day. When a lender agrees to purchase a loan from a broker, the broker receives the then applicable pricing for the loan based on the difference between the rate reflected in the rate quote and the rate of the loan entered into by the borrower. In some cases, the broker can increase its revenues by arranging a loan with the consumer at a particular rate and then, based on market changes or other factors which decrease the par rate, increase his or her fees. Some consumers allege that the compensation system for brokers results in higher loan rates for borrowers and/or that this compensation system is illegal under RESPA.

Lender payments to mortgage brokers may reduce the up-front costs to consumers. This allows consumers to obtain loans without paying direct fees themselves.[2] Where a broker is not compensated by the consumer through a direct fee, or is partially compensated through a direct fee, the interest rate of the loan is increased to compensate the broker or the fee is added to principal. In any of the compensation methods described, all costs are ultimately paid by the consumer, whether through direct fees or through the interest rate.

---

[1] The term "par rate" refers to the rate offered to the broker (through the lender's price sheets) at which the lender will fund 100% of the loan with no premiums or discounts to the broker.

[2] In many instances, these loans are called "no cost" or "no fee" loans. This terminology, however, may prove confusing because in such cases the costs are still paid by the borrower through a higher interest rate on the loan or by adding fees to principal. HUD's regulations implementing RESPA use the name "no cost" or "no point" loans consistent with industry practice.

### C. Coverage of This Policy Statement

HUD's RESPA rules, found at 24 CFR part 3500 (Regulation X), define a mortgage broker to be "a person (not an employee or exclusive agent of a lender) who brings a borrower and lender together to obtain a federally-related mortgage loan, and who renders * * * 'settlement services' " (24 CFR 3500.2(b)). In table funding, mortgage brokers may process and close loans in their own names. However, at or about the time of settlement, they transfer these loans to the lender, and the lender simultaneously advances the monies to fund the loan. In transactions where mortgage brokers function as intermediaries, the broker also provides loan origination services, but the loan funds are provided by the lender and the loan is closed in the lender's name.

In other cases, mortgage brokers may originate and close loans in their own name using their own funds or warehouse lines of credit, and then sell the loans after settlement on the secondary market. In such transactions, mortgage brokers effectively act as lenders under HUD's RESPA rules. Accordingly, the transfer of the loan obligation by, and payment to, these brokers after the initial funding is outside of RESPA's coverage under the secondary market exemption, found at 24 CFR 3500.5(b)(7), which states that payments to and from other loan sources following settlement are exempt from disclosure requirements and Section 8 restrictions. HUD's rule provides that in determining what constitutes a *bona fide* transfer in the secondary market, HUD considers the real source of funding and the real interest of the funding lender. (24 CFR 3500.5(b)(7).)

Because this Statement of Policy focuses on the legality of lender payments to mortgage brokers in transactions subject to RESPA, the coverage of this statement is restricted to payments to mortgage brokers in table-funded and intermediary broker transactions. Lender payments to mortgage brokers where mortgage brokers initially fund the loan and then sell the loan after settlement are outside the coverage of this statement as exempt from RESPA under the secondary market exemption.

### D. RESPA and Its Legislative History

In enacting RESPA, Congress sought to protect the American home-buying public from unreasonably and unnecessarily inflated prices in the home purchasing process (S. Rep. No. 93–866 (1974) *reprinted in* 1974

U.S.C.C.A.N. 6548). Section 2 of the Act provides:

"significant reforms in the real estate settlement process are needed to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country. * * * It is the purpose of this act to effect certain changes in the settlement process for residential real estate that will result—

in more effective advance disclosure to home buyers and sellers of settlement costs; [and]

(2) In the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services. * * *" 12 U.S.C. 2601.

Section 4(a) of RESPA requires the Secretary to create a uniform settlement statement which "shall conspicuously and clearly itemize all charges imposed upon the borrower and all charges imposed upon the seller in connection with the settlement" (12 U.S.C. 2603(a)).

Section 5(c) of RESPA requires the provision of a "good faith estimate of the amount or range of charges for specific settlement services the borrower is likely to incur in connection with the settlement as prescribed by the Secretary" (12 U.S.C. 2604(c)).

Section 8(a) of RESPA, prohibits any person from giving and any person from accepting any fee, kickback, or other thing of value pursuant to any agreement or understanding that business shall be referred to any person. (See 12 U.S.C. 2607(a).) Section 8(b) also prohibits anyone from giving or accepting any portion, split, or percentage of any charge made or received for the rendering of a settlement service other than for services actually performed. (12 U.S.C. 2607(b).) Section 8(c) of RESPA provides, however, that nothing in Section 8 shall be construed as prohibiting the payment to any person of a *bona fide* salary or compensation or other payment for goods or facilities actually furnished or services actually performed. (12 U.S.C. 2607(c)(2).)

Under Section 19 of RESPA, HUD is authorized to issue rules, establish exemptions, and make such interpretations as is necessary to implement the law. (12 U.S.C. 2618(a).)

RESPA's legislative history refers to HUD–VA Reports and subsequent hearings by the Housing Subcommittee as defining "major problem areas that [had to] be dealt with if settlement costs are to be kept within reasonable bounds." (S. Rep. No. 93–866, at 6547.) One "major problem area" identified was the "[a]busive and unreasonable

practices within the real estate settlement process that increase settlement costs to home buyers without providing any real benefits to them." Another major concern was "[t]he lack of understanding on the part of most home buyers about the settlement process and its costs, which lack of understanding makes it difficult for a free market for settlement services to function at maximum efficiency."

The legislative history reveals that Congress intended RESPA to guard against these unreasonable and excessive settlement costs in two ways. Under Section 4, Congress sought to "mak[e] information on the settlement process available to home buyers in advance of settlement and requir[e] advance disclosures of settlement charges." (S. Rep. 93–866, at 6548.) The Senate Report explained that "home buyers who would otherwise shop around for settlement services, and thereby reduce their overall settlement costs, are prevented from doing so because frequently they are not apprised of the costs of these services until the settlement date or are not aware of the nature of the settlement services that will be provided."

Under Section 8, Congress sought to eliminate what it termed "abusive practices"—kickbacks, referral fees, and unearned fees. In enacting these prohibitions, Congress intended that "the costs to the American home buying public will not be unreasonably or unnecessarily inflated." (S. Rep. 93–866 at 6548.) In describing the Section 8 provisions, the Senate Report explained that RESPA "is intended to prohibit all * * * referral fee arrangements whereby any payment is made or 'thing of value' is provided for the referral of real estate settlement business." (S. Rep. 93–866, at 6551.)

The legislative history adds that "[t]o the extent the payment is in excess of the reasonable value of the goods provided or services performed, the excess may be considered a kickback or referral fee proscribed by Section [8]." (S. Rep. 93–866, at 6551.) The Senate Report states that "reasonable payments in return for services actually performed or goods actually furnished" were not intended to be prohibited (Id).[3] It also provided that "[t]hose persons and companies that provide settlement

services should therefore take measures to ensure that any payments they make or commissions they give are not out of line with the reasonable value of the services received." (Id.)

The Department has consistently held that the prohibitions under Section 8 of RESPA cover the activities of mortgage brokers, because RESPA applies to the origination, processing, and funding of a federally related mortgage loan. This became an issue when, in 1984, the 6th Circuit Court of Appeals held that in applying Section 8 as a criminal statute, the definition of settlement services did not clearly extend to the activities of a mortgage loan. (*U.S. versus Graham Mortgage Corp.*, 740 F.2d 414 (6th Cir. 1984).) In 1992, Congress responded by amending RESPA to remove any doubt that, for purposes of RESPA, a settlement service includes the origination and making of a mortgage loan. (Section 908 of the Housing and Community Development Act of 1992 (Pub. L. 102–550, approved October 28, 1992; 104 Stat. 4413). At the same time, Congress also specifically made RESPA applicable to second mortgages and refinancings. (Id.)

*E. HUD's RESPA Rules*

On November 2, 1992 (57 FR 49600), the Department issued a major revision of Regulation X, the rule interpreting RESPA. The rule defined the term "mortgage broker" for the first time. Under the rule, mortgage brokers are required to disclose direct and indirect payments on the Good Faith Estimate (GFE) no later than 3 days after loan application. (See 24 CFR 3500.7(a) and (c).) Such disclosure must also be provided to consumers, as a final figure, at closing on the settlement statement. (24 CFR 3500.8; 24 CFR part 3500, Appendix A (Instructions for Filling Out the HUD–1 and HUD–1A).) On the GFE and the settlement statement, lender-paid mortgage broker fees must be shown as "Paid Outside of Closing" (P.O.C.), and not computed in arriving at totals. (See 24 CFR 3500.7(a)(2) and 24 CFR part 3500, Appendix A.) The 1992 rule treats mortgage brokers as settlement service providers whose fees are disbursed at or before settlement, akin to title agents, attorneys, appraisers, etc., whose fees are subject to disclosure and otherwise subject to RESPA, including Section 8.

The 1992 rule did not explicitly take a position on whether yield spread premiums or any other named class of back-funded or indirect fees paid by lenders to brokers are *per se* legal or illegal. By illustration, codified as Illustrations of Requirements of RESPA, Fact Situations 5 and 12 in Appendix B

---

[3] One of the examples of abusive activities listed in the legislative history that RESPA was intended to remedy is "a title insurance company [that] may give 10% or more of the title insurance premium to an attorney who may perform no services for the title insurance company other than placing a telephone call to the company or filling out a simple application." (S. Rep. 93–866, at 6551.) Accordingly, where insufficient services are provided, RESPA is intended to prohibit payment.

to 24 CFR part 3500, the 1992 rule specifically listed ''servicing release premiums'' and ''yield spread premiums'' as fees required to be itemized on the settlement statement. Although the 1992 rule specifically acknowledged the existence of such fees and provided illustrations of how they were to be denominated on HUD disclosure forms, this requirement was intended to ensure their disclosure, but not to create a presumption of *per se* legality or illegality.

The anti-kickback, anti-referral fee and unearned fee provisions of RESPA are implemented by 24 CFR 3500.14. Regulation X repeats the Section 8 prohibitions against compensation for the referral of settlement service business and for the giving or accepting of any portion, split or percentage of any charge other than for services actually rendered. (24 CFR 3500.14(c).) Regulation X provides that a charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates the unearned fee prohibition. (See 24 CFR 3500.14(c).) Moreover, 24 CFR 3500.14(g)(1)(iv) clarifies that Section 8 of RESPA permits ''[a] payment to any person of a *bona fide* salary or compensation or other payment for goods or facilities actually furnished or for services actually performed.''

The Department's regulations provide, under 24 CFR 3500.14(g)(2), that:

> The Department may investigate high prices to see if they are the result of a referral fee or a split of a fee. *If the payment of a thing of value bears no reasonable relationship to the market value of the goods or services provided, then the excess is not for services or goods actually performed or provided.* These facts may be used as evidence of a violation of section 8 and may serve as a basis for a RESPA investigation. High prices standing alone are not proof of a RESPA violation. The value of a referral (i.e., the value of any additional business obtained thereby) is not to be taken into account in determining whether the payment exceeds the reasonable value of such goods, facilities or services. \* \* \* (emphasis supplied).

In addition, Regulation X clarifies that ''[w]hen a person is in a position to refer settlement service business \* \* \* receives a payment for providing additional settlement services as part of a real estate transaction, such payment must be for services that are actual, necessary and distinct from the primary services provided by such person.'' (24 CFR 3500.14(g)(3).)

Since 1992, HUD has provided various interpretations and other issuances under these rules stating the Department's position that the legality

of a payment to a mortgage broker is not premised on the name of the particular fee. Rather, HUD has consistently advised that the issue under RESPA is whether the compensation to a mortgage broker in covered transactions is reasonably related to the value of the goods or facilities actually furnished or services actually performed. If the compensation, or a portion thereof, is not reasonably related to the goods or facilities actually furnished or the services actually performed, there is a compensated referral or an unearned fee in violation of Section 8(a) or 8(b) of RESPA, whether the compensation is a direct or indirect payment or a combination thereof.

### F. Recent HUD Rulemaking Efforts

The Department received comments on the 1992 rule's requirement that mortgage brokers disclose indirect payments from lenders on the GFE and the settlement statement. In response, the Department reviewed whether the disclosure of indirect or back-funded fees is necessary or in the borrower's interest and whether additional rulemaking was needed to clarify the legality of fees to mortgage brokers. Brokers had alleged that these disclosures were confusing to consumers and disadvantaged brokers as compared to other originators who were within the secondary market exemption and were not required to disclose their compensation for the subsequent sale of the loan. Consumer representatives said that consumers needed to understand the existence of indirect fees and whether brokers represented consumers in shopping for loans. On September 13, 1995, the Department issued a proposed rule (60 FR 47650) and in December 1995 through May 1996, embarked on a negotiated rulemaking on these subjects.

Although the negotiated rulemaking did not result in consensus, on October 16, 1997, HUD published a proposed rule (62 FR 53912) that was shaped by views from both industry and consumer representatives provided during the negotiated rulemaking (as well as by comments received from the September 13, 1995, proposed rule (60 FR 47650)). The 1997 proposed rule proposed a qualified ''safe harbor'' for payments to mortgage brokers under Section 8. Under the proposal, if a broker enters into a contract with consumers explaining the broker's functions (whether or not it represented the consumer) and the total compensation the broker would receive in the transaction, before the consumer applied for a loan, HUD would presume the broker fees, both direct and indirect,

to be legal. The 1997 proposal also provided, however, that this qualified safe harbor would only be available to those payments that did not exceed a test, to be established in the rulemaking, to preclude unreasonable fees. This proposal was intended, among other things, to establish that yield spread premiums paid to brokers meeting the rule's requirements were presumed legal when brokers provided consumers with prescribed information concerning the functions and compensation of mortgage brokers. The Department has received over 9,000 comments in response to this proposed rule.

### G. Litigation

During the last several years, more than 150 lawsuits have been brought seeking class action certification based in whole or in part on the theory that the making of indirect payments from lenders to mortgage brokers violates Section 8 of RESPA. In various cases, plaintiffs have argued that yield spread premiums or other denominated indirect payments to brokers, regardless of their amount, constitute prohibited referral fees under Section 8(a). These plaintiffs generally argue that yield spread premiums are payments based upon the broker's ability to deliver a loan that is above the par rate. Some lawsuits have alleged that such yield spread premiums or other indirect payments are a split of fees between the lender and the broker, or are simply unearned fees and, therefore, also violate Section 8(b) of RESPA. Other challenges rely, in part, on the alleged unreasonableness of brokers' fees. These complaints assert that under the RESPA regulations, payments must bear a reasonable relationship to the market value of the good or the service provided and that payments in excess of such amounts must be regarded as forbidden referral fees.

Many of the lawsuits involve allegations that consumers were not informed by mortgage brokers concerning the mortgage brokers' role and compensation. A common element in many allegations is that borrowers were not informed about the existence or the amount of the yield spread premiums paid to the mortgage broker, and the relationship of the yield spread premium to the direct fees that the borrower paid. The facts in these cases suggest generally that even where there were proper disclosures on the GFE and the settlement statement, borrowers allege that they were unaware of, or did not understand, that a yield spread premium was tied to the interest rate they agreed to pay, and that they could have reduced this charge or their direct

payment to the broker either by further negotiation or by engaging in additional shopping among mortgage loan providers.

Courts have been split in their decisions on these cases. Some of the decisions have concluded that yield spread premiums may be prohibited referral fees or duplicative fees in contravention of Section 8 of RESPA under the specific facts of the case. Some have held that the permissibility of yield spread premiums must be based on an analysis of whether the premiums constitute a reasonable payment, either alone or in combination with any direct fee paid by the borrower, for either the goods, services or facilities actually furnished. Because some courts have found that this necessitates an individual analysis of the facts of each transaction, some courts have denied plaintiffs' requests for class action certification. Some courts have certified a class without reaching a conclusion on the RESPA issues. Others have held that yield spread premiums constitute valid consideration to the mortgage broker in exchange for the origination of the loan and the sale of the loan to the lender. These courts have found that the payment of yield spread premiums is one method among many of compensating the broker for the origination services rendered.

### H. Reform

In July 1998, the Department and the Federal Reserve Board delivered a report to Congress recommending significant improvements to streamline and simplify current RESPA and Truth In Lending Act requirements. The Report proposed that along with a tighter and more enforceable scheme for providing consumers with estimated costs for settlements, an exemption from Section 8's prohibitions should be established for those entities that offer a package of settlement services and a mortgage loan at a guaranteed price, rate and points for the package early in the consumer's process of shopping for a loan. Such an approach, which also includes other additional consumer protection recommendations, would largely resolve these issues for any mortgage broker who chooses to abide by the requirements of this exemption. The Report's consumer protection recommendations included, among other items, that Congress consider establishment of an unfair and deceptive acts and practices remedy.

Under the "packaging" proposal set forth in the Report, settlement costs would be controlled more effectively by market forces. Consumers would be better able to comparison-shop, thereby encouraging creditors and others to operate efficiently and pass along discounts and lower prices. In addition, the Report's recommendations would greatly simplify compliance for the industry and clarify legal uncertainties that create liability risks.

### I. This Policy Statement

This policy statement provides HUD's views of the legality of fees to mortgage brokers from lenders under existing law. In accordance with the Conference Report, in developing this policy statement, HUD met with representatives of government agencies, as well as a broad range of consumer and industry groups, including the Office of Thrift Supervision, the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the Federal Reserve Board, the National Association of Mortgage Brokers, the Mortgage Bankers Association of America, the American Bankers Association, the Consumer Mortgage Coalition, America's Community Bankers, the Consumer Bankers Association, the Independent Bankers Association of America, AARP, the National Consumer Law Center, Consumers Union, and the National Association of Consumer Advocates.

### II. RESPA Policy Statement 1999–1

#### A. Introduction

The Department hereby states its position on the legality of payments by lenders to mortgage brokers under the Real Estate Settlement Procedures Act (12 U.S.C. 2601 *et seq.*) (RESPA) and its implementing regulations at 24 CFR part 3500 (Regulation X). This Statement of Policy is issued pursuant to Section 19(a) of RESPA (12 U.S.C. 2617(a)) and 24 CFR 3500.4(a)(1)(ii). HUD is cognizant of the Conferees' statement in the Conference Report on the FY 1999 HUD Appropriations Act that "Congress never intended payments by lenders to mortgage brokers for goods or facilities actually furnished or for services actually performed to be violations of [Sections 8](a) or (b) (12 U.S.C. Sec. 2607) in its enactment of RESPA." (H. Rep. 105–769, at 260.) The Department is also cognizant of the congressional intent in enacting RESPA of protecting consumers from unnecessarily high settlement charges caused by abusive practices. (12 U.S.C. 2601.)

In transactions where lenders make payments to mortgage brokers, HUD does not consider such payments (i.e., yield spread premiums or any other class of named payments), to be illegal *per se*. HUD does not view the name of the payment as the appropriate issue under RESPA. HUD's position that lender payments to mortgage brokers are not illegal *per se* does not imply, however, that yield spread premiums are legal in individual cases or classes of transactions. The fees in cases or classes of transactions are illegal if they violate the prohibitions of Section 8 of RESPA.

In determining whether a payment from a lender to a mortgage broker is permissible under Section 8 of RESPA, the first question is whether goods or facilities were actually furnished or services were actually performed for the compensation paid. The fact that goods or facilities have been actually furnished or that services have been actually performed by the mortgage broker does not by itself make the payment legal. The second question is whether the payments are reasonably related to the value of the goods or facilities that were actually furnished or services that were actually performed.

In applying this test, HUD believes that total compensation should be scrutinized to assure that it is reasonably related to goods, facilities, or services furnished or performed to determine whether it is legal under RESPA. Total compensation to a broker includes direct origination and other fees paid by the borrower, indirect fees, including those that are derived from the interest rate paid by the borrower, or a combination of some or all. The Department considers that higher interest rates alone cannot justify higher total fees to mortgage brokers. All fees will be scrutinized as part of total compensation to determine that total compensation is reasonably related to the goods or facilities actually furnished or services actually performed. HUD believes that total compensation should be carefully considered in relation to price structures and practices in similar transactions and in similar markets.

#### B. Scope

In light of 24 CFR § 3500.5(b)(7), which exempts from RESPA coverage *bona fide* transfers of loan obligations in the secondary market, this policy statement encompasses only transactions where mortgage brokers are not the real source of funds (i.e., table-funded transactions or transactions involving "intermediary" brokers). In table-funded transactions, the mortgage broker originates, processes and closes the loan in the broker's own name and, at or about the time of settlement, there is a simultaneous advance of the loan funds by the lender and an assignment of the loan to that lender. (See 24 CFR 3500.2 (Definition of "table funding").) Likewise, in transactions where

mortgage brokers are intermediaries, the broker provides loan origination services and the loan funds are provided by the lender; the loan, however, is closed in the lender's name.

*C. Payments Must Be for Goods, Facilities or Services*

In the determination of whether payments from lenders to mortgage brokers are permissible under Section 8 of RESPA, the threshold question is whether there were goods or facilities actually furnished or services actually performed for the total compensation paid to the mortgage broker. In making the determination of whether compensable services are performed, HUD's letter to the Independent Bankers Association of America, dated February 14, 1995 (IBAA letter) may be useful. In that letter, HUD identified the following services normally performed in the origination of a loan:

(a) Taking information from the borrower and filling out the application;[4]

(b) Analyzing the prospective borrower's income and debt and pre-qualifying the prospective borrower to determine the maximum mortgage that the prospective borrower can afford;

(c) Educating the prospective borrower in the home buying and financing process, advising the borrower about the different types of loan products available, and demonstrating how closing costs and monthly payments could vary under each product;

(d) Collecting financial information (tax returns, bank statements) and other related documents that are part of the application process;

(e) Initiating/ordering VOEs (verifications of employment) and VODs (verifications of deposit);

(f) Initiating/ordering requests for mortgage and other loan verifications;

(g) Initiating/ordering appraisals;

(h) Initiating/ordering inspections or engineering reports;

(i) Providing disclosures (truth in lending, good faith estimate, others) to the borrower;

(j) Assisting the borrower in understanding and clearing credit problems;

(k) Maintaining regular contact with the borrower, realtors, lender, between application and closing to apprise them of the status of the application and gather any additional information as needed;

(l) Ordering legal documents;

(m) Determining whether the property was located in a flood zone or ordering such service; and

(n) Participating in the loan closing. While this list does not exhaust all possible settlement services, and while the advent of computer technology has, in some cases, changed how a broker's settlement services are performed, HUD believes that the letter still represents a generally accurate description of the mortgage origination process. For other services to be acknowledged as compensable under RESPA, they should be identifiable and meaningful services akin to those identified in the IBAA letter including, for example, the operation of a computer loan origination system (CLO) or an automated underwriting system (AUS).

The IBAA letter provided guidance on whether HUD would take an enforcement action under RESPA. In the context of the letter's particular facts and subject to the reasonableness test which is discussed below, HUD articulated that it generally would be satisfied that sufficient origination work was performed to justify compensation if it found that:

• The lender's agent or contractor took the application information (under item (a)); and

• The lender's agent or contractor performed at least five additional items on the list above.

In the letter and in the context of its facts, HUD also pointed out that it is concerned that a fee for steering a customer to a particular lender could be disguised as compensation for "counseling-type" activities. Therefore, the letter states that if an agent or contractor is relying on taking the application and performing only "counseling type" services—(b), (c), (d), (j), and (k) on the list above—to justify its fee, HUD would also look to see that meaningful counseling—not steering—is provided. In analyzing transactions addressed in the IBAA letter, HUD said it would be satisfied that no steering occurred if it found that:

• Counseling gave the borrower the opportunity to consider products from at least three different lenders;

• The entity performing the counseling would receive the same compensation regardless of which lender's products were ultimately selected; *and*

• Any payment made for the "counseling-type" services is reasonably related to the services performed and not based on the amount of loan business referred to a particular lender.

In examining services provided by mortgage brokers and payments to

mortgage brokers, HUD will look at the types of origination services listed in the IBAA letter to help determine whether compensable services are performed.[5] However, the IBAA letter responded to a program where a relatively small fee was to be provided for limited services by lenders that were brokering loans.[6]

Accordingly, the formulation in the IBAA letter of the number of origination services which may be required to be performed for compensation is not dispositive in analyzing more costly mortgage broker transactions where more comprehensive services are provided. The determinative test under RESPA is the relationship of the services, goods or facilities furnished to the total compensation received by the broker (discussed below). In addition to services, mortgage brokers may furnish goods or facilities to the lender. For example, appraisals, credit reports, and other documents required for a complete loan file may be regarded as goods, and a reasonable portion of the broker's retail or "store-front" operation may generally be regarded as a facility for which a lender may compensate a broker. However, while a broker may be compensated for goods or facilities actually furnished or services actually performed, the loan itself, which is arranged by the mortgage broker, cannot be regarded as a "good" that the broker may sell to the lender and that the lender may pay for based upon the loan's yield's relation to market value, reasonable or otherwise. In other words, in the context of a non-secondary market mortgage broker transaction, under HUD's rules, it is not proper to argue that a loan is a "good," in the sense of an instrument bearing a particular yield, thus justifying any yield spread premium to the mortgage broker, however great, on the grounds that such yield spread premium is the "market value" of the good.

*D. Compensation Must Be Reasonably Related to Value of Goods, Facilities or Services*

The fact that goods or facilities have been actually furnished or that services have been actually performed by the mortgage broker, as described in the IBAA letter, does not by itself make a payment by a lender to a mortgage

---

[4] In a subsequent informal interpretation, dated June 20, 1995, HUD stated that the filling out of a mortgage loan application could be substituted by a comparable activity, such as the filling out of a borrower's worksheet.

[5] In the June 20, 1995 letter, the Department clarified that the counseling test in the IBAA letter would not apply if an entity performed only non counseling services (a, e, f, g, h, i, l, m, n) or a mix of counseling and non-counseling services (but did not rely only on the five counseling services (b, c, d, j, and k)).

[6] In the particular program reviewed by HUD in the IBAA letter, the average total compensation for performing six of the origination services listed above was below $200.

broker legal. The next inquiry is whether the payment is reasonably related to the value of the goods or facilities that were actually furnished or services that were actually performed. Although RESPA is not a rate-making statute, HUD is authorized to ensure that payments from lenders to mortgage brokers are reasonably related to the value of the goods or facilities actually furnished or services actually performed, and are not compensation for the referrals of business, splits of fees or unearned fees.

In analyzing whether a particular payment or fee bears a reasonable relationship to the value of the goods or facilities actually furnished or services actually performed, HUD believes that payments must be commensurate with that amount normally charged for similar services, goods or facilities. This analysis requires careful consideration of fees paid in relation to price structures and practices in similar transactions and in similar markets.[7] If the payment or a portion thereof bears no reasonable relationship to the market value of the goods, facilities or services provided, the excess over the market rate may be used as evidence of a compensated referral or an unearned fee in violation of Section 8(a) or (b) of RESPA. (See 24 CFR 3500.14(g)(2).) Moreover, HUD also believes that the market price used to determine whether a particular payment meets the reasonableness test may not include a referral or unearned fee, because such fees are prohibited by RESPA. Congress was clear that for payments to be legal under Section 8, they must bear a reasonable relationship to the value received by the person or company making the payment. (S. Rep. 93–866, at 6551.)

The Department recognizes that some of the goods or facilities actually furnished or services actually performed by the broker in originating a loan are ''for'' the lender and other goods or facilities actually furnished or services actually performed are ''for'' the borrower. HUD does not believe that it is necessary or even feasible to identify or allocate which facilities, goods or services are performed or provided for the lender, for the consumer, or as a function of State or Federal law. All services, goods and facilities inure to the benefit of both the borrower and the lender in the sense that they make the loan transaction possible (e.g., an appraisal is necessary to assure that the

lender has adequate security, as well as to advise the borrower of the value of the property and to complete the borrower's loan).

The consumer is ultimately purchasing the total loan and is ultimately paying for all the services needed to create the loan. All compensation to the broker either is paid by the borrower in the form of fees or points, directly or by addition to principal, or is derived from the interest rate of the loan paid by the borrower. Accordingly, in analyzing whether lender payments to mortgage brokers comport with the requirements of Section 8 of RESPA, HUD believes that the totality of the compensation to the mortgage broker for the loan must be examined. For example, if the lender pays the mortgage broker $600 and the borrower pays the mortgage broker $500, the total compensation of $1,100 would be examined to determine whether it is reasonably related to the goods or facilities actually furnished or services actually performed by the broker.

Therefore, in applying this test, HUD believes that total compensation should be scrutinized to assure that it is reasonably related to goods, facilities, or services furnished or performed to determine whether total compensation is legal under RESPA. Total compensation to a broker includes direct origination and other fees paid by the borrower, indirect fees, including those that are derived from the interest rate paid by the borrower, or a combination of some or all. All payments, including payments based upon a percentage of the loan amount, are subject to the reasonableness test defined above. In applying this test, the Department considers that higher interest rates alone cannot justify higher total fees to mortgage brokers. All fees will be scrutinized as part of total compensation to determine that total compensation is reasonably related to the goods or facilities actually furnished or services actually performed.

In so-called ''no-cost'' loans, borrowers accept a higher interest rate in order to reduce direct fees, and the absence of direct payments to the mortgage broker is made up by higher indirect fees (e.g., yield spread premiums). Higher indirect fees in such arrangements are legal if, and only if, the total compensation is reasonably related to the goods or facilities actually furnished or services actually performed.

In determining whether the compensation paid to a mortgage broker is reasonably related to the goods or facilities actually furnished or services

actually performed, HUD will consider all compensation, including any volume based compensation. In this analysis, there may be no payments merely for referrals of business under Section 8 of RESPA. (See 24 CFR 3500.14.)[8]

Under HUD's rules, when a person in a position to refer settlement service business receives a payment for providing additional settlement services as part of the transaction, such payment must be for services that are actual, necessary and distinct from the primary services provided by the person. (24 CFR 3500.14(g)(3).) While mortgage brokers may receive part of their compensation from a lender, where the lender payment duplicates direct compensation paid by the borrower for goods or facilities actually furnished or services actually performed, Section 8 is violated. In light of the fact that the borrower and the lender may both contribute to some items, HUD believes that it is best to evaluate seemingly duplicative fees by analyzing total compensation under the reasonableness test described above.

*E. Information Provided to Borrower*

Under current RESPA rules mortgage brokers are required to disclose estimated direct and indirect fees on the Good Faith Estimate (GFE) no later than 3 days after loan application. (See 24 CFR 3500.7(a) and (b).) Such disclosure must also be provided to consumers, as a final exact figure, at closing on the settlement statement. (24 CFR 3500.8; 24 CFR part 3500, Appendix A.) On the GFE and the settlement statement, lender payments to mortgage brokers must be shown as ''Paid Outside of Closing'' (P.O.C.), and are not computed in arriving at totals. (24 CFR 3500.7(a)(2).) The requirement that all fees be disclosed on the GFE is intended to assure that consumers are shown the full amount of compensation to brokers and others early in the transaction.

The Department has always indicated that any fees charged in settlement transactions should be clearly disclosed so that the consumer can understand the nature and recipient of the payment. Code-like abbreviations like ''YSP to DBG, POC'', for instance, have been noted.[9] Also, the Department has seen

---

[7] HUD recognizes that settlement costs may vary in different markets. The cost of a specific service in Omaha, Nebraska, for example, may bear little resemblance to the cost of a similar service in Los Angeles, California.

[8] The Department generally has held that when the payment is based on the volume or value of business transacted, it is evidence of an agreement for the referral of business (unless, for example, it is shown that payments are for legitimate business reasons unrelated to the value of the referrals). (See 24 CFR 3500.14(e).)

[9] This is an example only. HUD recognizes that current practices may leave borrowers confused. However, the use of any particular terms, including abbreviations, may not, by itself, violate RESPA. Nevertheless, going forward, HUD recommends that

examples on the GFE and/or the settlement statement where the identity and/or purpose of the fees are not clearly disclosed.

The Department considers unclear and confusing disclosures to be contrary to the statute's and the regulation's purposes of making RESPA-covered transactions understandable to the consumer. At a minimum, all fees to the mortgage broker are to be clearly labeled and properly estimated on the GFE. On the settlement statement, the name of the recipient of the fee (in this case, the mortgage broker) is to be clearly labeled and listed, and the fee received from a lender is to be clearly labeled and listed in the interest of clarity. For example, a fee would be appropriately disclosed as ''Mortgage broker fee from lender to XYZ Corporation (P.O.C.).'' In the interest of clarity, other fees or payments from the borrower to the mortgage broker should identify that they are mortgage broker fees from the borrower.[10]

There is no requirement under existing law that consumers be fully informed of the broker's services and compensation prior to the GFE. Nevertheless, HUD believes that the broker should provide the consumer with information about the broker's services and compensation, and agreement by the consumer to the arrangement should occur as early as possible in the process. Mortgage brokers and lenders can improve their ability to demonstrate the reasonableness of their fees if the broker discloses the nature of the broker's services and the various methods of compensation at the time the consumer first discusses the possibility of a loan with the broker.

The legislative history makes clear that RESPA was not intended to be a rate-setting statute and that Congress instead favored a market-based approach. (S. Rep. No. 93–866 at 6546 (1974).) In making the determination of whether a payment is *bona fide* compensation for goods or facilities actually furnished or services actually performed, HUD has, in the past, indicated that it would examine whether the price paid for the goods,

facilities or services is truly a market price; that is, if in an arm's length transaction a purchaser would buy the services at or near the amount charged. If the fee the consumer pays is disclosed and agreed to, along with its relationship to the interest rate and points for the loan and any lender-paid fees to the broker, a market price for the services, goods or facilities could be attained. HUD believes that for the market to work effectively, borrowers should be afforded a meaningful opportunity to select the most appropriate product and determine what price they are willing to pay for the loan based on disclosures which provide clear and understandable information.

The Department reiterates its long-standing view that disclosure alone does not make illegal fees legal under RESPA. On the other hand, while under current law, pre-application disclosure to the consumer is not required, HUD believes that fuller information provided at the earliest possible moment in the shopping process would increase consumer satisfaction and reduce the possibility of misunderstanding.

HUD commends the National Association of Mortgage Brokers and the Mortgage Bankers Association of America for strongly suggesting that their members furnish consumers with a form describing the function of mortgage brokers and stating that a mortgage broker may receive a fee in the transaction from a lender.

Although this statement of policy does not mandate disclosures beyond those currently required by RESPA and Regulation X, the most effective approach to disclosure would allow a prospective borrower to properly evaluate the nature of the services and all costs for a broker transaction, and to agree to such services and costs before applying for a loan. Under such an approach, the broker would make the borrower aware of whether the broker is or is not serving as the consumer's agent to shop for a loan, and the total compensation to be paid to the mortgage broker, including the amounts of each of the fees making up that compensation. If indirect fees are paid, the consumer would be made aware of the amount of these fees and their relationship to direct fees and an increased interest rate. If the consumer may reduce the interest rate through increased fees or points, this option also would be explained. HUD recognizes that in many cases, the industry has not been using

this approach because it has not been required. Moreover, new methods may require time to implement. HUD encourages these efforts going forward and believes that if these desirable disclosure practices were adhered to by all industry participants, the need for more prescriptive regulatory or legislative actions concerning this specific problem could be tempered or even made unnecessary.

While the Department is issuing this statement of policy to comply with a Congressional directive that HUD clarify its position on the legality of lender payments to mortgage brokers, HUD agrees with segments of the mortgage lending and settlement service industries and consumer representatives that legislation to improve RESPA is needed. HUD believes that broad legislative reform along the lines specified in the HUD/Federal Reserve Board Report remains the most effective way to resolve the difficulties and legal uncertainties under RESPA and TILA for industry and consumers alike. Statutory changes like those recommended in the Report would, if adopted, provide the most balanced approach to resolving these contentious issues by providing consumers with better and firmer information about the costs associated with home-secured credit transactions and providing creditors and mortgage brokers with clearer rules.

## III. Executive Order 12866, Regulatory Planning and Review

The Office of Management and Budget (OMB) reviewed this Statement of Policy under Executive Order 12866, *Regulatory Planning and Review.* OMB determined that this Statement of Policy is a ''significant regulatory action,'' as defined in section 3(f) of the Order (although not economically significant, as provided in section 3(f)(1) of the Order). Any changes made to the Statement of Policy subsequent to its submission to OMB are identified in the docket file, which is available for public inspection in the office of the Department's Rules Docket Clerk, Room 10276, 451 Seventh Street, SW, Washington, DC 20410–0500.

Dated: February 22, 1999.

**William C. Apgar,**

*Assistant Secretary for Housing-Federal Housing Commissioner.*

[FR Doc. 99–4921 Filed 2–26–99; 8:45 am]

**BILLING CODE 4210–27–P**

---

the disclosures on the GFE and the settlement statement be as described in the text. HUD recognizes that system changes may require time for lenders and brokers to implement.

[10] HUD recognizes that current software may not currently accommodate these additional disclosures. Both industry and consumers would be better served if these additional disclosures were included in future forms.

# EXHIBIT  C

Stanley D. Longhofer and Paul S. Calem,
"Mortgage Brokers and Fair Lending,"
Fed. Reserve Bank of Cleveland (May 15, 1999)

May 15, 1999

Federal Reserve Bank of Cleveland

# Mortgage Brokers and Fair Lending

### by Stanley D. Longhofer and Paul S. Calem

Fair-lending issues have gained new prominence over the course of the last decade. Spurred in part by the controversial findings of the now-famous "Boston Fed Study,"[1] financial institutions have come under more intense scrutiny over compliance with fair-lending laws, with the Department of Justice taking action in more than a dozen lending-discrimination cases since 1990.

Although the initial focus of these investigations was primarily on whether lenders illegally discriminate in the course of their underwriting decisions (that is, on relative denial rates), recent efforts have targeted bias in the pricing of mortgage loans.

The traditional mortgage loan origination process involves a lender with in-house (retail) loan officers who both collect the information that is used to make the underwriting decision and negotiate the ultimate price of the loan with the borrower. Many mortgage lenders, however, also originate loans that are solicited by outside independent mortgage brokers. Such "wholesale lending" presents unique challenges for the enforcement of fair-lending laws.

In this *Economic Commentary,* we discuss the role of brokers in the housing-finance market, focusing on the question of how responsible lenders should be for the pricing decisions of independent mortgage brokers. Although recent investigations by the Department of Justice appear to be based on the principle that lenders should be completely accountable for the actions of their brokers, we argue that this policy may be misguided.

In contrast to a lender's relationship with its in-house loan officers, with wholesale loans it is the broker and not the lender

that negotiates the price the borrower pays on the loan. Furthermore, the relationship between the broker and the lender is typically "arms-length," implying that the difference between the price charged by the broker and the wholesale price is not in any way controlled or influenced by the lender. Therefore, we question whether a lender should be held accountable for patterns that may emerge in the prices brokers negotiate with borrowers. Further, we are skeptical that one can conduct an adequate statistical evaluation of broker pricing practices using only data obtained from a single lender, in part because the typical broker deals with multiple lenders. As a result, we believe it is unreasonable to hold the lender accountable for the pricing decisions of its brokers. Instead, we argue that fair-lending investigations into the pricing of brokered loans should be targeted at the root source of any discriminatory behavior: the brokers themselves.

### ■ An Overview of Mortgage Pricing

In order to investigate an institution's pricing decisions, regulators must first confront the question of how to measure the mortgage's "price." As was argued in a previous *Economic Commentary,* the proper tool for conducting such investigations is through statistical comparisons of "overages" paid by different groups.[2] Essentially, an overage is calculated by comparing the up-front fee (the number of "points") a borrower actually pays on a loan with that listed on the lender's rate sheet on the day the borrower's interest rate is locked (the "required price").[3] This comparison would take into account regional location, the length of the borrower's rate lock, the size of the loan, and any other elements according to which prices may be arrayed on the rate sheet.

> Mortgage brokers play an important role in the housing-finance market, but they also present unique challenges to regulators attempting to enforce fair-lending laws. Should lenders be held responsible for the pricing decisions of brokers from whom they receive loan applications, or should fair-lending laws instead be applied directly to the brokers themselves?

To evaluate an institution's compliance with fair-lending laws, examiners calculate the overage charged each borrower and then compare the frequency and magnitude of overages charged to minorities with those charged to similarly situated white borrowers.[4] Raw differences in prices across racial groups would not constitute evidence of illegal discrimination in and of themselves. Rather, these differences must remain statistically significant even after controlling for other factors that might reasonably affect loan prices. (See box.)

When a loan is originated through a broker, the process of calculating an overage is essentially the same. As with their direct loans, wholesale lenders provide brokers with a rate sheet listing the prices at which they are willing to underwrite loans during a given time period, and they generally have a standard set of origination fees they charge on brokered loans.

However, there are important differences between brokered and direct lending that make testing for discriminatory lending patterns in brokered lending a fundamentally distinct exercise. First, in brokered lending, the actual origination and discount points charged, as well as the

ISSN 0428-1276

nominal interest rate, are set via nego-
tiations between the borrower and the
broker, not the wholesale lender that
underwrites the loan. Second, in most
cases the broker is able to keep any ex-
cess points that it is able to charge a bor-
rower over that required by the lender's
rate sheet. In other words, the broker is
the full beneficiary of any overage paid
by the borrower—the broker does not
share in the overage. Third, brokers gen-
erally are not bound by exclusivity
agreements with lenders. The typical
broker deals with several different
lenders simultaneously, selling each loan
to the lender that offers the best price on
any given day. As we shall see, these
features of wholesale lending have im-
portant implications for the interpreta-
tion of brokered-loan pricing patterns in
data from an individual lender.

### One Lender's Story
Consider the case of Acme Mortgage
Company, a hypothetical mortgage bank
that works with a large number of bro-
kers to solicit business. Suppose that in
their analysis of Acme's brokered lend-
ing portfolio, bank examiners find that
black borrowers pay overages more fre-
quently, resulting in a pricing disparity
of 1.5 points between white and black
borrowers, even after controlling for
other borrower and loan characteristics
that might legitimately and legally influ-
ence the prices of these loans. In com-
mon parlance, this disparity means that
the "typical" minority borrower paid
$1,500 dollars more in up-front fees on a
$100,000 loan than did an identical
white borrower for a loan with exactly
the same terms.

If such a disparity existed within Acme's
direct lending portfolio (among those
loans processed by Acme's own loan offi-
cers), it would be strong preliminary evi-
dence of illegal discrimination by Acme,
and the regulatory agency would investi-
gate further and possibly refer the case to
the Department of Justice.[5] There are a
number of reasons, however, why a refer-
ral may be inappropriate with regard to an
institution's wholesale portfolio (those
loans processed by outside brokers).

### Cross-Broker Disparities
It is important to note that pricing dispar-
ities within Acme's wholesale portfolio
can arise in two distinct ways: either
"across" or "within" individual brokers.
"Cross-broker disparities" result when
minority borrowers tend to apply at bro-
kers that charge higher fees, while white

borrowers tend to apply at brokers that
charge lower fees; despite this difference
in pricing across brokers, however, no
individual broker actually treats its own
minority and white customers differently.

In order to hold lenders accountable for
cross-broker disparities, regulators
would need to prove that the cause of the
disparity was differential treatment of
borrowers based on their race, and not
cost or other legitimate factors. This
would be very difficult. Indeed, there are
many conceivable reasons why individ-
ual brokers might charge more or less
for their services than other brokers and
why some brokers specialize in lending
to a particular segment of their commu-
nity. For example, a cross-broker dispar-
ity might be observed if higher-fee bro-
kers provide a fuller array of services,
such as spending more time with cus-
tomers, and minority borrowers tend to
prefer these brokers. As a result, we
argue that regulators should not view
cross-broker disparities on their own as
evidence of illegal discrimination.

### Within-Broker Disparities
Alternatively, "within-broker dispari-
ties" arise when white and minority cus-
tomers of the same broker are treated
differently. Within-broker disparities can
give rise to an overall pricing disparity
in Acme's portfolio in either of two
ways: if such disparities are pervasive
across many different brokers with
whom Acme does business; or if a single
broker with such a disparity supplies a
large proportion of Acme's loans.

Although within-broker disparities are,
on the surface, more suspect than cross-
broker disparities, in practice it can be
quite difficult to reliably interpret
whether they are truly the result of ille-
gal behavior. Proper evaluation requires
separately examining the data from each
individual broker for evidence that a
particular broker is engaged in discrimi-
natory practices. Separate statistical
tests should be conducted because dif-
ferent brokers generally are subject to
different economic factors affecting
their pricing patterns. Evaluating each
broker individually, however, entails
two types of difficulties.

First, for any given lender, the number of
loans originated via any one broker is
often too small to permit a meaningful
statistical analysis. Such an analysis re-
quires controlling for various factors that
are likely to affect the broker's propensity

to seek an overage, which in turn requires
a large sample of observations.[6]

More importantly, because an individual
broker typically deals with multiple
lenders, the loans the broker sends to any
one lender may not be representative of
the broker's overall activity. The loans
sent to that lender may happen to include
a disproportionate number originated to
minority borrowers and from which the
broker obtained an overage. Thus, while
the data from a given lender may indi-
cate a within-broker disparity, the bro-
ker's total activity may show no evi-
dence of discrimination.

### Should Lenders Be Liable for Their Brokers?
Even if regulators could reliably identify
discrimination arising from cross- or
within-broker disparities, the fundamen-
tal policy question remains as to whether
Acme should be held accountable for the
behavior of its brokers. We argue not. As
noted above, broker agreements gener-
ally do not require the broker to work
exclusively with any one bank, nor do
they require a certain number of loans to
be presented. Instead, they usually repre-
sent quintessential arms-length transac-
tions.[7] The broker solicits potential bor-
rowers, collects and verifies the
information on their applications, and
forwards the completed applications to
the lender offering the best price on any
given day. Pricing of these loans is the
result of negotiations between borrowers
and the broker. Indeed, the borrower and
the broker may agree upon a price long
before the ultimate lender is even cho-
sen.[8] In any event, the lender typically is
not a party to this decision, and receives
no portion of any overage obtained by
the broker. Given these facts, it seems
hard to justify holding Acme responsible
for a pricing decision in which it had lit-
tle or no input.[9]

Indeed, the relationship between the bro-
ker and Acme is substantively no differ-
ent than that between a lender and Fan-
nie Mae or Freddie Mac, the two major
secondary-market institutions that are
credited with making mortgage loans
substantially more affordable for con-
sumers.[10] When lenders prepare their
rate sheets, they do so based on esti-
mates of the prices at which various
loans will sell in the secondary market
weeks in the future. They then allow
borrowers to lock in an interest rate well
in advance of the actual funding date. Of
course, once the loan is actually funded,

## TESTING FOR PRICING BIAS

When regulators test for compliance with fair-lending laws, they typically conduct statistical analyses to see whether lenders systematically charge minority borrowers a higher price than they do whites. In doing so, they control for other factors that may affect the pricing of mortgage loans, many of which are correlated with race. For example:

• **Negotiation Skills** – Older, better educated, and more experienced borrowers may be more skilled at negotiating the terms of their loans.

• **Credit History** – Borrowers with poor credit histories may not deal for lower fees because they have fewer alternative sources of credit, and originators may seek higher fees to compensate for the extra time and effort such borrowers may entail.

• **Willingness to Shop** – Some borrowers may place a high premium on their time (for example, high-income borrowers) and choose not to shop for the best rate.

• **Market Conditions** – The competitiveness of the loan market may vary over the course of the year.

• **Length of Rate Lock** – Borrowers who let their rate float may be more susceptible to overaging at the time of closing; on the other hand, such borrowers may be more sophisticated and less prone to being overaged.

• **Loan Size** – Many of the costs associated with originating a mortgage do not vary with the size of the loan, giving originators a stronger incentive to overage borrowers with small loan amounts.

• **Type of Loan** – Cost differences across different loan products (conventional vs. government insured, home purchase vs. refinancing) may result from regulatory and market factors independent of the borrower's characteristics.

Fair-lending analyses attempt to control for these and other factors to isolate the effects of race on the pricing decision.

the actual price at which it will trade on the secondary market may be vastly different from that anticipated when the rate was locked. If loans are trading at a premium, the lender pockets the difference; if they are trading at a discount, the lender must eat the loss.[11] In either case, the borrower is helped by the fact that the rate can be locked in advance, effectively providing insurance against interest rate volatility.

This is essentially the same service that brokers provide to borrowers. The broker is an intermediary between the lender and the borrower in the same way that the lender is an intermediary between the borrower and the secondary market. Because brokers are in constant contact with lenders, they may be able to obtain better prices than borrowers could by contacting the lenders directly. If lenders were to be held liable for the pricing decisions of individual brokers, direct application of the same logic would suggest that Fannie Mae and Freddie Mac should be liable for the pricing decisions of anyone who sells loans to them, a policy that few are proposing.

### ■ What Should We Do?
Given the difficulty of evaluating lenders' wholesale loan portfolios for evidence of pricing discrimination, how are regulators to proceed? Clearly, brokered lending should not be exempt from fair-lending laws. This is an important and growing part of the housing-finance market, and basic fairness requires that all market participants be subject to the same rules and regulations. Nevertheless, the need for some kind of enforcement does not justify the use of methods that can be both unreliable and misleading.

We contend that fair-lending laws should be applied directly to brokers, not indirectly through the lenders they work with. The only way to determine whether a broker discriminates is by looking at all of that broker's pricing decisions, not just those loans that were funded by one particular lender or another. Only by observing the entire universe of a broker's loans can we begin to make a determination of whether a pattern of illegal discrimination exists.

Why is this not the current state of affairs? Most likely, the answer is historical accident. Depository institutions and their subsidiaries are already subject to regular examinations to verify their compliance with a host of consumer regulations. In contrast, independent mortgage brokers are not subject to regular examinations.[12]

Nevertheless, the most effective and accurate way of enforcing these laws is to evaluate mortgage brokers directly. Just as we do not hold Fannie Mae and Freddie Mac liable for the pricing decisions of the mortgage banks that sell them loans, neither should we hold lenders responsible for pricing decisions that are wholly out of their control.

### ■ Footnotes
1. Alicia H. Munnell, Lynn E. Browne, James McEneaney, and Geoffrey M.B. Tootell. "Mortgage Lending in Boston: Interpreting HMDA Data." Federal Reserve Bank of Boston Working Paper No. 92-7, October 1992. This paper was later revised and published in the *American Economic Review*, vol. 86, no. 1, March 1996, pp. 25–53.

2. See Stanley D. Longhofer, "Measuring Pricing Bias in Mortgages," Federal Reserve Bank of Cleveland, *Economic Commentary*, August 1, 1998.

3. The rate sheet indicates the number of discount points required by a lender to fund loans with various nominal interest rates. For an example of a rate sheet, see Stanley D. Longhofer, "Measuring Pricing Bias in Mortgages," Federal Reserve Bank of Cleveland, *Economic Commentary*, August 1, 1998.

4. For expositional convenience, we discuss only racial disparities in this article. Of course, disparities across other protected characteristics such as age, gender, or marital status are illegal as well, and are considered by examiners in their fair-lending investigations.

5. By law, if the Federal Reserve or other bank regulator uncovers substantial evidence that discrimination may have occurred, it is required to pass this information on to the Department of Justice for further investigation. Note that a referral to Justice does not constitute a conclusion of discrimination, merely that further investigation is warranted.

6. These are generally the same as the factors that influence a lender's propensity to seek an overage with a retail loan. For example, brokers typically are paid a fixed percentage of the loan amount by the lender as compensation for originating the loan, and, therefore, they have greater incentive to seek additional compensation (in the form of an overage) on smaller loans.

7. Some broker agreements tie the broker much more closely to the lender, with some brokers acting little differently than a lender's in-house loan officers. Obviously, the degree to which the lender should be held responsible for the broker's behavior should depend on the amount of freedom the broker has to act independently of the lending institution.

8. This fact suggests that the very notion of an overage is less meaningful in the context of the brokered lending relationship. That is, the proper measure of pricing bias would compare the points paid by the borrower with those required by the broker on the day the borrower's loan terms are set.

9. Some might argue that lenders, if they so desired, could act to influence the prices charged by the brokers with whom they deal (for example, by placing restrictions on the spread between the wholesale price and the price paid by the borrower), and that lenders should therefore be held accountable for broker pricing behavior. Such restrictions, however, would likely reduce competition among brokers or by constraining their ability to shop among lenders.

10. The secondary-mortgage market comprises a wide variety of investors who purchase pools of mortgage loans in order to receive the principal and interest payments they generate. Participants include depository institutions, institutional investors such as insurance companies and pension funds, and wealthy individuals. The primary difference distinguishing the relationships between broker and lender and that of lender and the secondary market is that brokers rarely fund loans and hold them on their own books prior to delivering them to a lender, whereas mortgage banks generally do hold loans for a short time before selling them on the secondary market.

11. Lenders do, of course, hedge these risks using a variety of tools.

12. Technically, enforcement of the Fair Housing Act and the Equal Credit Opportunity Act with respect to mortgage brokers falls under the jurisdiction of the Federal Trade Commission, but this agency does not conduct regular examinations of these brokers.

*Stanley D. Longhofer is the Stephen L. Clark Chair of Real Estate and Finance at Wichita State University. The work on this Economic Commentary was completed while he was an economist at the Federal Reserve Bank of Cleveland. Paul S. Calem is a senior economist at the Board of Governors of the Federal Reserve System. The authors thank Glenn Canner for helpful comments and suggestions.*

The views stated herein are those of the authors and not necessarily those of the Federal Reserve Bank of Cleveland or of the Board of Governors of the Federal Reserve System.

Economic Commentary is published by the Research Department of the Federal Reserve Bank of Cleveland. To receive copies or to be placed on the mailing list, e-mail your request to marvanne.kosut@clev.frb.org or fax it to 216-579-3050. Economic Commentary is also available at the Cleveland Fed's site on the World Wide Web: http://www.clev.frb.org/research.

**Now on our Web site!** See a glossary of terms used in this *Economic Commentary* when you visit us online.

**Federal Reserve Bank of Cleveland**
**Research Department**
**P.O. Box 6387**
**Cleveland, OH 44101**

**Return Service Requested:**
Please send corrected mailing label to the above address.

Material may be reprinted if the source is credited. Please send copies of reprinted material to the editor.

**BULK RATE**
**U.S. Postage Paid**
**Cleveland, OH**
**Permit No. 385**

# EXHIBIT  D

Real Estate Settlement Procedures Act Statement
of Policy 2001-1, 66 Fed. Reg. 53,052, 53,055
(Oct. 18, 2001) ("2001 HUD Policy Statement")



**Thursday,
October 18, 2001**

**Part V**

# Department of Housing and Urban Development

24 CFR Part 3500
Real Estate Settlement Procedures Act Statement of Policy 2001–1: Clarification of Statement of Policy 1999–1 Regarding Lender Payments to Mortgage Brokers, and Guidance Concerning Unearned Fees Under Section 8(b); Final Rule

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

**24 CFR Part 3500**

**[Docket No. FR–4714–N–01]**

**RIN 2502–AH74**

**Real Estate Settlement Procedures Act Statement of Policy 2001–1: Clarification of Statement of Policy 1999–1 Regarding Lender Payments to Mortgage Brokers, and Guidance Concerning Unearned Fees Under Section 8(b)**

**AGENCY:** Office of the Assistant Secretary for Housing-Federal Housing Commissioner, HUD.

**ACTION:** Statement of Policy 2001–1.

**SUMMARY:** This Statement of Policy is being issued to eliminate any ambiguity concerning the Department's position with respect to those lender payments to mortgage brokers characterized as yield spread premiums and to overcharges by settlement service providers as a result of questions raised by two recent court decisions, *Culpepper* v. *Irwin Mortgage Corp.* and *Echevarria* v. *Chicago Title and Trust Co.,* respectively. In issuing this Statement of Policy, the Department clarifies its interpretation of Section 8 of the Real Estate Settlement Procedures Act (RESPA) in Statement of Policy 1999–1 Regarding Lender Payments to Mortgage Brokers (the 1999 Statement of Policy), and reiterates its long-standing interpretation of Section 8(b)'s prohibitions. *Culpepper* v. *Irwin Mortgage Corp.* involved the payment of yield spread premiums from lenders to mortgage brokers. *Echevarria* v. *Chicago Title and Trust Co.* involved the applicability of Section 8(b) to a settlement service provider that overcharged a borrower for the service of another settlement service provider, and then retained the amount of the overcharge.

Today's Statement of Policy reiterates the Department's position that yield spread premiums are not per se legal or illegal, and clarifies the test for the legality of such payments set forth in HUD's 1999 Statement of Policy. As stated there, HUD's position that lender payments to mortgage brokers are not illegal per se does not imply, however, that yield spread premiums are legal in individual cases or classes of transactions. The legality of yield spread premiums turns on the application of HUD's test in the 1999 Statement of Policy as clarified today.

The Department also reiterates its long-standing position that it may violate Section 8(b) and HUD's

implementing regulations: (1) For two or more persons to split a fee for settlement services, any portion of which is unearned; or (2) for one settlement service provider to mark-up the cost of the services performed or goods provided by another settlement service provider without providing additional actual, necessary, and distinct services, goods, or facilities to justify the additional charge; or (3) for one settlement service provider to charge the consumer a fee where no, nominal, or duplicative work is done, or the fee is in excess of the reasonable value of goods or facilities provided or the services actually performed.

This Statement of Policy also reiterates the importance of disclosure so that borrowers can choose the best loan for themselves, and it describes disclosures HUD considers best practices. The Secretary is also announcing that he intends to make full use of his regulatory authority to establish clear requirements for disclosure of mortgage broker fees and to improve the settlement process for lenders, mortgage brokers, and consumers.

**EFFECTIVE DATE:** October 18, 2001.

**FOR FURTHER INFORMATION CONTACT:** Ivy M. Jackson, Acting Director, RESPA/ILS Division, Room 9156, U.S. Department of Housing and Urban Development, 451 Seventh Street, SW., Washington, DC 20410; telephone (202) 708–0502, or (for legal questions) Kenneth A. Markison, Assistant General Counsel for GSE/RESPA, Room 9262, Department of Housing and Urban Development, Washington, DC 20410; telephone (202) 708–3137 (these are not toll-free numbers). Persons who have difficulty hearing or speaking may access this number via TTY by calling the toll-free Federal Information Relay Service at (800) 877–8339.

**SUPPLEMENTARY INFORMATION:**

**General Background**

The Department is issuing this Statement of Policy in accordance with 5 U.S.C. 552 as a formal pronouncement of its interpretation of relevant statutory and regulatory provisions. Section 19(a) (12 U.S.C. 2617(a)) of the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2601–2617) (RESPA) specifically authorizes the Secretary "to prescribe such rules and regulations [and] to make such interpretations * * * as may be necessary to achieve the purposes of [RESPA]."

Section 8(a) of RESPA prohibits any person from giving and any person from accepting "any fee, kickback, or thing of value pursuant to an agreement or

understanding, oral or otherwise" that real estate settlement service business shall be referred to any person. See 12 U.S.C. 2607(a). Section 8(b) prohibits anyone from giving or accepting "any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service * * * other than for services actually performed." 12 U.S.C. 2607(b). Section 8(c) of RESPA provides, "Nothing in [Section 8] shall be construed as prohibiting * * * (2) the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed * * *" 12 U.S.C. 2607(c)(2). RESPA also requires the disclosure of settlement costs to consumers at the time of or soon after a borrower applies for a loan and again at the time of real estate settlement. 12 U.S.C. 2603–4. RESPA's requirements apply to transactions involving a "federally related mortgage loan" as that term is defined at 12 U.S.C. 2602(1).

*I. Lender Payments to Mortgage Brokers*

The Conference Report on the Department's 1999 Appropriations Act directed HUD to address the issue of lender payments to mortgage brokers under RESPA. The Conference Report stated that "Congress never intended payments by lenders to mortgage brokers for goods or facilities actually furnished or for services actually performed to be violations of [Sections 8](a) or (b) (12 U.S.C. sec. 2607) in its enactment of RESPA." H. Rep. 105–769, at 260. As also directed by Congress, HUD worked with industry groups, federal agencies, consumer groups and other interested parties in collectively producing the 1999 Statement of Policy issued on March 1, 1999. 64 FR 10080. Interested members of the public are urged to consult the 1999 Statement of Policy for a more detailed discussion of the background on lender payments to brokers addressed in today's Statement.

HUD's 1999 Statement of Policy established a two-part test for determining the legality of lender payments to mortgage brokers for table funded transactions and intermediary transactions under RESPA: (1) Whether goods or facilities were actually furnished or services were actually performed for the compensation paid and; (2) whether the payments are reasonably related to the value of the goods or facilities that were actually furnished or services that were actually performed. In applying this test, HUD believes that total compensation should be scrutinized to assure that it is reasonably related to the goods,

facilities, or services furnished or performed to determine whether it is legal under RESPA. In the determination of whether payments from lenders to mortgage brokers are permissible under Section 8 of RESPA, the threshold question is whether there were goods or facilities actually furnished or services actually performed for the total compensation paid to the mortgage broker. Where a lender payment to a mortgage broker comprises a portion of total broker compensation, the amount of the payment is not, under the HUD test, scrutinized separately and apart from total broker compensation.

Since HUD issued its 1999 Statement of Policy, most courts have held that yield spread premiums from lenders to mortgage brokers are legal provided that such payments meet the test for legality articulated in the 1999 Statement of Policy and otherwise comport with RESPA. However, in a recent decision, *Culpepper* v. *Irwin Mortgage Corp.*, 253 F.3d 1324 (11th Cir. 2001), the Court of Appeals for the Eleventh Circuit upheld certification of a class in a case alleging that yield spread premiums violated Section 8 of RESPA where the defendant lender, pursuant to a prior understanding with mortgage brokers, paid yield spread premiums to the brokers based solely on the brokers' delivery of above par interest rate loans. The court concluded that a jury could find that yield spread premiums were illegal kickbacks or referral fees under RESPA where the lender's payments were based exclusively on interest rate differentials reflected on rate sheets, and the lender had no knowledge of what services, if any, the broker performed. The court described HUD's 1999 Statement of Policy as "ambiguous." *Id.* at 1327. Accordingly, and because courts have now rendered conflicting decisions, HUD has an obligation to clarify its position and issues this Statement today to provide such clarification and certainty to lenders, brokers, and consumers.

Because this clarification focuses on the legality of lender payments to mortgage brokers in transactions subject to RESPA, the coverage of this statement is restricted to payments to mortgage brokers in table funded and intermediary broker transactions. Lender payments to mortgage brokers where mortgage brokers initially fund the loan and then sell the loan after settlement are outside the coverage of this statement as exempt from RESPA under the secondary market exception.

## II. Disclosure

Besides establishing the two-part test for determining the legality of yield spread premiums, the 1999 Statement of Policy discussed the importance of disclosure in permitting borrowers to choose the best loan for themselves. The mortgage transaction is complicated, and most people engage in such transactions relatively infrequently, compared to the other purchases they make. In some instances, borrowers have paid very large origination costs, either up front fees, yield spread premiums, or both, which they might have been able to avoid with timely disclosure. Timely disclosure would permit them to shop for preferable origination costs and mortgage terms and to agree to those costs and terms that meet their needs. The Department therefore is issuing a clarification of the importance of disclosure, with a description of disclosures that it considers to be best practices.

In this Statement of Policy, the Secretary is announcing that he intends to make full use of his regulatory authority as expeditiously as possible to provide clear requirements and guidance prospectively regarding disclosure of mortgage broker fees and, more broadly, to improve the mortgage settlement process so that homebuyers and homeowners are better served. Pending the promulgation of such a rule, the Secretary asks the industry to adopt new disclosure requirements to promote competition and to better serve consumers.

## III. Unearned Fees

The 1999 Statement of Policy also touched upon another area of recurring questions under Section 8 of RESPA: the legality of payments that are in excess of the reasonable value of the goods or facilities provided or services performed. See 64 FR 10082–3.

Since RESPA was enacted, HUD has consistently interpreted Section 8(b) and HUD's RESPA regulations to prohibit settlement service providers from charging unearned fees, as occurred in *Echevarria* v. *Chicago Title & Trust Co.*, 256 F.3d 623 (7th Cir. 2001). Such an interpretation is consistent with Congress's finding, when enacting RESPA, that consumers need protection from unnecessarily high settlement costs. Through this Statement of Policy, HUD makes clear that Section 8(b) prohibits any person from giving or accepting any fees other than payments for goods and facilities provided or services actually performed. Payments that are unearned fees occur in, but are not limited to, cases where: (1) Two or more persons split a fee for settlement services, any portion of which is unearned; or (2) one settlement service provider marks-up the cost of

the services performed or goods provided by another settlement service provider without providing additional actual, necessary, and distinct services, goods, or facilities to justify the additional charge; or (3) one settlement service provider charges the consumer a fee where no, nominal, or duplicative work is done, or the fee is in excess of the reasonable value of goods or facilities provided or the services actually performed.

In a July 5, 2001 decision, the Court of Appeals for the Seventh Circuit concluded that unearned fees must be passed from one settlement provider to another in order for such fees to violate Section 8(b). Accordingly, the court held that a settlement service provider did not violate Section 8(b) when, in billing a borrower, it added an overcharge to another provider's fees and retained the additional charge without providing any additional goods, facilities or services. *Echevarria* v. *Chicago Title & Trust Co.* Other courts have held that two or more parties must split or share a fee in order for a violation of Section 8(b) to occur. Still other courts have stated, however, that a single provider can violate Section 8(b). Because the courts are now divided, HUD is issuing this Statement of Policy to reiterate its interpretation of Section 8(b).

The Court of Appeals for the Seventh Circuit rendered its conclusion in *Echevarria* "absent a formal commitment by HUD to an opposing position. * * *" *Id.* at 630. In issuing this Statement of Policy pursuant to Section 19(a), HUD reiterates its position on unearned fees under Section 8(b) of RESPA, which HUD regards as long standing.

## IV. Statement of Policy 2001–1

To give guidance to interested members of the real estate settlement industry and the general public on the application of RESPA and its implementing regulations, the Secretary hereby issues the following Statement of Policy. The interpretations embodied in this Statement of Policy are issued pursuant to Section 19(a) of RESPA. 12 U.S.C. 2617(a).

### Part A. Mortgage Broker Fees

Yield Spread Premiums

One of the primary barriers to homeownership and homeowners' ability to refinance and lower their housing costs is the up front cash needed to obtain a mortgage. The closing costs and origination fees associated with a mortgage loan are a significant component of these up front

cash requirements. Borrowers may choose to pay these fees out of pocket, or to pay the origination fees, and possibly all the closing fees, by financing them; *i.e.*, adding the amount of such fees to the principal balance of their mortgage loan. The latter approach, however, is not available to those whose loan-to-value ratio has already reached the maximum permitted by the lender. For those without the available cash, who are at the maximum loan-to-value ratio, or who simply choose to do so, there is a third option. This third option is a yield spread premium.

Yield spread premiums permit homebuyers to pay some or all of the up front settlement costs over the life of the mortgage through a higher interest rate. Because the mortgage carries a higher interest rate, the lender is able to sell it to an investor at a higher price. In turn, the lender pays the broker an amount reflective of this price difference. The payment allows the broker to recoup the up front costs incurred on the borrower's behalf in originating the loan. Payments from lenders to brokers based on the rates of borrowers' loans are characterized as "indirect" fees and are referred to as yield spread premiums.[1]

A yield spread premium is calculated based upon the difference between the interest rate at which the broker originates the loan and the par, or market, rate offered by a lender. The Department believes, and industry and consumers agree, that a yield spread premium can be a useful means to pay some or all of a borrower's settlement costs. In these cases, lender payments reduce the up front cash requirements to borrowers. In some cases, borrowers are able to obtain loans without paying any up front cash for the services required in connection with the origination of the loan. Instead, the fees for these services are financed through a higher interest rate on the loan. The yield spread premium thus can be a legitimate tool to assist the borrower. The availability of this option fosters homeownership.

HUD has recognized the utility of yield spread premiums in regulations issued prior to the 1999 Statement of Policy. In a final rule concerning "Deregulation of Mortgagor Income Requirements," HUD indicated that up front costs could be lowered by yield spread premiums.54 FR 38646 (September 20, 1989).

In a 1992 rule concerning RESPA, HUD specifically listed yield spread

premiums as an example of fees that must be disclosed. The example was codified as Illustrations of Requirements of RESPA, Fact Situations 5 and 13 in Appendix B to 24 CFR part 3500. (See also Instructions at Appendix A to 24 CFR part 3500 for Completing HUD–1 and HUD–1A Settlement Statements.) HUD did not by these examples mean that yield spread premiums were *per se* legal, but HUD also did not mean that yield spread premiums were *per se* illegal.

HUD also recognizes, however, that in some cases less scrupulous brokers and lenders take advantage of the complexity of the settlement transaction and use yield spread premiums as a way to enhance the profitability of mortgage transactions without offering the borrower lower up front fees. In these cases, yield spread premiums serve to increase the borrower's interest rate and the broker's overall compensation, without lowering up front cash requirements for the borrower. As set forth in this Statement of Policy, such uses of yield spread premiums may result in total compensation in excess of what is reasonably related to the total value of the origination services provided by the broker, and fail to comply with the second part of HUD's two-part test as enunciated in the 1999 Statement of Policy, and with Section 8.

The 1999 Statement of Policy's Test for Legality

The Department restates its position that yield spread premiums are not per se illegal. HUD also reiterates that this statement "does not imply * * * that yield spread premiums are legal in individual cases or classes of transactions." 64 FR 10084. The legality of any yield spread premium can only be evaluated in the context of the test HUD established and the specific factual circumstances applicable to each transaction in which a yield spread premium is used.

The 1999 Statement of Policy established a two-part test for determining whether lender payments to mortgage brokers are legal under RESPA. In applying Section 8 and HUD's regulations, the 1999 Statement of Policy stated:

In transactions where lenders make payments to mortgage brokers, HUD does not consider such payments (*i.e.*, yield spread premiums or any other class of named payments) to be illegal *per se*. HUD does not view the name of the payment as the appropriate issue under RESPA. HUD's position that lender payments to mortgage brokers are not illegal *per se* does not imply, however, that yield spread premiums are legal in individual cases or classes of

transactions. The fees in cases and classes of transactions are illegal if they violate the prohibitions of Section 8 of RESPA.

In determining whether a payment from a lender to a mortgage broker is permissible under Section 8 of RESPA, the first question is whether goods or facilities were actually furnished or services were actually performed for the compensation paid. The fact that goods or facilities have been actually furnished or that services have been performed by the mortgage broker does not by itself make the payment legal. The second question is whether the payments are reasonably related to the value of the goods or facilities that were actually furnished or services that were actually performed.

In applying this test, HUD believes that total compensation should be scrutinized to assure that it is reasonably related to goods, facilities, or services furnished or performed to determine whether it is legal under RESPA. Total compensation to a broker includes direct origination and other fees paid by the borrower, indirect fees, including those that are derived from the interest rate paid by the borrower, or a combination of some or all. The Department considers that higher interest rates alone cannot justify higher total fees to mortgage brokers. All fees will be scrutinized as part of total compensation to determine that total compensation is reasonably related to the goods or facilities actually furnished or services actually performed. HUD believes that total compensation should be carefully considered in relation to price structures and practices in similar transactions and in similar markets. 64 FR 10084.

Culpepper

The need for further clarification of HUD's position, as set forth in the 1999 Statement of Policy, on the treatment of lender payments to mortgage brokers under Section 8 of RESPA (12 U.S.C. 2607), is evident from the recent decision of the Court of Appeals for the Eleventh Circuit in *Culpepper.*

In upholding class certification in *Culpepper,* the court only applied the first part of the HUD test, and then further narrowed its examination of whether the lender's yield spread payments were "for services" by focusing exclusively on the presumed intent of the lender in making the payments. The crux of the court's decision is that Section 8 liability for the payment of unlawful referral fees could be established under the first part of the HUD test alone, based on the facts that the lender's payments to mortgage brokers were calculated solely on the difference between the par interest rate and the higher rate at which the mortgage brokers delivered loans, and that the lender had no knowledge of what services, if any, the brokers had performed.

HUD was not a party to the case and disagrees with the judicial interpretation regarding Section 8 of

---

[1] Indirect fees from lenders are also known as "back funded payments," "overages," or "servicing release premiums."

RESPA and the 1999 Statement of Policy.

Clarification of the HUD Test

It is HUD's position that where compensable services are performed, the 1999 Statement of Policy requires application of both parts of the HUD test before a determination can be made regarding the legality of a mortgage payment to a mortgage broker.

1. *The First Part of the HUD Test:* Under the first part of HUD's test, the total compensation to a mortgage broker, of which a yield spread premium may be a component or the entire amount, must be for goods or facilities provided or services performed. HUD's position is that in order to discern whether a yield spread premium was for goods, facilities or services under the first part of the HUD test, it is necessary to look at each transaction individually, including examining all of the goods or facilities provided or services performed by the broker in the transaction, whether the goods, facilities or services are paid for by the borrower, the lender, or partly by both.

It is HUD's position that neither Section 8(a) of RESPA nor the 1999 Statement of Policy supports the conclusion that a yield spread premium can be presumed to be a referral fee based solely upon the fact that the lender pays the broker a yield spread premium that is based upon a rate sheet, or because the lender does not have specific knowledge of what services the broker has performed. HUD considers the latter situation to be rare. The common industry practice is that lenders follow underwriting standards that demand a review of originations and that therefore lenders typically know that brokers have performed the services required to meet those standards.

Yield spread premiums are by definition derived from the interest rate. HUD believes that a rate sheet is merely a mechanism for displaying the yield spread premium, and does not indicate whether a particular yield spread premium is a payment for goods and facilities actually furnished or services actually performed under the HUD test. Whether or not a yield spread premium is legal or illegal cannot be determined by the use of a rate sheet, but by how HUD's test applies to the transaction involved.

Section 8 prohibits the giving and accepting of fees, kickbacks, or things of value for the referral of settlement services and also unearned fees. It is therefore prudent for a lender to take action so as to ensure that brokers are performing compensable services and

receiving only compensation that, in total, is reasonable for those services provided. As stated, however, in the 1999 Statement of Policy:

The Department recognizes that some of the goods or facilities actually furnished or services actually performed by the broker in originating a loan are "for" the lender and other goods or facilities actually furnished or services actually performed are "for" the borrower. HUD does not believe that it is necessary or even feasible to identify or allocate which facilities, goods or services are performed or provided for the lender, for the borrower, or as a function of State or Federal law. All services, goods and facilities inure to the benefit of both the borrower and the lender in the sense that they make the loan transaction possible. * * * 64 FR 10086.

The 1999 Statement of Policy provided a list of compensable loan origination services originally developed by HUD in a response to an inquiry from the Independent Bankers Association of America (IBAA), which HUD considers relevant in evaluating mortgage broker services. In analyzing each transaction to determine if services are performed HUD believes the 1999 Statement of Policy should be used as a guide. As stated there, the IBAA list is not exhaustive, and while technology is changing the process of performing settlement services, HUD believes that the list is still a generally accurate description of settlement services. Compensation for these services may be paid either by the borrower or by the lender, or partly by both. Compensable services for the first part of the test do not include referrals or no, nominal, or duplicative work.

2. *Reasonableness of Broker Fees:* The second part of HUD's test requires that total compensation to the mortgage broker be reasonably related to the total set of goods or facilities actually furnished or services performed.

The 1999 Statement of Policy said in part:

The Department considers that higher interest rates alone cannot justify higher total fees to mortgage brokers. All fees will be scrutinized as part of total compensation to determine that total compensation is reasonably related to the goods or facilities actually furnished or services actually performed. 64 FR 10084.

Accordingly, the Department believes that the second part of the test is applied by determining whether a mortgage broker's total compensation is reasonable. Total compensation includes fees paid by a borrower and any yield spread premium paid by a lender, not simply the yield spread premium alone. Yield spread premiums serve to allow the borrower a lower up front cash payment in return for a

higher interest rate, while allowing the broker to recoup the total costs of originating the loan. Total compensation to the broker must be reasonably related to the total value of goods or facilities provided or services performed by the broker. Simply delivering a loan with a higher interest rate is not a compensable service. The Department affirms the 1999 Statement of Policy's position on this matter for purposes of RESPA enforcement.

The 1999 Statement also said:

In analyzing whether a particular payment or fee bears a reasonable relationship to the value of the goods or facilities actually furnished or services actually performed, HUD believes that payments must be commensurate with the amount normally charged for similar services, goods or facilities. This analysis requires careful consideration of fees paid in relation to price structures and practices in similar transactions and in similar markets. If the payment or a portion thereof bears no reasonable relationship to the market value of the goods, facilities or services provided, the excess over the market rate may be used as evidence of a compensated referral or an unearned fee in violation of Section 8(a) or (b) of RESPA. 64 FR 10086.

The 1999 Statement of Policy also stated:

The level of services mortgage brokers provide in particular transactions depends on the level of difficulty involved in qualifying applicants for particular loan programs. For example, applicants have differences in credit ratings, employment status, levels of debt, or experience that will translate into various degrees of effort required for processing a loan. Also, the mortgage broker may be required to perform various levels of services under different servicing or processing arrangements with wholesale lenders. 64 FR 10081.

In evaluating mortgage broker fees for enforcement purposes, HUD will consider these factors as relevant in assessing the reasonableness of mortgage broker compensation, as well as comparing total compensation for loans of similar size and similar characteristics within similar geographic markets.

Also, while the Department continues to believe that comparison to prices in similar markets is generally a key factor in determining whether a mortgage broker's total compensation is reasonable, it is also true that in less competitive markets comparisons to the prices charged by other similarly situated providers may not, standing alone, provide a useful measure. As a general principle, HUD believes that in evaluating the reasonableness of broker compensation in less competitive markets, consideration of price structures from a wider range of

providers may be warranted to reach a meaningful conclusion.

## Part B. Providing Meaningful Information to Borrowers

In addition to addressing the legality of yield spread premiums in the 1999 Statement of Policy, HUD emphasized the importance of disclosing broker fees, including yield spread premiums.

There is no requirement under existing law that consumers be fully informed of the broker's services and compensation prior to the GFE. Nevertheless, HUD believes that the broker should provide the consumer with information about the broker's services and compensation, and agreement by the consumer to the arrangement should occur as early as possible in the process. 64 FR 10087.

HUD continues to believe that disclosure is extremely important, and that many of the concerns expressed by borrowers over yield spread premiums can be addressed by disclosing yield spread premiums, borrower compensation to the broker, and the terms of the mortgage loan, so that the borrower may evaluate and choose among alternative loan options.

In the 1999 Statement of Policy, HUD stated:

* * * HUD believes that for the market to work effectively, borrowers should be afforded a meaningful opportunity to select the most appropriate product and determine what price they are willing to pay for the loan based on disclosures which provide clear and understandable information.

The Department reiterates its long-standing view that disclosure alone does not make illegal fees legal under RESPA. On the other hand, while under current law, pre-application disclosure to the consumer is not required, HUD believes that fuller information provided at the earliest possible moment in the shopping process would increase consumer satisfaction and reduce the possibility of misunderstanding. 64 FR 10087.

HUD currently requires the disclosure of yield spread premiums on the Good Faith Estimate and the HUD–1. The 1999 Statement of Policy said:

The Department has always indicated that any fees charged in settlement transactions should be clearly disclosed so that the consumer can understand the nature and recipient of the payment. Code-like abbreviations like 'YSP to DBG, POC', for instance, have been noted. [Footnote omitted.] Also the Department has seen examples on the GFE and/or the settlement statement where the identity and/or purposes of the fees are not clearly disclosed. The Department considers unclear and confusing disclosures to be contrary to the statute's and the regulation's purposes of making RESPA-covered transactions understandable to the consumer. At a minimum, all fees to the mortgage broker are to be clearly labeled and properly estimated

on the GFE. On the settlement statement, the name of the recipient of the fee (in this case, the mortgage broker) is to be clearly labeled and listed, and the fee received from a lender is to be clearly labeled and listed in the interest of clarity. 64 FR 10086–10087.

While the disclosure on the GFE and HUD–1 is required, the Department is aware and has stated that the current GFE/HUD–1 disclosure framework is often insufficient to adequately inform consumers about yield spread premiums and other lender paid fees to brokers. Under the current rules, the GFE need not be provided until after the consumer has applied for a mortgage and may have paid a significant fee, and the HUD–1 is only given at closing. Because of this, HUD has in recent years sought to foster a more consumer beneficial approach to disclosure regarding yield spread premiums through successive rulemaking efforts. This history is discussed more fully in the 1999 Statement of Policy.[2]

Representatives of the mortgage industry have said that since the 1999 Statement of Policy, many brokers provide borrowers a disclosure describing the function of mortgage brokers and stating that a mortgage broker may receive a fee in the transaction from the lender. While the 1999 Statement of Policy commended the National Association of Mortgage Brokers and the Mortgage Bankers Association of America for strongly suggesting such a disclosure to their respective memberships, the Statement of Policy added:

Although this statement of policy does not mandate disclosures beyond those currently required by RESPA and Regulation X, the most effective approach to disclosure would allow a prospective borrower to properly evaluate the nature of the services and all costs for a broker transaction, and to agree to such services and costs before applying for a loan. Under such an approach, the broker would make the borrower aware of whether the broker is or is not serving as the consumer's agent to shop for a loan, and the total compensation to be paid to the mortgage broker, including the amounts of each of the fees making up the compensation. 64 FR 10087.

In HUD's view, meaningful disclosure includes many types of information: what services a mortgage broker will perform, the amount of the broker's total compensation for performing those services (including any yield spread premium paid by the lender), and whether or not the broker has an agency

or fiduciary relationship with the borrower. The disclosure should also make the borrower aware that he or she may pay higher up front costs for a mortgage with a lower interest rate, or conversely pay a higher interest rate in return for lower up front costs, and should identify the specific trade-off between the amount of the increase in the borrower's monthly payment (and also the increase in the interest rate) and the amount by which up front costs are reduced. HUD believes that disclosure of this information, and written acknowledgment by the borrower that he or she has received the information, should be provided early in the transaction. Such disclosure facilitates comparison shopping by the borrower, to choose the best combination of up front costs and mortgage terms from his or her individual standpoint. HUD regards full disclosure and written acknowledgment by the borrower, at the earliest possible time, as a best practice.

Yield spread premiums are currently required to be listed in the "800" series of the HUD–1 form, listing "Items Payable in Connection with Loan." This existing practice, however, does not disclose the purpose of the yield spread premium, which is to lower up front cost to borrowers. To achieve this end it has been suggested to the Department that the yield spread premium should be reported as a credit to the borrower in the "200" series, among the "Amounts Paid by or in Behalf of Borrowers." The homebuyer or homeowner could then see that the yield spread premium is reducing closing costs, and also see the extent of the reduction.

HUD believes that improved early disclosure regarding mortgage broker compensation and the entry of yield spread premiums as credits to borrowers on the GFE and the HUD–1 settlement statement are both useful and complementary forms of disclosure. The Department believes that used together these methods of disclosure offer greater assurance that lender payments to mortgage brokers serve borrowers' best interests.

While the 1999 Policy Statement and IV. Part A. of this Statement only cover certain lender payments to mortgage brokers, as described above, HUD also believes that similar information on the trade-off between lower up front costs and higher interest rates and monthly payments should be disclosed to borrowers on all mortgage loan originations, not merely those originated by brokers. HUD is aware that while yield spread premiums are not used in loans originated by lenders, lenders are able to offer loans with low or no up

---

[2] In both the HUD/Federal Reserve Board Report on RESPA/TILA Reform, 1998, and the HUD/Treasury Report on Curbing Predatory Home Mortgage Lending, 2000, the agencies recommended earlier disclosures to facilitate shopping and lower settlement costs.

front costs required at closing by charging higher interest rates and recouping the costs by selling the loans into the secondary market for a price representing the difference between the interest rate on the loan and the par, or market, interest rate. Sale of such a loan achieves the same purpose as the yield spread premium does on a loan originated by a broker. The Department strongly believes that all lenders and brokers should provide the level of consumer disclosure that the purposes of RESPA intend and that fair business practices demand. As indicated in the 1999 Statement of Policy, HUD emphasizes that fuller information provided as early as possible in the shopping process would increase consumer satisfaction and reduce the possibility of misunderstanding. In the future, full and early disclosures are factors that the Department would weigh favorably in exercising its enforcement discretion in cases involving mortgage broker fees. Nevertheless, the Department also again makes clear that disclosure alone does not make illegal fees legal under RESPA. The Department will scrutinize all relevant information in making enforcement decisions, including whether transactions evidence practices that may be illegal.

*Part C. Section 8(b) Unearned Fees*

A. Background

RESPA was enacted in 1974 to provide consumers "greater and more timely information on the nature of the costs of the [real estate] settlement process" and to protect consumers from "unnecessarily high settlement charges caused by certain abusive practices * * *" 12 U.S.C. 2601.

Since RESPA was enacted, HUD has interpreted Section 8(b) as prohibiting any person from giving or accepting any unearned fees, i.e., charges or payments for real estate settlement services other than for goods or facilities provided or services performed. Payments that are unearned fees for settlement services occur in, but are not limited to, cases where: (1) Two or more persons split a fee for settlement services, any portion of which is unearned; or (2) one settlement service provider marks-up the cost of the services performed or goods provided by another settlement service provider without providing additional actual, necessary, and distinct services, goods, or facilities to justify the additional charge; or (3) one settlement service provider charges the consumer a fee where no, nominal, or duplicative work is done, or the fee is in excess of the reasonable value of

goods or facilities provided or the services actually performed.

In the first situation, two settlement service providers split or share a fee charged to a consumer and at least part, if not all, of at least one provider's share of the fee is unearned. In the second situation, a settlement service provider charges a fee to a consumer for another provider's services that is higher than the actual price of such services, and keeps the difference without performing any actual, necessary, and distinct services to justify the additional charge. In the third situation, one settlement service provider charges a fee to a consumer where no work is done or the fee exceeds the reasonable value of the services performed by that provider, and for this reason the fee or any portion thereof for which services are not performed is unearned.

HUD regards all of these situations as legally indistinguishable, in that they involve payments for settlement services where all or a portion of the fees are unearned and, thus, are violative of the statute. HUD, therefore, specifically interprets Section 8(b) as not being limited to situations where at least two persons split or share an unearned fee for the provision to be violated.

As already indicated in this Statement of Policy, meaningful disclosure of all charges and fees is essential under RESPA. Such disclosures help protect consumers from paying unearned or duplicate fees. However, as noted above, in the 1999 Statement of Policy the Department reiterated "its long-standing view that disclosure alone does not make illegal fees legal under RESPA." 64 FR 10087.

B. HUD's Guidance and Regulations

HUD guidance and regulations have consistently interpreted Section 8 as prohibiting all unearned fees. In 1976, HUD issued a Settlement Costs Booklet that provided that "[i] t is also illegal to charge or accept a fee or part of a fee where no service has actually been performed." 41 FR 20289 (May 17, 1976). Between 1976 and 1992, HUD indicated in informal opinions that unearned fees occur where there are excessive fees charged, regardless of the number of settlement service providers involved.[3]

In the preamble to HUD's 1992 final rule revising Regulation X (57 FR 49600 (November 2, 1992)), HUD stated: "Section 8 of RESPA (12 U.S.C. 2607) prohibits kickbacks for referral of business incident to or part of a settlement service and also prohibits the splitting of a charge for a settlement service, other than for services actually performed (i.e., no payment of unearned fees)." 57 FR 49600 (November 2, 1992).

HUD's regulations, published on November 2, 1992, implement Section 8(b). Section 3500.14(c)[4] provides:

No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a settlement service in connection with a transaction involving a federally-related mortgage loan other than for services actually performed. A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this Section. The source of the payment does not determine whether or not a service is compensable. Nor may the prohibitions of this part be avoided by creating an arrangement wherein the purchaser of services splits the fee.

24 CFR 3500.14(g)(2) states in part:

The Department may investigate high prices to see if they are the result of a referral fee or a split of a fee. If the payment of a thing of value bears no reasonable relationship to the market value of the goods or services provided, then the excess is not for services or goods actually performed or provided. These facts may be used as evidence of a violation of Section 8 and may serve as a basis for a RESPA investigation. High prices standing alone are not proof of a RESPA violation.

24 CFR 3500.14(g)(3) provides in part:

When a person in a position to refer settlement service business * * * receives a payment for providing additional settlement services as part of a real estate transaction, such payment must be for services that are actual, necessary and distinct from the primary services provided by such person.

---

administrative agencies could use HUD's previous opinions to determine the validity of conduct occurring under the previous version of Regulation X. *See* 24 CFR 3500.4(c).

[4] The heading to 24 CFR 3500.14 is titled "Prohibition against kickbacks and unearned fees." However, the heading of subsection (c) is titled "split of charges," and the preamble to the November 1992 rule states "[s]ection 8 of RESPA (12 U.S.C. 2607) prohibits kickbacks for referral of business incident to or part of a settlement service and also prohibits the splitting of a charge for a settlement service, other than for services actually performed (i.e., no payment of unearned fees)." 57 FR 49600 (November 2, 1992). The rule headings and preamble text are a generalized description of Section 8 that is more developed in the actual regulation text. As discussed in Section D of this Statement of Policy, HUD believes that the actual text of the rule, as amended in 1992, makes clear that Section 8(b)'s prohibitions against unearned fees apply even when only one settlement service provider is involved.

[3] *See* e.g., Old Informal Opinion (6), August 16, 1976 and Old Informal Opinion (65), April 4, 1980; Barron and Berenson, *Federal Regulation of Real Estate and Mortgage Lending,* (4th Ed.1998). On November 2, 1992 (57 F.R. 49600), when HUD issued revisions to its RESPA regulations, it withdrew all of its informal counsel opinions and staff interpretations issued before that date. The 1992 rule provided, however, that courts and

**53058    Federal Register** / Vol. 66, No. 202 / Thursday, October 18, 2001 / Rules and Regulations

In Appendix B to the HUD RESPA regulations, HUD provides illustrations of the requirements of RESPA. Comment 3 states in part:

> The payment of a commission or portion of the * * * premium * * * or receipt of a portion of the payment * * * where no substantial services are being performed * * * is a violation of Section 8 of RESPA. It makes no difference whether the payment comes from [the settlement service provider] or the purchaser. The amount of the payment must bear a reasonable relationship to the services rendered. Here [the real estate broker in the example] is being compensated for a referral of business to [the title company].

In 1996, in the preamble to the final rule on the Withdrawal of Employer/Employee and Computer Loan Origination Systems Exemptions [5] (61 FR 29238 (June 7, 1996)), HUD reiterated its interpretation of Section 8(b) of RESPA as follows:

> HUD believes that Section 8(b) of the statute and the legislative history make clear that no person is allowed to receive 'any portion' of charges for settlement services, except for services actually performed. The provisions of Section 8(b) could apply in a number of situations: (1) where one settlement service provider receives an unearned fee from another provider; (2) where one settlement service provider charges the consumer for third-party services and retains an unearned fee from the payment received; or (3) where one settlement service provider accepts a portion of a charge (including 100% of the charge) for other than services actually performed. The interpretation urged [by the commenters to the proposed rule published on July 21, 1994], that a single settlement service provider can charge unearned or excessive fees so long as the fees are not shared with another, is an unnecessarily restrictive interpretation of a statute designed to reduce unnecessary costs to consumers. The Secretary, charged by statute with interpreting RESPA, interprets Section 8(b) to mean that two persons are not required for the provision to be violated. 61 FR 29249.

The latest revision to the Settlement Costs Booklet for consumers, issued in 1997, also provides "[i]t is also illegal for anyone to accept a fee or part of a fee for services if that person has not actually performed settlement services for the fee." 62 FR 31998 (June 11, 1997).

Further, HUD has provided information to the public and the mortgage industry in the "Frequently Asked Questions" section of its RESPA Web site, located at <http://www.hud.gov/fha/sfh/res/resindus.html>. Question 25 states:

Can a lender collect from the borrower an appraisal fee of $200, listing the fee as such on the HUD–1, yet pay an independent appraiser $175 and collect the $25 difference?

The answer reads:

> No, the lender may only collect $175 as the actual charge. It is a violation of Section 8(b) for any person to accept a split of a fee where services are not performed.

In 1999, by letter submitted at the request of the Superior Court of California, Los Angeles County, in the case of *Brown* v. *Washington Mutual Bank* (Case No. BC192874), HUD provided the following response to a specific question posed by the court on lender "markups" of another settlement service provider's fees:

> A lender that purchases third party vendor services for purposes of closing a federally related mortgage loan may not, under RESPA, mark up the third party vendor fees for purposes of making a profit. HUD has consistently advised that where lenders or others charge consumers marked-up prices for services performed by the third party providers without performing additional services, such charges constitute "splits of fees" or "unearned fees" in violation of Section 8(b) of RESPA.

HUD noted in its letter to the court that the response reflected the Department's long-standing position.

### C. Recent Cases

Notwithstanding HUD's regulations and other guidance, the Court of Appeals for the Seventh Circuit held, in *Echevarria* v. *Chicago Title and Trust Co.*, 256 F.3d 623 (7th Cir. 2001), that Section 8(b) was not violated where a title company, without performing any additional services, charged the plaintiffs more money than was required by the recorder's office to record a deed and the title company then retained the difference. The court reasoned that plaintiffs "failed to plead facts tending to show that Chicago Title illegally shared fees with the Cook County Recorder. The Cook County Recorder received no more than its regular recording fees and it did not give to or arrange for Chicago Title to receive an unearned portion of these fees. The County Recorder has not engaged in the third party involvement necessary to state a claim under [RESPA § 8(b)]." Id. at 626. The court in essence concluded that unearned fees must be passed from one settlement provider to another in order for such fees to violate Section 8(b).

Earlier, in *Willis* v. *Quality Mortgage USA, Inc.*, 5 F. Supp. 2d 1306 (M.D. Ala. 1998), cited by the Seventh Circuit in support of its conclusion, the district court concluded that 24 CFR 3500.14(c),

"[w]hen read as a whole," prohibits payments for which no services are performed "only if those payments are split with another party." Id. at 1309. The *Willis* court held that there must be a split of a charge between a settlement service provider and a third party to establish a violation Section 8(b). The court also concluded that 24 CFR 3500.14(g)(3) only applied when there was a payment from a lender to a broker, or vice versa. The payment from a borrower to a mortgage lender could not be the basis for a violation of 24 CFR 3500.14(g)(3) and Section 8(b).

HUD was not a party to the cases and disagrees with these judicial interpretations of Section 8(b) which it regards as inconsistent with HUD's regulations and HUD's long-standing interpretations of Section 8(b).

### D. Unearned Fees Under Section 8(b)

This Statement of Policy reaffirms HUD's existing, long-standing interpretation of Section 8(b) of RESPA. Sections 8(a) and (b) of RESPA contain distinct prohibitions. Section 8(a) prohibits the giving or acceptance of any payment pursuant to an agreement or understanding for the referral of settlement service business involving a federally related mortgage loan; it is intended to eliminate kickbacks or compensated referral arrangements among settlement service providers. Section 8(b) prohibits the giving or accepting of any portion, split, or percentage of any charge other than for goods or facilities provided or services performed; it is intended to eliminate unearned fees. Such fees are contrary to the Congressional finding when enacting RESPA that consumers need protection from unnecessarily high settlement charges. 12 U.S.C. 2601(a).

It is HUD's position that Section 8(b) proscribes the acceptance of any portion or part of a charge other than for services actually performed. Inasmuch as Section 8(b)'s proscription against "any portion, split, or percentage" of an unearned charge for settlement services is written in the disjunctive, the prohibition is not limited to a split. In HUD's view, Section 8(b) forbids the paying or accepting of any portion or percentage of a settlement service—including up to 100%—that is unearned, whether the entire charge is divided or split among more than one person or entity or is retained by a single person. Simply put, given that Section 8(b) proscribes unearned portions or percentages as well as splits, HUD does not regard the provision as restricting only fee splitting among settlement service providers. Further, since Section 8(b) on its face prohibits

---

[5] This final rule was delayed by legislation, but the Department implemented portions of the final rule that were not affected by the legislative delay on November 15, 1996. 61 FR 58472 (November 15, 1996).

the giving or accepting of an unearned fee by any person, and 24 CFR 3500.14(c) speaks of a charge by "a person," it is also incorrect to conclude that the Section 8(b) proscription covers only payments or charges among settlement service providers.[6]

A settlement service provider may not levy an additional charge upon a borrower for another settlement service provider's services without providing additional services that are bona fide and justify the increased charge. Accordingly, a settlement service provider may not mark-up the cost of another provider's services without providing additional settlement services; such payment must be for services that are actual, necessary and distinct services provided to justify the charge. 24 CFR 3500.14(g)(3).[7] The HUD regulation implementing Section 8(b) states: "[a] charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this Section." 24 CFR 3500.14 (c).

The regulations also make clear that a charge by a single service provider where little or no services are performed is an unearned fee that is prohibited by the statute. 24 CFR 3000.14(c). A single service provider is also prohibited from charging a duplicative fee. Further, a

single service provider cannot serve in two capacities, e.g., a title agent and closing attorney, and be paid twice for the same service. The fee the service provider would be receiving in this case is duplicative under 24 CFR 3000.14(c) and not necessary and distinct under 24 CFR 3000.14(g)(3). Clearly, in all of these instances, the source of the payment—whether from consumers, other settlement service providers, or other third parties—is not relevant in determining whether the fee is earned or unearned because ultimately, all settlement payments come directly or indirectly from the consumer. See 24 CFR 3500.14(c). Therefore, a single settlement service provider violates Section 8(b) whenever it receives an unearned fee.

A single service provider also may be liable under Section 8(b) when it charges a fee that exceeds the reasonable value of goods, facilities, or services provided. HUD's regulations as noted state: "If the payment of a thing of value bears no relationship to the goods or services provided, then the excess is not for services or goods actually performed or provided." 24 CFR 3500.14(g)(2). Section 8(c)(2) only allows "the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or services actually performed," i.e., permitting only that compensation which is reasonably related to the goods or facilities provided or services performed. Compensation that is unreasonable is unearned under Section 8(b) and is not bona fide under Section 8(c)(2).

The Secretary, therefore, interprets Section 8(b) of RESPA to prohibit all

unearned fees, including, but not limited to, cases where: (1) Two or more persons split a fee for settlement services, any portion of which is unearned; or (2) one settlement service provider marks-up the cost of the services performed or goods provided by another settlement service provider without providing additional actual, necessary, and distinct services, goods, or facilities to justify the additional charge; or (3) one service provider charges the consumer a fee where no, nominal, or duplicative work is done, or the fee is in excess of the reasonable value of goods or facilities provided or the services actually performed.

*V. Executive Order 12866, Regulatory Planning and Review*

The Office of Management and Budget (OMB) has reviewed this Statement of Policy in accordance with Executive Order 12866, (captioned "Regulatory Planning and Review"). OMB determined that this Statement of Policy is a "significant regulatory action" as defined in Section 3(f) of the Order (although not an economically significant regulatory action under the Order). Any changes to the Statement of Policy resulting from this review are available for public inspection between 7:30 a.m. and 5:30 p.m. weekdays in the Office of the Rules Docket Clerk.

Dated: October 15, 2001.

**John C. Weicher,**

*Assistant Secretary for Housing-Federal Housing Commissioner.*

[FR Doc. 01–26321 Filed 10–15–01; 4:51 pm]

**BILLING CODE 4210–27–P**

---

[6] HUD is, of course, unlikely to direct any enforcement actions against consumers for the payment of unearned fees, because a consumer's intent is to make payment for services, not an unearned fee.

[7] HUD notes that some lenders have charged an additional fee merely for "reviewing" another settlement service provider's services. HUD does not regard such "review" as constituting an actual, necessary, or distinct additional service permissible under HUD's regulations.

# EXHIBIT  E

Federal Reserve Board, Frequently Asked
Questions About the New HMDA Data
(Apr. 3, 2006) ("FRB FAQ")

available at http://www.federalreserve.gov/newsevents/press/bcreg
/bcreg20060403a1.pdf

April 3, 2006

**FREQUENTLY ASKED QUESTIONS ABOUT THE NEW HMDA DATA**

**General Background**

**1.  What is the Home Mortgage Disclosure Act (HMDA)?**

HMDA, enacted by Congress in 1975, requires most mortgage lenders located in metropolitan areas to collect data about their housing-related lending activity, report the data annually to the government, and make the data publicly available.  Initially, HMDA required reporting of the geographic location of originated and purchased home loans.  In 1989, Congress expanded HMDA data to include information about denied home loan applications, and the race, sex, and income of the applicant or borrower.  In 2002, the Federal Reserve Board (the Board) amended the regulation that implements HMDA (Regulation C) to add new data fields, including price data for some loans (see Q. 9).  HMDA does not prohibit any lending activity, nor is it intended to encourage unsound lending practices or the allocation of credit.

**2.  What are the purposes of HMDA?**

Congress enacted HMDA to:
- provide the public with information to judge whether lenders are serving their communities;
- enhance enforcement of laws prohibiting discrimination in lending; and
- provide private investors and public agencies with information to guide investments in housing.

**3.  What are HMDA data?**

HMDA data cover home purchase and home improvement loans and refinancings, and contain information about loan originations, loan purchases, and denied, incomplete or withdrawn applications.  With some exceptions, for each transaction the lender reports data about:
- the loan (or application), such as the type and amount of the loan made (or applied for) and, in limited circumstances, its price;
- the disposition of the application, such as whether it was denied or resulted in an origination of a loan;
- the property to which the loan relates, such as its type (single-family vs. multi-family) and location (including the census tract);
- the applicant's ethnicity, race, sex, and income; and
- the sale of the loan, if it was sold.

In 2004, HMDA data included a total of 33 million reported loans and applications.  More information about HMDA data can be found at http://www.ffiec.gov/hmda.

- 2 -

**4.  Are all home mortgage loans covered by HMDA?**

Most home-secured loans are included in HMDA data.  Some, however, are not included.
For example, a home equity loan taken out for consolidation of credit-card debt or to pay
for medical expenses is not covered by HMDA, unless some part of the loan proceeds are
also intended for home improvement or home purchase purposes. Home equity lines of
credit (HELOCs) may not be in the data even if intended for home improvement or home
purchase because reporting HELOCs is optional. Additionally, not all mortgage lenders
are HMDA reporters.  For example, a lender does not have to report HMDA data unless it
has an office in a metropolitan statistical area (MSA).  As a result, reporting of home
loans made in some rural areas may be relatively low.

**5.  When, and in what forms, are HMDA data made available to the public?**

March 31 is the earliest date that data from the previous calendar year are required to be
publicly available.  That is the date by which an institution must respond to any request it
receives by March 1 for its "loan application register" (LAR).  The LAR is the format for
data disclosure required by law.  It itemizes reportable transactions application by
application, loan by loan.  Lenders are not required, however, to arrange transactions on
the LAR in any particular order (for example, by branch or by type of loan).  Any
member of the public may request a modified LAR from any lender covered by HMDA.
To help preserve consumer privacy, the law requires lenders to remove the loan or
application number and the application and action-taken dates before making the LAR
public.

September 2006 is the expected publication date for summary tables of the 2005 data.
The tables are published by the Federal Financial Institutions Examination Council
(FFIEC). Summary tables will be available on three levels.  A summary is published for
every mortgage lender, broken down by each metropolitan area in which it does business;
for every metropolitan area, aggregating information about different lenders' activity in
the area; and for the nation as a whole.   For more information about the tables and how
to get them, go to http://www.ffiec.gov/hmda.

**6.  How do government agencies use HMDA data?**

Government agencies use HMDA data to assist in evaluating lender compliance with
anti-discrimination laws and other consumer protection laws.  The anti-discrimination
laws include the Equal Credit Opportunity Act (ECOA) and the Fair Housing Act (FHA).
These laws prohibit discrimination in home mortgage lending, among other things, on
several bases such as race, national origin, sex, and, in the case of ECOA, age. For more
information on ECOA and FHA, see the *Policy Statement on Discrimination in Lending*,
59 Fed. Reg. 18266 (April 15, 1994), available at
http://www.fdic.gov/regulations/laws/rules/5000-3860.html).

- 3 -

Government agencies use HMDA data to identify institutions, loan products, or geographic markets that show disparities in loan applications or originations by race, ethnicity, or other characteristics that may warrant further investigation under ECOA or FHA. With the addition of price data for higher-priced loans, the agencies are also able to identify in the HMDA data price disparities that may warrant further investigation (see Q. 13, 15 and 16). If disparities are found to violate ECOA or FHA, certain federal agencies are authorized to compel lenders to cease discriminatory practices and, among other remedies, obtain monetary relief for victims.

In addition, the agencies responsible for evaluating insured depository institutions under the Community Reinvestment Act (CRA) use HMDA data to evaluate institutions' records of helping to meet community mortgage credit needs. For more information about CRA, go to http://www.ffiec.gov/cra.

### 7. Who reports HMDA data?

Banks, savings and loan associations, credit unions, and mortgage and consumer finance companies are required to report HMDA data if they meet the law's criteria for coverage. Generally, whether a lender is covered by HMDA depends on:
- The lender's asset size (for example, an institution with assets of $34 million or less on December 31, 2004, did not have to collect HMDA data in 2005);
- Whether the lender has an office in a metropolitan statistical area; and
- The extent of the lender's housing-related lending activity.
In 2005, 8,853 lenders reported 2004 HMDA data. For more information about the law's criteria for coverage, go to http://www.ffiec.gov/hmda/pdf/2004guide.pdf.

### 8. What is the Federal Reserve Board's role in HMDA?

Congress authorized the Federal Reserve Board (the Board) to write rules to carry out HMDA. The Board's HMDA rules are known as Regulation "C" (12 CFR Part 203). The Board also provides guidance about HMDA through a staff commentary (12 CFR Part 203, Supp. I). Additionally, the Board assists the FFIEC in publishing the manual, "A Guide to HMDA Reporting: Getting it Right!" (available at http://www.ffiec.gov/hmda/pdf/2004guide.pdf), processing the reported data, and publishing summary tables each year (see Q. 5).

### Price Data on "Higher-Priced Loans"

### 9. What price data are available under HMDA?

The price data take the form of a "rate spread." Lenders must report the spread (difference) between the annual percentage rate (APR) on a loan and the rate on Treasury securities of comparable maturity – but only for loans with spreads above designated thresholds. So rate spreads are reported for some, but not all, reported home loans.

- 4 -

The APR represents the cost of credit to the consumer. It captures not just the contract-based interest rate on a loan, but also the points and fees that a consumer pays and other finance charges such as premiums for private mortgage insurance. Lenders must calculate and disclose the APR to consumers under a separate law, the Truth in Lending Act.

Lenders also report price information in the form of a "flag" indicating whether a loan exceeds the price triggers of the Home Ownership and Equity Protection Act (HOEPA). Those triggers are substantially higher than the thresholds for reporting rate spreads. The rate-spread thresholds and the HOEPA triggers are discussed below (see Q. 10, 20).

**10. Which loans are deemed "higher-priced" and therefore have their prices reported?**

A loan's rate spread (see Q. 9) must be reported if the spread exceeds the threshold set by the Board in Regulation C. For first-lien loans, the threshold is three percentage points above the Treasury security of comparable maturity; for second-lien loans, which tend to have higher prices, the threshold is five percentage points above the Treasury security of comparable maturity. The Board chose the thresholds in the belief that they would exclude the vast majority of prime-rate loans and include the vast majority of subprime-rate loans. From year to year, however, the proportion of subprime-rate loans that have their prices reported may vary because of changes in the interest rate environment (see Q. 27).

**11. Why is the requirement to report price data limited to higher-priced loans?**

The higher-priced mortgage market has grown substantially in the last decade. Its expansion has afforded some consumers greater access to home mortgage credit. The growth of the higher-priced mortgage market, however, has raised concerns that consumers in this market lack the information needed to negotiate the best terms and may be vulnerable to unfair or deceptive practices. Also, the wider range of prices in this market has raised concerns that price differences may reflect unlawful discrimination rather than legitimate risk- and cost-related factors.

In contrast, the prime market's limited variation in prices helps allay concerns about market efficiency and consumer protection. Though the prime market is not without risk of unlawful discrimination or violation of other consumer protection laws, the banking agencies use their routine examinations of depository institutions to address that risk (see Q. 16).

**12. Is price information reported on all mortgage loans that have prices above the price reporting thresholds?**

Price information is reported on most, but not all, loans that have prices above the price reporting thresholds. Under Regulation C, some loans are not reportable at all, such as home equity loans for consolidation of debt (see Q. 4). Moreover, for certain kinds of

- 5 -

loans that Regulation C requires be reported, a lender need not report price information. Examples in this category include unsecured home improvement loans, assumptions, and loans purchased from other lenders (though purchased loans would likely have been reported by the original lenders). Finally, reporting information about home equity lines of credit (HELOCs) is optional; a lender opting to report HELOCs need not report price information.

**13. To the extent the HMDA data indicate that minorities pay more for loans than whites on average, does that difference prove unlawful discrimination?**

No. However, such a disparity may indicate a need for closer scrutiny. Supervisory and enforcement agencies investigating disparities typically collect additional information about factors that may determine loan prices from lenders' loan files or other sources. Without information about relevant price determinants, one cannot draw definitive conclusions about whether particular lenders discriminate unlawfully or take unfair advantage of consumers. HMDA data include some potentially relevant determinants of price, such as lien status, but exclude many other potential determinants, such as borrower credit history, borrower debt-to-income ratio, and the ratio of the loan amount to the value of the property securing the loan (loan-to-value ratio). Therefore, price disparities by race, ethnicity, or sex disclosed in HMDA data will not alone prove unlawful discrimination.

**14. Why aren't all pricing factors reported in HMDA data?**

In 2002, when the Board adopted the requirement to report price data and lien status, an important determinant of loan price, the Board considered adding to HMDA data other data items relevant to loan pricing, such as loan-to-value ratio. For each possible new data item, the Board weighed the potential benefit and burden that would result, such as the costs of collection and reporting. On the basis of that analysis, which relied in part on public comments, the Board decided not to add more factors.

**15. If HMDA data cannot support definitive conclusions about whether price differences reflect unlawful discrimination, then what is the point of requiring disclosure of price data?**

Though the price data do not support definitive conclusions, they are a useful screen, previously unavailable, to identify lenders, products, applicants, and geographic markets where price differences among racial or other groups are sufficiently large to warrant further investigation. Enforcement and supervisory agencies can use the HMDA price data to better target their resources. HMDA price data can also be a valuable part of any mortgage lender's self-evaluation program.

**16. What other tools beside the HMDA price data are used to detect price discrimination?**

- 6 -

The federal banking agencies analyze HMDA price data in conjunction with other information to evaluate the potential for price discrimination. The Interagency Fair Lending Examination Procedures direct examiners to identify risk factors for discrimination by reviewing a variety of information, including an institution's records, to understand the institution's fair lending compliance management program. Examiners evaluate a lender's risk of price discrimination based on several factors, including the relationship between loan pricing and compensation of loan officers or brokers; the presence of broad pricing discretion; the use of a system of risk-based pricing that is not empirically based and statistically sound; substantial disparities among prices quoted or charged to applicants who differ in their protected characteristics such as race or ethnicity; and consumer complaints alleging price discrimination. The HMDA price data are analyzed in conjunction with these other factors to determine the level of risk of price discrimination. The level of risk of price discrimination, in turn, is one of the factors examiners consider when determining the depth and breadth of a fair lending examination by a federal banking agency.

**17.  Why do some borrowers pay higher prices than others?**

Many factors affect the price of a mortgage loan. Some factors, such as a borrower's credit history, debt-to-income (DTI) ratio, or the ratio of the loan amount to the value of the property that secures the loan (LTV), are used by lenders to set loan prices because they have been shown to predict whether or not borrowers will pay their loans as agreed. Generally, borrowers with poor credit histories or high DTI or LTV ratios represent increased risk of non-payment, which lenders offset with a higher price to such borrowers.

Other factors that may affect loan price include the price the lender pays for the money it lends to borrowers ("cost of funds"), the type of loan product and whether its rate and terms are fixed or variable, whether the lender holds its loans in portfolio or sells them in the secondary market, and whether the lender extends credit through its own loan officers or independent brokers. Discretionary pricing by loan officers and brokers can also produce differing loan prices, although discretionary pricing is not, by itself, unlawful. Unfortunately, price disparities may also be the result of unfair or deceptive behavior by lenders or brokers, or unlawful discrimination on the basis of race, ethnicity, or sex.

**18.  How can a consumer obtain the best price on a loan?**

It is important that borrowers shop, compare, and negotiate the price and other terms of their loans. For more information about shopping for a mortgage loan, go to www.mymoney.gov or call 1-888-MYMONEY.

**Data on HOEPA Loans**

**19.  Lenders are required to report a loan's HOEPA status. What is HOEPA?**

- 7 -

Lenders are required to report whether a loan is subject to the provisions of the Home Ownership and Equity Protection Act (HOEPA).  HOEPA, enacted as part of the Truth in Lending Act, imposes substantive limitations and additional disclosures on certain types of home mortgage loans with rates or fees above a certain percentage or amount.  For more information about HOEPA, see the Board's Regulation Z, 12 CFR part 226, sections 31, 32 and 34.

**20.  What is the difference between a HOEPA loan and a higher-priced loan reported under HMDA?**

Many, but not all, HOEPA loans are reported under HMDA; there are some kinds of home equity loans that HOEPA covers that HMDA does not require to be reported (see Q. 4).  Moreover, only a minority of loans that have their rate spreads reported under HMDA are HOEPA loans, because HMDA's threshold rate for reporting a loan's rate spread is much lower than the threshold rate for HOEPA's coverage of a loan.  On first lien loans, for example, HMDA-reportable loans must have their rate spread reported if the APR exceeds the yield on comparable Treasury securities by three or more percentage points (see Q. 9, 10), while HOEPA covers loans with APRs that exceed the comparable Treasury yield by more than eight percentage points – a much higher threshold.  An alternative test for HOEPA coverage (whether the points and fees exceed 8 percent of the total loan amount) also sets a high threshold.  In short, Congress limited HOEPA's protections and disclosures to the highest-priced loans in the subprime home mortgage market, while the Board set HMDA's price thresholds to include the vast majority of subprime-rate mortgage loans.

**21.  Does the requirement in Regulation C to report HOEPA status impose any new obligations on lenders?**

Under the amendments to Regulation C, lenders are required to report whether a loan is subject to the requirements of HOEPA.  The amendments to Regulation C do not, however, affect any of HOEPA's requirements or limitations.  Lenders should already have in place procedures for monitoring and complying with the provisions of HOEPA.

### Other Items in HMDA Data that Aid Interpretation of Price Data

**22.  Why must lenders report the lien status of a loan?**

Lenders report whether a loan is or would be secured by a lien on a dwelling and, if so, whether a first lien or a subordinate (junior) lien.  A loan's lien status determines what rate-spread reporting threshold applies to the loan (see Q. 9, 10).  Also, because lien status is an important determinant of loan price (interest rates on first-lien loans are generally lower than rates on junior-lien loans), lien status differences may explain some price disparities.

**23.  Why must lenders identify loans involving manufactured homes?**

- 8 -

HMDA has long required lenders to identify whether a loan or application involved a one-to-four family home or a multi-family home.  Lenders also must identify whether a loan or application involves a manufactured home.  Generally speaking, manufactured homes are factory-built homes essentially ready for occupancy when they leave the factory.  The market for credit to finance manufactured home purchases is somewhat different from the market for credit to finance site-built home purchases.  For example, applications for manufactured home financing are denied at much higher rates than applications for site-built home financing.  Identification of manufactured home loans will make it easier to identify the sources of differences in denial rates, and will improve understanding of manufactured home financing.

**Year-To-Year Comparison of HMDA Data**

**24.  How has the reporting of borrower ethnicity and race under HMDA changed?**

In 2002, the Board amended Regulation C's rules for collection of information about applicants' ethnicity and race, to conform them to revised standards of the Office of Management and Budget (OMB) for collection of such data.  These standards are available at http://www.whitehouse.gov/omb/fedreg/1997standards.html.  The new rules for collecting ethnicity and race information under HMDA became effective with the collection of 2004 data.  Therefore, the change may complicate comparisons based on race between HMDA data preceding 2004 and HMDA data from 2004 and later years.  For more information about the changes, go to http://www.federalreserve.gov/boarddocs/press/bcreg/2004/20041210/attachment2.pdf

**25.  How will changes in OMB's standards for defining metropolitan and micropolitan statistical areas affect comparison of HMDA data preceding 2004 with data from 2004 and later years?**

HMDA requires the use of metropolitan statistical areas defined by OMB for a variety of purposes: determining whether a lender has reporting obligations, reporting property location, providing disclosures and reports of lending activity, and posting notices about the availability of HMDA data.  For HMDA data collected in 2003 and previous years, OMB's 1990 standards for defining MSAs were in effect.  OMB's 2000 standards, however, apply to HMDA data collected in 2004 and later years. The application of the new OMB standards will, therefore, affect comparisons of HMDA data for 2004 and later years with data for previous years.  For more information, go to http://www.federalreserve.gov/boarddocs/press/bcreg/2003/20031219/attachment.pdf

**26.  How do the transition rules affect the HMDA data?**

HMDA requires lenders to report data about an application in the year in which the application was denied or resulted in an origination.  The 2002 amendments to HMDA took effect on January 1, 2004.  The Board provided guidance, in the form of transition rules, to assist lenders in collecting and reporting data for applications received before

- 9 -

January 1, 2004, but not acted on until later. For more information, go to
http://www.ffiec.gov/hmda/pdf/transitionrules.pdf

The transition rules primarily affect lenders' 2004 data but could also affect their 2005
data in unusual cases in which applications taken before 2004 were not acted on until
2005. To help data users isolate the effects of the transition rules, the FFIEC flagged
applications taken before 2004 in the lender disclosure reports and aggregate reports for
2004 data released in September 2005; the FFIEC will also flag pre-2004 applications in
the reports for 2005 data to be released in September 2006. In addition, lenders were
encouraged to flag applications taken before 2004 on their 2004 Loan Application
Registers.

**27. How should year-to-year changes in the number or proportion of loans with
prices above the HMDA price reporting thresholds (higher-priced loans) be
interpreted?**

Year-to-year changes in the number or proportion of loans with prices that exceed the
thresholds for reporting price information (higher-priced loans) should be interpreted
with great care. Changes in the number or proportion of higher-priced loans could be due
to changes in the interest rate environment – specifically, in the relationship between
short-term and long-term interest rates. Such changes also could be due to changes in
lenders' business practices or consumers' borrowing practices or risk profiles.

The "yield curve" displays how the yield on an instrument varies with its maturity and,
therefore, it reflects the relationship between short-term and long-term interest rates. The
yield curve is typically upward-sloped, that is, short-term rates are typically lower than
long-term rates. Sometimes, however, the yield curve is flat, that is, short-term rates are
sometimes close to long-term rates. And, occasionally, the yield curve inverts, so that
short-term rates are above long-term rates.

Changes in the shape of the yield curve, that is, the relationship between short-term and
long-term interest rates, can affect the reporting of higher-priced loans. Lenders usually
use relatively short-term interest rates to set mortgage rates (for example, interest rates on
maturities of less than ten years); but, for most loans, Regulation C requires lenders to
use long-term rates (20 years or more) to determine whether to report a loan as higher-
priced. Thus, a change from one year to the next in the relationship between short-term
rates and long-term rates will cause a change from one year to the next in the proportion
of loans that are reported as higher-priced loans, all other things being equal. For
example, if short-term rates rise more than long-term rates, then the number and
proportion of loans reported as higher-priced loans will increase if all other factors that
may influence the number and proportion of higher-priced loans, such as the business
practices of lenders and the risk profiles and borrowing practices of borrowers, remain
constant. Conversely, if short-term rates fall more than long-term rates, then the number
and proportion of loans reported as higher-priced loans will fall if all other potentially
influential factors remain constant. It is also possible that the number or proportion of

- 10 -

loans reported as higher-priced could change in response to both a change in the interest rate environment and to changes in other factors.

Short-term interest rates rose over 2004 and 2005, while long-term rates fell over 2004 and were relatively stable over 2005.  Thus, while in 2004, short-term rates were well below long-term rates, by the end of 2005, short-term rates and long-term rates were fairly close.  Accordingly, one would expect a higher proportion of loans originated in 2005 than of loans originated in 2004 to be reported under HMDA as higher-priced loans. Changes in other factors, such as the business practices of lenders or the risk profiles or borrowing practices of borrowers, also could have affected the proportion of loans reported as higher-priced loans.

# EXHIBIT  F

Joint Press Release, Board of Governors of the
Federal Reserve System (Apr. 12, 2007)

## Board of Governors of the Federal Reserve System

# Joint Press Release

Board of Governors of the Federal Reserve System
Department of Housing and Urban Development
Federal Deposit Insurance Corporation
National Credit Union Administration
Office of the Comptroller of the Currency
Office of Thrift Supervision

**For immediate release**                                                      **April 3, 2006**

### Agencies Announce Updated Answers to Frequently Asked Questions About HMDA Price Data

The federal bank, credit union, and thrift supervisory agencies, along with the Department of Housing and Urban Development (HUD), today released updated "Answers to Frequently Asked Questions" (FAQs) to aid interpretation of the 2005 home loan data to be disclosed this year under the Home Mortgage Disclosure Act (HMDA).

For the second year in a row, the data will include price information on loans priced above reporting thresholds set by the Federal Reserve Board regulation that implements HMDA, Regulation C. As of March 31, lenders started making these data available to the public upon request in the form of a Loan Application Register, after removing certain information to protect the privacy of applicants and borrowers. Summary statistical reports for each lender and an aggregate report for each Metropolitan Statistical Area will be released in September by the Federal Financial Institutions Examination Council (FFIEC).

Preliminary indications are that the data will show that the proportion of mortgage loans with prices above the HMDA price reporting thresholds increased from 2004 to 2005. The updated FAQs, newly added Question 27, explain that an increase is expected because of changes in the interest rate environment from 2004 to 2005--specifically, the narrowing of the difference between short-term interest rates and long-term interest rates (sometimes referred to as a "flattening of the yield curve"). Changes in other factors, such as the business practices of lenders or the risk profiles or borrowing practices of borrowers, also could have affected the proportion of loans reported as higher-priced loans.

The updated FAQs will be posted on each of the agencies' web sites and on the web site of the FFIEC.

HMDA, which was enacted by Congress in 1975, requires most mortgage lenders located in metropolitan areas to collect data about their housing-related lending activity, report the data annually to the government, and make the data publicly available in a modified Loan Application Register.

Initially, HMDA required reporting of the geographic location of originated and purchased home loans. In 1989, Congress expanded HMDA data to include information about denied home loan applications and the race, sex, and income of applicants and borrowers. In 2002, the Federal Reserve Board amended the HMDA regulations to require lenders to report price data for certain higher-priced home mortgage loans, and other new data.

Attachment (73 KB PDF)

**Media Contacts:**

| Federal Reserve | Susan Stawick | (202) 452-2955 |
| HUD | Antoinette Banks | (202) 708-0685 |
| FDIC | David Barr | (202) 898-6992 |
| NCUA | John McKechnie | (703) 518-6331 |
| OCC | Kevin Mukri | (202) 874-5770 |
| OTS | Kevin Petrasic | (202) 906-6677 |