# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **HERBERT and DORIS STEELE, ERIC R. CHAVEZ, ALEXANDRA DIAZ, AND SONIA TORRES, on behalf of themselves and all others similarly situated,**<br><br>    **Plaintiffs,**<br><br>**vs.**<br><br>**GE MONEY BANK, a federal savings bank; WMC MORTGAGE CORPORATION and WMC MORTGAGE, LLC**<br><br>    **Defendants.** | | **C.A. NO. 08 CV 1880   PH**<br><br>**JUDGE MANNING**<br><br>**MAGISTRATE JUDGE ASHMAN** |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ..................................................................................1

II.   FACTUAL ALLEGATIONS ..................................................................4

      A.    DEFENDANTS' "DISCRETIONARY PRICING POLICY"............5

      B.    PLAINTIFFS' LOAN TRANSACTIONS ........................................8

III.  THE AMENDED COMPLAINT STATES A CLAIM AND SHOULD NOT BE
      DISMISSED ...........................................................................................9

      A.    THE CORRECT PLEADING STANDARD......................................9

      B.    PLAINTIFFS ADEQUATELY ALLEGE A DISPARATE IMPACT CLAIM..11

            1.    PLAINTIFFS ADEQUATELY ALLEGE A SPECIFIC POLICY OR
                  PRACTICE ..............................................................................11

            2.    PLAINTIFFS ADEQUATELY ALLEGE A DISPARATE IMPACT
                  UPON MINORITIES.................................................................14

            3.    PLAINTIFFS ADEQUATELY ALLEGE THEY WERE DISPARATELY
                  IMPACTED ..............................................................................17

            4.    PLAINTIFFS ADEQUATELY ALLEGE A CAUSAL CONNECTION
                  BETWEEN DEFENDANTS' DISCRETIONARY PRICING POLICY
                  AND THE DISPARATE IMPACT ............................................18

            5.    ALTHOUGH PROOF OF AGENCY IS NOT NECESSARY TO THIS
                  CASE, PLAINTIFFS' ALLEGATIONS OF AGENCY ARE SUFFICIENT
                  FOR AN ARGUMENT IN THE ALTERNATIVE.......................19

      C.    MS. DIAZ ADEQUATELY ALLEGES CLAIMS AGAINST WMC...............21

IV.   MORTGAGE BROKERS ARE NOT NECESSARY PARTIES .......................21

      A.    COMPLETE RELIEF CAN BE AWARDED WITHOUT THE BROKERS.....21

      B.    THE BROKERS' INTERESTS WILL NOT BE IMPAIRED ...........................23

V.    THE STATUTE OF LIMITATIONS TOLLING ALLEGATIONS ARE
      PROPERLY PLED.................................................................................24

i.

VI.   DISORGEMENT AND RESTITUTION ARE APPROPRIATE REMEDIES ...............28

VII.  PLAINTIFF DIAZ STATES DISPARATE IMPACT CLAIMS AGAINST GEMB.........29

      A.    THE DISCRETIONARY PRICING POLICY INCLUDES ALL NON-RISK
           RELATED POINTS AND FEES AND ALL SUCH POINTS AND FEES
           AFFECT THE APPLICABLE COST OF CREDIT ............................................30

      B.    GEMB CHARGED DIAZ DISCRETIONARY FEES ......................................31

VIII. ALL OTHER PLAINTIFFS HAVE STANDING TO AND ADEQUATELY ALLEGE
     CLAIMS AGAINST GEMB ..............................................................................34

IX.   THE CLASS INCLUDES MINORITY CONSUMERS WITH GEMB ORIGINATED
     HOME MORTGAGE LOANS ...........................................................................34

X.    CONCLUSION ...............................................................................................35

Plaintiffs Herbert and Doris Steele, Eric Chavez, Alexandra Diaz and Sonia Torres respectfully submit this Response to the Motions to Dismiss of Defendants GE Money Bank and WMC (Dkt. Nos. 32, 35). For the following reasons, the motions should be denied in their entirety.

## I.    INTRODUCTION

Defendants WMC Mortgage Corporation and GE Money Bank offer no valid reason for dismissing Plaintiffs' Amended Class Action Complaint ("Amended Complaint"), striking any of its allegations, or joining additional parties.[1] The Defendants ask this Court to ignore at least *ten* other cases, *including four decided by published opinions of other judges in this Court*, in which motions to dismiss adverse impact discrimination claims by minority homeowners against subprime lenders have been denied. The Defendants' motions here should likewise be denied in their entirety.[2]

Plaintiffs in this case seek a remedy for a startling injustice at the heart of the national mortgage lending crisis. WMC and GE Money Bank have originated hundreds of thousands of subprime mortgages across the country. In order to enhance the profitability of their lending, Defendants implemented and maintained a "Discretionary Pricing Policy,"

---

[1]  In this Response, citations to Plaintiffs' Amended Class Action Complaint are in the form "AC ¶ __."

[2]  Per the Court's July 16, 2008 Order (Dkt. No. 38), Plaintiffs address in this consolidated response the arguments made by Defendant WMC Mortgage Corp. in Memorandum in Support of Motions of Defendant WMC Mortgage Corporation to Dismiss for Failure to State a Claim, or in the Alternative to Join Necessary Parties and to Strike Certain Allegations in the Amended Complaint (Dkt. No. 36), and by GE Money Bank in GE Money Bank's Memorandum in Support of Its Motion to Dismiss for Failure to State a Claim Pursuant to Rule 12(b)(6), or, in the Alternative, to Strike Certain Allegations Pursuant to Rule 12(f) (Dkt. No. 33), in their separately filed motions to dismiss. Citations to Defendants memoranda are in the form "WMC Memo. at __," or "GEMB Memo. at __."

a practice through which they provide financial incentives to nominally independent

mortgage brokers to markup interest rates on subprime loans and otherwise to add

discretionary finance charges. As a result, borrowers are given loans at rates substantially

higher than those for which they qualify based on their objectively determined credit

profile.

　　　　As discussed more fully below, it has long been known throughout the lending

industry (though hidden from borrowers) that discretionary pricing has a substantial and

quantifiable adverse impact on minority homeowners.  This adverse impact of the

Discretionary Pricing Policy results in higher borrowing costs to African-Americans and

Hispanics, often totaling in the thousands or tens of thousands of dollars over the life of

their loans. As described in the complaint, these extra, unjustifiable costs lead not just to

financial hardship, but also to a substantially increased risk of default and foreclosure.

　　　　Rather than address the injustice that would result from denying a remedy to

minority homeowners who are struggling to pay more for loans because of their race,

Defendants raise a laundry list of extraordinarily marginal technical arguments, all of

which have been rejected by other courts considering the same issues.  At bottom,

Defendants' attack on the sufficiency of Plaintiffs' disparate impact discrimination

allegations is based on a legally unsupported heightened pleading standard and a failure to

read the detailed allegations of the complaint as a whole.  Plaintiffs' allegations fully and

clearly apprise Defendants of the nature of the claims and their basis, and to plausibly

suggest that they have a right to relief.  Nothing more is required.

　　　　The Defendants' arguments here are strikingly similar to those made by lenders in

at least ten other cases -- and rejected in each one.  In the past year, motions to dismiss

complaints raising similar or identical issues of mortgage discrimination have been repeatedly denied by courts in this jurisdiction and across the country, including the following:

- *Carter Ware v. Indymac Bank*, 534 F. Supp. 2d 835 (N.D. Ill. 2008) (Bucklo, J.);

- *Zamudio v. HSBC North America Holdings, Inc.*, No. 07-C-4315, 2008 WL 517138 (N.D. Ill. Feb. 20, 2008) (Darrah, J.);

- *Newman v. Apex Financial Group, Inc.*, No. 07 D 4475, 2008 WL 130924 (N.D. Ill. Jan. 11, 2008) (Der-Yeghiayan, J.)

- *Martinez v. Freedom Mortg. Team, Inc.*, 527 F. Supp. 2d 827 (N.D. Ill. 2007) (Shadur, J.);

- *National Community Reinvestment Coalition v. Accredited Home Lender Holding Co., et al.* CV 07-2357 EGS, 2008 WL 3974310 (D.D.C. August 28, 2008);

- *Miller v. Countrywide Bank, FSB,* C.A. No. 1:07 CV-11275-RGS, 2008 WL 3522374 (D. Mass. July 30, 2008)**;**

- *Payares v. JP Morgan Chase & Co.*, CV 07-5540 ABC (C.D. Cal. May 15, 2008) (attached as Exhibit A) and 2008 WL 2485592 (C.D. Cal. June 17, 2008) (denial of Defendants' motion for interlocutory appeal on grounds that the underlying decision were "not a close call");

- *Ramirez v. GreenPoint Mortgage Funding, Inc.*, No. C08-0369, 2008 WL 2051018 (N.D. Cal. May 13, 2008);

- *Garcia v. Countrywide*, No. EDCV 07-1161-VAP (C.D. Cal. Jan. 17, 2007 (attached as Exhibit B); and

- *Jackson v. Novastar Mortg. Inc.*, No. 06-2249, 2007 WL 4568976 (W.D. Tenn. Dec. 20, 2007).

As Judge Gertner found in denying Countrywide's motion to dismiss the FHA and ECOA claims against it:

> If the facts alleged in the complaint are to be believed – which they must at
> this point in the litigation – the net effect of [Defendant]'s pricing policy is
> a classic case of disparate impact: White homeowners with identical or
> similar credit scores pay different rates and charges than African-American
> homeowners, because of a policy that allows racial bias to play a part in the
> pricing scheme.

*Miller*, 2008 WL 3522374 at *1.

Defendants' arguments should fare no better here than they did in those cases --

their Rule 12(b) motions should be denied.

## II.    FACTUAL ALLEGATIONS

Mortgage lenders have long discriminated against minority borrowers. Through

the middle of the twentieth century, lenders and other institutions openly discriminated on

the basis of race. The passage of civil rights and fair lending legislation in the 1960s and

1970s ended the most virulent forms of overt racial discrimination. But discrimination

persisted in more subtle forms. For example, through the 1980s and 1990s, some lenders

practiced redlining and refused to lend at all on properties in predominantly minority

neighborhoods. AC ¶¶ 14-15.

When mortgage lenders' redlining practices were challenged in the 1990s, they

changed their tactics again. Lenders began making mortgage loans to minorities, but

surreptitiously charged them higher interest rates and loan-related fees than they charged

similarly-situated Caucasians. AC ¶ 16. This discriminatory practice became even more

pervasive in the last few years, as Defendants and other lenders began selling subprime

loans to minorities. WMC was one of America's top ten subprime lenders until it recently

shut down operations. AC ¶ 29.[3] WMC, GE Money Bank and other subprime lenders

---

[3] GE Money Bank is also heavily involved in the subprime mortgage market. In 2006,
based on GE's two mortgage subsidiaries, GE Money Bank and WMC, 86.89% of GE's

4

preyed on minorities who were unlikely to discover that they were being charged higher

loan fees and rates than their white counterparts.

### A.    Defendants' "Discretionary Pricing Policy"

In recent years, Defendants have developed and used a lending practice that

appears facially neutral, but in reality adversely impacts minority borrowers by charging

them higher loan fees and interest rates than are charged to similarly-situated Caucasians.

Defendants developed a "Discretionary Pricing Policy," through which they encourage the

mortgage brokers and correspondent lenders who place their loans to charge discretionary

subjectively-determined loan fees, points and interest rates that are *not* based on the loan

applicant's credit standing (e.g., credit history, credit score, debt-to-income ratio, loan-to-

value ratio).  AC ¶¶ 41-43.

Defendants' "Discretionary Pricing Policy" works as follows:  When a borrower

applies for a loan, the broker transmits the applicant's financial information (debt-to-

income ratios, loan-to-value ratios, credit score and credit history) to one of the

Defendants.  AC ¶ 41.  Based on these financial and credit criteria, the Defendant

determines, based on policies developed jointly by the Defendants, an objective risk-based

interest rate – called a "par rate."  The par rate is the interest rate at which Defendants will

make the loan, based on an evaluation of credit risk in light the borrower's entire,

objectively evaluated, credit profile.  AC ¶¶ 41, 42.

But the loan ultimately sold to the applicant is not made at the par rate.  Rather,

Defendants through their Discretionary Pricing Policy authorize and encourage their

---

mortgages were subprime.  *See* Inner City Press, *Subprime Disparities Grew Worse in 2006 at Citigroup, HSBC and Other Large Banks*, available at http://www.innercitypress.com/subprime040407.html.

brokers and correspondent lenders to charge the borrower inordinately high loan fees and a marked up interest rate on the loan.  AC ¶¶ 43-44.  These fees and increased rates are *discretionary* -- they are not risk-based.  The result of these discretionary charges is a mortgage loan at an interest rate often substantially above the par rate.

Defendants know that brokers and correspondent lenders are charging unsuspecting borrowers these inflated discretionary fees and rates, and intend that they do so.  AC ¶¶ 48, 50-51.  Both the brokers and Defendants profit when borrowers pay these discretionary charges and rates.  The brokers get paid inflated fees and commissions, including yield spread premiums.  Defendants lock the unsuspecting borrower into profitable higher-than-par interest rates.  AC ¶¶ 43, 44.

The Discretionary Pricing Policy is the creation of Defendants – not the brokers and correspondent lenders.  The brokers and correspondent lenders are simply vehicles through which the practice is carried out.  Defendants provide training, marketing support, loan-related forms and instructions to assist their brokers and correspondent lenders in implementing Defendant's Discretionary Pricing Policy.  AC ¶¶ 33, 37, 40.  Defendants evaluate and monitor the brokers' compliance and financially reward the successful steering of clients into loans with higher interest rates. AC ¶¶ 32 and 34.  Defendants assume part or all of the risk on such loans.  AC ¶ 39.  All loans are priced according to Defendants' Discretionary Pricing Policy.  AC ¶ 49.

Minority borrowers are adversely impacted by the Discretionary Pricing Policy and therefore pay rates and loan fees higher than similarly-situated non-minorities. The HMDA data and reports cited in the Amended Complaint evidence the disparate impact on minority borrowers.  The 2004 and 2005 HMDA data -- collected from Defendants and

other mortgage lenders following the same discretionary pricing practices -- reveal profound loan pricing disparities between minority borrowers and similarly-situated non-minority borrowers.  AC ¶ 17.  For example, 2004 HMDA data reveals that minority borrowers were "twice as likely" to receive a higher-rate home loan as non-minorities – even after controlling for differences in income, gender, property location and loan amount.  AC ¶ 19.  According to the Vice Chairman of the FDIC, the disparities shown by the 2004 data "clearly indicated" that minority borrowers are more likely to receive high-cost home loans than are non-minorities.  AC ¶ 19.

2005 HMDA data shows the same disparities, revealing that (on conventional home-purchase loans) the gross mean incidence of higher-priced lending was 54.7% for African-Americans, while only 17.2% for non-minority whites (a difference of over 37 percentage points).  AC ¶ 20.  For refinancing, the difference is 28.3 percentage points.  AC ¶ 20.   Independent research confirms the HMDA data.  AC ¶¶ 21-26.  One study found that "[i]n every metropolitan area where at least 50 refinances were made to African-American homeowners, African-Americans were more likely to receive a high-cost loan than White homeowners."  AC ¶ 26.

Defendants well know that the financial incentives they offer brokers induce them to steer minorities into loans involving higher fees and rates.  AC ¶ 32.  Studies show that subprime lenders like WMC targeted minorities like Plaintiffs in carrying out its Discretionary Pricing Policy.  The California Reinvestment Coalition ("CRC") studied the activities of a number of subprime lenders – including WMC – in seven metropolitan areas.  The CRC study revealed that subprime lenders focused their activities in minority

neighborhoods.  *See* AC ¶ 24 (over 40% of the loans made by subprime lenders were to borrowers in neighborhoods where 80% or more of the residents were minorities).

The research studies indicate that these loan price disparities cannot be explained by objective credit risk differences between minorities and non-minorities.  AC ¶¶ 31, 52. To the contrary, "[r]esearchers have raised 'doubts that risk can adequately explain racial differences' in high cost loans," and have concluded that "evidence suggests that weak borrower credit profiles do not fully explain why some borrowers get stuck with higher cost home loans."  AC ¶¶ 20, 27 (citations omitted).  These disparities are not random, nor do they occur by chance.  AC ¶ 31, 52.  They are the direct result of Defendants' Discretionary Pricing Policy which, by design, is readily amenable to racial bias causing persons with identical or similar credit scores to pay differing amounts for obtaining credit. AC ¶¶ 46-47.

### B.    Plaintiffs' Loan Transactions

Plaintiffs Herbert and Doris Steele, Eric Chavez, Alexandra Diaz and Sonia Torres all allege that they were victimized and financially damaged by Defendants' Discretionary Pricing Policy.  AC ¶¶ 54-63 (the Steeles), ¶¶ 64-72 (Chavez), ¶¶ 73-81 (Diaz), ¶¶ 82-90 (Torres).  Each Plaintiff paid discretionary loan fees, either to their broker or Defendants (or both).  All allege that the interest rates they were charged were based on both an objective risk-based rate determination *and* a subjective discretionary markup as part of Defendants' Discretionary Pricing Policy.  AC ¶¶ 61 (the Steeles), 70 (Chavez), 79 (Diaz), 88 (Torres).  All Plaintiffs allege that they were charged more for their mortgage loans than non-minority borrowers with similar or identical credit characteristics.  AC ¶¶ 63 (the Steeles), 72 (Chavez), 81 (Diaz), 90 (Torres).

Plaintiffs also allege that they did not know and reasonably could not have discovered that Defendants were charging them higher rates or more discretionary fees than charged to non-minority borrowers with similar credit profiles.  AC ¶ 91.  Defendants never disclosed and actively concealed that their credit rates are subjective and discretionary, that Plaintiffs were charged additional subjective fees, and Plaintiffs paid more for their loans than similarly situated non-minority borrowers.  AC ¶ 96.

### III.    THE AMENDED COMPLAINT STATES A CLAIM AND SHOULD NOT BE DISMISSED

#### A.    The Correct Pleading Standard

Defendants' attack on the factual sufficiency of Plaintiffs' disparate impact discrimination allegations is based on a heightened pleading standard unsupported by Fed. R. Civ. P. 8 or precedent.  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512-13 (2002) (no heightened pleading standard in civil rights cases).  In *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), the Supreme Court recognized that its holding was in accordance with Fed. R. Civ. P. 8(a)(2), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  *Twombly,* 127 S. Ct. at 1964.  As the Supreme Court stated in *Erickson v. Pardus*, decided two weeks after *Twombly*, it is still the law under Fed. R. Civ. P. 8(a)(2) that for a complaint, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (*per curiam*) (citations omitted).  The Amended Complaint meets and exceeds this standard.

Nonetheless, Defendants list the *prima facie* elements of a disparate impact claim and argue that Plaintiffs must "plead facts" establishing each element. WMC Memo. at 16.

The Seventh Circuit has *never* required this fact-intensive pleading standard. To the contrary, "[a] complaint need not 'allege all, or *any*, of the facts logically entailed by the claim,' and it certainly need not include evidence." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (*quoting Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998)). As Judge Easterbrook succinctly observed: "Facts that substantiate the claim ultimately must be put into evidence, but the rule 'plaintiff needs to prove Fact Y' does not imply 'plaintiff must allege Fact Y at the outset.'" *Vincent v. City Colleges of Chicago*, 485 F.3d 919, 923-24 (7th Cir. 2007).[4]

Another Judge of this Court recently emphasized that pleading specific facts on each element of a disparate impact claim simply is not necessary:

> Nowhere in *Twombly* or in *Concentra*, interpreting *Twombly*, did either Court state that a plaintiff in federal court must plead facts to match up with each element of a claim in order to state a claim, and in fact the Seventh Circuit in *Concentra* made it clear that a plaintiff need not plead an exhaustive list of facts to state a valid claim, stating that "[m]ost details are more efficiently learned through the flexible discovery process."

*Newman v. Apex Fin. Group., Inc.*, No. 07-C-4475, 2008 WL 130924, at *4 (N.D. Ill. Jan. 11, 2008) (citing *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 779 (7th Cir. 2007)); *see also Wiltse v. Discover Fin. Servs., Inc.*, No. 07 CV 7073, 2008 WL 2839259, at *5 (N.D. Ill. July 22, 2008) ("[D]efendant's position that a plaintiff must plead all facts that support a particular element of a discrimination claim directly contradicts the language in *Bell Atlantic* that a complaint 'does not need detailed factual allegations.'").

---

[4] Judge Easterbrook pointed out that "[t]his court has issued at least 12 opinions or orders during the last year alone reversing decisions that had dismissed complaints for failure to plead facts." *Vincent*, 485 F.3d at 924 n.†. He also cautioned: "Any district judge (for that matter, any defendant) tempted to write 'this complaint is deficient because it does not contain …' should stop and think: What rule of law *requires* a complaint to contain that allegation?" *Id.* at 924 (*quoting Doe v. Smith*, 429 F.3d 706, 708 (7th Cir. 2005)).

Plaintiffs' Amended Complaint need only do two things: (1) it must describe the claim in sufficient detail to give the defendants fair notice of what the claim is and the grounds upon which it rests; and (2) the allegations – taken as true – must plausibly suggest that the plaintiffs have a right to relief. *Id.*; *Concentra*, 496 F.3d at 776. The Amended Complaint does both.

### B.    Plaintiffs Adequately Allege a Disparate Impact Claim

Besides applying an errant evidentiary pleading standard, Defendants ignore numerous factual allegations in the Amended Complaint. As demonstrated below, these allegations are more than adequate to plead FHA and ECOA disparate impact claims.[5]

### 1.    Plaintiffs Adequately Allege a Specific Policy or Practice

Defendants' claim that Plaintiffs have not alleged a cognizable disparate impact policy or practice completely mischaracterizes the alleged Discretionary Pricing Policy. Defendants try to liken their discriminatory policy to allowing "independent businesses to charge their clients what they want," or to a wholesaler of goods allowing retailers "to re-sell products at prices of their own choosing." WMC Memo. at 21, 22.

---

[5]  Plaintiffs have not alleged an intentional discrimination claim under the FHA or ECOA. As is abundantly clear in the law of the Seventh Circuit, both the FHA and ECOA allow for claims of disparate impact. *Village of Bellwood v. Dwivedi*, 895 F. 2d 1521, 1533-1534 (7th Cir. 1990) (FHA); *Southend Neighborhood Improvement Association v. County of St. Clair*, 743 F.2d 1207, 1209 (7th Cir. 1983) (FHA); *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977) (FHA); *Buycks-Roberson v. Citibank, F.S.B.*, 162 F.R.D. 322, 329, 332-33 (N.D. Ill. 1995) (FHA and ECOA); *Saldana v. Citibank*, 1996 U.S. Dist. LEXIS 8327, *5-11 (N.D. Ill., June 12, 1996) (FHA and ECOA); *Wilson v. Union Acceptance Corp.*, 2002 WL 31730920 (S.D. Ind. 2002) (ECOA); *Wise v. Union Acceptance Corp.*, 2002 U.S. Dist. LEXIS 23335, *10 (N.D. Ind. 2002) (ECOA).

The Amended Complaint categorically contradicts Defendants' "independent businesses" argument.  Plaintiffs make it clear that Defendants – not the brokers or correspondent lenders – developed the Discretionary Pricing Policy, mandate compliance and supervise its operation.  AC ¶¶ 2, 39-43, 100.  Defendants do not merely *allow* brokers – as independent businesses or retailers -- to "resell" their loans at higher prices; they are actively involved through the entire process.  Defendants encourage brokers to impose high loan fees (which usually end up being financed with the loan) and to hike interest rates to above-par levels, including by payment of financial incentives.  AC ¶¶ 43, 31. Defendants supplied brokers and correspondent lenders with rate sheets that showed what Defendants would pay in yield spread premiums for loans placed at an above-par rate.  AC ¶ 43.  Defendants also provided brokers with loan applications and contracts, training and marketing support.  AC ¶¶ 33, 40, 43, 44.

Defendants – both active subprime lenders -- knew that the financial incentives made available to brokers under the Discretionary Pricing Policy would encourage them to target minorities and place them in higher priced loans. AC ¶¶ 46, 48.  They knew that such borrowers would be easier marks for these unfairly priced loans.

Defendants' argument has been addressed and rejected in several other cases. For example, In *Miller v. Countrywide*, which involves an almost identical "Discretionary Pricing Policy," Judge Gertner easily saw through the same blame-shifting argument offered by the lenders:

> Where the allocation of subjective decision making authority is at issue, the "practice" Countrywide has enacted effectively amounts to the *absence* of a policy, an approach that allows racial bias to seep into the process. Allowing this "practice" to escape scrutiny would enable companies responsible for complying with anti-discrimination laws to "insulate"

themselves by "refrain[ing] from making standardized criteria absolutely determinative."

*Miller*, slip op. at 12 (denying defendants' motion to dismiss) (emphasis in original).[6]

Similarly, in *Jones v. Ford Motor Credit Co.*, No. 00 Civ. 8330, 2002 WL 88431 (S.D.N.Y. Jan. 22, 2002), the plaintiffs' ECOA complaint was sustained over a motion to dismiss based on allegations that a specific policy - a creditor's authorization of third-party subjective markups to loan rates - resulted in disproportionately high interest rates for African-American borrowers. *Id.* at *1, *See also Smith v. Chrysler Fin. Co., L.L.C.*, No. Civ. A. 00-6003, 2003 WL 328719 (D.N.J. Jan. 15, 2003) (holding that "[s]ubjective applications of neutral underwriting criteria is standardized conduct because the loan originators have the opportunity to use their discretion with respect to each loan application") (*citing Buycks-Roberson v. Citibank Fed. Sav. Bank*, 162 F.R.D. 322, 332 (N.D. Ill. 1995)). Indeed, as in *Buycks-Roberson,* the Plaintiffs here allege a policy or practice of discrimination that "arises out of the subjectivity and discretion vested in the decisionmaker (the loan originator) and can be proved by use of expert testimony and statistical evidence showing 'disparities rather than specific incidents of discrimination'

---

[6]  As discussed in *Miller*, the cases Defendants rely on are easily distinguishable.  In *American Fed'n of State, County & Mun. Employees, AFL-CIO (AFSCME) v. State of Washington*, 770 F.2d 1401 (9th Cir. 1985), the plaintiffs alleged that the Washington State's compensation system resulted in female-predominated jobs being lower paying than male-predominated jobs.  The court held that Washington State's compensation system, which was "the result of a complex of market forces," does not constitute a cognizable disparate impact policy. *Id.* at 1406.  In *Kulkarni v. City Univ. of New York*, No. 01-CIV-10628 (DLC), 2002 WL 1315596 (S.D.N.Y. June 14, 2002), the court concluded that the defendant's process for determining the workload of its doctoral faculty was simply "the organizational structure of the CUNY Graduate School and University Center" and not an employment practice. *Id.* at 1.  By contrast, here Plaintiffs *have* alleged a specific policy or practice:  Defendants established a par rate keyed to objective credit indicators while simultaneously authorizing and encouraging the charging of additional fees keyed to factors unrelated to credit, and readily amenable to bias.

between the relevant comparison groups." *Buycks-Roberson v. Citibank Fed. Sav. Bank*,
162 F.R.D. 322, 332 (N.D. Ill. 1995) (citation omitted).

### 2.   Plaintiffs Adequately Allege a Disparate Impact Upon Minorities

To defeat a motion to dismiss, a plaintiff needs simply to allege that a facially
neutral policy or practice adversely affects one group disproportionately. *Ladd v. Boeing
Co.*, 463 F. Supp.2d 516, 522 (E.D. Pa. 2006); *see O'Neill v. Gourmet Systems of
Minnesota, Inc.*, 219 F.R.D. 445, 456 (W.D. Wis. 2002) ("other courts have recognized
that in disparate impact cases, 'to survive a motion to dismiss, all that plaintiff must do is
plead that a facially neutral practice's adverse effects fall disproportionately' on a
protected class.") (quoting *Powell v. Ridge*, 189 F.3d 387, 394 (3d. Cir. 1999).

Plaintiffs' allegations are more than sufficient to meet this requirement. As
explained above, Plaintiffs allege and describe in detail the facially neutral Discretionary
Pricing Policy. The Amended Complaint makes it clear that the Discretionary Pricing
Policy followed by Defendants and other mortgage lenders exerts a disparate impact on
minorities. 2004 and 2005 HMDA data cited in the Amended Complaint document the
disparity, showing that minority borrowers were significantly more likely to receive a
higher-rate home loan as non-minority whites. AC ¶ 19. Studies and investigations have
concluded that this disparity likely cannot be explained by differences in minorities' credit
characteristics. AC ¶¶ 27.

In *Garcia*, Judge Phillips found that the statistical evidence of industry-wide
disparate impact, combined with the allegation that the defendant was one of the country's
leading lenders, was enough to raise above the speculative level the plaintiff's allegations
that borrowers were paying disproportionately high fees. *Garcia*, slip op. at 16-17.

14

Indeed, Plaintiffs could not realistically be expected to plead more specifically. *Zamudio v. HSBC N. Am. Holdings, Inc.*, 2008 WL 517138 at *2 ("The only way for [plaintiff] to ascertain a more detailed picture of defendants' use of credit-related variables would be through discovery."); *Newman*, 2008 WL 130924, at *4 ("requiring the plaintiff to plead those unknown details before discovery would improperly deny the plaintiff the opportunity to prove its claim") (*quoting Concentra Health Servs., Inc.*, 496 F.3d at 780). This is particularly true given that Defendants knowingly and actively concealed their Discretionary Pricing Policy.  AC ¶ 91.

In addition to the allegations of industry-wide disparate impact, Plaintiffs allege that "[b]y its Discretionary Pricing Policy Defendants discriminated against Plaintiffs and Class Members, systematically giving them mortgage loans with less favorable terms than were given to similarly situated non-minority borrowers."  AC ¶¶ 31.  Other courts in this district have held that similar allegations sufficiently allege disparate impact.  In *Ware v. Indymac Bank, FSB* 534 F. Supp. 2d 835, 840 (N.D. Ill. 2008), *Newman v. Apex Financial Group, Inc.*,  No. 07 C 4475, 2008 WL 130924 (N.D. Ill. Jan. 11, 2008) and *Martinez v. Freedom Mortg. Team, Inc.*, 527 F. Supp.2d 827 (N.D. Ill. 2007), three judges in this district concluded that allegations similar to those Plaintiffs make here successfully alleged a disparate impact.  *Ware*, 534 F. Supp.2d at 840; *Newman*, 2008 WL 130924, at *3; *Martinez*, 527 F. Supp.2d at 834-35.

Defendants try to circumvent *Ware*, *Newman* and *Martinez*  by claiming they were wrongly decided or involved irrelevant differences (such as allegations of broker misconduct).  This attempt fails completely.  *Ware*, *Newman* and *Martinez* squarely addressed the issue here – whether Plaintiffs have alleged a disparate impact.  In upholding

the complaints, those decisions employed the correct pleading standard, concluding that an

extensive evidentiary showing of disparate impact is not required at the pleading stage.[7]

     *Tribett v. BNC Mortg., Inc.*, No. 07 C 2809, 2008 WL 162755 (N.D. Ill. Jan. 17,

2008) does not help Defendants.  The *Tribett* plaintiffs alleged only that the yield spread

premiums charged by defendants' brokers disproportionately impacted minority borrowers.

*Id.* at 2.  Unlike here, there were no allegations in *Tribbett* of industry studies showing that

yield spread premiums and other discretionary charges caused minority homeowners to

pay more for a home loan than non-minority homeowners with similar credit profiles *Cf.*

AC ¶ 47.  Nor were there allegations that defendants knew the significant and pervasive

discriminatory impact of such discretionary credit pricing systems.  *Cf.* AC ¶ 92.  And,

there were no allegations that defendants encouraged their lending agents to steer clients

into higher interest rate loans by paying higher commissions.  *Cf.* AC ¶ 32.  Significantly,

the *Tribett* court concluded that, had the plaintiffs included such allegations in their

complaint like Plaintiffs do here, it would have weighed against dismissal. *Id.* at 3.  The

court allowed plaintiffs to amend their complaint to add such allegations.  *Id.*[8]

     Plaintiffs allege facts stating a disparate impact upon minorities "that is plausible

on its face" and "raise[s] a reasonable expectation that discovery will reveal evidence" on

---

[7] *See also Jackson v. Novastar Mortg., Inc.*, No. Civ. A. 06-2249, 2007 WL 4568976 at *9 (W.D. Tenn. Dec. 20, 2007) (allegations that mortgage lender provided lucrative financial incentives in yield spread premiums to encourage brokers to target financially disadvantaged and unsophisticated minorities and bind them to loans with higher interest rates than similarly situated non-minority borrowers stated discrimination claims under the FHA and ECOA).

[8]  The *Tribett* plaintiffs included the additional information in their briefing on the motion to dismiss.  The court, however, refused to consider the extraneous information on a Rule 12(b) motion.  *Id*. at 2.

the issue.  *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965, 1974 (2007).  Nothing more is required at the pleading stage.

### 3.  Plaintiffs Adequately Allege They Were Disparately Impacted

Defendants' half-hearted standing argument that Plaintiffs do not allege any causal harm to themselves (i.e., that they were disparately impacted) is patently meritless.  As explained above, Plaintiffs need not present evidence or prove that they suffered injury – they need only allege that Defendants' Discretionary Pricing Policy caused them harm.

Plaintiffs do this.  They specifically allege the types and dollar amounts of the discriminatory discretionary fees they paid. AC ¶¶ 57 (the Steeles), 66 (Chavez), 75 (Diaz), 84 (Torres).  Plaintiffs allege that, because of Defendants' Discretionary Pricing Policy, they paid loan rates that were higher than those paid by similarly-situated non-minorities. AC ¶¶ 63 (the Steeles), 72 (Chavez), 81 (Diaz), 90 (Torres)..

As discussed below, that two Plaintiffs (Mr. Chavez and Ms. Torres) do not allege payment of a yield spread premium has no effect on their standing as payment of yield spread premiums is plainly not the sole manifestation of the Discretionary Pricing Policy being challenged here. AC ¶ 44 (Defendants gave authorized mortgage brokers and correspondent lenders discretion to impose yield spread premiums *and other subjective points and fees* on borrowers.") (emphasis added).  Nor does it matter that some Plaintiffs were more disparately impacted than others.  All Plaintiffs specifically allege that Defendants charged them a disproportionately greater amount in non-risk-related credit charges than they charge similarly situated white borrowers and their loan rates exceeded the rates provided to white borrowers with similar credit profiles.  AC ¶¶ 60, 63, 69, 72,

17

78, 81, 87, 90.  Plaintiffs have stated individual claims against Defendants and have

standing to pursue those claims.

> **4.  Plaintiffs Adequately Allege A Causal Connection Between Defendants' Discretionary Pricing Policy and the Disparate Impact**

Plaintiffs also adequately allege causation.  Plaintiffs allege that "[b]y its

Discretionary Pricing Policy Defendants discriminated against Plaintiffs and Class

Members, systematically giving them mortgage loans with less favorable terms than were

given to similarly situated non-minority borrowers."  AC ¶¶ 31, 47.  The Amended

Complaint includes allegations that the resulting discrimination is not "random," "cannot

be a product of chance and cannot be explained by factors unrelated to race, but instead,

[is] the direct causal result of the use of the discriminatory Discretionary Pricing Policy."

AC ¶¶ 31, 52.  Plaintiffs support these causation allegations with citations to various

industry studies identifying and quantifying the racial disparities and wherein,

"[r]esearchers have raised 'doubts that risk can adequately explain racial differences' in

high cost loans" and found that the "evidence 'suggests that weak borrower credit profiles

do not fully explain why some borrowers get stuck with higher-cost home loans.'"  AC ¶¶

20, 27 (citations omitted).[9]  Thus, "Plaintiffs' complaint plainly gives rise to a fair

inference of causation."  *Miller*, slip op. at; 15-16 (finding plaintiffs adequately pled a

causal connection having "identified the mechanism by which the disparate impact is

effected").

---

[9]    The *Miller* court rejected as premature arguments like those made by Defendants here that "other factors" explain the disparate impact.  *Miller*, 2008 WL 3522374 at *6 ("the question of proof will become an issue at later stages in the proceedings").  *See also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513-14 (2002); *Tamayo*, 526 F.3d at 1081.

**5. Although Proof of Agency is Not Necessary to this Case, Plaintiffs' Allegations of Agency are Sufficient for their Argument in the Alternative**

Defendants' agency argument fails as a matter of law.  The Amended Complaint makes it clear that Defendants' liability under the ECOA flows directly from their own participation in the loan transactions as a "creditor" which set the markup policy at issue, not from any derivative liability theory.  *See* AC ¶¶ 2, 43, 100.  The ECOA defines a "creditor" as "any person who regularly extends, renews, or continues credit; or any assignee of an original creditor who *participates in* the decision to extend, renew, or continue credit."  15 U.S.C. § 1691a(e); *see* 12 C.F.R. § 202.2(I) (defining a person liable under ECOA as one who participates in the decision to extend credit).  Here, it is plainly the Defendants who extended the credit at issue.

Defendants are also directly liable under the FHA as principals who engage in real estate-related transactions, which include "[t]he making or purchasing of loans . . ."  42 U.S.C. § 3605(b)(1); *see* 24 C.F.R. § 100.20 (a principal in the sale or rental of dwellings or any interest therein is liable under the FHA); 24 C.F.R. §100.40(b) (defining unlawful conduct under the FHA as using different policies, practices or procedures in evaluating or determining creditworthiness of a person because of race, color, religion, sex, handicap, familial status , or national origin).

Defendants fall within the FHA and ECOA as entities that are liable for racial discrimination based on their own policies.  As the discretionary pricing policy-maker, Defendants are responsible under the ECOA and FHA for all of the procedures by which a credit price is set.  They cannot escape liability for establishing a policy that allows, and indeed encourages, their brokers to mark up credit prices.  *Alexander v. Local 496*, 177

F.3d 394, 410 (6th Cir. 1999) ("We are baffled and amazed as to how [the defendant] can contend that it did not instigate, support, ratify, or encourage a policy that it created.); *see Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 991, 108 S. Ct. 2777, 101 L. Ed. 2d 827 (1988) (holding that a company's subjective or discretionary practices, enacted through employees or agents, are impermissible if they have a disparate impact).

Nevertheless, Plaintiffs' allegations are sufficient to form the basis of an argument in the alternative that the brokers acted as agents of the Defendants.  Defendants rely on *Rand Bond of North America, Inc. v. Saul Stone & Co.*, 726 F. Supp. 684 (N.D. Ill. 1989) which found the plaintiff's agency allegations insufficient because the allegations were nothing but a "naked conclusion" of agency.  *See id.* at 687 ("nothing in the Complaint sets out even the bare bones of an agency relationship in factual terms").  By contrast, Plaintiffs here state with particularity the facts giving rise to the agency relationship.  Among other things, Plaintiffs' Amended Complaint alleges that Defendants: 1) authorized their brokers to fund loans in conformance with Defendants' Discretionary Pricing Policy; 2) trained the brokers about Defendants' credit policies and procedures; 3) supplied brokers with loan related forms and agreements; 4) communicated applicable par rates, authorized yield spread premiums and other discretionary fees via "rate sheets"; 5) encouraged brokers to make loans in accordance with Defendants' crediting policies by compensating them for steering clients into higher rate loans; 6) obtained their agreement to comply with Defendants' crediting policies; 7) evaluated and monitored their compliance; and 8) shouldered part or all the risk on such loans.  AC ¶¶ 30, 32-34, 39-40, 43.

Although the Plaintiffs' allege direct involvement of the Defendants, the Amended Complaint allows the alternative argument that an agency relationship existed between

20

Defendants and their brokers and correspondent lenders.  Although Plaintiffs are not relying on an agency relationship, they have not, as Defendants contend, "pleaded themselves out of" any agency-based claim.[10]

### C.    Ms. Diaz Adequately Alleges Claims Against WMC

Plaintiff Alexandra Diaz has stated claims against WMC.  Although Ms. Diaz alleges that her discriminatory loan was "finalized" by GE Money Bank, the Amended Complaint also alleges that, in 2007 when the loan was *originated* (and the discriminatory rates and fees imposed), both WMC and GE Money Bank were wholly-owned subsidiaries of GE Consumer Finance.  AC ¶ 12.  Plaintiffs also allege that following the acquisition of WMC by GE Consumer Finance in 2004, a number of loans originated and financed by WMC have been assumed by GE Money Bank and GE Money Bank began using WMC's trade names.  AC ¶ 12.  Given the alleged inter-relatedness of the Defendants, Ms. Diaz has sufficiently pled claims against WMC.

### IV.    MORTGAGE BROKERS ARE NOT NECESSARY PARTIES

The court may award Plaintiffs complete relief without impairing the interest of the mortgage brokers in each transaction.  Thus, pursuant to Rule 19(a), the brokers are not necessary parties and this action may proceed without them.

### A.    Complete Relief Can Be Awarded Without the Brokers

Defendants argue that complete relief is not obtainable without the brokers' presence because they "maintain practical control over the conduct at issue in the

---

[10]  *Richardson v. New Century Mortgage Corp.,* No. Civ.A. 2:03CV372PA, 2005 WL 1554026 (N.D. Miss. July 1, 2005), cited by Defendants, is inapplicable.  There, the court – on summary judgment – held that the broker was not the lender's agent where the contract between them specifically disclaimed an agency relationship and the plaintiff produced no evidence of agency.  *Id.* at 9.

Amended Complaint." WMC Memo. at 30-31.  Again, Defendants ignore the Plaintiffs'

allegations.  The Amended Complaint alleges that "*Defendants'* Discretionary Pricing

Policy caused and causes minorities to pay disparately [higher rates] and more finance

charges than similarly situated non-minorities."  AC ¶ 47 (emphasis added).  The

Discretionary Pricing Policy at issue was "designed, disseminated, controlled [and]

implemented" by *Defendants*. AC ¶ 50 (emphasis added).  And, importantly, the Amended

Complaint alleges that "Defendant WMC actively trained its authorized brokers to follow

WMC's policy and procedures," "reinforced that training with marketing support" and

consequently credit price "was always set based on *Defendants'* policies." AC ¶¶ 40, 49

(emphasis added).

　　　　When presented with similar factual allegations, the *Miller* court found that "this

case … is not about third party liability.  Countrywide's responsibility, if any, flows

directly from *its own* participation in the transactions as the 'creditor' which set the

markup policy at issue."  *Miller*, 2008 WL 3522374 at *6 (emphasis in original).  Thus,

even though the brokers participated in the wrongdoing, their presence is not needed for

complete relief.  *See, e.g.*, *Household Retail Servs. Inc. v. CVS Sys., Inc.*, No. 95 C 2862,

1996 WL 411497, at *4 (N.D. I11. July 18, 1996) ("The fact that in proving the ultimate

issue plaintiffs will produce evidence of wrongdoing by non-parties (the dealers) is not

enough to necessitate the dealers presence in the case."); *Leigh v. Engle*, No. 78 C 3799,

1986 WL 892, at *3 (N.D. Ill. Jan. 8, 1986) ("agents are not necessary parties to actions

against their principals even when those actions arise out of the agents' wrongdoing").

　　　　*Hashop v. Federal Home Loan Mortg. Corp.*, 171 F.R.D. 208 (N.D. Ill. 1997), is

readily distinguishable.  In *Hashop*, unlike here, defendant's alleged liability for collecting

excessive escrow payments was premised *solely* upon the actions of the absent parties – loan servicers defendant contracted to service the plaintiffs' mortgage loans. In a complete role reversal from this case, the *Hashop* loan servicers – not the defendant – established, maintained, computed, collected, adjusted and disbursed the escrow and maintained all records on the accounts. *Id*. at 211.

   Not surprisingly given these very different facts, the *Hashop* court concluded that the loan servicers' presence was necessary because the plaintiffs were seeking to impose liability on defendant not for its own acts, but for the acts of the absent loan servicers. *Id*. Here, Plaintiffs have sued Defendants for their own discriminatory acts.

   Nor is joinder of the brokers necessary to award Plaintiffs the injunctive relief they seek. Any injunction against Defendants also will bind the brokers to the extent of their agency under Fed. R. Civ. P. 65(d). "Rule 65 obviously contemplates that agents need not be parties to suits for injunctive relief against their principals." *Pasco Int'l (London) Ltd. v. Stenograph Corp.*, 637 F.2d 496, 501 (7th Cir. 1980). A harmonious reading of Rules 65 and 19 is that agents are not necessary parties to a suit against their principals. *Id*.

### B.    The Brokers' Interests Will Not Be Impaired

   The brokers' interests will not be impaired if this action proceeds without them. Defendants speculate that the brokers "have legal rights and obligations" that *could* be "directly impacted by a judgment in this case" and/or a judgment ending Defendants' Discretionary Pricing Policy *could* affect the brokers' "extant contracts." WMC Memo. at 29 (emphasis added). Defendants never explain what the brokers' "legal rights and obligations" might be, and never explain how a discrimination-ending judgment will affect

any contractual relations.  Defendants' speculation falls far short of satisfying their burden of proving the brokers are necessary parties.

Defendants' argument that the brokers' financial interest may be impaired if Plaintiffs prevail because they will have to stop imposing discriminatory interest rates and loan charges which will reduce their profits.  However, the "interest" contemplated by Rule 19 is a legally protected interest, not merely a financial stake in the outcome.  *See Burger King Corp. v. American Nat'l Bank & Trust Co. of Chicago*, 119 F.R.D. 672, 676 (N.D. Ill. 1988) (if the absent party has only a financial interest or an interest of convenience in the action, he falls outside Rule 19(a)(2)'s bounds); *Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 879-82 (9th Cir. 2004) (holding arena owner was not necessary party in ADA suit challenging private entities' operation of rodeo arena, rejecting argument that arena owner's financial interest in current and future contracts with defendant entities was sufficient interest under Rule 19(a)(2)); *Kenko Int'l, Inc. v. Asolo S.r.l.*, 838 F. Supp. 503, 506 (D. Colo. 1993) ("The 'interest relating to the subject matter of the action,' that makes an absent person a party needed for just adjudication, must be a legally protected interest, and not merely a financial interest or interest of convenience.") (*quoting* 3A James W. Moore et al., *Moore's Federal Practice* ¶19.07-1[2.-0] at 19-99 (1993)).[11]

## V.    THE STATUTE OF LIMITATIONS TOLLING ALLEGATIONS ARE PROPERLY PLED

---

[11] Defendants rely heavily on *Hashop* for the proposition that an absent party's financial stake in the outcome of the litigation qualifies as a legally protectable interest.  WMC Memo. at 28.  However, the *Hashop* court's holding was based on the combined effect of the loan servicers having unilaterally engaged in the escrow practices at issue and their consequent financial stake in the outcome should the court determine overescrowing occurred. 171 F.R.D. at 211.

In a thinly disguised attempt to limit discovery, restrict the size of the Class and ultimately reduce its liability exposure, Defendants move to strike the tolling allegations for the stated reason that they purportedly are "immaterial." WMC Memo. at 31.  Because the Class Period extends back to January 1, 2001 – well beyond the applicable two-year statute of limitations period [12] -- the tolling allegations are properly included in Plaintiffs' Amended Complaint and Plaintiffs should be permitted to pursue discovery related thereto.  Plaintiffs sufficiently allege three independent reasons – two of which are supported by allegations in the paragraphs Defendants move to strike as "immaterial"  -- supporting the timeliness of their *and all Class members'* claims.

First, Class members' claims are timely under the continuing violation doctrine.  The doctrine was endorsed by the Supreme Court in *Havens Realty Corp. v. Coleman,* 455 U.S. 363 (1982), for the purpose of dealing with the statute of limitations for private lawsuits under the FHA.  The plaintiffs in *Havens Realty* accused a real estate firm and one of its agents of illegal racial steering, citing five specific incidents in which black and white testers were directed to homes in different areas.  *Id.* at 380.  Although only one of these incidents occurred within the applicable limitations period, the Court held that plaintiffs' claims were timely saying:

> [A] "continuing violation" of the Fair Housing Act should be treated differently from one discrete act of discrimination.  Statutes of limitations such as that contained in [the FHA] are intended to keep stale claims out of the courts.  Where the challenged violation is a continuing one, the staleness concern disappears.  [Defendants'] wooden application of [the FHA's statute of limitations], which ignores the continuing nature of the alleged violation, only undermines the broad remedial intent of Congress embodied in the Act … [W]e therefore conclude that where a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of

---

[12] Both the ECOA and FHA impose a two-year statute of limitations for bringing civil claims.  *See* 15 U.S.C. § 1692e(f) (ECOA); 42 U.S.C. § 3613(a)(1)(A) (FHA).

the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within [the statutory limit] of the last asserted occurrence of that practice.

*Id.* at 380-81 (citations omitted). [13]

Here, Plaintiffs similarly allege that Defendants established, continually implemented, and all Class members were subject to and affected by Defendants' Discretionary Pricing Policy during the Class Period.  AC ¶¶ 99, 102.  These allegations are sufficient to bring Class members' claims into the limitations period under the continuing violations doctrine.  *See also Wallace v. Chicago Housing Authority,* 321 F. Supp. 2d 968, 974-75 (N.D. Ill. 2004) (allegations that defendants engaged in a pattern or practice of racial steering found sufficient to bring acts occurring prior to the FHA's two-year statute of limitations into the limitations period) (*citing Havens,* 455 U.S. at 381); *Miller,* 2008 WL 3522374 at *7-9 (finding plaintiffs' ECOA and FHA discriminatory mortgage lending claims to be timely pled under the continuing violation doctrine); *Ramirez v. Greenpoint Mortgage Funding, Inc.*, No. C08-0369, 2008 WL 2051018, at *3-4 (N.D. Cal. May 13, 2008) (same).  While the Supreme Court has refined the continuing violations doctrine in other contexts, its subsequent jurisprudence leaves untouched the application of *Havens Realty* to cases involving a pattern or practice of discrimination. [14]

---

[13] "Congress since codified this continuing violation doctrine by amending the FHA to include both the occurrence and the termination of the alleged discriminatory housing practice as events triggering the two-year statute of limitations."  *Garcia v. Brockway,* 503 F.3d 1092, 1097 (9th Cir. 2007) (*citing* 42. U.S.C. § 3613(a)(1)(A)).

[14] Defendants may cite *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 127 S. Ct. 2162 (2007) and *Nat'l R.R. Corp. v. Morgan*, 536 U.S. 101 (2002) in opposition to this argument – regardless of the Defendants' position, the Supreme Court made clear in both cases that pattern or practice cases were not within the scope of these rulings.  *See Ledbetter*, 127 S. Ct. at 2165-66 (describing plaintiff's allegations as those of a single employee complaining of discrimination occurring outside the limitations period); *Morgan,* 536 U.S. at 115 n.9

Second, and alternatively, Class members' claims are timely under the federal discovery rule[15] because Plaintiffs allege *inter alia*, industry discriminatory impact data was just recently released and none of the loan documents disclose the use of subjective criteria to markup standard rates. AC ¶¶ 91, 93. The cases Defendant cites are from foreign jurisdictions that have refused to apply the discovery rule to ECOA and FHA claims. In this jurisdiction, however, the discovery rule applies to both claims. *See Jones v. Citibank Fed. Sav. Bank,* 844 F. Supp. 437, 440-42 (N.D. Ill. 1994). Therefore, the discovery allegations should not be stricken.

Yet a third and independent reason that Class members' claims are timely is because they allegedly relied on Defendants' representation that its loan rates were objectively set. And, even though Defendants had a non-delegable duty to disclose material loan information to Class members, Defendants allegedly concealed the following material information which Class members could not have reasonably discovered: (1) its subjective credit pricing policy; (2) that Class members were charged additional subjective credit charges; (3) that Class members were charged a disproportionately greater amount than similarly situated white persons; and (4) that Defendants authorized and paid mortgage brokers to subjectively increase the credit rates. AC ¶¶ 93-96. These allegations are sufficient to toll the statute of limitations and should not be stricken. *See, e.g., Cement-Lock v. Gas Tech. Inst.,* No. 05 C 0018, 2005 WL 2420374, at *22 (N.D. Ill. Sept. 30, 2005) (finding plaintiffs properly pled fraudulent concealment by identifying "numerous

---

(2002) ("We have no occasion here to consider the timely filing question with respect to 'pattern or practice' claims brought by private litigants as none are at issue here").

[15] "[U]nder the federal discovery rule, a claim accrues once the party performs the alleged unlawful act and once the party bringing a claim discovers an injury resulting from this unlawful act." *Tolle v. Carroll Touch, Inc.,* 977 F.2d 1129, 1139 (7th Cir. 1992).

examples of misrepresentations and concealments" by defendants who were under a duty

to speak); *Hecny Transportation, Inc. v. Chu,* No. 98-C-335, 2000 WL 1285433, at *7

(N.D. Ill. Sept. 8, 2000) (silence or passive concealment tolls the statute of limitations

where there is a duty to speak).[16]

## VI.    DISGORGEMENT AND RESTITUTION ARE APPROPRIATE REMEDIES

Where, as here, the FHA and the ECOA provide for a broad range of both legal and

equitable remedies, the Court should presume that it has the full scope of equitable powers

at its disposal for the proper and complete vindication of the statutory purposes.  *Porter v.*

*Warner Holding Co.,* 328 U.S. 395, 398 (1946) ("unless otherwise provided by statute, all

the inherent equitable powers of the District Court are available for the proper and

complete exercise of that jurisdiction").[17]  Equitable monetary relief is instrumental in

deterring discrimination.  As the Supreme Court explained in *Albemarle Paper Co. v.*

*Moody*, 422 U.S. 405 (1975), in considering the availability of equitable monetary relief in

addition to injunctive relief as a remedy for discriminatory employment practices:

> If employers faced only the prospect of an injunctive order, they would
> have little incentive to shun practices of dubious equality.  It is the
> reasonably certain prospect of a back pay award that provides the spur or
> catalyst which causes employers and unions to self-examine and to self-
> evaluate their employment practices and to endeavor to eliminate, so far as
> possible, the last vestiges of an unfortunate and ignominious page in this
> country's history.

*Id.* at 417-418.

---

[16]  The elements of fraudulent concealment include: (1) concealment of a material fact; (2)
a duty to speak; (3) inability of injured party to reasonably discover the truth; (4) injured
party would have acted differently if they knew the truth; and (5) reliance by the injured
party. *Damian Services Corp. v. White*, No. 96-C-8623, 1998 WL 596466 (N.D. Ill. Sept.
3,1998) at *3.  Plaintiffs have pled all elements.  *See* AC ¶¶ 91-96.

[17] *See also Town of Muenster, Indiana v. Sherwin-Williams Co.,* 27 F. 3d 1268, 1271 (7th
Cir. 1994); *Commodity Futures Trading Comm'n v. Hunt,* 591 F. 2d 1211, 1222-23 (7th
Cir. 1979).

Importantly, Congress provided that the Supreme Court's analysis in *Albemarle* and judicial constructions of antidiscrimination legislation in the employment field in general, "are intended to serve as guides in the application of the [ECOA]." *Senate Report No. 94-5891* (Jan. 21, 1976). Thus, courts regularly award equitable monetary relief in FHA and ECOA cases. *See U.S. v. J.C. Long,* 537 F.2d 1151, 1155 (4th Cir. 1975) (finding "equitable restitution" available remedy in FHA case); *Zuch v. Hussey,* 394 F. Supp. 1028, 1055 n. 13 (E.D. Mich. 1975), *aff'd without op.,* 547 F.2d 1168 (6th Cir. 1977) (finding disgorgement of profits available remedy in FHA case). *See generally Stuart T. Rossman, The Discriminating Predator,* Vol. 1 Ann. 2004 ATLA-CLE (July 2004) ("A court has the equitable authority to consider the disgorgement of unjust enrichment as an appropriate remedy for violations of the ECOA and the FHA"). As the Supreme Court noted in *Porter*, "[n]othing is more clearly a part of the subject matter of a suit for an injunction than the recovery of that which has been illegally acquired and which has given rise to the necessity for injunctive relief." *Porter*, 328 U.S. at 399.

Contrary to Defendants' argument, Plaintiffs do not have an adequate remedy at law. Restitution and disgorgement of profits forces a defendant to give up the amount by which it was unjustly enriched and, as such, may exceed the measurable injury to Plaintiffs and Class members. *Telewizja Polska U.S.A., Inc. v. Echostar Satellite, Corp.*, No. 02 C 3293, 2004 WL 2005808, at *4 (N.D. Ill. Sept. 3, 2004). Because the remedies differ, Plaintiffs properly may plead both for later election. *See Tull v. U.S.,* 481 U.S. 412, 425 (1987); *U.S. v. Philip Morris, Inc.,* 2002 WL 1925881, at *4 (D.D.C.) (*citing NSC Int'l Corp. v. Ryan,* 531 F. Supp. 362, 363 (N.D. Ill. 1981)).

## VII.    PLAINTIFF DIAZ STATES DISPARATE IMPACT CLAIMS AGAINST GEMB

Remarkably, GEMB argues that Diaz does not have standing to pursue and cannot state claims against it because her transaction did not include a yield spread premium payment, the loan origination and processing fees she paid her broker were dictated by the market and not Defendants' Discretionary Pricing Policy, and the administrative fee she paid to GEMB was allegedly set in a "non-discriminatory manner."  GEMB Memo. at 12. GEMB's argument is inconsistent with the allegations of the Amended Complaint and the legal standard governing its Motion to Dismiss.

> **A.    The Discretionary Pricing Policy Includes All Non-Risk Related Points and Fees and All Such Points and Fees Affect the Cost of Credit**

GEMB originated Diaz's loan.  AC ¶ 74 and AC Ex. 4.  Diaz's settlement sheet does not disclose any yield spread premium.  AC Ex. 4.  But the settlement sheet does disclose that Diaz paid a $4,990 origination fee and a $995 processing fee to her broker and a $950 administrative fee to GEMB.  AC ¶ 75 and AC Ex. 4.  Contrary to GEMB's argument, the Complaint alleges that the three fees are included in and were paid pursuant to Defendants' Discretionary Pricing Policy.

Plaintiffs plainly allege that the Discretionary Pricing Policy includes subjective charges other than the cost of yield spread compensation:  "Although Defendants' initial analysis applied objective criteria to calculate [a] risk-related interest rate, Defendants' Discretionary Pricing Policy authorized their brokers and correspondent lenders *to add to that rate* and also to impose additional non-risk-based charges, including yield spread premiums, *and other discretionary fees.*" AC ¶ 43 (emphasis added).  Plaintiffs are seeking remedies for discretionary rate markups and discretionary fees, whether or not such mark-ups result in or are identified by the lender as yield spread compensation.  *Id.* at ¶¶ 44 and

45 (references to other "subjective" and "discretionary" fees); ¶ 100 ("The phrase

'Discretionary Pricing Policy' refers to the Defendants' policy of authorizing its loan

officers and brokers to impose subjective, discretionary charges and interest mark-ups that

are included in the finance charge [of] loans they originate.").  Moreover, the Amended

Complaint alleges that *all of the discretionary fees* affect the rate in Diaz's transaction.  *Id.*

at 78 ("Because of the discretionary fees, the rates in Diaz's transaction exceed the rates

provided to white borrowers . . .").  The effect of the fees on the ultimate cost of the

transaction is manifest in consumer lending laws and implementing regulations of the

Federal Reserve Board.  15 U.S.C. § 1605; 12 C.F.R. § 226.4.  All loan fees and charges

are ultimately elements of the finance charges and the annual percentage rate in the

transaction.

Ultimately, GEMB is attempting to mislead the Court about the nature of Plaintiffs

claims.  One manifestation of the Discretionary Pricing Policy is evidenced by payment of

yield spread premiums, but the Complaint is about discretionary rate and fee markups and

not payment of yield spread compensation alone.

## B.    GEMB Charged Diaz Discretionary Fees

In addition to the foregoing allegations, the Amended Complaint alleges that the

loan origination, processing and administrative fees Diaz paid "were assessed pursuant to

GEMB's credit pricing policies."  AC ¶ 75.  And, "[b]ecause of the discretionary fees, the

rates in Diaz's transaction exceed the rates provided to white borrowers."  Id. at ¶ 78.

Nothing further is required at the pleading stage for Diaz to state disparate impact claims

against GEMB.  *Zamudio*, 2008 WL 517138, at *2 ("The only way for [plaintiff] to

ascertain a more detailed picture of defendants' use of credit-related variables would be

through discovery."); *Newman*, 2008 WL 130924, at *4 ("requiring the plaintiff to plead those unknown details before discovery would improperly deny the plaintiff the opportunity to prove its claim").

Contrary to GEMB's argument, the discretionary fees Diaz paid her broker are not any less discriminatory because they purportedly resulted from market forces or from the absence of any affirmative measures implemented by GEMB to prevent discrimination. As more fully set forth in Section III. B. (1) above, it is the very absence of a policy that "allows racial bias to seep into the process." *Miller,* 2008 WL 3522374 at *4* (rejecting same argument in analogous case against Countrywide Bank). *See also Watson,* 487 U.S. at 990-91 (finding disparate impact analysis "no less applicable to subjective employment criteria than to objective or standardized tests").

Nor is GEMB any less liable because the origination and processing fees were charged by, and paid to, Diaz's broker. As explained more fully in Section III. B. (5) above, GEMB's liability flows directly from its participation in Diaz's transaction as the "creditor" who sets the markup policy at issue, not from any derivative liability theory. The Amended Complaint specifically alleges that "Defendants designed, disseminated, controlled, implemented and profited from the Discretionary Pricing Policy creating the disparate impact." AC ¶ 50.

Finally, the Amended Complaint does not allege that "GEMB's own rates were set in a non-discriminatory manner." GEMB Memo. at 12. To the contrary, the Amended Complaint alleges that the $950 administrative fee GEMB charged Diaz was "a totally subjective, discretionary component added pursuant to the Defendants' Discretionary Pricing Policy." AC ¶ 79.

Thus, fairly read and drawing all reasonable inferences in Plaintiffs' favor, the
Amended Complaint sufficiently alleges that Diaz was disparately impacted by GEMB's
Discretionary Pricing Policy.  Indeed, these same allegations have been held by two judges
in this District to be sufficient to defeat a motion to dismiss.  *See Ware,* 534 F. Supp. 2d at
840 ("Here, taking the facts alleged in the amended complaint as true, plaintiffs have a
right to relief that is more than speculative because they have alleged sufficient facts to
suggest the possibility that [defendants] discriminated against minority borrowers.");
*Newman, slip op.* at *4 ("requiring the plaintiff to plead those unknown details before
discovery would improperly deny the plaintiff the opportunity to prove its claim") (*quoting
E.E.O.C. v. Concentra Health Services, Inc.,* 496 F.3d 773, 780 (7th Cir. 2007)).

The cases upon which GEMB relies are inapplicable.  The two disparate impact
employment discrimination cases GEMB cites were decided on motions for summary
judgment, not on the pleadings, and are distinguishable on their facts. *Johnson v. Uncle
Ben's, Inc.,* 965 F.2d 1363, 1369 (5th Cir. 1992) (summary judgment granted because
plaintiff offered no evidence that the smaller number of black promotions was causally
related to employer's policy of leaving promotion decisions to the unchecked discretion of
supervisors); *Richardson v. Rush-Presbyterian-St. Lukes Med. Ctr.,* No. 99 C 7540, 2002
WL 461695, at *14 (N.D. Ill. Mar. 26, 2002) (summary judgment granted because plaintiff
held the positions from which he claims defendant had a policy to exclude him).  And, the
two disparate impact age discrimination cases GEMB cites are inapposite because
plaintiffs failed to identify the specific employment practices at issue.  *Cf. Smith v. City of
Jackson, Miss.,* 544 U.S. 228, 241 (2005) (finding plaintiffs could not maintain a disparate
impact claim under the ADEA because plaintiffs had "done little more than point out that

the pay plan at issue is relatively generous to older workers," and had "not identified any specific test, requirement or practice within the pay plan that has an adverse impact on older workers"); *Syverson v. Int'l Bus. Machs. Corp.,* No. C-03-04529 RMW, 2007 WL 2904252, at *6 (N.D. Cal. Oct. 3, 2007) (same because plaintiffs failed to identify the "highly subjective criteria" that allegedly caused the age discrimination). Here the case is at the pleading stage and the Amended Complaint at issue is highly detailed.

### VIII.   ALL OTHER PLAINTIFFS HAVE STANDING TO AND ADEQUATELY ALLEGE CLAIMS AGAINST GEMB

GEMB did not originate the other Plaintiffs' loans, but rather only participated in their origination. However, that fact alone does not deprive these Plaintiffs of standing or absolve GEMB from potential liability to them given the alleged relationship between GEMB and WMC. Specifically, the Amended Complaint alleges that GEMB is wholly-owned subsidiary of GE Consumer Finance, Inc., which is the same consumer lending unit of General Electric Company that acquired WMC in June, 2004. AC ¶¶ 11-12. Following the June, 2004 acquisition of WMC, GEMB had the right to use the "WMC Mortgage" trade name. *Id.* at ¶ 12. Further, a comparison of Diaz's and Torres' settlement statements reveals that both GEMB and WMC have the same address. AC Exs. 4-5.

Drawing all reasonable inferences from the foregoing allegations in Plaintiffs' favor and recognizing that the particulars of the corporate relationship are uniquely within Defendants' control, all Plaintiffs with WMC originated loans also have sufficiently pled claims against GEMB.

### IX.   THE CLASS INCLUDES MINORITY CONSUMERS WITH GEMB ORIGINATED HOME MORTGAGE LOANS

34

Finally, contrary to GEMB's argument, the alleged Class does not exclude minority borrowers with loans originated by GEMB. The Class definition includes all minority consumers who obtained "a WMC home mortgage loan" and "who were subject to Defendants' Discretionary Pricing Policy." AC ¶ 99. Because GEMB has the right to use the "WMC Mortgage" trade name (AC ¶ 12), it is included within the Class definition. On the basis of this overlapping relationship, the use of the plural possessive "Defendants'" in the Amended Complaint shows the Plaintiffs' intent to include in the class borrowers with loans originated by all Defendants.

## X.        CONCLUSION

For the reasons stated above, the Defendants' motions should be denied in their entirety.

Respectfully submitted,
On behalf of the Plaintiffs,


/s/ Gary Klein
Gary Klein (*admitted pro hac vice*)
Elizabeth Ryan (MA BBO # 549632)
Shennan Kavanagh (MA BBO # 655174)
Kevin Costello (MA BBO # 669100)
RODDY KLEIN & RYAN
727 Atlantic Avenue
Boston, MA   02111-2810
Telephone:  (617) 357-5500 ext. 15
Facsimile:   (617) 357-5030

Al Hofeld, Jr.
Law Offices of Al Hofeld, Jr., LLC
and The Social Justice Project, Inc.
208 S. LaSalle Street, Suite #1650
Chicago, IL 60604
Phone (312) 345-1004
Fax (312) 346-3242

Marvin A. Miller

Matthew E. VanTine
Lori A. Fanning
MILLER LAW LLC
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone: (312) 332-3400

Samuel H. Rudman
Robert M. Rothman
Mark S. Reich
COUGHLIN STOIA GELLER RUDMAN &
ROBBINS LLP
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: (631) 367-7100
Facsimile: (631) 367-1173

John J. Stoia, Jr. (CA SBN 141757)
Theodore J. Pintar (CA SBN 131372)
COUGHLIN STOIA GELLER RUDMAN &
ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

Andrew S. Friedman (pro hac vice pending)
Wendy J. Harrison (pro hac vice pending)
BONNETT, FAIRBOURN, FRIEDMAN &
BALINT, P.C.
2901 North Central Avenue, Suite 1000
Phoenix, Arizona 85012
(602) 274-1100

Mark A. Chavez (CA SBN 90858)
Jonathan Gertler (CA SBN 111531)
Nance F. Becker (CA SBN 99292)
CHAVEZ & GERTLER, L.L.P.
42 Miller Avenue
Mill Valley, California 94941
(415) 381-5599

Dated: September 2, 2008                    *Attorneys for Plaintiffs*

*EXHIBIT A*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-5540 ABC (SHx) | Date | May 15, 2008 |
|---|---|---|---|

| Title | Alfredo B. Payares v. JP Morgan Chase & Co, et al. |
|---|---|

Present: The
Honorable       Audrey B. Collins

| Daphne Alex | Not present | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:**       DEFENDANTS' MOTION TO DISMISS (In Chambers)

Pending before the Court is Defendants' Motion to Dismiss ("Motion"), filed March 11, 2008. Plaintiff filed his Opposition on April 7, 2008; Defendants filed their Reply on April 21, 2008. The Court finds that the motion is appropriate for submission without oral argument and VACATES the hearing set for May 19, 2008. See Fed. R. Civ. P. 78(b); Local Rule 7-15. Having considered the materials submitted by the parties and the case file, the Court hereby GRANTS Defendants' Motion in part and DENIES it in part, as set forth below.

### BACKGROUND

On August 23, 2007, Plaintiff Alfredo B. Payares ("Plaintiff") filed a class action complaint against Defendants JP Morgan Chase & Co. and Chase Bank U.S.A., N.A. ("Defendants"), alleging violations of the Equal Credit Opportunity Act (15 U.S.C. §§ 1691-1691f), the Fair Housing Act (42 U.S.C. §§ 3601-3619), and two provisions of the Civil Rights Act (42 U.S.C. §§ 1981-1982). Plaintiff asserts that Defendants, in funding residential mortgage loans, follow "discretionary loan pricing procedures that cause minority borrowers to pay subjective fees such as yield spread premiums and other mortgage-related finance charges at higher rates than similarly situated non-minority borrowers." (Compl. ¶ 19.) Specifically, Plaintiff focuses on the use of "yield spread premiums," which he does not define or explain in his complaint.

Plaintiff, who identifies himself as Latino, purports to bring this action on behalf of members of all minority racial groups "who have entered into residential mortgage loan contracts that were financed or purchased by [Defendants], and who have been subjected to racial discrimination." (Compl. ¶ 5.) Plaintiff claims that he was injured by Defendants' discriminatory pricing policies in August, 2005, when he refinanced his home in Paramount, California. (Id. at ¶¶ 35-39.) This refinancing was arranged through Amstar Mortgage Company, a brokerage company whose loan officers work on commission in obtaining financing from Defendants. (Id. at ¶ 35.) Plaintiff alleges that, in addition to a number of other fees, he was charged a "yield spread premium" of $5,640, "paid outside of closing," to receive his new loan. (Id. at ¶37.)

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 07-5540 ABC (SHx) | Date | May 15, 2008 |

| | |
|---|---|
| Title | Alfredo B. Payares v. JP Morgan Chase & Co., et al. |

On March 11, 2008, Defendants filed a motion to dismiss the complaint, arguing that the complaint does not sufficiently allege facts to support claims of intentional discrimination. Further, they argue that the theory of "disparate impact" discrimination is not available to Plaintiff under any of his causes of action, but that even if it were, he has not alleged sufficient facts to support any claims of disparate impact.

## LEGAL STANDARD

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in a complaint. Fed. R. Civ. P. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure: Civil § 1356. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1988). To survive a Rule 12(b)(6) motion, a complaint "does not need detailed factual allegations," but the "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007).

The Court must accept as true all material allegations in the complaint, as well as reasonable inferences to be drawn from them. Pareto v. F.D.I.C., 139 F.3d 696, 699 (9th Cir. 1998). Furthermore, the complaint must be read in the light most favorable to plaintiff. Id. However, the Court need not accept as true any unreasonable inferences, unwarranted deductions of fact, or conclusory legal allegations cast in the form of factual allegations. Id.; Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981).

## DISCUSSION

In theory, two different methods of proving discrimination are potentially available to Plaintiff: showing that Defendants engaged in intentional discrimination against minorities, or "disparate treatment"; and showing that Defendants's actions resulted in a "disparate impact" on minority groups. Defendants argue that the theory of "disparate impact" discrimination is not available to Plaintiff under any of his causes of action. If true, his claims could only survive a motion to dismiss if he had sufficiently alleged the existence of intentional discrimination. Plaintiff appears to concede that claims for violations of the Civil Rights Act cannot proceed under a disparate impact theory, asserting that his Section 1981 and 1982 causes of action are based solely on claims of intentional discrimination. (Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss, at 15 n.14.)   Thus if the complaint does not include facts sufficient to show intentional discrimination, as Defendants also argue, Plaintiff's Civil Rights Act claims must fail. On the other hand, Plaintiff disputes Defendants' argument that disparate impact claims are not cognizable under either the Fair Housing Act ("FHA") or the Equal Credit Opportunity Act ("ECOA"), arguing that not only can he bring disparate impact claims under those two statutes, he has sufficiently alleged facts to support these claims.

## A.    "Disparate Impact" Discrimination

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5540 ABC (SHx) | Date | May 15, 2008 |

| Title | Alfredo B. Payares v. JP Morgan Chase & Co, et al. |

    Defendants argue that disparate impact discrimination is not cognizable under either the FHA or the ECOA. Their entire argument is based on two Supreme Court decisions: <u>Alexander v. Sandoval</u>, 532 U.S. 275 (2001), and <u>Smith v. City of Jackson</u>, 544 U.S. 228 (2005). Neither of these cases addressed either of the two statutes at issue here, but Defendants nonetheless argue that they "compel[] the conclusion" that Plaintiff's disparate impact claims are not permissible. (Defs.' Mem. of Ps. & As. in Support of Mot. to Dismiss ("Defs.' Mem."), at 14.) In short, these cases purportedly suggest that anti-discrimination statutes must contain language expressly prohibiting actions that "adversely affect" a protected class of individuals in order to authorize "disparate impact" claims. Accordingly, Defendants continue, as the FHA and ECOA lack such "effects" language, they cannot support disparate impact claims. This argument is creative, but not convincing. Ninth Circuit law makes clear that both the FHA and the ECOA support disparate impact claims. <u>Budnick v. Town of Carefree</u>, 518 F.3d 1109, 1114-15 (9th Cir. 2008) ("Title VII discrimination analysis is used to examine claims under the FHAA; thus, a plaintiff may establish discrimination in violation of the FHAA under a theory of disparate treatment or disparate impact."); <u>Affordable Housing Dev. Corp. v. City of Fresno</u>, 433 F.3d 1182, 1194 (9th Cir. 2006) (finding that plaintiffs made a prima facie showing of disparate impact discrimination under the FHA, but upholding judgment for defendants after jury trial); <u>Harris v. Itzhaki</u>, 183 F.3d 1043, 1051 (9th Cir. 1999) ("A plaintiff can establish a[n] FHA discrimination claim under a theory of disparate treatment or disparate impact."); <u>Gamble v. City of Escondido</u>, 104 F.3d 300, 304-05 (9th Cir. 1997) ("We apply Title VII discrimination analysis in examining Fair Housing Act . . . discrimination claims. . . . Thus, a plaintiff can establish an FHA discrimination claim under a theory of disparate treatment . . . or disparate impact . . . ."); <u>Pfaff v. United States Dept. of Hous. & Urban Dev.</u>, 88 F.3d 739, 745-46 (9th Cir. 1996) (discussing elements of prima facie case of disparate impact under FHA); <u>Keith v. Volpe</u>, 858 F. 2d 467, 482 (9th Cir. 1988) (upholding order finding defendants liable under FHA on disparate impact theory; "discriminatory effect" sufficient to make prima facie showing); <u>Miller v. American Express Co.</u>, 688 F.2d 1235, 1240 (9th Cir. 1982) (finding, in reversing summary judgment for defendant on ECOA claim, that legislative history of ECOA "allows but does not limit proof of credit discrimination to the two traditional Title VII tests for employment discrimination," i.e., disparate treatment and disparate impact).

    Defendants argue that the Ninth Circuit has never addressed their particular argument, and that many of the cases recognizing disparate impact claims under the FHA and ECOA pre-date the Supreme Court's <u>Sandoval</u> and <u>Smith</u> decisions. Defendants imply that <u>Sandoval</u> held, for the first time, that disparate impact claims were not actionable under Section 601 of Title VI of the Civil Rights Act, and that this should cast doubt on any pre-<u>Sandoval</u> case in which disparate impact claims were allowed to proceed under any anti-discrimination statute with language similar to that of Section 601. (Defs.' Mem. at 12, 18.) However, <u>Sandoval</u> merely acknowledged that disparate impact claims under Section 601 had been foreclosed in 1978, by the Court's decision in <u>Regents of Univ. of Cal. v. Bakke</u>, 438 U.S. 265 (1978). 532 U.S. at 280. <u>Sandoval</u> itself held only that no private right of action was available to enforce regulations enacted by federal agencies to prohibit disparate impact discrimination under a statute previously held to prohibit only intentional discrimination. 532 U.S. at 278, 293. While some of the relevant Ninth Circuit law on disparate impact claims under the FHA and ECOA may pre-date <u>Sandoval</u>, it does not appreciably pre-date <u>Bakke</u>.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5540 ABC (SHx) | Date | May 15, 2008 |
|---|---|---|---|
| Title | Alfredo B. Payares v. JP Morgan Chase & Co. et al. | | |

As for <u>Smith</u>, Defendants rely primarily on language taken from a section of the opinion not joined by a majority of the Justices. (Defs.' Mem. at 13-14 (citing <u>Smith</u>, 544 U.S. at 236-38 (Stevens, J., joined by Souter, Ginsburg, and Breyer, JJ.).) The one relevant fact clear from those sections of the opinion that are supported by a majority of Justices is that the Age Discrimination in Employment Act ("ADEA") does in fact permit disparate treatment claims. 544 U.S. at 232 (Stevens, J., joined by Souter, Ginsburg, Breyer, and Scalia, JJ.) Furthermore, the plurality section of the opinion on which Defendants so heavily rely by no means provides unambiguous support for Defendants' position, looking beyond the text of the statute at issue to its purpose and legislative history, and to its implementing regulations. In no way can <u>Smith</u> be read as holding that an anti-discrimination statute must contain "effects" language like that in the ADEA in order to allow disparate treatment claims. Nor is this the first Court to read <u>Smith</u> in such a way. <u>See, e.g.</u>, <u>Garcia v. Countrywide Fin. Corp.</u>, Case No. EDCV 07-1161-VAP (JCRx), Am. Order Granting in Part & Denying in Part Defs.' Mot. to Dismiss, at 9 (C.D. Cal. Jan. 17, 2008); <u>Ramirez v. Greenpoint Mortgage Funding, Inc.</u>, Case No. C08-0369 TEH, Order Denying Mot. to Dismiss, at 5-6 (N.D. Cal. May 13, 2008).

While it is not impossible that the Supreme Court would agree with Defendants' position if faced with the issue of disparate treatment claims in FHA or ECOA cases, it is by no means "clear," as Defendants repeatedly claim, how that Court would rule in such a case. Lacking such clarity, this Court must follow binding Ninth Circuit precedent allowing disparate impact claims of discrimination to be brought under both the FHA and the ECOA; precedent which, as it happens, appears to be well-reasoned, consistent with Congressional intent, in accord with the law in other circuits, and reflective of good public policy.

Having determined that Plaintiff can assert disparate impact claims under both the FHA and the ECOA, it is clear that Defendants' motion to dismiss must be denied. Plaintiff has alleged sufficient facts to proceed under either statute. He has alleged that Defendants have a facially neutral policy (granting discretion to their brokers to mark up the previously calculated risk-related interest rate and impose additional, non-risk-based charges, and encouraging those brokers to steer applicants into loans with higher interest rates), which, as applied, disproportionally causes minority borrowers to pay higher interest rates and more fees than similarly situated non-minority borrowers. He has alleged that statistics disclosed by lenders to the Federal Reserve Board pursuant to Congressional mandate demonstrate this disparity. Further, Plaintiff has alleged that he himself was injured by Defendants' policy, when he refinanced his home on less favorable terms than similarly situated non-minority borrowers. Whether Plaintiff will ever be able to prove any of these allegations remains to be seen. However, he has provided sufficient detail to provide Defendants with "fair notice" of his claims and the grounds on which they rest, which is enough to survive a motion to dismiss at this stage of the case. <u>Twombly</u>, 127 S. Ct. at 1964-65.

**B.   "Disparate Treatment" Discrimination**

On the other hand, Plaintiff has not alleged sufficient facts to suggest the existence of any intentional discrimination by Defendants. True, he repeats the words "intentionally discriminated"

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5540 ABC (SHx) | Date | May 15, 2008 |
|---|---|---|---|
| Title | Alfredo B. Payares v. JP Morgan Chase & Co. et al. | | |

several times in his complaint, but the mere recitation of these words does not magically create a disparate treatment claim. Unlike a plaintiff with a disparate impact claim, a disparate treatment plaintiff must show that the defendants' intent in adopting the challenged policy was deliberately discriminatory. American Fed'n of State, County, and Municipal Employees, AFL-CIO (AFSCME) v. Washington, 770 F.2d 1401, 1405 (9th Cir. 1985). It is not enough to show that the defendants were aware of the potential discriminatory impact of the policy. Id. The defendants must have chosen the policy at least in part because of its discriminatory impact, not in spite of that impact. Id. Of course, the plaintiff does not have to prove such discriminatory intent at the pleading stage, but he must provide something that raises an inference of deliberate discrimination "above the speculative level." Twombly, 127 S. Ct. at 1964-65. This the instant plaintiff has not done. He has provided nothing whatsoever to suggest that Defendants ever deliberately acted to impose less favorable loan terms on minority applicants. At most, the complaint supports an inference that Defendants may have known their attempts to achieve higher profits by encouraging brokers to steer applicants into loans with higher fees and interest rates may have impacted minority populations more than non-minorities. This is not sufficient to make out a claim of deliberate discrimination. Accordingly, Plaintiff's two Civil Rights Act claims, which can only proceed on a disparate treatment theory, must be dismissed.

## CONCLUSION

Therefore, for the reasons set forth above, the Court hereby GRANTS Defendants' motion to dismiss as to Plaintiff's Second and Third Causes of Action, for racial discrimination under 42 U.S.C. sections 1981 and 1982, with leave to amend. The motion is otherwise DENIED. Plaintiff shall have 30 days from the date of this order in which to file an amended complaint.

**IT IS SO ORDERED.**

_____ : _____

Initials of Preparer    AB for DA

*EXHIBIT B*

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| GABRIEL GARCIA, | ) | Case No. EDCV 07-1161-VAP (JCRx) |
| Plaintiff, | ) ) | |
| v. | ) ) | **[Motion filed on November 8, 2007]** |
| COUNTRY WIDE FINANCIAL CORPORATION and COUNTRYWIDE HOME LOANS, INC., | ) ) ) ) | **AMENDED ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS** |
| Defendants. | ) ) | |

Defendants' Motions to Dismiss came before the Court for hearing on January 7, 2008. After reviewing and considering all papers filed in support of, and in opposition to, the Motion, as well as the arguments advanced by counsel at the hearing, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss.

## I. BACKGROUND

**A.  Procedural History**

Plaintiff Gabriel Garcia filed a putative class action Complaint ("Compl.") on September 12, 2007,

1  alleging that Defendants Countrywide Financial

2  Corporation and Countrywide Home Loans, Inc.

3  (collectively, "Defendants") violated and continue to

4  violate (1) the Equal Credit Opportunity Act ("ECOA");

5  (2) the Fair Housing Act ("FHA"); and (3) the Civil

6  Rights Act, 42 U.S.C. §§ 1981 and 1982.

7

8      On November 8, 2007, Defendants filed a Motion to

9  Dismiss ("Mot.") pursuant to Federal Rule of Civil

10  Procedure 12(b)(6).  Plaintiff filed an Opposition

11  ("Opp'n") on December 3, 2007.  On December 10, 2007,

12  Defendants filed a Reply.

13

14      **B.   Plaintiff's Allegations**

15      Nationwide, minority consumers "have less-than-equal

16  access to loans at the best prices and on the best terms

17  that their credit history, income, and other individual

18  financial considerations merit."  (Compl. ¶ 13 (citing

19  Joint Center for Housing Studies, The Dual Mortgage

20  Market: The Persistence of Discrimination in Mortgage

21  Lending (2005).)  Even after controlling for a borrower's

22  gender, income, property location, and loan amount,

23  federally mandated lender disclosures show that Hispanic

24  and black borrowers were 37.5 to 50 per cent more likely

25  to receive a higher-rate home loan than non-Hispanic

26  whites.  (Id.  ¶ 15-16.)

27  ///

28

2

1    Defendants represent themselves as "America's #1 home
2  lender" and "America's #1 Lender to Minorities."  (Id. ¶
3  19.)   They originate and fund mortgage loans through loan
4  officers, brokers and a network of correspondent lenders
5  (collectively "loan originators").  (Id.)   These loan
6  originators act as Defendants' agents in originating
7  loans.  (Id. ¶¶ 26-27.)

8

9    Defendants encourage and offer incentives to these
10 loan originators to increase interest rates, charge
11 additional fees, and include prepayment penalties and
12 other less favorable terms in loans to certain borrowers.
13 (Id. ¶ 3.)   As a direct result of these policies,
14 minorities receive residential loans with higher interest
15 rates and higher fees and costs than similarly situated
16 non-minority borrowers.  (Id.)

17

18    Specifically, Defendants employ discretionary loan
19 pricing procedures that cause minority borrowers to
20 purchase loans with prepayment penalties and other
21 unfavorable terms, and to pay subjective fees such as
22 yield spread premiums and other mortgage-related finance
23 charges, at higher rates than similarly situated non-
24 minority borrowers.  (Id. ¶ 21.)   Defendants' loan
25 originators receive more compensation when they steer
26 borrowers into loans with these higher interest rates,
27 penalties and fees.  (Id. ¶ 22.)

28

                              3

1     Moreover, these discretionary charges are unrelated
2   to any objective risk-based credit evaluation.   When a
3   loan applicant provides credit information to Defendants
4   through a loan originator, Defendants perform an initial
5   objective credit analysis, evaluating numerous risk-
6   related credit variables, including debt-to-income
7   ratios, loan-to-value ratios, credit bureau histories,
8   debt ratios, bankruptcies, automobile repossessions,
9   prior foreclosures, payment histories, and credit scores.
10   (Id. ¶ 29.)   From these objective factors, Defendants
11   derive a risk-based financing rate called the "par rate."
12   (Id. ¶ 30.)

13

14     Defendants, however, authorize and offer incentives
15   to their loan originators to charge discretionary, non-
16   risk-based fees in addition to the "par rate," including
17   "yield spread" or "broker premiums."   (Id. ¶ 31.)   This
18   practice causes persons with identical or similar credit
19   scores to pay differing amounts for obtaining credit, and
20   disparately impacts Defendants' minority borrowers.   (Id.
21   ¶ 34.)   Specifically, Defendants' use of yield spread
22   premiums and other discretionary fees disproportionately
23   and adversely affects minorities relative to similarly
24   situated non-minorities.   (Id. ¶ 35.)

25

26     Defendants have intentionally discriminated against
27   minority borrowers through these policies and procedures,
28

4

1  systematically giving them mortgage loans with less
2  favorable conditions than were given to similarly
3  situated non-minority borrowers.  (Id. ¶ 21, 36.)  This
4  pattern of discrimination is a direct result of
5  Defendants' mortgage lending policies and procedures,
6  cannot be justified by business necessity, and could be
7  avoided by alternative policies and procedures that have
8  less discriminatory impact and no less business efficacy.
9  (Id.  ¶¶ 21, 25, 26.)
10
11      These discriminatory practices directly damaged
12  Plaintiff.  (Id. ¶ 37.)  On or about February 27, 2006,
13  Plaintiff obtained $415,000 in financing from Defendants
14  to purchase a single-family house.  (Id.)  The loan
15  originator and Defendants knew that Plaintiff was a
16  minority borrower, and because of Defendants'
17  discriminatory practices, Plaintiff received a loan on
18  worse terms with higher costs than similarly situated
19  non-minority borrowers.  (Id.  ¶¶ 40-41.)  Specifically,
20  Plaintiff paid a $8,300 "broker origination fee," a
21  $1,250 "broker administration fee," a $550 "processing
22  fee," a $830 yield spread premium, a $150 "loan tie in
23  fee" and a $995 "underwriting fee." (Id. ¶ 39.)  All of
24  these fees were assessed pursuant to Defendants' credit
25  pricing policies.  (Id.)
26  ///
27  ///
28

## II. LEGAL STANDARD

Under Rule 12(b)(6), a party may bring a motion to dismiss for failure to state a claim upon which relief can be granted.  As a general matter, the Federal Rules require only that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  Conley v. Gibson, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)(2)); Bell Atlantic Corp. v. Twombly, 550 U.S. __, 127 S. Ct. 1955, 1964 (2007).  In addition, the Court must accept all material allegations in the complaint -- as well as any reasonable inferences to be drawn from them -- as true.  See Doe v. United States, 419 F.3d 1058, 1062 (9th Cir. 2005); ARC Ecology v. U.S. Dep't of Air Force, 411 F.3d 1092, 1096 (9th Cir. 2005).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atlantic, 127 S. Ct. at 1964-65 (citations omitted). Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." Id. at 1965.

6

1    Although the scope of review is limited to the
2  contents of the complaint, the Court may also consider
3  exhibits submitted with the complaint, <u>Hal Roach Studios,</u>
4  <u>Inc. v. Richard Feiner & Co.</u>, 896 F.2d 1542, 1555 n.19
5  (9th Cir. 1990), and "take judicial notice of matters of
6  public record outside the pleadings," <u>Mir v. Little Co.</u>
7  <u>of Mary Hosp.</u>, 844 F.2d 646, 649 (9th Cir. 1988).

8

9                         **III. DISCUSSION**

10    Defendants argue that (1) the FHA and ECOA do not
11  authorize disparate impact claims; (2) Plaintiff fails to
12  state a disparate impact claim; (3) Plaintiff fails to
13  state a claim for intentional discrimination; (4)
14  Plaintiff does not have standing to assert claims on
15  behalf of minority populations of which he is not a
16  member; (5) Plaintiff fails to allege liability on the
17  part of Defendant Countrywide Financial Corporation,
18  Inc.; and (6) Plaintiff's allegations regarding tolling
19  of the statute of limitations should be stricken.    The
20  Court considers each of these arguments in turn.

21

22  **A.    Disparate Impact Under the FHA and ECOA**

23    Plaintiff alleges that Defendants violate the FHA and
24  ECOA, in part, because Defendants' policies have a
25  negative disparate impact on minority borrowers.    The
26  Fair Housing Act, in relevant part, states that "it shall
27  be unlawful":

28

                               7

1

2

3

4

> To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

5

6

7

8

9

42 U.S.C. § 3604(a).  In the Ninth Circuit, a plaintiff can establish an FHA discrimination claim under a theory of disparate treatment or disparate impact.  <u>Gamble v. City of Escondido</u>, 104 F.3d 300, 304-05 (9th Cir. 1996).

10

11

12

13

14

15

16

17

18

19

The ECOA provides, in relevant part, that "[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex or marital status, or age."  15 U.S.C. § 1691(a).  A plaintiff can establish an ECOA claim under a theory of disparate treatment or disparate impact.  <u>Miller v. American Exp. Co.</u>, 688 F.2d 1235, 1240 (9th Cir. 1982).

20

21

22

23

24

25

26

27

28

Defendant argues that the Ninth Circuit cases recognizing disparate impact claims under FHA and ECOA "were wrongly decided" and "cannot be good law in light of the subsequent Supreme Court decision in <u>Smith v. City of Jackson</u>."  (Mot. at 14 (citing <u>Smith v. City of Jackson</u>, 544 U.S. 228 (2005)).)  In <u>Smith</u>, the Supreme Court held a plaintiff could bring a disparate impact claim under the Age Discrimination in Employment Act

1  ("ADEA").  Smith, 544 U.S. at 235-39.  The Court compared
2  the text of the ADEA to the text of Title VII, and
3  reasoned that both statutes authorized disparate impact
4  claims when they prohibited "actions that deprive any
5  individual of employment opportunities or *otherwise*
6  *adversely affect* his status as an employee, because of
7  such individual's race or age."  Id. at 235 (emphasis in
8  original; citations omitted).
9
10  Defendants argue that the FHA and ECOA do not support
11  disparate impact claims because, unlike the ADEA and
12  Title VII, they do not contain text expressly prohibiting
13  actions that "otherwise adversely affect" individuals
14  based on their protected status.  (Mot. at 15-16.)
15  Smith, however, did not hold that a statute *must* contain
16  this "effects" language in order to authorize disparate
17  impact claims.  Indeed, the Court did not rely only on
18  this textual analysis of the statutes, but also held that
19  the purpose and legislative history of the ADEA, as well
20  as unanimous circuit court treatment of the Act,
21  supported disparate treatment claims.  Smith, 544 U.S. at
22  236-39.
23
24  Like the Supreme Court in Smith, the Ninth Circuit
25  relied on the purposes of the ECOA in determining that
26  Act supports disparate impact claims.  See Miller, 688
27  F.2d at 1239-40.  It held that "not requiring proof of
28

1  discriminatory intent is especially appropriate in
2  analysis of ECOA violations because discrimination in
3  credit transactions is more likely to be of the
4  unintentional, rather than the intentional, variety."
5  Id. at 1239 (citations omitted).

6

7      Moreover, all eleven circuits that have considered
8  the matter have concluded that the FHA supports disparate
9  impact claims.  See 2922 Sherman Ave. Tenants' Ass'n v.
10 District of Columbia, 444 F3d 673, 679 (D.C. Cir. 2006)
11 (analyzing circuit holdings); Note, The Fair Housing Act
12 and Disparate Impact in Homeowners' Insurance, 104 Mich.
13 L. Rev. 1993, 2006-07 & n.117 (listing cases).
14 Furthermore, in Village of Arlington Heights v.
15 Metropolitan Housing Development Corp., the Supreme Court
16 affirmed summary judgment against the plaintiffs on all
17 claims requiring discriminatory intent, finding that the
18 plaintiffs had failed to prove such intent, but remanded
19 for consideration of an FHA claim, thus implying that
20 discriminatory intent was not necessary for an FHA claim.
21 Village of Arlington Heights v. Metropolitan Housing
22 Development Corp., 429 U.S. 252, 270-71 (1977).

23

24     Indeed, the Ninth Circuit has recognized the
25 viability of disparate impact claims under the FHA after
26 Smith.  See Affordable Housing Dev. Corp. v. City of
27 Fresno, 433 F.3d 1182, 1195-96 (9th Cir. 2006) (affirming

28

10

1  a judgment for the defendants but recognizing the
2  viability of such a claim).  The Sixth Circuit similarly
3  has recognized the continuing viability of ECOA disparate
4  impact claims.  See Golden v. City of Columbus, 404 F.3d
5  950, 964-65 (6th Cir. 2005) (same).  Accordingly, this
6  Court declines to hold that Smith overturned Ninth
7  Circuit precedent recognizing disparate impact claims
8  under the FHA and ECOA.
9
10 **B.    Disparate Impact**
11      In analyzing discrimination claims under the FHA,
12 courts have borrowed the analysis that they use in
13 assessing claims under Title VII.  Gamble, 104 F.3d at
14 304.  To establish discrimination through disparate
15 impact, a plaintiff must (1) identify a specific practice
16 of the Defendant; (2) identify a significant
17 discriminatory impact on the protected class of which the
18 plaintiff is a member; and (3) demonstrate that the
19 identified practice causes the identified discriminatory
20 impact.  Paige v. California, 291 F.3d 1141, 1144-45 (9th
21 Cir. 2002); Gamble, 104 F.3d at 304.  The causation
22 requirement may be inferred through statistical evidence
23 showing a sufficiently substantial disparity.  Id.
24
25      **1.    Specific Practice**
26      Defendants argue that Plaintiff fails to challenge a
27 sufficiently specific practice on the part of Defendants.
28

11

1  (Mot. at 6-10.)   To establish discrimination based on
2  disparate impact, a plaintiff must "isolate[e] and
3  identify[y] the *specific* . . . practices that are
4  allegedly responsible for any observed statistical
5  disparities."  Smith, 544 U.S. at 241 (emphasis in
6  original; citations omitted).  In Smith, plaintiffs
7  challenged a pay plan that granted proportionately
8  greater pay raises to employees with less than five years
9  of tenure, arguing that the plan had a discriminatory
10  impact on older employees.  Id. at 231.  The Supreme
11  Court held that the plaintiffs failed to identify the
12  specific practice being challenged, and that imposing
13  liability for the pay plan in general could "result in
14  employers being potentially liable for the myriad of
15  innocent causes that may lead to statistical imbalances."
16  Id. at 241.  Additionally, the Court stressed that the
17  plaintiffs could not successfully challenge the plan as a
18  whole because it "was based on reasonable factors other
19  than age."  Id.
20
21      The Ninth Circuit similarly has rejected challenges
22  to a defendant's overall processes.  In Stout v. Potter,
23  postal inspectors challenged the process by which a
24  review panel screened applicants for promotion.  Stout v.
25  Potter, 276 F.3d 1118, 1121 (9th Cir. 2002).  The Ninth
26  Circuit held that by merely attacking "the decision-
27  ///
28

12

1  making process" or "the process by which the [screening]
2  Panel evaluated applications," the plaintiffs failed
3  to identify a "specific employment practice or selection
4  criterion." <u>Id.</u> at 1124.   The court explained,

> Plaintiffs generally cannot attack an
> overall decisionmaking process in the
> disparate impact context, but must
> instead identify the particular element
> or practice within the process that
> causes an adverse impact. A
> decisionmaking process may be analyzed as
> a single employment practice if the
> complaining party can demonstrate to the
> court that the elements of a respondent's
> decisionmaking process are not capable of
> separation for analysis.

<u>Id.</u>  In <u>Stout</u>, the court did not treat the decision-
making process as a single practice because the overall
process consisted of discrete elements and the plaintiffs
failed to argue that the various elements could not be
separated for analysis. <u>Id.</u> at 1124-25.


      Similarly, the Ninth Circuit has frowned on a
challenge to a complex market-based process.  In <u>AFSCME</u>
<u>v. State of Wash.</u>, the plaintiffs attacked the state's
practice of setting salaries based on biennial studies
assessing prevailing market rates for each position.
<u>AFSCME v. State of Wash.</u>, 770 F.2d 1401, 1403 (9th Cir.
1985.)  The Ninth Circuit held that "the decision to base
compensation on the competitive market . . . involves the
assessment of a number of complex factors not easily
ascertainable, an assessment too multifaceted to be
appropriate for disparate impact analysis." <u>Id.</u> at 1406.

1    In contrast, challenges to subjective decision-making
2  practices are more likely to survive initial pleading
3  attacks.   In <u>Watson v. Fort Worth Bank and Trust</u>, the
4  plaintiff challenged her employer's practice of promoting
5  employees based on the "subjective judgment of
6  supervisors who were acquainted with the candidates and
7  with the nature of the jobs to be filled."   <u>Watson v.</u>
8  <u>Fort Worth Bank and Trust</u>, 487 U.S. 977, 982 (1988).   The
9  Court held that "subjective or discretionary employment
10  practices may be analyzed under the disparate impact
11  approach," but did not decide whether the plaintiff had
12  made out a *prima facie* claim for disparate impact
13  discrimination.   <u>Id.</u> at 991, 1000.

14

15    Here, Plaintiff challenges Defendants' practice of
16  authorizing and offering incentives to their loan
17  originators to charge discretionary, non-risk-based fees
18  in addition to the "par rate," including "yield spread"
19  or "broker premiums."   (Compl. ¶ 31.)   Like the practice
20  challenged in <u>Watson</u>, Defendants' practice allows
21  subjective decision-making that is alleged to result in a
22  discriminatory impact.   Unlike the practice challenged in
23  <u>Smith</u>, the challenged decision-making, is *not*, on its
24  face, based on objective factors other than prohibited
25  discrimination.   See <u>Smith</u>, 544 U.S. at 241 (stressing
26  that the challenged plan is based on reasonable factors
27  other than age).

28

14

1    Defendants argue that, like the practice challenged

2  in AFSCME, the practice attacked here is merely a "policy

3  of allowing pricing to be responsive to supply and demand

4  and other market forces."  (Mot. at 9 (quotations

5  omitted).)  Plaintiff, however, alleges that Defendants'

6  assessment of fees in addition to the "par rate" is *not*

7  based on market-based factors such as risk or

8  creditworthiness, and indeed is unrelated to legitimate

9  business necessity.  (Compl. ¶ 25, 28-35.)  From this, it

10 is reasonable to infer that the challenged practices do

11 not merely allow pricing to be responsive to market

12 forces.  In the context of a motion to dismiss, the Court

13 takes as true these allegations and reasonable inferences

14 therefrom.  See Doe, 419 F.3d at 1062.

15

16    Finally, unlike in Stout, Plaintiff does not

17 challenge the overall process by which Defendants

18 determine borrowers' rates and fees.  Instead, Plaintiff

19 challenges only the practice of allowing and

20 incentivizing individual loan originators to assess

21 additional, non-risk-based fees.  (Compl. ¶ 31.)  In the

22 context of a  motion to dismiss, this is sufficient to

23 give Defendants "fair notice of what the plaintiff's

24 claim is and the grounds upon which it rests."  See

25 Conley, 355 U.S. at 47; Bell Atlantic, 127 S. Ct. at

26 1964.

27 ///

28

15

## 2. Significant Discriminatory Impact

To establish disparate impact discrimination, a plaintiff must demonstrate that there is a significant disparity in outcomes between minorities and similarly situated non-minorities. <u>See</u>, <u>e.g.</u> <u>Wards Cove</u>, 490 U.S. at 651-53.  Here, Defendants argue that the nationwide statistics cited by Plaintiff "fail[] to allege a disparate impact because the cited data is not specific to Countrywide." (Mot. at 10.)  As Plaintiff points out, however, he is not required at the pleading stage to produce statistical evidence proving a disparate impact on Defendants' customers -- all that is required is fair notice of the claims and the grounds upon which they rest, sufficient to raise a right to relief above the speculative level. <u>Bell Atlantic</u>, 127 S. Ct. at 1964-65 (citations omitted); <u>see also</u> <u>Swierkeiwicz v. Sorema</u>, 534 U.S. 506, 514-15 (2002) (no heightened pleading standard to state a discrimination claim).  Here, Plaintiff does allege that Defendants' minority customers, specifically, pay disproportionately higher fees for mortgages than Defendants' nonminority customers.  (<u>See</u> Compl. ¶¶ 21, 22, 24, 35.)  Moreover, he provides statistical evidence of a nationwide disparate impact which, combined with an allegation that Defendants are "America's #1 home lender," is enough to raise above the speculative level Plaintiff's allegation that Defendants' minority buyers
///

1  pay disproportionately high fees.  (See Compl. ¶¶ 13-16,
2  19.)

3

4      Defendants also argue that Plaintiff fails to allege
5  that "the relevant groups of whites and Hispanics are
6  similarly-situated."  (Mot. at 10-11.)  The Complaint,
7  however, does allege that Defendants charge minorities
8  higher fees "even after controlling for borrowers'
9  gender, income, property location, and loan amount."
10  (Compl. ¶ 15.)  Moreover, Plaintiff alleges that
11  Defendants charge minorities higher fees than others with
12  the same "par-rate," a number which takes into account
13  numerous risk-related credit variables, including debt-
14  to-income ratios, loan-to-value ratios, credit bureau
15  histories, debt ratios, bankruptcies, automobile
16  repossessions, prior foreclosures, payment histories, and
17  credit scores.  (Id. ¶ 29.)  Finally, Plaintiff alleges
18  Defendants' use of yield spread premiums and other
19  discretionary fees disproportionately and adversely
20  affects minorities "relative to similarly situated non-
21  minorities."  (Id. ¶ 35.)  Accordingly, Plaintiff has
22  alleged that there is a significant disparate impact on
23  minorities compared to similarly situated non-minorities.
24

25      **3.   Causation**
26      To allege causation, Plaintiff must allege facts
27  sufficient to raise above a speculative level the
28

17

1  inference that, but for Defendants' challenged policy,
2  minorities would not receive higher-cost loans than
3  similarly situated non-minority borrowers.  See Bell
4  Atlantic, 127 S. Ct. at 1964-65.  Here, Plaintiff alleges
5  that Defendants' policy of allowing and offering
6  incentives to its loan originators to add fees in
7  addition to the "par rate" directly causes minorities to
8  receive home loans with higher interest rates and higher
9  fees and costs.  (Compl. ¶¶ 3, 21, 24, 35, 62, 80.)
10  Defendants argue that these allegations are conclusory
11  and that Plaintiff fails to "allege a set of facts from
12  which causation plausibly can be inferred."  (Mot. at
13  13.)

14

15      Defendants claim that the higher costs imposed on
16  minority borrowers could be explained by such borrowers'
17  lower average credit scores.  (Id.)  This explanation
18  ignores Plaintiff's allegation that Defendants impose the
19  challenged discretionary fees in addition to the "par
20  rate," which is calculated based on a borrower's credit
21  score.  (Compl. ¶¶ 15, 29.)  Indeed, Plaintiff alleges
22  that the higher costs imposed on minority borrowers
23  cannot be explained by any factor other than Defendants'
24  challenged policies.  (Compl. ¶ 15.)  These allegations
25  are sufficient to raise above a speculative level the
26  inference that, but for Defendants' policy of offering
27  incentives for discretionary fees, minorities would not
28

18

1 | receive higher-cost loans than similarly situated non-
2 | minority borrowers.  Accordingly, Plaintiff has stated a
3 | claim for disparate impact discrimination.

4 |

5 | **C.   Disparate Treatment**

6 | To show disparate treatment based on race, a
7 | plaintiff must establish that the defendant was *motivated*
8 | to discriminate against the plaintiff on the basis of
9 | race.  See AFSCME, 770 F.2d at 1406-07.  Where a
10 | plaintiff challenges a defendant's policy, the plaintiff
11 | must establish that the defendant implemented the policy
12 | "because of, not merely in spite of," its adverse effects
13 | on the protected group.  Personnel Adm'r of Massachusetts
14 | v. Feeney, 442 U.S. 256, 279 (1979).

15 |

16 | Here, Plaintiff alleges that Defendants have
17 | intentionally discriminated against minority borrowers
18 | through their policy of offering incentives for
19 | discretionary loan fees, and that Defendants
20 | intentionally designed this policy to discriminate
21 | against minority borrowers.  (Compl. ¶¶ 21, 36.)
22 | Plaintiff maintains that this policy perpetuates past
23 | racial discrimination in mortgage lending.  (Id. at 12-
24 | 18.)

25 |

26 | To state a claim for disparate treatment, Plaintiff
27 | must provide more than mere conclusory allegations of
28 |

1  Defendants' intent to discriminate.  <u>See</u> <u>Bell Atlantic</u>,
2  127 S. Ct. at 1964-65.  Rather, the allegations in the
3  complaint "must be enough to raise a right to relief
4  above the speculative level."  <u>Id</u>. at 1965.  Here,
5  Plaintiff provides no factual allegations regarding
6  intent to discriminate beyond his bare assertion that
7  Defendants "intentionally discriminated" and that
8  Defendants' policy "by design discriminates against
9  minority borrowers."  (<u>Compl.</u> ¶¶ 21, 36.)  These
10 assertions are not enough to raise Plaintiff's right to
11 relief for disparate treatment above the speculative
12 level.  <u>See</u> <u>Bell Atlantic</u>, 127 S. Ct. at 1965.
13 Accordingly, Plaintiff has failed to state a claim for
14 disparate treatment.
15
16 **D.    Standing**
17      To satisfy Article III's standing limitations, a
18 plaintiff must demonstrate that:  (1) he or she has
19 suffered an "'injury in fact' -- an invasion of a legally
20 protected interest which is (a) concrete and
21 particularized, and (b) actual or imminent, not
22 conjectural or hypothetical"; (2) there is a causal
23 connection between the injury and the conduct complained
24 of -- the injury is "fairly traceable" to the challenged
25 action of Defendants, and not the result of the
26 independent action of some third party not before the
27 court; and (3) it is "likely," as opposed to merely
28

1  "speculative," that the injury will be redressed by a

2  favorable judicial decision.  Lujan v. Defenders of

3  Wildlife, 504 U.S. 555, 560-561 (1992) (citations

4  omitted).  "In the class action context, Article III

5  standing simply requires that the class representatives

6  satisfy standing individually."  In re Verisign, Inc.,

7  2005 WL 88969, *4 (N.D. Cal. 2005).

8

9       Defendants argue that Plaintiff cannot establish

10  standing to sue on behalf of potential class members of

11  minority groups other than Hispanics.  (Mot. at 19-20.)

12  To establish Article III standing, however, Plaintiff

13  must only show that he has standing to sue on his own

14  behalf.  In re Verisign, 2005 WL at *4.  Whether he may

15  represent the claims of the class is a separate inquiry,

16  governed by Federal Rule of Civil Procedure 23.  Id.

17

18       Defendants do not argue that Plaintiff does not have

19  standing to sue on his own behalf.  Indeed, Plaintiff has

20  alleged he has suffered an actual injury that is fairly

21  traceable to Defendants' acts, and the type of injury he

22  alleges (discriminatory fees) is redressible by a federal

23  court.  (See Compl. ¶¶ 39-41 (alleging that as a result

24  of Defendants' discriminatory credit pricing policies,

25  Plaintiff received a loan on worse terms with higher

26  costs than similarly situated non-minority borrowers).)

27  ///

28

1  Accordingly, Plaintiff has established Article III

2  standing.[1]

3

4  **E.   Liability of Defendant Countrywide Financial**

5  **Corporation, Inc.**

6  Plaintiff's Complaint does not distinguish between

7  the two named Defendants.   (Compl. ¶ 1.)   Nonetheless,

8  Defendants argue that Defendant Countrywide Financial

9  Corporation ("CFC") cannot be liable because Plaintiff

10  "states no factual allegations at all as to CFC."   (Mot.

11  at 21.)   The Complaint, however, alleges numerous acts by

12  CFC.   Every allegation of an act by Defendants is an

13  allegation of an act by both CFC and Countrywide Home

14  Loans, Inc.   (See Compl. passim.)   For instance, the

15  Complaint alleges Plaintiff obtained a residential loan

16  from "CONTRYWIDE," which he defines as Countrywide

17  Financial Corporation *and* Countywide Home Loans, Inc.

18  (See Compl. ¶¶ 1, 37-38.)   The Complaint also alleges

19

20  _____

    [1]At the hearing on this matter, Defendants' counsel

21  argued that Plaintiff lacks Article III standing to
represent minority groups of which he is not a part under

22  the Ninth Circuit holding in Black Coalition v. Portland
School Dist. No. 1.   Black Coalition held that a

23  plaintiff has no standing to challenge a policy or
procedure which has not adversely affected that

24  individual plaintiff's interests.   Black Coalition v.
Portland School Dist. No. 1., 484 F.2d 1040, 1042-43

25  (1973).   In contrast, Plaintiff here challenges a policy
that he alleges directly and adversely affected him.

26  Moreover, while Black Coalition considered an appeal of a
district court judgment in a class action, here a class

27  has not yet been certified, so the issue of whether
Plaintiff may represent all members of the class is not

28  yet properly before the Court.

22

1  that Defendants collectively designed, implemented, and

2  oversee the allegedly discriminatory policy of allowing

3  loan officers to add discretionary fees to the

4  objectively determined "par rate."   (Compl. ¶¶ 3, 21-25,

5  29-36.)

6

7      Defendant argues that these allegations are untrue

8  and cannot be proven as to CFC, but for the purposes of a

9  Motion to Dismiss, the Court takes Plaintiff's

10  allegations as true.   <u>Doe</u>, 419 F.3d at 1062.

11  Accordingly, the Court declines to dismiss Defendant CFC.

12

13  **F.   Motion to Strike Allegations re Tolling of the**

14      **Statute of Limitations**

15      Under Federal Rule of Civil Procedure 12(f), a party

16  may ask the court to strike any "insufficient defense or

17  any redundant, immaterial, impertinent, or scandalous

18  matter."   Fed. R. Civ. Proc. 12(f).   "'Immaterial' matter

19  is that which has no essential or important relationship

20  to the claim for relief or the defenses being pleaded. .

21  . . 'Impertinent' matter consists of statements that do

22  not pertain, and are not necessary, to the issues in

23  question."   <u>Fantasy, Inc. v. Fogerty</u>, 984 F.2d 1524, 1527

24  (9th Cir. 1993), <u>rev'd on other grounds by</u> <u>Fogerty v.</u>

25  <u>Fantasy, Inc.</u>, 510 U.S. 517 (1994).

26  ///

27  ///

28

23

1    "Motions to strike are generally regarded with
2  disfavor because of the limited importance of pleading in
3  federal practice, and because they are often used as a
4  delaying tactic." <u>Cal. Dept. of Toxic Substances Control</u>
5  <u>v. Alco Pacific, Inc.</u>, 217 F. Supp. 2d 1028, 1033 (C.D.
6  Cal. 2002).  Thus, "courts often require 'a showing of
7  prejudice by the moving party' before granting the
8  requested relief," and "[u]ltimately, whether to grant a
9  motion to strike lies within the sound discretion of the
10  district court." <u>Id.</u> (citing <u>Fantasy</u>, 984 F.2d at 1528).
11  A court should deny "[a] motion to strike under Rule
12  12(f) . . . unless it can be shown that no evidence in
13  support of the allegation would be admissible, or those
14  issues could have no possible bearing on the issues in
15  the litigation." <u>Gay-Straight Alliance Network v.</u>
16  <u>Visalia Unified Sch. Dist.</u>, 262 F. Supp. 2d 1088, 1099
17  (E.D. Cal. 2001).

18

19    Defendant moves to strike the allegations in
20  paragraphs 51-58 of the Complaint.  (Mot. 21-22.)  These
21  paragraphs allege that class members' claims did not
22  accrue until shortly before the filing of the action,
23  that Defendants fraudulently concealed their
24  discriminatory practices, and that Defendants'
25  discriminatory conduct is continuing and recurrent.
26  (Compl. ¶¶ 51-55.)  Accordingly, Plaintiff alleges that
27  "[t]he statute of limitations applicable to any claims
28

24

1  that Plaintiff or other class members have brought or

2  could bring as a result of the unlawful and fraudulent

3  concealment and course of conduct described herein, have

4  been tolled."  (Id. ¶ 58.)

5

6      Defendants argue that the allegations in paragraphs

7  51-58 of the Complaint are irrelevant because the named

8  Plaintiff filed his claim within all applicable statutes

9  of limitations.  (Mot. 21-22.)  This argument is

10  premature.  Until the Court has ruled on the issue of

11  class certification, it cannot be shown that the

12  allegations regarding other class members "could have no

13  possible bearing on the issues in the litigation."  See

14  Gay-Straight Alliance Network, 262 F. Supp. 2d at 1099.

15

16      Defendants further argue that the Court should strike

17  Plaintiff's allegations of fraudulent concealment because

18  Plaintiff failed to plead with particularity sufficient

19  facts showing fraudulent conduct.  (Mot. at 22-23.)

20  Indeed, one pleading fraudulent concealment "must plead

21  with particularity the facts which give rise to the

22  claim.  Conerly v. Westinghouse Elec. Corp., 623 F.2d

23  117, 120 (9th Cir. 1980); see also Fed. R. Civ. Proc.

24  9(b).  Here, Plaintiff merely alleges that Defendants

25  "took steps to conceal [their] fraudulent and unfair

26  conduct," but fails to allege what steps were taken, how

27  those steps were intended to mislead Plaintiff and class

28

1  members, or why those steps would lead a reasonable

2  person to be misled into believing that he did not have a

3  claim for relief.  See Conerly, 623 F.2d at 120.  In his

4  Opposition, Plaintiff does not contest that the Complaint

5  fails to plead fraudulent concealment properly.

6

7      Plaintiff has failed to plead fraudulent concealment

8  with sufficient particularity, and Plaintiff's

9  allegations regarding fraudulent concealment are

10  stricken.

11

12      Finally, Defendants argue that Plaintiff's

13  allegations of a continuing violation are insufficient as

14  a matter of law to justify tolling the statute of

15  limitations under the "continuing violation" doctrine.

16  (Mot. at 24-25.)  Defendants cite Ledbetter v. Goodyear

17  Tire & Rubber Co. Inc., which held that the statute of

18  limitations was not tolled when the alleged

19  discriminatory act was a pay decision that occurred

20  before the limitations period, even though the plaintiff

21  continued to receive lower pay during the limitations

22  period.  Ledbetter v. Goodyear Tire & Rubber Co. Inc.,

23  127 S. Ct. 2162, 2166-69 (2007).  The Court held that a

24  limitations period does not recommence "upon the

25  occurrence of subsequent nondiscriminatory acts that

26  entail adverse effects resulting from the past

27  discrimination."  Id. at 2169.

28

26

1    Unlike the plaintiff in Ledbetter, however, Plaintiff
2  here alleges a discriminatory act —— Defendants' sale to
3  him of an allegedly high-cost loan  —— which occurred
4  during the limitations period.  (Compl. ¶ 37.)  Indeed,
5  in an FHA case similar to this one, the Supreme Court
6  tolled the statute of limitations under a "continuing
7  violation" theory.  See Havens Realty Corp. v. Coleman,
8  455 U.S. 363, 380 (1982).  In Havens Realty, the
9  plaintiffs alleged five specific incidents of alleged FHA
10  violations.  Id.  Only one of the incidents, involving
11  only one of the plaintiffs, occurred within the
12  limitations period.  Id.  Nevertheless, the Court tolled
13  the statute as to the other incidents involving the other
14  plaintiff.  Id.  The Court held, "where a plaintiff,
15  pursuant to the Fair Housing Act, challenges not just one
16  incident of conduct violative of the Act, but an unlawful
17  practice that continues into the limitations period, the
18  complaint is timely when it is filed within 180 days of
19  the last asserted occurrence of that practice."  Id. at
20  380-81.

21

22    Here, Plaintiff alleges an occurrence of Defendants'
23  allegedly discriminatory practice within the statute of
24  limitations.  (Compl. ¶ 37.)  Thus, his allegations
25  regarding a "continuing violation" as to other potential
26  class members are not irrelevant, redundant, or
27  scandalous, and are accordingly not stricken.

28

1 | ### IV. CONCLUSION

2 |     For the foregoing reasons, the Court GRANTS

3 | Defendants' Motion to Dismiss as to Plaintiff's claims of

4 | disparate treatment discrimination under the FHA, ECOA,

5 | and 42 U.S.C. §§ 1981 and 1982 with leave to amend,

6 | DENIES the Motion to Dismiss as to Plaintiff's claims of

7 | disparate impact discrimination, and STRIKES the

8 | allegations of fraudulent concealment in paragraphs 53,

9 | 57, and 58 of the Complaint.

10 |

11 |     Defendants shall answer or otherwise respond to the

12 | Complaint by January 23, 2008.

13 |

14 |

15 | Dated: ___January 17, 2008___      *Virginia A. Phillips*

16 |                             VIRGINIA A. PHILLIPS
                         United States District Judge