**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **HERBERT AND DORIS STEELE,** | ) | |
| **et al.,** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | 08 C 1880 |
| | ) | |
| **GE MONEY BANK, et al.,** | ) | |
| **Defendants.** | ) | |

**MEMORANDUM AND ORDER**

Plaintiffs Herbert and Doris Steele, Eric Chavez, and Sonia Torres obtained home

mortgage loans from defendant WMC Mortgage, LLC ("WMC") by engaging the services of

three non-party mortgage brokers (E-Z Home Loans, Apex Mortgage, and U.S. Mutual Bank).[1]

In turn, plaintiff Alexandra Diaz obtained a home mortgage loan from defendant GE Money

Bank ("GEMB") by working with her own non-party mortgage broker (Bridgeline Capital

Group). The plaintiffs, all of whom are minorities, contend that GEMB and WMC violated the

Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691, and the Fair Housing Act ("FHA"),

42 U.S.C. § 3605, by imposing discretionary fees that caused them to pay higher costs for their

mortgage loans than comparable non-minority buyers. Their complaint is styled as a class action

and seeks relief on behalf of all minority consumers who obtained home mortgage loans in the

United States from WMC or GEMB beginning on January 1, 2001 through the present, and thus

were subject to the defendants' allegedly discriminatory discretionary pricing policies.

GEMB and WMC filed separate motions to dismiss, arguing that the plaintiffs have

failed to state a claim for which relief may be granted. Alternatively, they ask the court to join

---

[1] WMC was formerly known as WMC Mortgage Corporation, which is named
separately as a defendant. The court will refer to the two WMC entities collectively.

the four mortgage brokers, to strike certain allegations with respect to the tolling of the statute of limitations, and to disallow the plaintiffs' request for disgorgement and restitution. GEMB and WMC's motions are granted in part and denied in part as detailed below.

## I.     Background

The following facts are drawn from the plaintiffs' amended class action complaint and are accepted as true for purposes of the motions to dismiss.

### A.     The Parties

GEMB is a federal savings bank with its principal place of business in Salt Lake City, Utah. GEMB is a wholly owned subsidiary of GE Consumer Finance, Inc., a consumer lending unit of General Electric Company and its holding company, General Electric Capital Corporation. WMC Mortgage LLC is a successor in interest to WMC Mortgage Corporation, and is a mortgage lender based in California. The plaintiffs allege that WMC and its parent company, WMC Finance Co., were acquired by GEMB's parent company, GE Consumer Finance, in 2004; however the plaintiffs further allege that the lending practices in question pre-date the acquisition.

Plaintiffs Herbert and Doris Steele are African-American homeowners residing in Illinois who refinanced their original mortgage with WMC in 2006. Plaintiff Eric Chavez is a Latino homeowner residing in California who refinanced his home with two separate loans financed by WMC in 2006. Plaintiff Alexandra Diaz is a Latina homeowner residing in California who refinanced her home with GEMB in 2007. Plaintiff Sonia Torres is a Latina homeowner residing in Massachusetts who financed her home with two mortgage loans issued by WMC in 2006.

### B.    The Plaintiffs' Complaint

The plaintiffs allege that the defendants engaged in a residential mortgage pricing practice that set rates using objective criteria, such as credit scores and debt-to-income ratios, as well as subjective factors based on the borrowers' minority status. According to the plaintiffs, this practice caused them to pay certain "discretionary fees" resulting in higher costs for their mortgage loans compared to the average non-minority borrower. These fees fall into two categories: (1) origination fees, appraisal fees, and processing fees paid by the borrowers directly to their brokers ("Broker Fees"), and (2) a fee paid by the borrowers indirectly to their brokers, such as yield spread premiums.[2]

Though the plaintiffs secured their residential financing through mortgage brokers, they allege that the defendants set the policies used by the mortgage brokers and the brokers are merely the vehicles through which the defendants' practices are carried out. The plaintiffs also contend that the defendants offer financial incentives to brokers to induce them to steer minorities into loans involving higher fees and rates. Based on these allegations, the plaintiffs filed a two-count complaint, styled as a class action complaint, that seeks relief under the ECOA (Count I) and the FHA (Count II).

## II.    Discussion

The defendants contend that the plaintiffs' requests for relief under the ECOA and the FHA fail to state a claim for which relief may be granted because it does not state a claim of

---

[2] "A yield spread premium is a payment by a lender to a broker based on the extent to which the interest rate on the loan exceeds a base or 'par' rate. The lender's payment of a yield spread premium to the broker, and the broker's imposition of a higher interest rate, are unrelated to the borrower's creditworthiness." *Ware v. Indymac Bank*, FSB, 534 F.Supp.2d 835, 839 (N.D. Ill. 2008).

disparate impact under the FHA or the ECOA. In the alternative, the defendants move to: (1) join the mortgage brokers as necessary parties; (2) strike certain allegations with respect to the tolling of the statute of limitations; and (3) strike the plaintiffs' request for disgorgement and restitution as remedies that are not available as a matter of law. As discussed more fully below, the court finds that the brokers are necessary parties, but denies the defendants' remaining motions.

### A.    Motion to Dismiss

The court will begin by recapping the standard for a Rule 12(b)(6) motion to dismiss. It will then consider the defendants' consolidated motion to dismiss based on grounds applicable to both defendants. Finally, it will address the defendants' separate motions to dismiss.

### 1.    Standard for a Rule 12(b)(6) Motion to Dismiss

A plaintiff's complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief" and "fair notice" of the plaintiff's claims and the basis for those claims. Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, — U.S. —, 127 S.Ct. 1955, 1964 (2007). According to the Seventh Circuit, this language imposes two hurdles. First, the complaint must describe the claim in sufficient detail to give the defendant "fair notice of what the . . . claim is and the grounds upon which it rests." *E.E.O.C. v. Concentra Health Servs.*, 496 F.3d 773, 776 (7th Cir. 2007), *quoting Bell Atlantic Corp. v. Twombly*, 127 S.Ct. at 1964. Second, the factual allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff pleads itself out of court." *Id.*

Meanwhile, the court is neither bound by the plaintiff's legal characterization of the facts, nor required to ignore facts set forth in the complaint that undermine the plaintiff's claims. *See*

-4-

*Scott v. O'Grady*, 975 F.2d 366, 368 (7th Cir. 1992).   The court must also assume the truth of all

well-pleaded facts, construing the allegations liberally and viewing them in the light most

favorable to the plaintiff.  *See, e.g., McMath v. City of Gary*, 976 F.2d 1026, 1031 (7th Cir.

1992).

### 2.      The Plaintiffs' FHA and ECOA Disparate Impact Claims

Under the FHA, it is "unlawful for any person or other entity whose business includes

engaging in residential real estate-related transactions to discriminate against any person in

making available such a transaction, or in the terms or conditions of such a transaction, because

of race ...."  42 U.S.C. § 3605(a).  Similarly, under the ECOA, a creditor may not "discriminate

against any applicant, with respect to any aspect of a credit transaction-on the basis of race."  15

U.S.C. § 1691(a)(1).  The ECOA's definition of "creditor" includes lenders and mortgage

brokers.  *See* 15 U.S.C. § 1691a(e) (a "creditor" is "any person who regularly extends, renews, or

continues credit" as well as "any person who regularly arranges for the extension, renewal, or

continuation of credit").

It is undisputed that the plaintiffs all worked with mortgage brokers when obtaining the

loans at issue in this case.  In order to proceed directly against the defendant lenders, the

plaintiffs thus assert that the defendants had a policy under which mortgage brokers were

authorized to impose subjective additional charges and that the mortgage brokers acted as the

defendants' agents.  The defendants disagree, and also contend that in any event, the plaintiffs

have failed to plead a cognizable ECOA or FHA disparate impact claim (Counts I and II,

respectively).

To allege a disparate impact claim under both the ECOA and the FHA, a plaintiff must:

(1) identify a specific practice or policy adopted by a defendant; (2) demonstrate a disparate

impact on a protected group; and (3) show a causal relationship between the challenged practice and the alleged disparate impact. *See Smith v. City of Jackson*, 544 U.S. 228, 241 (2005). The defendants argue that the plaintiffs have not satisfied this standard because they failed to: (1) adequately allege a specific practice or policy imposing a pricing scheme that was designed and implemented by either GEMB or WMC; (2) allege any facts demonstrating that they paid more than similarly situated non-minority borrowers; or (3) allege that the defendants' alleged "discriminatory pricing policy" caused the alleged disparate impact.

### a.    Practice or Policy

As noted above, a plaintiff alleging disparate impact under the ECOA or FHA must identify a specific business practice or policy that gives rise to the alleged disparate impact. *Hoffman v. Option One Mortg. Corp.*, No. 07, 4916, — F.Supp.2d —, 2008 WL 5157734, at *2 (N.D. Ill. Dec. 9, 2008), *citing Smith v. City of Jackson*, 544 U.S. 228, 241 (2005). Here, the plaintiffs allege that the defendants "designed, disseminated, controlled, implemented and profited from the discriminatory policy and practice," AC ¶ 109, authorized their brokers and correspondent lenders to impose non-risk-based charges, including YSPs and other discretionary fees, and "regularly communicated applicable par rates, authorized yield spread premiums, and other discretionary fees to brokers and correspondent lenders via 'rate sheets' and other communications," *id*. at ¶ 43.

The defendants assert that these allegations do not demonstrate that they had a specific policy or practice, and instead show that the mortgage brokers were exclusively responsible for negotiating the fees and interest rates charged for each loan. The defendants also contend that the plaintiffs were aware of and accepted the terms of their loans because the mandatory HUD-1 statements provided to them disclosed the rates and fees in detail.

Regulation B, the ECOA's implementing regulation, provides that, "[a] person is not a creditor regarding any violation of the Act or this regulation committed by another creditor unless the person knew or had reasonable notice of the act, policy, or practice that constituted the violation before becoming involved in the credit transaction." 12 C.F.R. § 202.2(*l*). Here, the complaint specifically alleges that the defendant lenders (not the brokers) designed and implemented a discretionary pricing policy that was implemented by brokers and negatively impacted minority borrowers. The plaintiffs' counsel, who are subject to Rule 11, assert that the brokers imposed at least some of their fees at the specific direction of the defendants. The court thus disagrees with the defendants' contention that the complaint merely alleges wrongdoing based on "the decision-making of independent third-parties – the brokers." Consolidated Reply at 9.

The court accepts, as it must, the representations made by plaintiffs' counsel regarding the existence of a relationship between the defendant lenders and the brokers who handled the loans at issue in this case and the defendant lenders' alleged control, at least in part, of the brokers' decisions about fees. Based on these representations, the court concludes that the complaint sufficiently pleads a discriminatory practice or policy used by the defendants.

### b.     Disparate Impact on Protected Group

To plead disparate impact, a plaintiff must allege that a facially neutral practice or policy adversely affects a protected group disproportionately. *Hoffman v. Option One Mortg. Corp.*, 2008 WL 5157734, at *2; *see also Martinez v. Freedom Mortgage Team, Inc.*, 527 F.Supp.2d 827, 834 (N.D. Ill. 2007). The defendants take issue with the plaintiffs' reliance on statistical data compiled under the Home Mortgage Disclosure Act ("HMDA") and various other studies to allege disparate impact. *See, e.g.*, AC ¶ 19 (the 2004 data shows that "minority borrowers were

-7-

… almost twice as likely to receive a higher-rate home loan as non-minority whites"). On the other hand, the plaintiffs argue that the statistics in their complaint show that minorities are more likely to receive higher interest rates for home loans than non-minorities based on reasons other than traditional, objective credit evaluation criteria.

It is well established that statistics may be used to support a disparate impact claim. *See Teamsters v. United States*, 431 U.S. 324, 339 (1977); *see also Hoffman v. Option One Mortg. Corp.*, 2008 WL 5157734, at *2 (approving use of statistics in ECOA and FHA disparate impact case). The court, however, need not delve into the degree that statistics by themselves can support a claim of disparate impact because the plaintiffs do not rely exclusively on statistics. Instead, they allege that they were harmed by specific policies put in place by the defendants, and that this caused them to pay more than similarly situated non-minority borrowers.

The defendants vigorously dispute these allegations and assert that the plaintiffs are required to include facts showing statistical disparities between the discretionary fees they paid and the discretionary fees paid by an average minority borrower or an average, similarly situated non-minority borrower. The court declines to impose a strict fact-pleading requirement on the plaintiffs as the basis of the plaintiffs' disparate impact claim is clear, and it is supported by sufficient factual allegations to withstand a motion to dismiss. Thus, the court finds that the complaint adequately alleges the existence of a disparate impact on a protected group.

### c. Causal Relationship

Finally, to survive the defendants' motion to dismiss, the plaintiffs must allege that the defendants' purported policy caused the alleged disparate impact. *See Smith v. City of Jackson*, 544 U.S. at 241. According to the plaintiffs, the defendants' facially neutral "Discretionary Pricing Policy" was a means of "systematically giving [Plaintiffs] mortgage loans with less

favorable terms than were given to similarly situated non-minority borrowers." AC ¶¶ 31, 47. The plaintiffs further allege that the resulting discrimination was the direct outcome of the defendants' policies and practices.

The defendants counter that the amended complaint is conclusory and that any purported disparate impact was the result of "the needs and preferences of Plaintiffs and the conduct of the mortgage brokers in interaction with the Plaintiffs." WMC Br. At 23. They also note that the terms of the named plaintiffs' loans vary widely and thus show that the plaintiffs and their brokers, not the defendants, are responsible for any alleged unfairness.

The parties' arguments about causation thus boil down to a fundamental disagreement as to who is responsible for the alleged disparate impact vis-a-vis the plaintiffs' loans. This issue cannot be resolved via a motion to dismiss. Moreover, the complaint plausibly points the finger at the defendants' alleged practices and thus provides sufficient detail to give the defendants fair notice of the nature of the plaintiffs' argument about causation and the ground upon which it rests. *See Limestone Dev. Corp. v. Village of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008). As such, it adequately alleges causation.

In sum, the plaintiffs have pleaded enough facts to allege a disparate impact claim under the ECOA and the FHA. Accordingly, the defendants' motion to dismiss Counts I (discrimination in violation of ECOA) and II (discrimination in violation of FHA) is denied.

### 3. Broker Fees

The plaintiffs appear to be contending, in the alternative, that even if their direct claims against the lenders fail, the lenders are nevertheless derivatively liable under an agency theory for any wrongdoing committed by the brokers used for the plaintiffs' loans. The court will address this argument in the interests of completeness. Judge Kendall recently summed up the

requirements for pleading the existence of a lender-broker agency relationship in the

FHA/ECOA context:

> An agency relationship exists when one "undertakes to manage some affairs to be
> transacted for [and] ... on account of the ... principal." *Wargel v. First Nat'l Bank*,
> 121 Ill.App.3d 730, 736-37 (Ill. 1984). The test for such agency is "whether the
> alleged principal has the right to control the manner and method in which work is
> carried out by the alleged agent and whether the alleged agent can affect the legal
> relationships of the principal." *Chemtool, Inc. v. Lubrication Techs.*, 148 F.3d
> 742, 745 (7th Cir. 1998). The parties must consent to a principal-agency
> relationship. *Id.* While the agency relationship may be created by conduct or
> contract, not all conduct or contracts will create an agency relationship. *Id.*
> Further, an "apparent agency" relationship exists where "a reasonably prudent
> [person], exercising diligence and discretion, in view of the principal's conduct,
> would naturally suppose the agent to possess" the principal's authority. *Wargel*,
> 121 Ill.App.3d at 736-37. The existence and scope of an agency relationship are
> questions of fact. *Id.* at 736.

*Tribett v. BNC Mortg., Inc.*, No. 07 C 2809, 2008 WL 162755 (N.D. Ill. Jan. 17, 2008); see also

Restatement (Third) of Agency § 1.01 (2006) ("Agency is the fiduciary relationship that arises

when one person (a 'principal') manifests assent to another person (an 'agent') that the agent

shall act on the principal's behalf and subject to the principal's control, and the agent manifests

assent or otherwise consents to so act").

In support of their agency theory, the plaintiffs point to their allegations that the

defendants: (1) authorized brokers to fund loans in conformance with the defendants' alleged

"Discretionary Pricing Policy"; (2) trained brokers about their credit policies and procedures; (3)

supplied brokers with loan-related forms and agreements; (4) communicated applicable par rates,

authorized YSPs and other discretionary fees via "rate sheets"; (5) encouraged brokers to make

loans in accordance with defendants' policies by compensating them for steering clients into

higher rate loans; (6) obtained the brokers' agreement to comply with the defendants' policies;

(7) evaluated and monitored the brokers' compliance with these policies; and (8) shouldered part or all of the risk on such loans. *See* AC ¶¶ 30, 32-34, 39-40, 43.

At best, these allegations show that the defendant lenders made loans that involved brokers and provided information to the brokers. They do not support an inference that the defendant lenders had the ability to control the manner and method in which the brokers carried out their work or that the lenders authorized the brokers to affect the lenders' legal relationships. Similarly, although the complaint contains allegations about direct conduct by the defendant lenders (*e.g.*, the existence of the alleged "Discretionary Pricing Policy" put in place by the lenders), it contains no allegations showing that the lenders manifested to the plaintiffs, and that the plaintiffs reasonably believed, that his or her broker had the authority to act on behalf of the defendant lenders. Because the existence of an actual or apparent agency relationship is based entirely on speculation, the portions of the complaint which rest on an agency theory between the defendants and the brokers are dismissed.

The court notes that this ruling does *not* affect claims against the lender defendants based on their own actions. It further notes that the plaintiffs' claim that a discriminatory policy exists is based on allegations that the defendant lenders, in essence, told brokers (at least in part) what fees they should charge. An agency relationship between a lender and a broker need not exist for a lender to direct a broker to take a specified action in order for that broker to do business with that lender. Plaintiffs' counsel has alleged that the second kind of relationship existed, and the court is not at liberty to ignore this specific factual assertion. Thus, the court's dismissal of any claims based on an agency theory does not require dismissal of claims based merely on alleged directions to brokers provided by the defendant lenders.

-11-

4.    **Claims Against Lenders Who Did Not Originate Loans (Claims Against WMC Brought by Plaintiffs with GEMB Loans & Claims Against GEMB Brought by Plaintiffs with WMC Loans)**

Stressing that the complaint alleges that GEMB – not WMC – was the lender on Ms. Diaz's mortgage loan, WMC asserts that her claims against it should be dismissed. GEMB makes an identical argument as to the plaintiffs asserting claims against it whose loans were originated by WMC (Herbert and Doris Steele, Eric Chavez, and Sonia Torres). To tie WMC into loans made by GEMB and vice-versa, the plaintiffs allege that: (1) WMC and GEMC are wholly owned subsidiaries of GE Consumer Finance; (2) GEMB assumed loans originated and financed by WMC; (3) settlement statements from GEMB and WMC purportedly have the same address; and (4) GEMB allegedly is authorized to use the "WMC Mortgage" trade name.

This is, essentially, an alter ego theory based on the idea that these two subsidiaries of GE Consumer Finance are not legally separate entities. When considering the sufficiency of allegations whether to pierce the corporate veil, Rule 8(a)'s notice pleading standard, rather than the heightened pleading standard required under Rule 9(b), applies. *See, e.g., Platinumtel Communications, LLC v. Zefcom, LLC*, No. 08 C 1062, 2008 WL 5423606, at *11 (N.D. Ill. Dec. 30, 2008). To survive a motion to dismiss a claim based on an alter ego theory, a complaint must "fairly allege[] an entity exists as the alter ego of another" and point to facts suggesting that the two entities operate as a single entity. *Flentye v. Kathrein*, 485 F.Supp.2d 903, 912 (N.D.Ill. 2007) (collecting cases).

The allegations here do not satisfy this standard. Even if WMC and GEMC were wholly owned subsidiaries of GE Consumer Finance – a point which the defendants dispute – this does not necessarily mean that the court may ignore their separate corporate identities. Moreover, various entities may assume loans throughout the lifespan of a borrower's mortgage regardless

-12-

of whether they are related, so GEMB's assumption of loans originated and financed by WMC does not credibly show that GEMB and WMC are each other's alter egos. Similarly, even if settlement statements bear the same processing address, this does not colorably point to corporate intermingling. This leaves the allegation that GEMB has used a WMC trade name. This allegation is simply not enough to plausibly suggest that the plaintiffs have a right to relief based on an alter ego theory. *See Bell Atlantic Corp. v. Twombly*, 127 S.Ct. at 1964. Accordingly, Ms. Diaz's claims against WMC are dismissed because her loan is from GEMB, and all claims against GEMB brought by the non-GEMB plaintiffs who had WMC loans are dismissed.

### 5.    Loans By GEMB – No YSPs

Part of the alleged "Discretionary Pricing Policy" that is at the heart of the plaintiffs' complaint involves the use of YSPs. GEMB notes that none of its loans at issue in this case included a YSP, and thus contends that the plaintiff who borrowed from GEMB (Ms. Diaz) lacks standing to pursue any claims against GEMB. In response, the plaintiffs note that the alleged "Discretionary Pricing Policy" includes a host of discretionary fees, not just YSPs, so the lack of a YSP for the loan originated by GEMB is immaterial.

The court declines Ms. Diaz's invitation to rely exclusively on her general allegations about the purported "Discretionary Pricing Policy" and thus will focus on Ms. Diaz's specific allegations about the fees she actually paid. Ms. Diaz alleges that she paid a $4,900 origination fee and a $995 processing fee to her broker (Bridgeline) and a $950 administrative fee to GEMB. She then directs the court's attention to her allegations that the defendants' "Discretionary Pricing Policy" specifically authorized the brokers to add non-risk-based charges. In addition,

-13-

she challenges the $995 processing fee, arguing that it includes administrative fees that were greater than those charged to non-minority borrowers.

There is some charm to GEMB's argument that Ms. Diaz cannot allege in the complaint that the terms of her loan are discriminatory and then change tacks in her response to the motion to dismiss and allege that the broker fees are discriminatory. However, contrary to GEMB's characterization of the complaint, the plaintiffs do not focus exclusively on the terms of their loans. Instead, they repeatedly contend that they paid YSPs and/or higher mortgage related finance charges than similarly situated non-minorities. Thus, the court cannot dismiss Ms. Diaz's claims based on the fact that her loan did not include a YSP.

This is especially true because Ms. Diaz argues that the $995 fee paid to GEMB was itself higher than the fee charged by GEMB to a similarly situated non-minority borrower. She also contends that GEMB was at least partially and directly responsible for the fees charged by her broker. These assertions are very similar to the allegations about the lender-broker relationship made by the other plaintiffs. The court trusts that plaintiffs' counsel has a proper basis for all of these allegations and that they are fully aware of their Rule 11 obligations and are not merely postulating facts that support their theories. As such, the court concludes that the claim that Ms. Diaz paid higher discretionary fees than similarly situated non-minority borrowers due to allegedly discriminatory charges by GEMB and her broker, who was acting at GEMB's direction, is sufficient to withstand a motion to dismiss.

**B.     Joinder of Mortgage Brokers under FRCP 19(a)**

In the event that their motion to dismiss is denied, the defendants ask the court to add the mortgage brokers involved in the allegedly discriminatory practices as parties pursuant to Rule

-14-

19(a) of the Federal Rules of Civil Procedure.  Under Rule 19(a)(1), a party is necessary and should be joined if feasible when:

> (A) in that [party's] absence, the court cannot accord complete relief among existing parties; or
>
> (B) that [party] claims an interest relating to the subject of the action and is so situated that disposing of the action in the [party's] absence may:
>
> > (i)    as a practical matter impair or impede the [party's] ability to protect the interest; or
> >
> > (ii)   leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

To determine if a party is necessary under Rule 19(a), courts examine whether:  (1) complete relief can be accorded among the present parties to the lawsuit; (2) the absent party's ability to protect its interest will be impaired; and (3) any existing parties might be subjected to a substantial risk of multiple or inconsistent obligations unless the absent party is joined.  *Thomas v. U.S.*, 189 F.3d 662, 667 (7th Cir. 1999).  Here, these factors show that joinder is necessary.

First, the plaintiffs allege that both the defendant lenders and the non-party lenders engaged in discrimination.  Given that the plaintiffs' complaint is based on the existence of an interrelationship between the defendant lenders and the non-party brokers and actions taken by the brokers allegedly at the direction of the defendants, complete relief cannot be accorded among the present parties to the lawsuit.  *See Hashop v. Federal Home Loan Mortg. Corp.*, 171 F.R.D. 208, 211 (N.D. Ill. 1997).

Second, the plaintiffs ask for injunctive relief against the defendants, their agents, employees, affiliates and subsidiaries from discriminating "against plaintiff and the members of the Class because of their race through further use of the Discretionary Pricing Policy."  AC at ¶ 25.  They also request that the defendants "adopt and enforce a policy that requires appropriate

-15-

training of the Defendants'…brokers…to prevent discrimination." *Id*. at ¶ 25.  Finally, the

plaintiffs seek disgorgement of "all disproportionate non-risk charges imposed on minorities by

the Defendants' Discretionary Pricing Policy…together with other relief for unjust enrichment."

*Id*.  Clearly, if the plaintiffs prevail, the brokers' legal rights and obligations (not just their

financial situation) will be impacted.  Thus, unless the brokers are joined, their ability to protect

their interests will be impaired.  *See Hashop v. Federal Home Loan Mortg. Corp.*, 171 F.R.D. at

212.

      For all of these reasons, the brokers are necessary parties and must be joined.  Because

the parties have not weighed in as to whether joinder is feasible, the court assumes that joinder is

feasible.  Accordingly, the plaintiffs must join the brokers if they wish to proceed with this

action.

### C.    Motions to Strike

#### 1.    GEMB's Motion to Strike the Plaintiffs' Class Allegations

      GEMB moves to strike the plaintiffs' class allegations against it, contending that GEMB-

originated loans do not fall within the class definition, which is limited to persons with a "WMC

home mortgage loan" and "were subject to Defendants' Discretionary Pricing Policy."

According to GEMB, none of the members of the putative class have GEMB loans, so any class

allegations as to GEMB should be stricken.  In response, the plaintiffs contend that GEMB has

the right to use the WMC trade name, so GEMB is, in fact, included in the class definition.  The

parties then briefly delve into the plaintiffs' use of "the plural possessive defendants" and

whether in all instances the plaintiffs' pleadings distinguish between WMC, GEMB, and the

collective term "defendants."

The court agrees with GEMB that, at the very least, the class definition as to GEMB is inartfully drafted. The class allegations as to GEMB are thus stricken, and may be amended consistent with this order and counsel's Rule 11 obligations.

### 2. Statute of Limitations – Unnamed Plaintiffs

The ECOA and the FHA impose a two-year statute of limitations for bringing civil claims. *See* 15 U.S.C. § 1692e(f) (ECOA); 42 U.S.C. § 3613(a)(1)(A) (FHA). The putative class period extends to January 1, 2001, which is well beyond the two-year statute of limitations. However, each of the named plaintiffs' claims arose within the applicable limitations period. The defendants thus contend that the plaintiffs' allegations about tolling are irrelevant to the claims of the named plaintiffs and seek to strike allegations in the complaint aimed at tolling the statute of limitations (Amended Complaint at ¶¶ 91-96).

The court agrees with the defendants that the plaintiffs – all of whose claims are timely – do not need to allege anything about claims arising outside the limitations period. The plaintiffs have not yet moved for class certification, and unless and until the court finds that the class properly includes the claims of plaintiffs arising outside the two-year statute of limitations, allegations that are not germane to the named plaintiffs merely serve to muddy the waters. In other words, the plaintiffs are trying to put the cart before the horse by assuming that the class goes back to 2001 and then pursuing discovery based on this assumption before they actually obtain an order certifying a class going back to 2001. Thus, the defendants' motion to strike the allegations (Amended Complaint at ¶¶ 91-96) aimed at tolling the statute of limitations is granted.

### 3. Fraudulent Concealment Allegations

Certain tolling allegations that were struck in the preceding section appear to allege that the defendants fraudulently concealed information. In the interests of completeness, the court notes its agreement with the defendants' argument that to the extent the plaintiffs are attempting to allege fraudulent concealment, they have failed to satisfy Rule 9(b)'s heightened pleading standard.

### 4. Request for Disgorgement and Restitution

"It is a basic doctrine of equity jurisprudence that courts of equity should not act . . . when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (internal quotations omitted). Relying on this principle, the defendants move to strike the plaintiffs's request for the equitable monetary remedies of disgorgement or restitution, contending that these remedies are unavailable because the plaintiffs have an adequate remedy at law.

The ECOA, however, provides that courts may grant actual, punitive, and equitable relief. *See* 15 U.S.C. § 1691(a) (actual damages), (b) (punitive damages), and (c) (equitable relief). Similarly, the FHA provides that, ". . . if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages, and . . . may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate)." 42 U.S.C. § 3613(c)(1).

The ECOA and the FHA, therefore, appear to sanction the pursuit of both legal and equitable remedies, and do not contain any language limiting the types of equitable remedies that are available. Moreover, the defendants' briefs do not "engage the language" of the relevant statutes and explain how their suggested result is consistent with the statutory language. *See Lake Shore Asset Management Ltd. v. Commodity Futures Trading Com'n*, 511 F.3d 762, 765 (7th Cir. 2007). In addition, the defendants' position depends on the existence of a clear demarcation between legal and equitable remedies. This is at odds with Seventh Circuit precedent noting that the line between these remedies is, at best, blurry. *First Nat. Bank of Waukesha v. Warren*, 796 F.2d 999, 1000-01 (7th Cir. 1986) ("terms such as 'restitution' and 'unjust enrichment' have slowly changed from distinctive forms of action to measures of damages available in actions of all sorts . . . . [so] [t]he evolution of the legal terms, coupled with the merger of the court systems, makes it difficult to say when a request for 'restitution' ... is distinctively legal and when it is distinctively equitable – if these distinctions any longer have meaning for remedies measured solely in money"); *see also Reich v. Continental Casualty Co.*, 33 F.3d 754, 756 (7th Cir. 1994) ("restitution straddles th[e] divide" between legal and equitable relief so "[r]estitution is merely not an *exclusively* equitable remedy like an injunction") (emphasis in original).

Accordingly, the defendants' treatment of the statutory language and their reliance on a purported bright line division between legal and equitable relief is unconvincing. The court, therefore, denies their motion to strike the plaintiffs' request for the equitable monetary remedies of disgorgement and restitution.

-19-

## III.    Conclusion

For the reasons set forth above, the motions to dismiss, strike, and to join necessary parties filed by GEMB [#32] and WMC [#35] are granted in part and denied in part. Specifically: (1) the defendants' motions to dismiss the plaintiffs' disparate impact claims (Count I – ECOA and Count I – FHA) are denied; (2) the portions of the complaint which rest on an agency theory between the defendants and the brokers are dismissed; (3) Ms. Diaz's claims against WMC are dismissed because her loan is from GEMB, and all claims against GEMB brought by the non-GEMB plaintiffs who had WMC loans are dismissed; (4) GEMB's motion to dismiss based on the fact that its loans did not include YSPs is denied; (5) the brokers are necessary parties and must be joined; (6) the class allegations as to GEMB are stricken; (6) the allegations (Amended Complaint at ¶¶ 91-96) aimed at tolling the statute of limitations and relating to alleged fraudulent concealment are stricken; (7) the defendants' motion to strike the plaintiffs' request for the equitable monetary remedies of disgorgement and restitution is denied.

Consistent with this order and counsel's Rule 11 obligations, the plaintiffs may, by March 11, 2009, file an amended complaint that repleads the portions of the complaint that were dismissed or stricken. The plaintiffs must also join the brokers as necessary parties by this date.


DATE:   February 17, 2009

Blanche M. Manning
United States District Judge